## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                 No. CR 16-1613 JB

ANTHONY RAY BACA, a.k.a. "Pup;"
CHRISTOPHER GARCIA, MANUEL
JACOB ARMIJO, a.k.a. "Big Jake;"
FREDERICO MUNOZ, a.k.a. "Playboy;"
SERGIO LOYA RODRIGUEZ, a.k.a.
"Churro;" MANUEL BENITO, a.k.a.
"Panther;" VINCENT GARDUÑO a.k.a.
"Fatal; MANDEL LON PARKER, a.k.a.
"Chuco;" DANIEL ARCHULETA, a.k.a.
"Smurf;" DANIEL SANCHEZ, a.k.a. "Dan
Dan;" ANTHONY CORDOVA, a.k.a.
"Antone;" and RICHARD GALLEGOS,
a.k.a. "Dopey,"

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) Defendant Richard Gallegos' Motion for

a Definite Trial Setting, Severance, and for Scheduling Conference, filed May 20, 2016 (Doc.

106)("Motion to Sever"); (ii) the United States' Motion to Declare Case Complex, filed May 23,

2016 (Doc. 107)("Motion to Declare Case Complex"); and (iii) Defendant Richard Gallegos'

Motion to Compel Discovery, filed May 26, 2016 (Doc. 114)("Motion to Compel Discovery").

The Court held hearings on June 3, 2016, and July 8, 2016.  The primary issues are: (i) whether

the Court should sever the case against Defendant Richard Gallegos from the joint prosecution of

his co-Defendants; (ii) whether the Court should thereby set a new date for Gallegos' severed

trial; (iii) how the Court should approach a complex-case designation with respect to all of the

Defendants; and (iv) how the Court should manage discovery while the Plaintiff United States of America awaits entry of a protective order. The Court first concludes that Gallegos' conditional severance is warranted, and it will thus grant Gallegos' Motion to Sever. Accordingly, the Court will sever the case against Gallegos from the joint prosecution of his co-Defendants and set him a new trial date. At the hearing, the United States moved to withdraw its Motion to Declare the Case Complex, but, upon an objection and subsequent oral motion to declare the case complex by Defendant Anthony Baca -- joined by all Defendants that had not been severed -- the Court concluded that it would nonetheless declare the case complex. Accordingly, the Court grants the United States Motion to Declare Case Complex. Last, the Court denies the Motion to Compel Discovery without prejudice to the Defendants renewing it at an appropriate time, pending all parties' continued compliance with the protective order the Court entered on June 17, 2016. See Protective Order, filed June 17, 2016 (Doc. 146)("Protective Order").

## FACTUAL BACKGROUND

To provide context, the Court takes its recitation of facts from the Grand Jury Indictment, filed Apr. 23, 2016 (Doc. 2)("Indictment"). The Court does not adopt the facts as findings or truth. Syndicato de Nuevo Mexico ("SNM") is a prison gang that controls drug distribution and other illegal activities within the New Mexico prison system, and is similarly involved in narcotics trafficking occurring outside of the prison system. See Indictment ¶ 3, at 2. It is alleged that SNM's leaders, members, prospects, and associates constitute an enterprise as is defined under 18 U.S.C. §§ 1959(b)(2) and 1961(4), which provide that an enterprise constitutes a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce. See Indictment ¶ 2, at 2. The Indictment thus provides that SNM constitutes "an ongoing organization whose members/prospects/associates function[] as a

continuing unit for the common purpose of achieving the objectives of the enterprise." Indictment ¶ 2, at 2.  Accordingly, the Indictment alleges that Defendants Anthony Ray Baca, Christopher Garcia, Manuel Jacob Armijo, Frederico Munoz, Sergio Loya Rodriguez, Manuel Benito, Vincent Garduño, Mandel Lon Parker, Daniel Archuleta, Daniel Sanchez, Anthony Cordova, and Richard Gallegos, committed: (i) Racketeering Conspiracy under 18 U.S.C. § 1962(d); (ii) Violent Crimes in Aid of Racketeering (Murder) under 18 U.S.C. § 1959(a)(1); (iii) Aiding and Abetting under 18 U.S.C. § 2; and (iv) Violent Crimes in Aid of Racketeering (Conspiracy to Murder) under 18 U.S.C. § 1959(a)(5).  See Indictment at 1.

SNM was formed after the February, 1980 prison riots at the New Mexico Penitentiary in Santa Fe, New Mexico.  See Indictment ¶ 3, at 2.  During the prison riot, thirty-three inmates were killed; more than 200 inmates were injured; and certain inmates held hostage, assaulted, and raped twelve correctional officers.  See Indictment ¶ 3, at 2.  Since the prison riot, SNM has expanded throughout the New Mexican prison system and has an estimated 250 members.  See Indictment ¶ 4, at 2-3.  SNM's main goals include controlling and profiting from narcotics trafficking.  See Indictment ¶ 5, at 3.  SNM members are often expected to confront and attack suspected informants, cooperating witnesses, homosexuals, and sex offenders.  See Indictment ¶ 8, at 4.

Despite prison officials' close scrutiny, SNM leaders communicate orders to members and associates throughout and outside of the prison system by a variety of means, including secret notes, coded letters, and messages that complicit visitors deliver.  See Indictment ¶ 5, at 3. SNM members are expected to remain loyal to the gang when they are released from prison.  See Indictment ¶ 5, at 3.  SNM disciplines members who fail to show continued loyalty in a variety of ways, including assault and murder.  See Indictment ¶ 5, at 3.  SNM members might display

affiliation and loyalty with the Zia symbol,[1] the letters "SNM", the letter "S," and the numbers "19" and "505"[2] in tattoos, graffiti, drawings, and on clothing.  Indictment ¶ 9, at 4-5.

SNM also operates outside of the prison system in the streets of New Mexico, influencing and intimidating smaller New Mexico gangs to establish a larger network for its illegal activities. See Indictment  6, at 3.  Accordingly, SNM does not always have to use violence to assert its control outside of prison, because the smaller gangs often fear that SNM members will assault or kill their compatriots should they be incarcerated.  See Indictment  6, at 3.  SNM thus retains a large membership and powerful reputation which subdues rival gangs and prevents victims and witnesses from assisting authorities.  See Indictment  ¶ 8, at 4.

The Indictment alleges that SNM engages in violence

to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, to gain notoriety and show its superiority over others, and to send a message to others that it is strong, powerful, and not to be provoked.

Indictment ¶ 8, at 4.  SNM "members and associates commit, conspire, attempt, and threaten to commit acts of violence, including murders and assaults to protect and expand the enterprise's criminal operations."  Indictment ¶ 13(a), at 6.  If the gang had a weak reputation, it would lose its membership and dissolve.  See Indictment ¶ 8, at 4.

With respect to Gallegos, the plaintiff United States of America alleges that Defendants Christopher Garcia and Manuel Jacob Armijo, SNM members, ordered Gallegos and another

---

[1]The Zia sun symbol, originating as the sun symbol of the Zia Pueblo, now serves as the centerpiece of the New Mexico state flag.  See The Zia Sun Symbol, New Mexico History, available at  http://newmexicohistory.org/multimedia/videos/the-zia-sun-symbol  (last accessed October 13, 2016).

[2]Until October 7, 2007, the "505" area code covered the entire state of New Mexico, and currently serves the Albuquerque, Santa Fe, and Farmington metropolitan areas.  See Area Code 505, available at https://en.wikipedia.org/wiki/Area_code_505 (last accessed October 13, 2016).

person to shoot and kill the SNM member Michael Giron, "for the purpose of gaining entrance to and maintaining and increasing position in [SNM] . . . ."   Indictment at ¶¶ 178-79, at 38, 51-52. The United States alleges that Gallegos and another individual picked up SNM member Giron, and drove in another person's vehicle to a dead-end street where Gallegos shot and killed Giron. See Indictment at ¶ 179, at 38.  The United States alleges that Gallegos thus committed two overt acts in furtherance of an enterprise, charging him with one count of racketeering conspiracy and two counts of conspiracy to murder and murder.  See Indictment at ¶¶ 178-79, at 38, 51-52.

The allegation of Giron's murder, as it pertains to Gallegos, was prosecuted by the State of New Mexico, and ultimately dismissed by state prosecutors, before the federal charges arose. Those circumstances surrounding the state prosecution can be gleaned from the representations made by Gallegos' counsel at the July 8, 2016, hearing.

> At the state level prosecution that occurred for this incident prosecutors and investigators had come to the same conclusion that -- I understand Your Honor has heard lots about these two co-defendants from the state prosecution pointing their fingers at each other, and what decisions the state prosecutor made.  But prosecutors and investigators all came to the same conclusion at the state prosecution level that this wasn't a gang murder.  Instead, it was a murder that had to do with a debt of some kind related to a scooter, and that that was the motive underlying it.  The idea that it was some kind of a gang initiation, again, hangs on the testimony of one very, you know, difficult to lend credibility witness.

Transcript of Hearing at 8:3-18 (taken July 8, 2016)("July Tr.")(Ray).[3]  Gallegos' counsel also provided that:

> Mr. Gallegos' case unique is that there was a ramp-up to a prosecution of this incident before we got into federal court.   The only difference being the allegations that the United States has to prove to essentially create federal jurisdiction here under the RICO case.  So there was a lot of discovery at the state court level, a lot of investigation done.  The facts were out there.  And the main

---

[3]The Court's citations to the transcript of this hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

witnesses had essentially been spoken to.  And they were prepared to go to trial at the state court.  So it's not like Mr. Gallegos is just impetuously charging into the fray, having not thought through the consequences.  He was ready to go to trial at the state court, and he's basically being tried for the same thing here.  So there has been a ramp-up to this day that makes the August trial date very realistic for Mr. Gallegos, even if it isn't for the other defendants.

July Tr. at 10:6-23 (Ray).

## PROCEDURAL BACKGROUND

Following the indictment, a variety of different motions were filed.  Gallegos, in particular, filed the Motion to Sever and the Motion to Compel Discovery.  The United States filed the Motion to Declare the Case Complex.  In this opinion, the Court considers the three motions, and concludes that: (i) it will grant Gallegos' Motion to sever, thereby severing Gallegos' case from the case against his co-Defendants; (ii) deny without prejudice Gallegos' Motion to Compel Discovery; and (iii) declare the case complex.

### 1.    The Motion to Sever.

Gallegos moved to sever on May 20, 2016.  See Motion to Sever at 1.  Gallegos requests that the Court sever and separately try him, and provide him with a definite trial date.  See Motion to Sever at 1.  Gallegos notes that the indictment alleges murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1); conspiracy to commit murder, in violation of 18 U.S.C. § 1959(a)(5); and aiding and abetting.  See Motion to Sever at 1.  He makes two arguments supporting his Motion to Sever: (i) severance is appropriate, because his charges arise from a single incident and he will suffer undue prejudice if he is not severed; and (ii) under the requirements of the Speedy Trial Act, 18 U.S.C. § 3161(a), his speedy trial rights are in danger of being violated if he does not receive a new trial date.  See Response at 1-2.

Accordingly, Gallegos first argues that severance is appropriate, because he is indicted for charges relating to one incident -- Giron's murder.  See Motion to Sever at 2.  He argues that

he will be prejudiced if the Court does not sever the case against him, because "he will be implicated by association with his co-defendants."  Motion to Sever at 2.  He contends that the single incident is "not substantially connected to the larger conspiracy that the United States alleges."  Motion to Sever at 2.  Reemphasizing his rights to a speedy trial, Gallegos notes that, because the Honorable Karen Molzen, Chief Magistrate Judge for the District of New Mexico, denied his request to be released, he will remain incarcerated until the United States prepares its case against his co-Defendants, who have been implicated in many more overt acts in furtherance of the enterprise.  See Motion to Sever at 2.

Second, Gallegos emphasizes the importance of his right to a speedy trial, under the Speedy Trial Act, 18 U.S.C.S. § 3161(a).  See Motion to Sever at 2.  He explains that he received the indictment on April 21, 2016, and pled not guilty at his arraignment hearing on May 5, 2016.  See Motion to Sever at 1.  Chief Judge Molzen denied his request to be released pending trial.  See Motion to Sever at 1.  Gallegos cites precedent from the Unites States Court of Appeals for the Tenth Circuit explaining that the Speedy Trial Act is meant to protect a criminal defendant's right to a speedy trial as well as to serve the public's interest in having a "prompt" proceeding.  Motion to Sever at 2 (citing United States v. Abdush v. Shakur, 465 F.3d 458, 461 (10th Cir. 2006)(quoting United States v. Apperson, 441 F.3d 1162, 1177-78 (10th Cir. 2006)).  Gallegos concludes that the Court must hold his trial within seventy days of the arraignment hearing, not including excludable days.  See Motion to Sever at 2 (citing 18 U.S.C. §§ 3161(c) and (d)).  Gallegos requests that the Court set a severed trial for either August 22, 2016, or August 29, 2016, to reflect both his trial counsel's other obligations and his right to a speedy trial.  See Motion to Sever at 3.

2.     **The Response**.

The United States responded to the Motion on June 2, 2016.  See United States'
Response in Opposition to Defendant Richard Gallegos' Motion for a Definite Trial Setting,
Severance, and for Scheduling Conference [Doc. 106], filed June 2, 2016 (Doc.
120)("Response").  The United States requests that the Court deny Gallegos' Motion.  See
Response at 19.

The United States makes two arguments: (i) Gallegos' case is appropriately joined under
rules 8(b) and 14(a) of the Federal Rules of Criminal Procedure, because a joint trial is more
efficient and Gallegos will not be prejudiced by the joinder; and (ii) an ends-of-justice
continuance granted upon either the United States' or a co-Defendants' request would not violate
Gallegos' Speedy-Trial-Act rights.  See Response at 11, 13, 17.

Accordingly, the United States first argues that Gallegos' joinder is appropriate under
rules 8 and 14, and that he cannot meet his "heavy burden to warrant severance."  Response at 1.
The United States insists that Gallegos fails to support his Motion with relevant case law.  See
Response at 1.  Despite Gallegos' Motion, the United States contends that rule 8(b) renders
Gallegos' joinder appropriate, because the alleged murder is one of the overt acts committed in
furtherance of racketeering.  See Response at 11.  The United States explains that "the propriety
of joinder is tested by Rule 8(b) and that 8(a) has no application."  Response at 5-6.  Accord
United States v. Eagleston, 417 F.2d 11, 14 (10th Cir. 1969)("Rule 8(a) . . . does not apply in
cases where more than one defendant is joined in the same indictment.  Such joinder is governed
by Rule 8(b).").

The United States emphasizes that "[t]he phrase 'same series of acts or transactions' in
rule 8(b) is construed broadly to allow liberal joinder to enhance the efficiency of the judicial

system."  Response at 6 (quoting United States v. Hopkinson, 631 F.2d 665, 668 (10th Cir. 1980))(internal quotation marks omitted).  The United States notes that rule 8(b) is broadly construed and that courts have held joinder proper for all defendants charged in a conspiracy, regardless of whether each defendant is charged in each count or for individual substantive acts.  See Response at 6 (citing United States v. Hill, 786 F.3d 1254, 1272 (10th Cir. 2015)("Hill").  In Hill, the Tenth Circuit stated:

> Although the Indictment in this case charged six different robberies alleged to have been committed by different defendants over a more than two-year period, it also alleged that the defendants conspired and agreed with each other to commit all six of the robberies.  Given the broad construction we afford Rule 8 and our preference for liberal joinder, this was sufficient to permit joinder.

Hill, 786 F.3d at 1272.

The United States then acknowledges Gallegos' assertion that the incident in which he is implicated is "not substantially connected to the larger conspiracy."  Response at 12.  The United States, however, explains the application rule 8(b): "[R]ule 8(b) makes clear that a defendant need not be charged in each count, and may be charged in only one count, and still be properly joined in a single matter."  Response at 12.  The United States thus argues that the SNM gang enterprise is engaged in a racketeering conspiracy as has been alleged under Count 1, and that the enterprise's goals are generally furthered "through the means of murdering those who oppose SNM or fail to abide by SNM's directives."  Response at 12 (citing Indictment at ¶¶ 12-14, at 5-6).  The United States emphasizes that the charges alleged in both Count 3 and Count 4 thereby state that "Defendant Gallegos murdered M.G. for the purpose of gaining entrance to and maintaining and increasing . . . position in SNM."  Response at 4 (quoting Indictment at 51-52)(internal quotation marks omitted).

Accordingly, the United States explains that Gallegos is charged for participating in an overt act that furthered the alleged racketeering conspiracy that has been alleged in Count 1 of the Indictment. <u>See</u> Response at 13. It also notes that Gallegos' allegedly criminal conduct has been indicted in relation to Counts 3 and 4. <u>See</u> Response at 13. The United States asserts that "[c]ourts unanimously, and the Tenth Circuit particularly, conclude that a conspiracy count, while not necessary, is sufficient to render joinder of defendants charged in that conspiracy proper." Response at 13 (quoting <u>Hill</u>, 786 F.2d at 1272). Finally, the United States repeats its request that the Court thereby deny Gallegos' request for severance. <u>See</u> Response at 13.

The United States further argues that Gallegos' "naked assertion" fails to satisfy his burden to show actual prejudice from proper joinder, and that he cannot show that any prejudice outweighs a separate trial's expense and inconvenience. Response at 13. The United States contends that rules 8(b) and 14(a) support Gallegos' joinder. <u>See</u> Response at 13. Again, the United States points to Tenth Circuit precedent and cases from the United States District Court for the District of New Mexico favoring joinder's judicial efficiency under rule 8(a) when the defendants engage in the same series of acts of transactions. <u>See</u> Response at 13 (citing <u>United States v. Gould</u>, No. CR 03-2274 JB, 2007 WL 1302587, at *1 (D.N.M. 2007)(Browning, J.)("<u>Gould</u>")(citing <u>United States v. Hall</u>, 473 F.3d 1295, 1302 (10th Cir. 2010)).

The United States cites to that same precedent and asserts that rule 14(a) is Gallegos' only possible source of relief: "If the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials or provide any other relief that justice requires." Response at 13 (quoting Fed. R. Crim. P. 14(a)). The United States references rule 14(a)'s advisory committee notes, which state that Gallegos bears a "heavy burden of showing real prejudice to his case."

Response at 13 (citing Gould, 2007 WL 1302587, at *1 (quoting Hall, 473 F.3d at 1302)).  The Defendant also cites Tenth Circuit precedent elaborating a defendant's burden: "To establish prejudice, a defendant must identify a specific trial right that was compromised or show the jury was prevented from making a reliable judgment about guilt or innocence.  Defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials."  Response at 7 (quoting Hall, 473 F.3d at 1302).

The United States also relies on the Tenth Circuit's rulings in United States v. Hutchinson, 573 F.3d 1011 (10th Cir. 2009)("Hutchinson"), holding that, even when there is a "significant risk of prejudice," limiting jury instructions are ordinarily sufficient to protect defendants from potential prejudice.  Response at 8 (quoting Hutchinson, 573 F.3d at 1026).  The United States notes that Hutchinson establishes that Gallegos is required to show, among other things, that: "(i) the denial of severance would result in actual prejudice to his defense, and (ii) that this prejudice would outweigh the expense and inconvenience of separate trials."  Response at 8 (quoting Hutchinson, 573 F.3d at 1025)(internal citations and brackets omitted).

The United States argues that Gallegos' assertion that he will be unduly prejudiced "does not withstand even the most passing scrutiny."  Response at 13-14.  The United States contends that Gallegos fails to meet his heavy burden, because he does not show any prejudice, and has only made a "boiler-plate assertion" that the jury will associate him with his co-Defendants and their extensive alleged offenses.  Response at 13-14.  The United States argues that, "[i]f a defendant could simply allege -- without an explanation or a shred of supporting evidence -- that he or she will be unduly burdened by joinder in a conspiracy trial, relief under those circumstances would render rule 8(b) a nullity."  Response at 13-14.  The United States concedes, however, that Gallegos' assertion that he will be unduly prejudiced is better read as

"[Gallegos will] be unduly prejudiced by association with his co-defendants who have many more overt acts, even though there is only one overt act alleged that involves him."  Response at 14 (quoting Motion to Sever at 7)(internal quotation marks omitted).

The United States argues that Gallegos' Motion to Sever contradicts the alleged facts and precedent that the District of New Mexico has set.  See Response at 14.  The United States relies on Gould, which states that "defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." Response at 14 (quoting Gould, 2007 WL 1302587, at *2 (internal quotation marks and citation omitted)).  The United States reiterates that Gallegos is charged with murder, and that many of his co-Defendants are also charged with committing murder, so it is likely he will not be the only Defendant implicated by association because of his co-Defendants' crimes.  See Response at 14.

The United States contends that Gallegos is unable to show that his prejudice would outweigh the expense and inconvenience of separate trials.  See Response at 14 (citing 18 U.S.C. § 1969).  The United States explains that, to prove that Gallegos murdered Giron in Counts 3 and 4, "[it] must first prove exactly what it must also prove in Count 1: that SNM is an enterprise within the meaning of [the Racketeer Influenced and Corrupt Organizations Act ("RICO")]." Response at 16 (emphasis in original)(alterations added)(citing United States v. Smith, 413 F.3d 1253, 1277)(10th Cir. 2005), overruled on other grounds by Boyle v. United States, 556 U.S. 938, 948-49 (2009)).

The United States concludes its request by asserting that a separate trial would nonetheless implicate Gallegos by association, because its evidence would, to some extent, involve the conduct of the other co-Defendants.  See Response at 16.  The United States repeats: "'[A] single trial is ideal when the government plans to recite a single factual history, put on a

single array of evidence, and call a single group of witnesses.'"  Response at 16 (quoting United States v. Margheim, 770 F.3d 1312, 1320 (10th Cir. 2014)("Margheim")(citations omitted)).

The United States then argues that a reasonable continuance, requested by either of Gallegos, his co-Defendants, or the United States, would protect Gallegos' rights under the Speedy Trial Act.  See Response at 18.  The United States urges the Court to consider judicial efficiency and the interests of justice, and to conclude that Gallegos' rights will not be violated. See Response at 1, 17.  Additionally, the United States points to Congress' reasons for providing ends-of-justice continuances for multiple defendant or complex cases in the first place: "To accommodate the efficient use of prosecutorial and judicial resources in trying multiple defendants in a single trial."  Response at 17 (quoting Margheim, 770 F.3d at 1320).  The United States cites Margheim to rebut Gallegos' assertion that delays attributable to or requested by his co-Defendants violate his speedy trial act rights.  See Response at 17 (quoting Motion to Sever at 7)(citing Margheim, 770 F.3d at 1320).

The United States then emphasizes its own heavy burden to show beyond a reasonable doubt that: (i) a RICO conspiracy exists; (ii) Gallegos murdered Giron; and (iii) Gallegos murdered Giron in furtherance of the SNM enterprise.  See Response at 15, 17-8.  The United States contends that it cannot properly be disputed that this case "is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established."  Response at 18 (quoting 18 U.S.C. § 3161(h)(7)(B)(ii)(internal quotation marks omitted)).  The United States argues that "[e]ither the United States or any one of Defendant Gallegos's co-Defendants may . . . reasonably move for a continuance, and the ends of justice served by such a continuance likely

will, under the circumstances, outweigh the best interests of the public and the defendant(s) in a speedy trial." Response at 18 (citing 18 U.S.C. § 3161(h)(7)(A); United States v. Thomas, 749 F.3d 1302, 1308 (10th Cir. 2014)).

The United States concludes by repeating that "[j]oint trials of defendants who are indicted together are preferred because they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." Response at 18-19 (quoting Gould, 2007 WL 1302587, at *1). The United States notes that the Tenth Circuit also attributes one co-defendant's delays to all co-defendants. See Response at 19. The United States thus argues that Gallegos' Speedy Trial Act rights parallel his co-Defendant's rights. See Response at 19.

      **3.**      **The Motion to Declare Case Complex.**

The United States filed the Motion to Declare Case Complex on May 23, 2016. See Motion to Declare Case Complex at 1. In the Motion to Declare Case Complex, the United States provides that only Gallegos opposed the motion. See Motion to Declare Case Complex at 1. As grounds for the Motion to Declare Case Complex, the United States argues that the "government has received thousands of pages of discovery and is continuing to receive from the investigative agency thousands more, which have yet to be disclosed in this case." Motion to Declare Case Complex at 1. In addition, the United States anticipates having discovery from "all related Syndicato Nuevo Mexico cases once a protective order is in place. The discovery in those cases to date consists of approximately 4,972 pages of discovery and six DVDs." Motion to Declare Case Complex at 1. Accordingly, the United States requests that the Court declare this case complex under 18 U.S.C. § 3161(h)(7)(B)(ii), so that it might suspend the standard scheduling order imposing a seventy-day time limit to begin trial. See Motion to Declare Case

Complex at 1-2.  "Allowing time for such review and investigation may lead to the conservation of public and judicial resources, in that it may result in a resolution of the case without the need for trial."  Motion to Declare Case Complex at 2.

    **4.**       **<u>The Motion to Compel Discovery</u>.**

      In the Motion to Compel Discovery, Gallegos provides that "the United States represents that it will produce information once a protective order is in place, but it has taken no substantive action to present a protective order to Defendant's counsel despite multiple requests from the undersigned counsel."  Motion to Compel Discovery at 1.  Essentially, Gallegos argues that: "No protective order has been forthcoming.  As the record shows, Defendant is not very particular about how the protective order is put into place.  Defendant simply wishes to cooperate in getting one in place as soon as possible so that he can receive discovery and prepare for trial."  Motion to Compel Discovery at 3.  In particular, Gallegos indicates that the primary source of evidence the United States will present against him involves the statements made by an informant and that, "[a]t a minimum, the United States is constitutionally required to produce the statements of that informant because such statements will be necessary for purposes of impeachment."  Motion to Compel Discovery at 4.  Gallegos also requests that the United States proffer "evidence that implicates him in SNM gang activity."  Motion to Compel Discovery at 4.

    **5.**       **<u>The June 3, 2016, Hearing</u>.**

      The Court held a hearing on June 3, 2016, and addressed -- in part -- the Motion to Sever, the Motion to Compel Discovery, and the Motion to Declare the Case Complex.  <u>See</u> Transcript of Hearing (taken June 3, 2016), filed June 3, 2016 (Doc. 140)("June Tr.").[4]  At the outset, the

---

[4]The Court's citations to the transcript of this hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

Court continued the hearing on Gallegos' Motion to Sever and Motion to Compel Discovery at his counsel, Kari Morrissey's, request, which was joined by all Defendants.  See Unopposed Motion to Continue all Matters Filed on behalf of Richard Gallegos Scheduled to be Heard on June 3, 2016, filed June 1, 2016 (Doc. 117).  The Court next noted that Gallegos opposed the complex designation and had moved for severance.  See June Tr. at 7:4-6 (Court).  The Court then explained that it had made a decision in a related case involving alleged SNM members, in a hearing on June 2, 2016, for United States v. DeLeon, CR No. 15-4268 JB, in which it had, with respect to an opposed motion, appointed learned counsel for all defendants who were death-penalty eligible.  See June Tr. at 7:6-12 (Court).  The Court proposed that it was inclined to take a similar action in Gallegos' case, because he was death-penalty eligible.  See June Tr. at 7:11-12 (Court).  The Court mentioned that Defendant Anthony Cordova was also in the process of submitting a motion for the appointment of learned counsel, and, because of this, Gallegos would be left as the only death-penalty-eligible Defendant in this case still requiring appointment of learned counsel.  See June Tr. at 7:15-17 (Court).  The Court told Gallegos that he is welcome to nonetheless oppose the Court's appointment of learned counsel, but that its mind was "pretty made up."  June Tr. at 7:23-8:4 (Court).

The Court then addressed the United States.  See June Tr. at 8:12-9:5 (Court).  The Court informed the United States that it was amenable to severing Gallegos' case because, it was concerned about Gallegos' speedy trial rights and him remaining in custody for a lengthy period of time.  See June Tr. at 8:17-19 (Court).  The Court told the United States that, if the soon-to-be appointed learned counsel disagrees, Gallegos' Motion to Sever may be moot, but added that the United States should focus on "making sure discovery moves forward."   June Tr. at 8:20-9:2

-16-

(Court).  The Court thereby reiterated its inclination to sever Gallegos' case.  See June Tr. at 9:2-5 (Court).

The Court then turned to Gallegos' Motion to Compel Discovery.  See June Tr. at 9:6-8 (Court).  Gallegos requested that the Court postpone the hearing on the Motion to Compel Discovery until his other motions, that the Court had already agreed to continue, were heard, explaining that his understanding was that "something is coming together to get us discovery within 30 days . . . ."  June Tr. at 9:9-13 (Ray).

The Court noted that the only motion which was left to be heard that day was the Motion to Declare the Case Complex.  See June Tr. at 9:16-8 (Court).  The Court stated that it was unable to decide the Motion to Declare the Case Complex until it decided the Motion to Sever.  See June Tr. at 9:14-18 (Court).  The Court informed the parties that it was inclined to not certify the case complex while Gallegos was still a part of the case.  See June Tr. at 9:21-24 (Court).  The Court clarified that it was not denying the Motion to Declare the Case Complex, but that it wanted to wait until it decided Gallegos' Motion to Sever.  See June Tr. at 10:1-4 (Court).

The Court then transitioned to the subject of discovery.  See June Tr. at 10:18-11:21 (Court).  The Court repeated its discovery rulings from its decision the day prior, in United States v. DeLeon, explaining that all Defendants would receive a tablet with discovery from the United States.  See June Tr. at 10:18-22 (Court).  The Court noted that, when the Defendants' counsel goes to the jails and prisons, they are not allowed to leave with the Defendants any sealed or ex parte documents -- those must be produced on the tablets, or shown to the Defendants and then removed when counsel departs -- the only exception being for certain documents that had been filed publicly.  See June Tr. at 10:22-1:7 (Court).  No Defendant opposed this rule.  See June Tr. at 11:13-15 (Court).

-17-

The United States then clarified that: (i) no discovery would be released until a protective order, pursuant to the Court's rulings in the United States v. DeLeon hearing, was in place; (ii) the first set of discovery would be the discovery package that had already been distributed for the United States v. DeLeon Defendants; and (iii) Defendants would likely not receive their tablets until August, 2016. See June Tr. at 12:4-23 (Armijo). Defendant Christopher Garcia objected to this statement's clarification on discovery, noting that, because the case has not yet been declared complex, the United States must adhere to its discovery obligations consistent with the Speedy Trial Act. See June Tr. at 13:14-19, 22-25 (Sirignano). Garcia emphasized discovery's importance, given that he faced the death penalty, and noted that he had not yet received discovery on the alleged murder. See June Tr. at 13:23-14:2 (Sirignano).

The United States responded that, if it must adhere to the ten-day discovery obligation incumbent to a noncomplex case, it would want to declare the case complex immediately. See June Tr. at 14:5-6 (Armijo). The Court repeated that it would not hear the motion to declare the case complex yet, and told the United States to make copies of the discovery it did have and give those copies to the Defendants' lawyers. See June Tr. at 14:7-9, 12-13 (Court). The United States explained that it does not have all of discovery ready for the case, because it needs the Federal Bureau of Investigation ("FBI") to finish making copies, and that the United States Attorney's Office does not have the manpower to get discovery out within the ten days. See June Tr. at 14:14-21 (Armijo). The United States asked if all of discovery needed to be given to the Defendants' lawyers in ten days. See June Tr. at 14:24-25 (Armijo). The Court clarified that the United States has produced 5,000 pages of discovery thus far for United States v. DeLeon, and that it must copy and give the Defendants' counsel those 5,000 pages. See June Tr. at 15:1-4 (Court). The United States again attempted to explain the difficulties with copying discovery,

but the Court instructed the United States to comply with the order and, if it cannot comply, to inform the Court. See June Tr. at 15:11-19, 20-24 (Court, Armijo).

Garcia requested that discovery be disclosed within ten days of the hearing because the United States was already past the Speedy Trial Act's deadlines. See June Tr. at 17:17-19, 23-18:16 (Sirignano). The United States countered that the Court should not require discovery until at least ten days after a protective order is put into place. See June Tr. at 18:18-19:6 (Armijo). Defendant Vincent Garduño stated that, because the importance of the discovery production was lessened -- in his opinion -- if he was no longer in custody, he would thus only oppose the United States' argument if Judge Molson ruled against him at his detention hearing. See June Tr. at 19:14-16 (Esquibel). Garduño also stated that he is a "good candidate" for in-home detention with an ankle monitor or a halfway house. See June Tr. at 19:25-20:2 (Esquibel).

Garcia proposed that the old protective order governing discovery in the SNM prosecutions entered by the Honorable Ken Gonzales, United States District Judge for the District of New Mexico, before the case was transferred to the Court, be kept in place until a new protective order could be issued. See June Tr. at 23:13-21 (Adams). Defendant Daniel Sanchez supported Garcia's proposal. See June Tr. at 24:16-18 (Jacks). The Court noted that it did not like the proposal, because it would not represent the conditions upon which the parties had already agreed. See June Tr. at 24:19-22 (Court). Rather, the Court decided that the production of discovery would begin, and that the Defendants who needed that discovery immediately, such as Garcia, would get it first. See June Tr. at 24:23-25:14 (Court). Gallegos requested that he be placed on the priority list that included Garcia. See June Tr. at 38:1-8 (Ray). The Court responded that there was no priority list yet. See June Tr. at 37:9-11 (Court). The Court also notified the parties that it would want a report about the status of discovery from the United

-19-

States and from the Defendants, as well as a near-complete draft protective order, ten days from the hearing.  See June Tr. at 24:16-25 (Court).  The Court informed the parties that it would enter the protective order as soon as possible.  See June Tr. at 28:10-17 (Court).

Gallegos requested that the Court hear his motions on July 5, 2016.  See June Tr. at 38:24-39:5 (Ray).  The Court noted that it could not set anything that day, but that it would try to set it promptly.  See June Tr. at 39:6-8,10 (Court).

6.      **The Reply**.

Gallegos replied to the United States' Response on June 10, 2016.  See Defendant Richard Gallegos' Reply in Support of Motion for Severance and Definite Trial Setting, filed June 10, 2016 (Doc. 137)("Reply").  Gallegos requested that the Court grant his Motion to Sever, emphasizing the importance of preventing prejudice under rule 8(b).  See Reply at 2.

Gallegos argues that the Response was inaccurate, because it fails to note that: (i) he is not and has not been an SNM member; (ii) he does not have gang tattoos or SNM indicia; and (iii) he has no felony history in his adult life.  See Reply at 1 (citing Email Between Kari Morrissey to Maria Armijo at 1 (sent May 20, 2016), filed June 7, 2016 (Doc. 137-1)("Email Between Kari Morrissey to Maria Armijo")).  He asserts that the State of New Mexico had investigated, and indeed concluded, that a United States' informant had committed the murder for which he is now accused.  See Reply at 1 (citing Email Between Kari Morrissey to Maria Armijo at 1).  Gallegos further asserts that severance is appropriate, because he intends to present testimony that the informant committed the accused murder, and it was not committed for reasons related to SNM.  See Reply at 1.  Gallegos makes two arguments in support of his Motion to Sever: (i) severance will cause undue prejudice that outweighs judicial efficiency; and

(ii) a late-August, 2016, trial date is needed to protect his speedy trial rights.  See Reply at 2, 6, 10.

First, Gallegos argues that, if the Court does not grant his Motion to Sever, he might not receive a fair trial.  See Reply at 6.  Gallegos notes that severance is discretionary until the joinder of either defendants or offenses cause actual or threatened deprivation of a fair trial.  See Reply at 6 (quoting United States v. Butler, 494 F.2d 1246, 1256 (10th Cir. 1974)).  He explains that courts recognize that a joint trial may produce undue prejudice, because evidence of a co-defendant's wrongdoing may unduly prejudice another defendant.  See Reply at 7 (citing United States v. Kelly, 349 F.2d 720, 759 (2d Cir. 1965)(reversing a defendant's conviction because the trial court should have granted severance, explaining "[t]hat some [of the evidence regarding co-defendant's actions] rubbed off on [defendant] we cannot doubt.")).  Gallegos asserts that courts should utilize "every safeguard to individualize each defendant in his relation to this mass" to prevent the "dangers of transferred guilt."  Reply at 7 (quoting Kotteakos v. United States, 328 U.S. 750, 773 (1946)).

Gallegos reiterates that he is only indicted for two acts, but would be put on trial for over two hundred overt acts.  See Reply at 7.  He cites Justice Robert H. Jackson's concurrence in Krulewitch v. United States, 336 U.S. 440 (1949)(Jackson, J., concurring):

> As a practical matter, the accused [in a conspiracy case] is often confronted with a hodgepodge of acts and statements by others which he may never have authorized or intended or even known about, but which help to persuade the jury of existence of the conspiracy itself.  In other words, a conspiracy often is proved by evidence that is admissible only upon assumption that conspiracy existed.  The naïve assumption that prejudicial effects can be overcome by instructions to the jury, all practicing lawyers know to be unmitigated fiction.

Reply at 7 (quoting Krulewitch v. United States, 336 U.S. at 453 (Jackson, J., concurring)).  He concedes that "the United States should have some leeway to bring RICO or other conspiracy

prosecutions against multiple defendants," but contends that the indictment creates a tenuous tie between himself and the other defendants.  Reply at 8.  He argues that there is strong evidence that (i) he has no gang ties; (ii) he did not commit the murder; (iii) the murder was unrelated to the gang conspiracy; and (iv) a confidential informant committed the murder.  See Reply at 8. He contends that, after spending days or weeks listening to evidence against eleven other Defendants, it is likely that a jury will "lump all defendants together and potentially think of them as a unit, rather than as individuals."  Reply at 7-8.

Gallegos first contends that Gould does not address the issues in this case.  See Reply at 8 (citing 2007 WL 1302587, at *1).  Gallegos asserts that, in Gould, the Court considered a motion for severance and a separate trial nine days into a trial, and the issue turned on whether the two co-defendants had mutually antagonistic defenses.  See Reply at 8 (citing Gould, 2007 WL 1302587, at *1).  Gallegos asserts that the Court did "not believe that Ms. Gould identifie[d] a specific trial right that joinder seriously risks compromising or demonstrate[d] that joinder [would] prevent the jury from making a reliable judgment."  Reply at 8 (citing Gould, 2007 WL 1302587, at *2).  Gallegos further distinguished his case from Gould, stating that the United States is relying on a single informant's testimony, but that informant was already prosecuted for the same incident for which he is now saying Gallegos is responsible.  See Reply at 8-9. Gallegos also notes that Gould is not analogous to his case, because the Gould trial was already in progress.  See Reply at 9.

Gallegos also attempts to distinguish his case from Margheim.  See Reply at 9.  Gallegos asserts that Margheim is inapposite, because the defendant there created much of the disputed delay -- by seeking a 120-day ends-of-justice continuance, filing many pre-trial motions, firing multiple lawyers, not requesting severance from his co-defendants, and failing to demonstrate a

"cognizable hindrance."  Reply at 9 (quoting 770 F.3d at 1328).  Gallegos argues that <u>Margheim</u> is also inapplicable, because the Tenth Circuit did not consider the number of counts charged when it rejected that defendant's speedy trial arguments.  <u>See</u> Reply at 9 (citing 770 F.3d at 1321).  Gallegos emphasizes that he is requesting severance from his co-Defendants, a remedy which the defendant in <u>Margheim</u> never sought.  <u>See</u> Reply at 9.

Gallegos also argues that the United States overstates the efficiency that a single trial would generate.  <u>See</u> Reply at 10.  He notes that <u>Hutchinson</u> held that judicial economy must give way if prejudice overrides efficiency.  <u>See</u> Reply at 10 (citing 573 F.3d at 1025).  He explains that the United States has only one witness to connect him to the RICO conspiracy charges.  <u>See</u> Reply at 10.  He asserts that it would not be a severe hardship to try him separately, because, although the United States has to present of evidence to tie Gallegos to his alleged overt act, it only has one witness to attempt to tie him to the larger conspiracy.  <u>See</u> Reply at 10 ("After all, the price of judicial economy should not be the abrogation of an accused individual's constitutional rights.")

Second, Gallegos argues that severance is necessary to protect his speedy trial rights.  <u>See</u> Reply at 1-2 (citing Email from Maria Armijo to Kari Morrissey (sent May 20, 2016), filed June 10, 2016 (Doc. 137-2)).  Gallegos asserts that the United States brought a large indictment to blend his case into a larger case that contains no novel question of fact or law.  <u>See</u> Reply at 4 (citing 18 U.S.C. § 3161(h)(7)(B)(ii)).  Gallegos contends that the matter's complexity is largely "illusory."  Reply at 3-4 (citing Response at 9).  He then reiterates that, even though there are twelve Defendants, there is no question of fact or law that makes it "unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by [the Speedy Trial Act]."  Reply at 4 (quoting 18 U.S.C. § 3161(h)(7)(B)(ii)).

Gallegos contends that the United States' approach will be highly prejudicial and will violate his constitutional rights to a speedy trial.  See Reply at 4.  He articulates the interests that prejudice may affect:

> Prejudice [in the context of the right to a speedy trial], of course, should be assessed in the light of the interests of defendants, which the speedy trial right was designed to protect.  This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.  Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.  If witnesses die or disappear during a delay, the prejudice is obvious.  There is also prejudice if defense witnesses are unable to recall accurately events of the distant past.  Loss of memory however, is not always reflected in the record because what has been forgotten can rarely be shown.

Reply at 4 (quoting Barker v. Wingo, 407 U.S. 514, 532 (1972)("Barker")).

Using the interests that the United States Supreme Court listed in Barker, Gallegos notes that his speedy trial right is in jeopardy while his case remains joined.  See Reply at 4-5.  First, the Defendant states that he has suffered from a "lengthy pre-trial incarceration."  Reply at 4-5.  He quotes Barker: "'The time spent in jail awaiting trial has a detrimental impact on the individual.  It often means loss of a job; it disrupts family life; and it enforces idleness.'"  Reply at 4-5 (quoting 407 U.S. at 532).  Gallegos also asserts that, even if he is released, the more time he spends in jail undermines his ability to defend himself.  See Reply at 5 (citing Barker, 407 U.S. at 533)("Moreover, if a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense[.]")  Last, Gallegos notes one of his key witnesses is diagnosed with cancer, and "[t]he loss of the witness' testimony due to illness or death would be severely prejudicial."  Reply at 6 (asserting that the witness can show that the accused murder was not gang-related because she heard the confidential informant threaten to kill the victim in three days if he did not pay a debt and three days later, the victim was killed).

-24-

Gallegos requests that his case be severed and allowed to go to trial in August, 2016, to prevent "an untold amount of delay to stand trial, with severe impediments to his ability to prepare." Reply at 6.

**7.      The United States' Response to the Motion to Compel Discovery.**

The United States responded to the Motion to Compel with the United States' Response to Defendant Richard Gallegos Motion to Compel Discovery (Doc. 114), filed July 5, 2016 (Doc. 165)("Response to the Motion to Compel Discovery").  The Response to the Motion to Compel Discovery provides that, on June 3, 2016, the Court ordered the United States to disclose discovery when a protective order is in place.  See Response to the Motion to Compel Discovery at 1.  Accordingly, the United States explains that, "[o]n June 17, 2016, the United States received notice that the Protective Order was signed on June 16, 2016.  The United States began disclosure to the discovery coordinator on June 17, 2016.  To date, approximately 12,113 bates stamped pages have been disclosed in addition to numerous recordings."   Response to the Motion to Compel Discovery at 1.  The United States thus argues that it will now comply fully with its discovery obligations and that the "Defendant's motion is moot based on the Court's order and entry of the Protective Order."  Response to the Motion to Compel Discovery at 2.

**8.      The July 8, 2016, Hearing.**

The Court held a hearing on July 8, 2016.  Before the hearing, the Court appointed learned counsel, David Evans, for Gallegos in response to his Motion for Appointment of Learned Counsel, filed July 7, 2016 (Doc. 174).  The Court explained that the Court had initially set the Motion to Sever to be heard on June 3, 2016, but Gallegos requested that the Court continue the hearing.  See July Tr. at 7:2-6 (Court).  Gallegos confirmed that he still wished to be severed from the case.  See July Tr. at 7:13 (Ray).  The Court also specifically asked Gallegos'

-25-

now-appointed learned counsel if he agreed with lead counsel's desire to sever and seek a separate trial.  See July Tr. at 11:12-15 (Court, Evans).

Gallegos emphasized that he is situated differently than his co-Defendants, because he has no ties to SNM, no gang history, and no violent history.  See July Tr. at 7:20-25 (Ray).  He argued that he is factually innocent.  See July Tr. at 7:25 (Ray).  He explained that the charged murder is a "discrete incident," and that state investigators and prosecutors concluded that the incident was not a gang murder.  See July Tr. at 8:8-12 (Ray).  He noted that the United States' claim that the murder was a gang initiation comes from a single witness with serious credibility issues.  See July Tr. at 8:13-15 (Ray).

The Court asked Gallegos whether his main concern was that his assertion of innocence would be lost in a larger case.  See July Tr. at 8:18-21 (Court).  Gallegos agreed that it was one of his concerns.  See July Tr. at 8:22-23 (Ray).  Gallegos also argued that, although there are over two hundred overt acts alleged against the twelve Defendants, he was allegedly involved in only three overt acts: (i) the murder, (ii) aiding and abetting the murder, and (iii) a murder in furtherance of a RICO conspiracy.  See July Tr. at 9:6-8, 11-16 (Ray).

The Court then asked Gallegos if he would still insist on a "fairly prompt trial" if the Court granted severance.  July Tr. at 9:17-20 (Court).  Gallegos stated that he would ask the Court to keep the August, 2016, trial date.  See July Tr. at 9:21-24 (Ray).  He emphasized that his case is unique, because the state investigation ramped up prosecution before the case was brought in federal court, so there was "a lot of discovery at the state court level, a lot of investigation done."  July Tr. at 9:25, 10:1-8 (Ray).  He noted that the only difference between the state and federal case is that, in the present indictment, the United States has to bring evidence to prove the RICO conspiracy.  See July Tr. at 10:4-7 (Ray).  Gallegos also explained

that an August, 2016, trial date is realistic, because he was ready for the state trial, and he "[is]

basically being tried for the same thing here. . . ." July Tr. at 10:13-18 (Ray).

The Court then directed a series of questions to Gallegos' learned counsel. See July Tr.

at 11:3-4 (Court). Mr. Evans stated that he supports Gallegos in the Motion. See July Tr. at

11:8-9 (Evans). The Court asked Mr. Evans to explain the request for a quick trial, given that the

other Defendants were not making the same request. See July Tr. at 11:13-18 (Court). Mr.

Evans explained that Gallegos' other attorneys are already well acquainted with the case,

because of the state prosecution. See July Tr. at 11:19-21 (Evans). Mr. Evans also noted that he

doubted that the United States would authorize capital litigation in a case where the state

prosecutor already dismissed the case. See July Tr. at 11:21-25, 12:1-2 (Evans).

The Court asked Mr. Evans whether it should expect to hear death penalty motions or

whether Gallegos would proceed in the trial as if the case was a non-death penalty case. See July

Tr. at 12: 3-11 (Court). Mr. Evans clarified that, if the United States does not seek the death

penalty, the case would proceed as a normal murder case. See July Tr. at 13: 5-7 (Evans). Mr.

Evans again noted that Gallegos' case is in a different position than his co-Defendants, because

of the previous work done by his local counsel, Kari Morrissey and David Ray, who believe that

the case is ready for trial. See July Tr. at 13: 12-14 (Evans). The Court then asked Mr. Evans

what actions Gallegos would take if the United States sought the death penalty closer to trial.

See July Tr. at 13:24-25, 14:1-4 (Court). Mr. Evans responded that Gallegos would be ready to

proceed, because Gallegos' counsel in the state case had already prepared the case in state court,

and discovery has not produced new information. See July Tr. at 14:5-11 (Evans). The Court

then asked what Gallegos would do if the United States Attorney General sought the death

penalty during trial. See July Tr. at 14:20-22 (Court). Mr. Evans answered that the only time he

-27-

saw the Attorney General act in the middle of trial was to dismiss the death penalty.  <u>See</u> July Tr. at 14:23-26 (Evans).  He also noted that the United States seeking the death penalty during trial would be an extraordinary circumstance that would not survive appellate review.  <u>See</u> July Tr. at 15:1-3 (Evans).

The Court asked Gallegos if he would be willing for the Court to grant his request as a conditional severance, in case it made sense to unsever if Gallegos' case did not proceed as quickly as he now thinks it will and should, and the co-Defendants' case gets ready in the meantime.  <u>See</u> July Tr. at 15:4-10 (Court).  Gallegos stated that he would support a conditional severance.  <u>See</u> July Tr. at 15:11-12 (Ray).

The Court then asked whether any of the co-Defendants opposed Gallegos' Motion.  <u>See</u> July Tr. at 15:13-22 (Court).  Defendant Daniel Archuleta informed the Court that he may request to sever, too, but that his answer would depend on the Court's decision to grant Gallegos' Motion to Sever.  <u>See</u> July Tr. at 15:23-25, 16:4 (Assed, Cool).  Defendant Anthony Cordova also informed the Court that he was in a similar situation as Gallegos, because the indictment barely mentions Cordova.  <u>See</u> July Tr. at 16:7-12 (Morrissey).  Cordova also noted that he and Archuleta could not give an answer at that time, because they had not yet assessed all of discovery.  <u>See</u> July Tr. at 16:13-17 (Morrissey).  Archuleta said that, if he submitted a motion to sever, the motion would likely not argue severance to protect his Speedy Trial Act rights.  <u>See</u> July Tr. at 17: 4-8 (Assed).  Defendant Vincent Garduño explained to the Court that he could not commit to making a motion yet for the same reasons as Archuleta.  <u>See</u> July Tr. at 17:17-23 (Esquibel).

The Court then asked the United States to address the motion to sever and the speedy trial timeframe.  <u>See</u> July Tr. at 18:16-22 (Court).  The United States explained that severance would

be a slippery slope, because the other defendants would move to sever, and it would become increasingly difficult for the Court and the United States to distinguish which Defendants would qualify for severance.  See July Tr. at 18:23-25-19:1-8 (Beck).

The United States reiterated that the case against Gallegos' alleges counts under the Violent Crimes in Aid of Racketeering Activity ("VICAR") statute, 18 U.S.C. § 1959, and also a count of murder.  See July Tr. at 19:11-16 (Beck).  It explained that, because there are murder and VICAR charges, the United States must prove beyond a reasonable doubt: (i) a murder, (ii) a RICO conspiracy, and (iii) that the murder was in furtherance of the conspiracy.  See July Tr. at 19:17-24 (Beck).  The United States then clarified that its concern was not merely getting ready for a trial in six weeks, but that discovery was still ongoing and that there may be additional evidence against Gallegos.  See July Tr. at 20:7-21:21 (Beck).  The United States stated its concern that Gallegos would not have an "adequate opportunity" to digest discovery and prepare for a trial which would be different than the state court trial for which Gallegos' counsel prepared.  See July Tr. at 21:24-22:1-2 (Beck).  The United States complained that "preparing [Gallegos'] case by August 29, I think is difficult."  July Tr. at 22:12-14 (Beck).

The Court then asked the United States to address the Speedy Trial Act issue.  See July Tr. at 22:22-24 (Court).  The United States explained that, even though it is not pursuing the death penalty, it is waiting for the Attorney General to decide Gallegos' death penalty status. See July Tr. at 23:2-9 (Beck).

Gallegos responded that the Court should sever his case, because only a small portion of the recently disclosed evidence concerns charges against him.  See July Tr. at 24:3-10 (Ray). Gallegos stated that he had already received the bulk of the information from the state investigation.  See July Tr. at 24:10-15 (Ray).  He dismissed the United States' complaint that its

resources would be strained if the trial proceeded in August, 2016.  See July Tr. at 24:19-20 (Ray).  He stated that the United States should not have moved forward with the indictment until it was ready.  See July Tr. at 24:23-25:7 (Ray).  Gallegos asked that he not be punished for the United States' decision to pursue the indictment when it did.  See July Tr. at 25:3-7 (Ray).  He also argued that the United States has a large amount of resources to prepare for the trial, so its burden is not too high.  See July Tr. at 25:10-14 (Ray).

The Court asked Gallegos whether he worried about having to change his strategy if new evidence came to light before trial.  See July Tr. at 25:17-22 (Court).  Gallegos answered that he was not concerned about that possibility, but rather about the United States not appropriately disclosing discovery.  See July Tr. at 25:23-26:13 (Ray).  Gallegos explained that the FBI it did not create a 302 report[5] for the "star witness who is going to tie Mr. Gallegos to this RICO conspiracy or generally to the gang . . . ."  July Tr. at 25:23-26:13 (Ray).  Gallegos contended that common sense does not support the United States' theory that he attempted to join a prison gang because he did not have a prison history.  See July Tr. at 26:14-17 (Ray).  Thus, the United States' only evidence could be the single witness, who Gallegos said has "severe credibility issues."  July Tr. at 26:17-22 (Ray).  The United States stated that, if the Court is inclined to sever Gallegos' case, then the United States would prefer to try all Defendants on August 29, 2016.  See July Tr. at 27:6-11 (Beck).

Regarding the evidence against him, Gallegos again noted that the United States has discussed the statements of a third individual involved in the murder Gallegos has been implicated in, but that no 302 record was made by the investigators.  See July Tr. at 28:3-6

---

[5]A 302 report, done with the FBI's Form FD-302, is used by FBI agents to report and summarize the interviews that the conduct.  See List of FBI Forms, Wikipedia, available at https://en.wikipedia.org/wiki/List_of_FBI_forms (last accessed on October 14, 2016).

(Ray).  He emphasized that if the FBI took a statement, there should have been a 302, or some other record, disclosed to the defense regarding the third individual's statements.  See July Tr. at 28:8-18 (Ray).  Gallegos clarified that the United States informed him that the individual, "Mr. Yanez-Morales," was not interviewed by any law enforcement until after the state case had been dismissed.  See July Tr. at 28:20-29:1 (Morrissey).  Gallegos noted that the United States incorrectly asserted that the interview was taken during the state prosecution.  See July Tr. at 29:1-4 (Morrissey).  He stated that FBI agents Thomas Neal and Joseph Sainato conducted the interview, and investigated the case, but that they did not produce a 302.  See July Tr. at 29:4-14 (Morrissey).

The United States clarified that the agents visited Yanez-Morales, showed him the affidavit he had given in the context of the state case, and asked if the affidavit was accurate, and that he confirmed the affidavit was true.  See July Tr. at 29:16-24 (Castellano).  The United States then noted that, if Gallegos wished, the United States could provide a 302, but it had already disclosed the relevant information to the Defendants.  See July Tr. at 29:25-30:3 (Castellano).  Gallegos requested the 302, emphasizing the importance that the agents follow the FBI's operating standards.  See July Tr. at 30:9-12 (Morrissey).  The United States argued that there is no requirement to create discovery for the Defendants if the evidence is not exculpatory. See July Tr. at 30:20-23 (Castellano).

The Court then granted Gallegos' motion to sever.  See July Tr. at 31:7-11 (Court).  The Court noted that the grant is conditional and that it could reverse the severance if conditions change during the case.  See July Tr. at 31:24-25 (Court).  The Court then discussed the new trial date.  See July Tr. at 32:7-8 (Court).  The Court first listed dates that Gallegos requested, and Gallegos explained that he would accept "August 29 unless the Court believes that a September

trial date is more appropriate[,]" but deferred to the Court.[6]  July Tr. at 32:14-17 (Morrissey). The United States said that it would prefer the Tuesday of the week of September 19, 2016.  See July Tr. at 32:25-33:2. (Armijo).  The Court then asked the United States how long it believed the trial would take.  See July Tr. 33:7-10 (Court).  The United States answered that its previous VICAR cases took approximately three or four weeks.  See July Tr. at 33:11-25 (Armijo).

Gallegos noted that September 20, 2016, is fine, but explained that his counsel had prior trial obligations beginning on October 24, 2016, and thus, needed assurance that she would have time before her next trial.  See July Tr. at 34:6-12 (Morrissey).  The Court noted that September 20, 2016, would give Gallegos' counsel almost five weeks to prepare for her next trial.  See July Tr. at 34:16-18 (Court).  The United States stated that it would do its best to stay within that timeframe.  See July Tr. at 34:25-35:3 (Castellano).  The Court granted Gallegos a new trial date -- September 20, 2016 -- and neither Gallegos nor the United States objected.  See July Tr. at 35:8-17 (Court, Morrissey, Castellano).  The Court asked that the United States prepare the motion to continue and justify the continuance to prevent problems with the Speedy Trial Act. See July Tr. at 35:10-14 (Court).

After severing Gallegos, the Court turned to the Motion to Declare Case Complex, which the United States promptly moved to withdraw.  See July Tr. at 37:16-38:3 (Court, Armijo). Counsel for Defendant Anthony Ray Baca objected to the United States' proffer of withdrawal, arguing that the case, at least as it applied to him, warranted the complex declaration.  See July Tr. at 38:7-24 (Duncan).  Baca therefore orally moved to declare the case complex.  See July Tr. at 38:7-24 (Duncan).  All other Defendants, excluding Gallegos, joined in both Baca's objection

---

[6]The Court had already, on June 6, 2016, continued the case's trial date, as to all Defendants, to August 29, 2016.  See Order to Continue, filed June 6, 2016 (Doc. 130).

and oral motion.  See July Tr. at 39:14-16 (Court).  Accordingly, the Court declared the case

complex.  See July Tr. at 46:20-47:4 (Court).

> I think everybody, other than Mr. Gallegos and his defense team has agreed this
> case is complex.  It sure looks complex, and I think I understand the position [of
> Gallegos] and I recognized and acknowledged it [in] setting the trial for him, but I
> think for everybody else including the Government I think it remains a complex
> case so it will be declared complex.

July Tr. at 46:20-47:4 (Court).  The Court then, although having just declared the case complex,

explored trial dates with the Defendants other than Gallegos.  See July Tr. at 47:23-48:4 (Court).

The parties, at that time, settled on a trial date of July 10, 2017.  See July Tr. at 49:15-17 (Court).

Last, the Court turned to the Motion to Compel Discovery.  See July Tr. at 49:18-21

(Court).  Although, as the Court indicated, it appeared that the Motion to Compel Discovery was

now moot, Gallegos presented one lingering issue.  See July Tr. at 49:18-21 (Court).  According

to Gallegos, he had still yet to receive any discovery related to the agreements that the United

States has made with the cooperating witness who is both testifying against Gallegos and has

been indicted in a similar case.  See July Tr. at 50:2-22 (Morrissey).  The United States

responded that, because the witness has not yet testified, the United States is not under any

obligation yet to disclose the information that Gallegos seeks.  See July Tr. at 50:5-13

(Castellano).  Despite that trial is in the future, though, the United States indicated that it would

nonetheless disclose the information that Gallegos seeks before the trial.  See July Tr. at 50:5-13

(Castellano).

The Court then inquired whether the other Defendants had any lingering discovery issues.

See July Tr. at 53:17-21 (Court).  Garcia listed out certain documents that he still had not

received in discovery.  See July Tr. at 53:23-54-14 (Sirignano).  The United States indicated that

three large batches of discovery had been sent, and that the requested documents have been

produced.  See July Tr. at 54:17-55:24 (Armijo).  Accordingly, the Court provided that:

I'm going to deny the motion without prejudice.  If something else pops up the Government has made representations that it's going to provide Jencks material before trial, so they will, and that's been their practice in other cases I've had so I think it will probably work out.  If anybody has any specific problems, concrete problems, contact [us].

July Tr. at 50:5-13 (Court).

## LAW REGARDING THE SPEEDY TRIAL ACT

"The dual purpose of the Speedy Trial Act is to protect a defendant's constitutional right to a speedy indictment and trial, and to serve the public interest in bringing prompt criminal proceedings."  United States v. Saltzman, 984 F.2d 1087, 1090 (10th Cir. 1993)(quoting United States v. Noone, 913 F.2d 20, 28 (1st Cir. 1990)).  The Speedy Trial Act, 18 U.S.C. § 3161(c)(1), reads in relevant part:

In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.  If a defendant consents in writing to be tried before a magistrate judge on a complaint, the trial shall commence within seventy days from the date of such consent.

18 U.S.C. § 3161(c)(1).

The Speedy Trial Act requires "that an accused person's trial must begin within seventy days of his indictment or initial appearance, whichever is later."  United States v. Cano-Silva, 402 F.3d 1031, 1034 (10th Cir. 2006)(citing 18 U.S.C. § 3161(c)(1)).  The Speedy Trial Act provides that certain periods of delay are not included in computing the time limits for trial.  18 U.S.C. § 3161 states in relevant part:

(h)    The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence:

-34-

**(1)** Any period of delay resulting from other proceedings concerning the defendant, including but not limited to--

    **(A)** delay resulting from any proceeding, including any examinations, to determine the mental competency or physical capacity of the defendant;

    . . . .

    **(F)** delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion;

    . . . .

    **(J)** delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court.

    . . . .

**(4)** Any period of delay resulting from the fact that the defendant is mentally incompetent or physically unable to stand trial.

. . . .

**(7)**

    **(A)** Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case,

> either orally or in writing, its reasons for
> finding that the ends of justice served by the
> granting of such continuance outweigh the
> best interests of the public and the defendant
> in a speedy trial.

18 U.S.C. § 3161.  Courts are instructed to consider specific factors when determining whether

to grant a continuance under section (A) of 18 U.S.C. § 3161(h)(7).   See 18 U.S.C.

§ 3161(h)(7)(B).  Section 3161(h)(7)(B) sets forth the factors a court should consider:

> **(B)**     The factors, among others, which a judge shall consider in determining
> whether to grant a continuance under subparagraph (A) of this paragraph
> in any case are as follows:
>
> > **(i)**     Whether the failure to grant such a continuance in the
> > proceeding would be likely to make a continuation of such
> > proceeding impossible, or result in a miscarriage of justice.
>
> > **(ii)**     Whether the case is so unusual or so complex, due to the
> > number of defendants, the nature of the prosecution, or the
> > existence of novel questions of fact or law, that it is
> > unreasonable to expect adequate preparation for pretrial
> > proceedings or for the trial itself within the time limits
> > established by this section.
>
> > **(iii)**     Whether, in a case in which arrest precedes indictment,
> > delay in the filing of the indictment is caused because the
> > arrest occurs at a time such that it is unreasonable to expect
> > return and filing of the indictment within the period
> > specified in section 3161(b), or because the facts upon
> > which the grand jury must base its determination are
> > unusual or complex.
>
> > **(iv)**     Whether the failure to grant such a continuance in a case
> > which, taken as a whole, is not so unusual or so complex as
> > to fall within clause (ii), would deny the defendant
> > reasonable time to obtain counsel, would unreasonably
> > deny the defendant or the Government continuity of
> > counsel, or would deny counsel for the defendant or the
> > attorney for the Government the reasonable time necessary
> > for effective preparation, taking into account the exercise of
> > due diligence.

18 U.S.C. § 3161(h)(7)(B).

The Supreme Court of the United States of America in <u>United States v. Zedner</u>, 547 U.S. 489 (2006), held that, when a district court makes no findings on the record to support a § 3161(h)(8) continuance -- now § 3161(h)(7) -- harmless-error review is not appropriate. <u>See</u> 547 U.S. at 506-07. In <u>United States v. Williams</u>, 511 F.3d 1044 (10th Cir. 2007), the United States Court of Appeals for the Tenth Circuit held that "the Act does not allow a district court to retroactively grant an ends-of-justice continuance. 'Congress intended that the decision to grant an ends-of-justice continuance be prospective, not retroactive; an order granting a continuance on that ground must be made at the outset of the excludable period.'" 511 F.3d at 1055 (quoting <u>United States v. Doran</u>, 882 F.2d 1511, 1516 (10th Cir. 1989)). In granting an ends-of-justice continuance, a district court must make explicit finds showing why the continuance is necessary. <u>See</u> <u>United States v. Hernandez-Mejia</u>, 406 Fed. App'x 330, 336 (10th Cir. 2011)(unpublished).[7] The Tenth Circuit explained:

> This court has interpreted strictly the requirements of § 3161(h)(7)(A) and (B). We have held (1) that to satisfy the requirements of § 3161(h)(7)(A), the district court must make explicit oral or written on-the-record findings explaining the reasons why a trial continuance is necessary, unless the facts supporting the continuance "are obvious and set forth in the motion for the continuance itself," <u>United States v. Occhipinti</u>, 998 F.2d 791, 797 (10th Cir. 1993)(internal quotation marks omitted); (2) that "the record must clearly establish [that] the district court

---

[7]<u>United States v. Hernandez-Mejia</u> is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. <u>See</u> 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

<u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court finds that <u>United States v. Hernandez-Mejia</u> has persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

considered the proper factors at the time such a continuance was granted," [United States v.] Toombs, 574 F.3d [1262,] 1269 [10th Cir. 2009]; (3) that "it must be clear from the record that the trial court struck the proper balance when it granted the continuance," United States v. Williams, 511 F.3d 1044, 1056 (10th Cir. 2007)(alteration and internal quotation marks omitted); and (4) that although adequate trial-preparation time is a permissible reason for granting a continuance and tolling the Act, "such a reason must be supported by the information and evidence presented to the district court," United States v. Gonzales, 137 F.3d 1431, 1435 (10th Cir. 1998).

United States v. Hernandez-Mejia, 406 F. App'x at 336.

Section 3162(a)(1) and (2) of the Act sets out the sanctions applicable when the United States has not filed an indictment or information, or when the defendant is not brought to trial within the time limits that § 3161(b) and (c) require:

**(a)**

> **(1)** If, in the case of any individual against whom a complaint is filed charging such individual with an offense, no indictment or information is filed within the time limit required by section 3161(b) as extended by section 3161(h) of this chapter, such charge against that individual contained in such complaint shall be dismissed or otherwise dropped. In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice.

> **(2)** If a defendant is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h), the information or indictment shall be dismissed on motion of the defendant. The defendant shall have the burden of proof of supporting such motion but the Government shall have the burden of going forward with the evidence in connection with any exclusion of time under subparagraph 3161(h)(3). In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a

> reprosecution on the administration of this chapter and on
> the administration of justice. Failure of the defendant to
> move for dismissal prior to trial or entry of a plea of guilty
> or nolo contendere shall constitute a waiver of the right to
> dismissal under this section.

18 U.S.C. § 3162(a)(1), (2).

In United States v. Cano-Silva, the Tenth Circuit stated: "The fact that a violation has taken place is not alone sufficient for the application of the more severe sanction of dismissal with prejudice, which should be reserved for more egregious violations. Dismissal with prejudice is a strong message indeed, and one ill-suited to an isolated and inadvertent violation." 402 F.3d at 1035.

> While dismissal of the indictment is mandatory, the district court retains
> discretion to determine whether the indictment is dismissed with or without
> prejudice. In determining whether to dismiss with or without prejudice, the court
> "shall consider, among others, each of the following factors: the seriousness of the
> offense; the facts and circumstances of the case which led to the dismissal; and
> the impact of a reprosecution on the administration of this chapter and on the
> administration of justice."

United States v. Cano-Silva, 402 F.3d at 1034 (quoting 18 U.S.C. § 3162(a)(2))(citations omitted). The offense's seriousness must be weighed against the delay's severity. See United States v. Jones, 213 F.3d 1253, 1257 (10th Cir. 2000). In addition, the Supreme Court has suggested that the trial court should also consider, when determining whether to dismiss an indictment with prejudice, the prejudice to the defendant that a Speedy Trial violation delay has caused. See United States v. Taylor, 487 U.S. 326, 333-34 (1988).

"It is self-evident that dismissal with prejudice always sends a stronger message than dismissal without prejudice, and is more likely to induce salutary changes in procedures, reducing pretrial delays." United States v. Taylor, 487 U.S. at 342. "Preindictment delay that rises to a constitutional violation requires dismissal of the indictment with prejudice to retrial."

-39-

United States v. Johnson, 120 F.3d 1107, 1110 n.2 (10th Cir. 1997)(citing United States v. Marion, 404 U.S. 307, 324 (1971)).   "Where the delay is the result of intentional dilatory conduct, or a pattern of neglect on the part of the Government, dismissal with prejudice is the appropriate remedy."   United States v. Saltzman, 984 F.2d at 1093.   See United States v. Johnson, 120 F.3d at 1112 ("Ms. Johnson bears no responsibility for the circumstances leading to the Speedy Trial Act violation, and . . . she properly asserted her rights under the Act.").   In United States v. Johnson, one aspect of the Speedy Trial Act violations that troubled the Tenth Circuit was that, although the nature of the offense was relatively uncomplicated, the government delayed almost two years in indicting her.   See 120 F.3d at 1112.

In United States v. Perez-Alcatan, 376 F. Supp. 2d 1253 (D.N.M. 2005)(Browning, J.), the Court dismissed Perez-Alcatan's indictment without prejudice, because the United States, through inadvertent error, failed to indict him within thirty days of the arrest, as the Speedy Trial Act requires.   See 376 F. Supp. 2d at 1257.   Thirty days from Perez-Alcatan's arrest was May 26, 2005, and a grand jury indicted Perez-Alcatan on June 14, 2005.   See 376 F. Supp. 2d at 1254. Perez-Alcatan argued that the Court should dismiss his case with prejudice.   See 376 F. Supp. 2d at 1256.   He contended that his charged crime, re-entry into the United States after conviction for an aggravated felony, which carried a 16-level enhancement under the United States Sentencing Guidelines, was not a serious crime.   See 376 F. Supp. 2d at 1257.   His underlying aggravated felony, however, was voluntary manslaughter.   See 376 F. Supp. 2d at 1254.   The Court looked to the Sentencing Guidelines, stating that a 16-level enhancement is among the largest in the Sentencing Guidelines, which signals Congress' intent to consider the crime a serious one.   See 376 F. Supp. 2d at 1256.   Furthermore, the Court stated that the Guideline's lack of authorization for probation in such circumstances, and that Congress is hiring more border agents and

Assistant United States Attorneys to slow the flow of immigration and punish those who are already felons, indicates the crime's seriousness.  See 376 F. Supp. 2d at 1256.  The Court concluded that the seriousness of the offense favored dismissal without prejudice.  See 376 F. Supp. 2d at 1256.  The Court also held that the facts and circumstances that led to the delay did not favor dismissal with prejudice.  See 376 F. Supp. 2d at 1256-57.

While most immigration cases in which a defendant waives a preliminary hearing and detention hearing also involve a waiver of presentment to the grand jury, Perez-Alcatan chose to waive the detention hearing and the preliminary hearing, but not presentment to the grand jury. See 376 F. Supp. 2d at 1256.  As a result of the unique situation, the file cover in the United States Attorney's Office was annotated "waiver" and was incorrectly filed, causing untimely presentment.  376 F. Supp. 2d at 1257.  The Court further held that, because the delay-producing conduct was an administrative oversight, and was without bad faith, dismissing the case with prejudice would do little to prevent such future mistakes.  See 376 F. Supp. 2d at 1257.  The Court stated that the "United States continues to present its cases for indictment in a timely manner; dismissal with prejudice would not improve the professional efforts already in place in adhering to the Speedy Trial Act."  376 F. Supp. 2d at 1257.  The Court also stated that Perez-Alcatan had not alleged any actual prejudice in his ability to defend himself.  See 376 F. Supp. 2d at 1257.  The Court, therefore, dismissed the case without prejudice.  See 376 F. Supp. 2d at 1257.

## LAW REGARDING SEVERANCE

Under rule 8(b) of the Federal Rules of Criminal Procedure, multiple defendants may be tried jointly "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  "Joint

trials of defendants who are indicted together are preferred because 'they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" United States v. Hall, 473 F.3d 1295, 1301-02 (10th Cir. 2007)(quoting Zafiro v. United States, 506 U.S. 534, 537 (1993)).  Pursuant to rule 14(a) of the Federal Rules of Criminal Procedure, however, a court may order separate trials if joinder appears to prejudice a defendant.  See Fed. R. Crim. P. 14(a).  "Inasmuch as severance is a matter of discretion and not of right, the defendant must bear a heavy burden of showing real prejudice to his case."  United States v. Hall, 473 F.3d at 1302 (quoting United States v. McConnell, 749 F.2d 1441, 1444 (10th Cir. 1984)).

"Joint trials of defendants who are indicted together are preferred because 'they promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'"  United States v. Hall, 473 F.3d at 1301-02 (quoting Zafiro v. United States, 506 U.S. at 537).  Additionally, "a criminal defendant has no constitutional right to severance unless there is a strong showing of prejudice caused by a joint trial."  Cummings v. Evans, 161 F.3d at 619 (citing United States v. Youngpeter, 986 F.2d 349, 353 (10th Cir. 1993)).  The prejudice standard requires a showing of actual prejudice, not merely a showing that a defendant "may have a better chance of acquittal in separate trials."  United States v. Pursley, 474 F.3d 757, 766 (10th Cir. 2007).  To establish prejudice, a defendant must identify a "'specific trial right' that was compromised or show the jury was 'prevented . . . from making a reliable judgment about guilt or innocence.'"  United States v. Pursley, 474 F.3d at 766 (quoting United States v. Zafiro, 506 U.S. at 539).

A trial court that denies a request for severance will be reversed only where a defendant demonstrates an abuse of discretion.  See United States v. Pursley, 474 F.3d at 765.

### LAW REGARDING RULE 14(a) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

Rule 8(b) of the Federal Rules of Criminal Procedure allows grand juries to indict defendants together in the same charging instrument "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  Federal courts generally prefer that defendants who are indicted together be tried together.  See Zafiro v. United States, 506 U.S. at 537 (explaining the "preference in the federal system for joint trials of defendants who are indicted together").  As the Supreme Court has recognized, joint trials "promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'"  Zafiro v. United States, 506 U.S. at 537 (citing Richardson v. Marsh, 481 U.S. 200, 210 (1987)).

The rules envision, however, that circumstances may arise where joint trials would be inappropriate and, indeed, harmful to the accused's constitutional rights.  Under rule 14(a), the court may sever the trials of co-defendants when "the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government."  Fed. R. Crim. P. 14(a).  See Zafiro v. United States, 506 U.S. at 538 (using rule 14 as the standard for a severance); United States v. Cox, 934 F.2d 1114, 1119 (10th Cir. 1991)(applying rule 14 to set the standard for severance).  The decision to sever is "within the sound discretion of the trial court."  United States v. Cox, 934 F.2d at 1119 (citing United States v. Valentine, 706 F.2d 282, 289-90 (10th Cir. 1983)).  See United States v. Gant, 487 F.2d 30, 34 (10th Cir. 1973)(noting severance "is peculiarly within the discretion of the trial court")(citations omitted).

In exercising its discretion, the court must "weigh the prejudice resulting from a joint trial of co-defendants against the expense and inconvenience of separate trials."  United States v. Bailey, 952 F.2d 363, 365 (10th Cir. 1991)(quoting United States v. Cardall, 885 F.2d 665, 667-

68 (10th Cir. 1989). "Neither a mere allegation that defendant would have a better chance of acquittal in a separate trial, nor a complaint of the 'spillover effect' from the evidence that was overwhelming or more damaging against the co-defendant than that against the moving party is sufficient to warrant severance." United States v. Bailey, 952 F.2d at 365 (citation omitted). The only instance in which severance is appropriate is when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. at 539. On a rule 14(a) motion, the defendant bears the "heavy burden" of demonstrating prejudice from continued joinder. United States v. Bailey, 952 F.2d at 365 n. 4 (citing United States v. Jones, 707 F.2d 1169, 1171 (10th Cir. 1983); United States v. Petersen, 611 F.2d 1313, 1331 (10th Cir. 1979)).

## LAW REGARDING RULE 16

Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure provides:

**(E)** **Documents and Objects.**  Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:

  **(i)**    the item is material to preparing the defense;

  **(ii)**   the government intends to use the item it its case-in-chief at trial; or

  **(iii)**  the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E).  Although rule 16's language is permissive, it does not authorize "a blanket request to see the prosecution's file," and a defendant may not use the rule to engage in a "fishing expedition." United States v. Maranzino, 860 F.2d 981, 985-86 (10th Cir. 1988)(citing Jencks v. United States, 353 U.S. at 667)).  Rule 16 also does not obligate the United States to

"take action to discover information which it does not possess." United States v. Badonie, No. CR 03-2062 JB, 2005 WL 2312480, at *2 (D.N.M. Aug. 29, 2005)(Browning, J.)(quoting United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991))(internal quotation marks omitted). Nor is the United States required to secure information from third parties. See United States v. Gatto, 763 F.2d 1040, 1048 (9th Cir. 1985)(holding that rule 16 does not contain a due diligence element requiring a prosecutor to search for evidence not within the United States' possession, custody, or control).

Evidence is "material" under rule 16 if "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal." United States v. Graham, 83 F.3d 1466, 1474 (D.C. Cir. 1996)(internal quotation marks omitted)(quoting United States v. Lloyd, 992 F.2d 348, 351 (D.C. Cir. 1993))(internal quotation marks omitted). "Although the materiality standard is not a heavy burden, the Government need disclose rule 16 material only if it enables the defendant significantly to alter the quantum of proof in his favor." United States v. Graham, 83 F.3d at 1474 (alterations omitted)(citations omitted)(internal quotation marks omitted).

Rule 16(d)(2) "gives the district court broad discretion in imposing sanctions on a party who fails to comply with" Rule 16. United States v. Wicker, 848 F.2d 1059, 1060 (10th Cir. 1988).

> **(2)** **Failure to Comply.** If a party fails to comply with this rule, the court may:
>
> **(A)** order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;
>
> **(B)** grant a continuance;

**(C)**     prohibit that party from introducing the undisclosed evidence; or

**(D)**     enter any other order that is just under the circumstances.

Fed. R. Crim. P. 16(d)(2).

In selecting a proper sanction, a court should typically consider (1) the reasons the government delayed producing requested materials, including whether the government acted in bad faith; (2) the extent of prejudice to defendant as a result of the delay; and (3) the feasibility of curing the prejudice with a continuance.

United States v. Charley, 189 F.3d 1251, 1262 (10th Cir. 1999)(internal quotation marks omitted)(quoting United States v. Gonzales, 164 F.3d 1285, 1292 (10th Cir. 1999)).

## LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE UNDER THE DUE PROCESS CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA

The Due Process Clause requires that the United States disclose to the defendant any evidence that "is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963)("Brady"). The Supreme Court of the United State of America has extended the prosecution's disclosure obligation to include evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory. See Giglio v. United States, 405 U.S. 153 (1972)("Giglio"); Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [United States'] witnesses by showing bias and interest.'" (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)); United States v. Abello-Silva, 948 F.2d 1168, 1179 (10th Cir. 1991)("Impeachment evidence merits the same constitutional treatment as exculpatory evidence."). Finally, the Supreme Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory evidence:

"Regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government."  Kyles v. Whitley, 514 U.S. 419, 433 (1995)(quoting United States v. Bagley, 473 U.S. at 682).   See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.").

###### 1.      Material Exculpatory Evidence Under Brady.

"The Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant."  Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 823 (10th Cir. 1995).  Brady requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment."  Brady, 373 U.S. at 87.  "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  United States v. Bagley, 473 U.S. at 682.  See United States v. Allen, 603 F.3d 1202, 1215 (10th Cir. 2010).  A "reasonable probability," in turn, is a "probability sufficient to undermine confidence in the outcome."  United States v. Bagley, 473 U.S. at 682 (internal quotation marks omitted).  The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard."  United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994).  The Tenth Circuit has also stated that evidence is material if it "might meaningfully alter a defendant's choices before and during trial . . . including whether the defendant should testify."  Case v. Hatch, 731 F.3d 1015 (10th Cir. 2013)(quoting United States v. Burke, 571 F.3d 1048, 1054 (10th Cir. 2009))(internal quotation marks omitted).

"To be material under <u>Brady</u>, undisclosed information or evidence acquired through that information must be admissible."   <u>Banks v. Reynolds</u>, 54 F.3d 1508, 1521 n.34 (10th Cir. 1995)(quoting <u>United States v. Kennedy</u>, 890 F.2d at 1059).   The Supreme Court, in <u>Cone v. Bell</u>, 556 U.S. 449 (2009), noted:

> Although the Due Process Clause of the Fourteenth Amendment, as interpreted by <u>Brady</u>, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations.   <u>See Kyles</u>, 514 U.S. at 437 ("[T]he rule in <u>Bagley</u> (and, hence, in <u>Brady</u>) requires less of the prosecution than the <u>ABA Standards for Criminal Justice Prosecution Function and Defense Function</u> 3-3.11(a) (3d ed. 1993)").   <u>See also</u> <u>ABA Model Rules of Professional Conduct</u> 3.8(d) (2008)("The prosecutor in a criminal case shall" "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal").

<u>Cone v. Bell</u>, 556 U.S. at 470 n.15.

The government bears the burden of producing exculpatory materials; defendants have no obligation to first point out that such materials exist.   <u>See Kyles v. Whitley</u>, 514 U.S. at 437 (stating that the prosecution has an affirmative duty to disclose evidence, because "the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached."); <u>United States v. Deutsch</u>, 475 F.2d 55, 57 (5th Cir. 1973)(granting a mistrial for failure to produce personnel files of government witnesses), <u>overruled on other grounds by</u> <u>United States v. Henry</u>, 749 F.2d 203 (5th Cir. 1984); <u>United States v. Padilla</u>, No. CR 09-3598 JB, 2011 WL 1103876, at *6 (D.N.M. Mar. 14, 2011)(Browning, J.).   This obligation means that the United States must "volunteer exculpatory

evidence never requested, or requested only in a general way." Kyles v. Whitley, 514 U.S. at 433 (internal quotation marks omitted). Additionally, "[u]nder Brady, the good or bad faith of government agents is irrelevant." United States v. Quintana, 673 F.2d 296, 299 (10th Cir. 1982). "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence." Kyles v. Whitley, 514 U.S. at 439.

        2.      **Timing of the Disclosure Under Brady.**

    "The obligation of the prosecution to disclose evidence under Brady can vary depending on the phase of the criminal proceedings and the evidence at issue." United States v. Harmon, 871 F. Supp. 2d 1125, 1149 (D.N.M. 2012)(Browning, J.). As a general matter, "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in Brady v. Maryland." United States v. Burke, 571 F.3d at 1054. The Tenth Circuit has recognized, however, that "[i]t would eviscerate the purpose of the Brady rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial." United States v. Burke, 571 F.3d at 1054. "[T]he belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'" United States v. Burke, 571 F.3d at 1054. As the Tenth Circuit has stated:

> Where the district court concludes that the government was dilatory in its compliance with Brady, to the prejudice of the defendant, the district court has discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial.

United States v. Burke, 571 F.3d at 1054. Notably, "not every delay in disclosure of Brady material is necessarily prejudicial to the defense." United States v. Burke, 571 F.3d at 1056. "To justify imposition of a remedy, the defense must articulate to the district court the reasons

why the delay should be regarded as materially prejudicial." United States v. Burke, 571 F.3d at 1056.

Once a prosecutor's obligations under Brady have been triggered, however, they "continue[] throughout the judicial process." Douglas v. Workman, 560 F.3d at 1173. For instance, the prosecutor's obligation to disclose Brady material can arise during trial. See United States v. Headman, 594 F.3d at 1183 (10th Cir. 2010)("Although Brady claims typically arise from nondisclosure of facts that occurred before trial, they can be based on nondisclosure of favorable evidence (such as impeachment evidence) that is unavailable to the government until trial is underway."). The disclosure obligation continues even while a case is on direct appeal. See United States v. Headman, 594 F.3d at 1183; Smith v. Roberts, 115 F.3d 818, 819, 820 (10th Cir. 1997)(applying Brady to a claim that the prosecutor failed to disclose evidence received after trial but while the case was on direct appeal).

The Supreme Court has held that Brady does not require "preguilty plea disclosure of impeachment information." United States v. Ruiz, 536 U.S. 622, 629 (2002)("We must decide whether the Constitution requires that preguilty plea disclosure of impeachment information. We conclude that it does not."). The Supreme Court recognized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary." United States v. Ruiz, 536 U.S. at 632 (emphasis in original). The Supreme Court acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant." United States v. Ruiz, 536 U.S. at 632. The Supreme Court added:

> [T]his Court has found that the Constitution, in respect to a defendant's awareness
> of relevant circumstances, does not require complete knowledge of the relevant

circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor.

United States v. Ruiz, 536 U.S. at 630.  The Supreme Court explained that "a constitutional obligation to provide impeachment information during plea bargaining, prior to entry of a guilty plea, could seriously interfere with the Government's interest in securing those guilty pleas that are factually justified, desired by defendants, and help to secure the efficient administration of justice."  United States v. Ruiz, 536 U.S. at 630.  The Tenth Circuit has reiterated these principles from United States v. Ruiz:

> Johnson asserts that his plea was not knowing and voluntary because he did not know that he was giving up a claim that the government failed to disclose impeachment evidence.  The Supreme Court, however, foreclosed this exact argument in United States v. Ruiz, by holding that the government has no constitutional obligation to disclose impeachment information before a defendant enters into a plea agreement.  Ruiz emphasized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary."  Rather, "a waiver [is] knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances -- even though the defendant may not know the specific detailed consequences of invoking it."

United States v. Johnson, 369 F. App'x 905, 906 (10th Cir. 2010)(unpublished)(quoting United States v. Ruiz, 546 U.S. at 630).[8]

---

[8]United States v. Johnson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

The Tenth Circuit has held, however, that United States v. Ruiz does not apply to exculpatory evidence but rather applies only to impeachment evidence:

> Ruiz is distinguishable in at least two significant respects. First, the evidence withheld by the prosecution in this case is alleged to be exculpatory, and not just impeachment, evidence. Second, Ohiri's plea agreement was executed the day jury selection was to begin, and not before indictment in conjunction with a "fast-track" plea. Thus, the government should have disclosed all known exculpatory information at least by that point in the proceedings. By holding in Ruiz that the government committed no due process violation by requiring a defendant to waive her right to impeachment evidence before indictment in order to accept a fast-track plea, the Supreme Court did not imply that the government may avoid the consequence of a Brady violation if the defendant accepts an eleventh-hour plea agreement while ignorant of withheld exculpatory evidence in the government's possession.

United States v. Ohiri, 133 F. App'x 555, 562 (10th Cir. 2005)(unpublished). The Tenth Circuit qualified its holding in United States v. Ohiri, however, stating that the case presented "unusual circumstances." 133 F. App'x at 562.

The United States Courts of Appeals "have split on the issue whether Brady v. Maryland's restrictions apply to suppression hearings." United States v. Harmon, 871 F. Supp. 2d at 1151. In an unpublished opinion, the Tenth Circuit, without discussing whether Brady applies to a suppression hearing, rejected a defendant's argument that the prosecution violated Brady by failing to disclose impeachment evidence before a suppression hearing on the basis that the evidence was not impeachment evidence and not material. See United States v. Johnson, 117

---

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court comcludes that United States v. Johnson, United States v. Ohiri, 133 F. App'x 555 (10th Cir. 2005)(unpublished), Ortlieb v. Howery, 74 F. App'x 853 (10th Cir. 2003)(unpublished), United States v. Johnson, 117 F.3d 1429, 1997 WL 381926 (10th Cir. 1997)(unpublished table decision), and United States v. Shayesteh, 161 F.3d 19 (10th Cir. Oct. 6, 1998)(table opinion)(unpublished), have persuasive value with respect to a material issue, and will assist the court in its disposition of this Memorandum Opinion and Order.

F.3d 1429, 1997 WL 381926, at *3 (10th Cir. 1997)(unpublished table decision).  Specifically, the Tenth Circuit found:

> [D]isclosure of the evidence existing at the time of the hearing, even if impeaching, would not establish a reasonable probability that the outcome of the suppression hearing would have been different.  First, we question whether the evidence in question would have been admitted at the suppression hearing.  Even if it had been admitted, however, in light of [the defendant's] lack of truthfulness, our confidence in the result of the hearing has not been undermined.  Therefore, we hold that the evidence was not material, and that its nondisclosure by the prosecution does not constitute a Brady violation.

United States v. Johnson, 1997 WL 381926, at *3 (citation omitted).

The United States Court of Appeals for the District of Columbia Circuit has recognized that "it is hardly clear that the Brady line of Supreme Court cases applies to suppression hearings," because "[s]uppression hearings do not determine a defendant's guilt or punishment, yet Brady rests on the idea that due process is violated when the withheld evidence is 'material either to guilt or to punishment.'"  United States v. Bowie, 198 F.3d 905, 912 (D.C. Cir. 1999)(citation omitted).  Without deciding the issue, the United States Court of Appeals for the Sixth Circuit quoted with approval this language from United States v. Bowie.  See United States v. Bullock, 130 F. App'x 706, 723 (6th Cir. 2005)(unpublished)("Whether the suppression hearing might have come out the other way, however, is of questionable relevance to the Brady issues at stake here.").

The United States Court of Appeals for the Fifth Circuit and the United States Court of Appeals for the Ninth Circuit held, before the Supreme Court issued its opinion in United States v. Ruiz, that Brady applies to suppression hearings.  See United States v. Barton, 995 F.2d 931, 935 (9th Cir. 1993)("[W]e hold that the due process principles announced in Brady and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of

allegations in an affidavit for a search warrant."); Smith v. Black, 904 F.2d 950, 965-66 (5th Cir. 1990)("Timing is critical to proper Brady disclosure, and objections may be made under Brady to the state's failure to disclose material evidence prior to a suppression hearing."), vacated on other grounds, 503 U.S. 930 (1992).  The United States Court of Appeals for the Seventh Circuit held that, under its precedent and the law from other Courts of Appeals, it was not "obvious" for clear-error purposes that "Brady disclosures are required prior to suppression hearings."  United States v. Stott, 245 F.3d 890, 902 (7th Cir. 2001).  The Court has previously observed that, although the United States Courts of Appeals have split whether Brady applies to suppression hearings, "it is not likely that a prosecutor must disclose impeachment evidence before a suppression hearing in light of the Supreme Court's conclusion in United States v. Ruiz that a prosecutor does not have to disclose impeachment evidence before the entry of a guilty plea." United States v. Harmon, 871 F. Supp. 2d at 1151.  See United States v. Rodella, 2015 WL 711931 (D.N.M. 2015)(Browning, J.).

## LAW REGARDING THE JENCKS ACT

In Jencks v. United States, 353 U.S. 657, 667 (1957), the Supreme Court held that a "criminal action must be dismissed when the Government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at trial."  353 U.S. at 672.  In so holding, the Supreme Court recognized that the

> rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.

353 U.S. at 671.  The holding of Jencks v. United States was later codified into 18 U.S.C. § 3500.  See United States v. Kimoto, 588 F.3d 464, 475 (7th Cir. 2009)(explaining that, "the Jencks Act, 18 U.S.C. § 3500[,] . . . was enacted in response to the Supreme Court's holding in Jencks v. United States, 353 U.S. 657 . . . ").

Section 3500 of Title 18 of the United States Code provides:

**(a)**     In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

**(b)**     After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.  If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. §§ 3500(a)-(b).  "The Jencks Act requires the government to disclose to criminal defendants any statement made by a government witness that is 'in the possession of the United States' once that witness has testified."  United States v. Lujan, 530 F. Supp. 2d 1224, 1232 (2008)(Brack, J.)(quoting 18 U.S.C. §§ 3500(a) & (b)).  The Jencks Act "manifests the general statutory aim to restrict the use of such statements to impeachment."  Palermo v. United States, 360 U.S. 343, 349 (1959).  The Jencks Act's purpose is "not only to protect Government files from unwarranted disclosure but also to allow defendants materials usable for the purposes of impeachment."  United States v. Smaldone, 544 F.2d 456, 460 (10th Cir. 1976)(citing Palermo v. United States, 360 U.S. at 352).

The Jencks Act defines statements as:

     **(1)**     a written statement made by said witness and signed or otherwise adopted or approved by him;

     **(2)**     a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

     **(3)**     a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e).

The Tenth Circuit has held: "Interview notes could be 'statements' under the [Jencks] Act if they are substantially verbatim." United States v. Smith, 984 F.2d 1084, 1086 (10th Cir. 1993). At least one district court within the Tenth circuit has distinguished interview notes from reports that "embody only the agent's epitomization, interpretation, or impression of an interview," finding that the latter are not producible under the Jencks Act. United States v. Jackson, 850 F. Supp. 1481, 1508 (D. Kan. 1994)(Crow, J.). In United States v. Lujan, the Honorable Robert C. Brack, United States District Judge for the District of New Mexico, explained that rough interview notes may be discoverable under the Jencks Act, when a defendant makes "at least . . . a colorable claim that an investigator's discarded rough notes contained exculpatory evidence not included in any formal interview report provided to the defense." 530 F. Supp. 2d at 1266. Judge Brack went on to hold that, "[b]ecause the contents of rough interview notes may in some cases be subject to disclosure and because the potential impeachment value of the notes may not become evident until trial," the United States must preserve its rough interview notes "made by law enforcement agents during interview of potential witnesses" under 18 U.S.C. § 3500. 530 F. Supp. 2d at 1267. See United States v. Cooper, 283 F. Supp. 2d 1215, 1238 (D. Kan. 2003)(Crow, J.)(noting that rough interview notes

may be discoverable under the Jencks Act); United States v. Jackson, 850 F. Supp. at 1508-09 (finding that interview notes may be producible under the Jencks Act).

The defendant bears the initial burden of showing that particular materials qualify under the Jencks Act, but the defendant's burden is not heavy.  See United States v. Smaldone, 544 F.2d at 460 ("[T]he burden is on the defendant to show that particular materials qualify as 'Statements' and that they relate to the subject matter of the testimony of the witness.").  To satisfy this burden, the defendant need not prove that particular materials are within the scope of the Jencks Act, as the documents are not in the defendant's possession, but rather, "must plainly tender to the Court the question of the producibility of the document at a time when it is possible for the Court to order it produced, or to make an appropriate inquiry."  United States v. Smith, 984 F.2d at 1086 (quoting Ogden v. United States, 303 F.2d 724, 733 (9th Cir. 1962)).  The defendant's demand for documents under the Jencks Act must be sufficiently precise for a court to identify the requested statements.  See United States v. Smith, 984 F.2d at 1086.  For example, in United States v. Smith, the Tenth Circuit found that a defendant had met his burden and made a prima facie showing that a statement of a witness existed which may be producible under the Jencks Act when a government witness testified during the United States' case-in-chief that a government agent had interviewed her before she testified, and the defense counsel moved for production of the notes.  See 984 F.2d at 1085-86.  Once the defendant makes a prima facie showing that a witness statement exists that may be producible under the Jencks Act, the court should conduct a hearing or in camera review of the statement.  See 984 F.2d at 1086.

The Court has applied the Jencks Act to Drug Enforcement Agency agents' notes, generated from interviews with defendants, holding that the notes must be turned over to the defendants after the agents testify at trial.  See United States v. Goxcon-Chagal, 2012 WL

3249473, at *2, *6 (D.N.M. Aug. 4, 2012)(Browning, J.).  In United States v. Tarango, 760 F. Supp. 2d 1163 (D.N.M. 2009)(Browning, J.), the Court, applying 18 U.S.C. § 3500, held that the United States must produce Federal Bureau of Investigation ("FBI") agents' 302s, after the United States' witnesses testified at trial, to the extent those reports contained statements from witnesses who testified at trial.  See 760 F. Supp. 2d at 1164, 1167.

**ANALYSIS**

The Court will sever Gallegos from his co-Defendants case.  The case against Gallegos was already the subject of a state investigation, which the prosecutor for the state of New Mexico dismissed, and to delay his case until 2017 -- while the other Defendants get up to speed -- would not be favorable to Gallegos.  The case against Gallegos is also more contained that the case against the other eleven Defendants.  The Court will also declare complex the case against all Defendants except Gallegos.  Last, the Court will not compel discovery because discovery is currently being done in accordance with the Protective Order that was not yet in place when the Motion to Compel Discovery was filed.

## I.  THE COURT WILL SEVER GALLEGOS' CASE FROM THE CASE AGAINST HIS CO-DEFENDANTS.

The Court grants Gallegos' Motion and severs him from his co-Defendants.  "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."  Fed. R. Crim. P. 14(a).  The Court uses a three-part test, pursuant to rule 14(a), outlined in Gould, 2007 WL 1302587:

> First, it must determine whether the defenses presented are so antagonistic that they are mutually exclusive.  Second, because mutually antagonistic defenses are not prejudicial per se, a defendant must further show a serious risk that a joint trial

> would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence. Third, if the first two factors are met, the trial court exercises its discretion and weighs the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration.

Gould, 2007 WL 1302587, at *2 (discussing United States v. Pursley, 474 F.3d 757, 765 (10th

Cir. 2007)).  The Court first evaluates whether there are mutually antagonistic defenses.  See

Gould, 2007 WL 1302587, at *2.  The Court sees no indication that either of Gallegos or his co-

Defendants plan to present mutually antagonistic defenses.  See Reply at 9 ("[T]he issue is not so

much that defenses are antagonistic but that an individual accused of only one (or two) out of

244 overt acts will be unfairly treated by the jury.").

Second, the Court concludes that a joint trial would compromise Gallegos' right to a

speedy trial and would prevent the jury from making a reliable judgment about his guilt or

innocence.  See Gould 2007 WL 1302587, at *2.  When assessing Gallegos' speedy trial right,

the Court must assess both the Speedy Trial Act and the Constitution of the United States of

America.  The Speedy Trial Act states:

> In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.

18 U.S.C. § 3161(c)(1).  The Sixth Amendment to the Constitution states:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

U.S. Const. amend. VI.

Gallegos is similarly situated to the defendant in United States v. Byrd, 466 F. Supp. 2d 550 (S.D.N.Y. 2006)(Rakoff, J.), who was also indicted as a co-Defendant in a racketeering conspiracy involving death penalty eligible co-defendants.  See 466 F. Supp. 2d at 551.  The district court concluded that the defendant's severance was proper, because he "expressly invoked speedy trial rights" and the United States estimated that the co-defendants' trial would be delayed for many months, if not years.  United States v. Byrd, 466 F. Supp. 2d at 553.  See United States v. Magnotti, 51 F.R.D. 1, 1 (D.C. Conn. 1970)(Oakes, J.)("The factor of delay in the trial of one defendant is another that might well be taken into account.").  Gallegos is ready for trial, because his counsel prepared his state court defense and he "[is] basically being tried for the same thing here. . . ." in federal court.  See July Tr. at 10:13-18 (Ray).  If the Court does not sever, Gallegos will have to wait for discovery to be complete as to all Defendants, pre-trial motions as to all Defendants, and then, ultimately, the trial against him and all eleven of his co-Defendants.

Third, the Court grants Gallegos' Motion to Sever because a joint trial will prevent the jury from making a reliable judgment.  See Zafiro v. United States, 506 U.S. at 539 ("When many defendants are tried together in a complex case and they have markedly different degrees of culpability, the risk of prejudice that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence is heightened.").  See also United States v. Hack, 782 F.2d 862, 870 (10th Cir. 1986)("Neither a mere allegation that defendant would have a better chance of acquittal in a separate trial, nor a complaint of the 'spillover effect' from the evidence that was overwhelming or more damaging against the co-defendant than that against the moving party is sufficient to warrant severance.").  This risk is heightened here, however, where the co-Defendants have

"markedly different degrees of culpability."  Zafiro v. United States, 506 U.S. at 539.  Gallegos

has a markedly different degree of culpability, because, according to Gallegos, (i) he was

allegedly involved in a single incident; (ii) he has no adult criminal record to explain his desire to

join a prison gang; and (iii) the state investigators and prosecutors concluded that the incident

was not gang-related.[9]  See July Tr. at 8:8-12 (Ray).

Gallegos explained that after spending days or weeks listening to evidence against eleven

other Defendants, the jury would likely "lump all defendants together and potentially think of

them as a unit, rather than as individuals."  Reply at 7-8.  Although "claims of prejudice based on

'guilt by association,' do not in themselves warrant severance. . . . a defendant may suffer

transference of guilt merely due to his association with more culpable defendants and court will

not presume that jury instructions will adequately cure potential prejudice and will grant

severance." United States v. Stoecker, 920 F.Supp. 876, 886 (N.D. Ill. 1996)(Gettleman, J.).  See

United States v. Moreton, 25 F.R.D. 262, 263 (W.D.N.Y. 1960)(Henderson, J.)("The complex

involvement of the various defendants and the multiplicity of charges contained in the indictment

would render it difficult, if not impossible, for the court to adequately charge a jury as to the

applicable law with respect to each . . . defendant, and for the jury to apply that law intelligently

in reaching verdicts on the many charges involved.").

Fourth, the Court grants severance, because the prejudice Gallegos would suffer from a

lengthy pre-trial incarceration, and because the risk of losing a key witness testimony outweighs

any marginal harm to economy and expedition in judicial administration.  See Hutchinson, 573

F.3d at 1025.  While the United States stated that a separate trial would burden the Court, and

---

[9]The Court held a hearing on, and denied, Gallegos' Notice of Appeal of Detention Order
by Richard Gallegos, filed May 20, 2016 (Doc. 105) on July 8, 2016.  See Transcript of Hearing
at 116:9-11 (taken July 8, 2016)("July Detention Tr.")(Court).

that it has a significant burden to show beyond a reasonable doubt: (i) that a RICO conspiracy exists; (ii) that Gallegos murdered Giron; and (iii) that Gallegos murdered Giron in furtherance of the SNM enterprise, the Court nonetheless concludes that the harm Gallegos faces from a lengthy pre-trial incarceration when he is already prepared for trial outweighs the United States' burden.  See Response at 1, 15, 17-18.  "The time spent in jail awaiting trial has a detrimental impact on the individual.  It often means loss of a job; it disrupts family life; and it enforces idleness."  Barker v. Wingo, 407 U.S. at 532.

Gallegos' right to a full defense is also at risk, because he may be lose a key witness who will testify that Giron's murder did not further the RICO conspiracy.  See Reply at 6.  His witness suffers from cancer, and if trial is delayed while the United States produces discovery for the other two-hundred-plus overt acts, her health may deteriorate, putting her testimony at risk of being lost.  See Reply at 6.  The Supreme Court has noted that, "[i]f witnesses die or disappear during a delay, the prejudice is obvious."  Barker v. Wingo, 407 U.S. at 532.  The Court notes that losing a witness is the most serious prejudice possible, "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."  Barker v. Wingo, 407 U.S. at 532.

Holding a joint trial would certainly be more convenient for the Court.  The potential prejudice, however, outweighs this consideration.  The unusual circumstances of Gallegos' case -- he was ready to try the murder case in state court when the state dismissed that case -- gets Gallegos over the large hurdle of prejudice that is needed for a severance.

## II.  THE COURT WILL SET A NEW TRIAL DATE TO PROTECT GALLEGOS' RIGHTS.

The Court sets Gallegos' trial date for September 20, 2016.  See July Tr. at 31:21-25. First, September 20, 2016, is a date that the Court has available for a three to four-week trial, and

the parties have agreed that the date would not violate the Speedy Trial Act's deadlines.  See July Tr. at 31:1-32:25.  Second, Gallegos' counsel are confident that they do not need the discovery which the United States is disclosing and has disclosed, noting that the United States has only disclosed information they learned preparing for the state prosecution.  See July Tr. at 10:13-18 (Ray).  Appointed learned counsel supports Gallegos' conclusion that he is prepared for trial.  See July Tr. at 11:8-9 (Evans).  This second opinion, of a very experienced counsel, gives the Court great confidence that Gallegos is making the right decision.  The Court concludes that Gallegos is situated differently from his co-Defendants and the defendants in Gould, 2007 WL 1302587, at *2.  Although the Court agrees with the United States that Gallegos' trial will implicate the other co-Defendants that the indictment names, the Court concludes that the individual charges brought against Gallegos and his co-Defendants do not "involve many of the same issues and witnesses."  Gould, 2007 WL 1302587, at *2.  The Court therefore sets Gallegos' new trial date for September 20, 2016.

## III.   THE COURT WILL REQUIRE DISCOVERY IN ACCORDANCE WITH THE PROTECTIVE ORDER.

At the time that Gallegos filed his Motion to Compel Discovery, the United States was refusing to comply with its discovery requirements because a protective order was not yet in place.  See Response to Motion to Compel Discovery at 1-2.  Subsequent to the filing of the Motion to Compel Discovery, and the Response to the Motion to Compel Discovery, the Court entered the Protective Order.  See Protective Order at 1.  The Court will thus deny, without prejudice, Gallegos' Motion to Compel Discovery in light of the United States' continued compliance with its discovery obligations and the Protective Order.

## IV.   THE COURT WILL DECLARE COMPLEX THE CASE AGAINST ALL DEFENDANTS EXCEPT GALLEGOS.

The United States provided in its Motion to Declare Case Complex that "the government has received thousands of pages of discovery and is continuing to receive from the investigative agency thousands more."  Motion to Declare Case Complex at 1.  In addition, the discovery spans a long timeframe, considering that the United States anticipates having discovery from "all related Syndicato Nuevo Mexico cases once a protective order is in place.  The discovery in those cases to date consists of approximately 4,972 pages of discovery and six DVDs."  Motion to Declare Case Complex at 1.  Accordingly, "the joined parties believe that the ends of justice served by granting this motion outweigh the best interests of the public and the defendants in a speedy trial."  Motion to Declare Case Complex at 2.

In light of the massive amounts of discovery, the timeframe from which the discovery relates, and the high number of overt acts alleged to be committed by Defendants in furtherance of a "racketeering conspiracy," and also alleged to be "violent crimes in aid of racketeering," the Court agrees with the United States and the Defendants that joined the United States Motion to Declare Case Complex.  Motion to Declare Case Complex at 1.  Although the United States moved to withdraw its Motion to Declare Case Complex at the hearing, the Court believes that the United States was not indicating that it did not think the case was complex, but instead was simply reacting to the Court's grant of Gallegos' Motion to Sever because the United States wanted to try the case with all of the Defendants together.  The Court will thus grant the United States Motion to Declare Case Complex, declare the case complex, and authorize the ends-of-justice continuance pursuant to 18 U.S.C. § 3161(h)(7)(B)(ii).  See 18 U.S.C. § 3161(h)(7)(B)(ii)("The factors, among others, which a judge shall consider in determining whether to grant a continuance under subparagraph (A) of this paragraph in any case are . . . (ii)

Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section . . . .").

**IT IS ORDERED** that: (i) Defendant Richard Gallegos' Motion For a Definite Trial Setting, Severance, and For Scheduling Conference, filed May 20, 2016 (Doc. 106), is granted; (ii) Plaintiff United States of America's attempt at the July 8, 2016, hearing to withdraw its Motion to Declare Case Complex is denied, and both the United States' Motion to Declare Case Complex, filed May 23, 2016 (Doc. 107), and the request of the Defendants other than Gallegos to declare the case complex at the July 8, 2016, hearing, are granted; and (iii) Gallegos' Motion to Compel Discovery, filed May 26, 2016 (Doc. 114), is denied without prejudice to revisit after the United States has an opportunity to produce now that the Protective Order, filed June 17, 2016 (Doc. 146), is in place.   Defendant Richard Gallegos' case is severed from his co-Defendants' case, and his trial is set for September 20, 2016.   His co-Defendants case has been declared complex, and their trial is set for July 10, 2017.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Maria Y. Armijo
Randy M. Castellano
Matthew M. Beck
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Theresa M. Duncan
Theresa M. Duncan, Esq.
Albuquerque, New Mexico

-- and --

Marc M. Lowry
Rothstein, Donatelli, Hughes,
  Dahlstrom & Schoenburg, LLP
Albuquerque, New Mexico

    *Attorneys for the Defendant Anthony Ray Baca*

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

-- and --

Christopher W. Adams
Charleston, South Carolina

    *Attorneys for the Defendant Christopher Garcia*

Todd Bruce Hotchkiss
Todd B. Hotchkiss, Attorney at Law, LLC
Albuquerque, New Mexico

    *Attorney for the Defendant Manuel Jacob Armijo*

John C. Anderson
Holland & Hart, LLP
Santa Fe, New Mexico

      *Attorney for the Defendant Frederico Munoz*

Donald Kochersberger
Business Law Southwest, LLC
Albuquerque, New Mexico

      *Attorney for the Defendant Sergio Loya Rodriguez*

Barrett (Barry) George Porter
Burgess and Porter Law, LLC
Albuquerque, New Mexico

      *Attorney for the Defendant Manuel Benito*

Diego R. Esquibel
The Barnett Law Firm
Albuquerque, New Mexico

      *Attorney for the Defendant Vincent Garduño*

Marc Grano
Grano Law Offices
Las Vegas, New Mexico

      *Attorney for the Defendant Mandel Lon Parker*

Ahmad Assed
Law Office of Ahmad Assed
Albuquerque, New Mexico

-- and --

Daniel J. Tallon
Daniel J. Tallon, Attorney at Law
Placitas, New Mexico

      *Attorneys for the Defendant Daniel Archuleta*

Richard Jewkes
Richard Jewkes
El Paso, Texas

-- and --

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

    *Attorneys for the Defendant Daniel Sanchez*

Gregory M. Acton
Albuquerque, New Mexico

-- and --

Marcia A. Morrissey
Santa Monica, California

    *Attorneys for the  Defendant Anthony Cordova*

David Evans

-- and --

Marshall J. Ray
Law Offices of Marshall J. Ray LLC
Albuquerque, New Mexico

-- and --

Kari T. Morrissey
Law Office of Kari Morrissey
Albuquerque, New Mexico

    *Attorneys for the Defendant Richard Gallegos*