# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                          No. CR 15-4268 JB

ANGEL DELEON; JOE LAWRENCE
GALLEGOS; EDWARD TROUP, a.k.a.
"Huero Troup;" LEONARD LUJAN;
BILLY GARCIA, a.k.a. "Wild Bill;"
EUGENE MARTINEZ, a.k.a. "Little
Guero;" ALLEN PATTERSON;
CHRISTOPHER CHAVEZ, a.k.a. "Critter;"
JAVIER ALONSO, a.k.a. "Wineo;"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun;" BENJAMIN CLARK, a.k.a.
"Cyclone;" RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper;"
JERRY MONTOYA, a.k.a. "Boxer;"
MARIO RODRIGUEZ, a.k.a. "Blue;"
TIMOTHY MARTINEZ, a.k.a. "Red;"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts;" DANIEL SANCHEZ,
a.k.a. "Dan Dan;" GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma;" CONRAD
VILLEGAS, a.k.a. "Chitmon;" ANTHONY
RAY BACA, a.k.a. "Pup;" ROBERT
MARTINEZ, a.k.a. "Baby Rob;" ROY
PAUL MARTINEZ, a.k.a. "Shadow;"
CHRISTOPHER GARCIA; CARLOS
HERRERA, a.k.a. "Lazy;" RUDY PEREZ,
a.k.a. "Ru Dog;" ANDREW GALLEGOS,
a.k.a. "Smiley;" SANTOS GONZALEZ;
PAUL RIVERA and SHAUNA
GUTIERREZ,

     Defendants.

-- and --

UNITED STATES OF AMERICA,

Plaintiff,

vs.                                                                           No. CR 15-4269 JB

MAURICIO VARELA, a.k.a "Hog Nuts;"
DANIEL CALBERT, a.k.a "Spider;"
ROBERT MARTINEZ, a.k.a. "Baby Rob"
and MARIO RODRIGUEZ, a.k.a. "Blue,"

      Defendants.

-- and --

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                           No. CR 15-4275 JB

CHRISTOPHER GARCIA,

      Defendant.

-- and --

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                           No. CR 16-1613 JB

ANTHONY RAY BACA, a.k.a. "Pup;"
CHRISTOPHER GARCIA, MANUEL
JACOB ARMIJO, a.k.a. "Big Jake;"
FREDERICO MUNOZ, a.k.a. "Playboy;"
SERGIO LOYA RODRIGUEZ, a.k.a.
"Churro;" MANUEL BENITO, a.k.a.
"Panther;" VINCENT GARDUÑO a.k.a.
"Fatal; MANDEL LON PARKER, a.k.a.
"Chuco;" DANIEL ARCHULETA, a.k.a.
"Smurf;" DANIEL SANCHEZ, a.k.a. "Dan
Dan;" ANTHONY CORDOVA, a.k.a.
"Antone" and RICHARD GALLEGOS,
a.k.a. "Dopey,"

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Email from Royce Namoca (USMS) to K'Aun Wild (dated November 10, 2016), filed November 23, 2016 (Doc. 264)("Namoca Email"); and (ii) Anthony Ray Baca's Opposition to Proposed Restrictions on his Participation and Inclusion in Court Proceedings, filed November 24, 2016 (Doc. 267 in United States v. Baca, No. CR 16-1613 JB (D.N.M.)(Browning, J.))("Baca's Notice").   Defendants Daniel Sanchez, Jerry Montoya, Carlos Herrera, Rudy Perez, Edward Troup, Joe Gallegos, and Santos Gonzalez have joined in support of Baca's Notice.   See Baca's Notice at 1 n.1 (Sanchez and Montoya); Notice of Joinder of Defendant, Anthony Ray Baca's Opposition to Proposed Courtroom Restrictions (Doc. 777), filed November 28, 2016 (Doc. 779 in United States v. DeLeon, No. CR 15-4268 JB (D.N.M.)(Browning, J.))(Herrera); Notice of Joinder in Defendant Anthony Ray Baca's Opposition to Courtroom Restrictions [Doc. 777], filed November 28, 2016 (Doc. 781 in United States v. DeLeon, No. CR 15-4268 JB)(Perez); Notice of Joinder of Defendant Edward Troup in Anthony Ray Baca's Opposition to Proposed Courtroom Restrictions (Doc. 777), filed November 28, 2016 (Doc. 782 in United States v. DeLeon, No. CR 15-4268 JB)(Troup); Notice of Joinder of Defendant Joe Gallegos to Anthony Ray Baca's Opposition to Proposed Courtroom Restrictions (Doc. 777), filed November 28, 2016 (Doc. 783 in United States v. DeLeon, No. CR 15-4268 JB)(J. Gallegos); Notice of Joinder of Defendant Santos Gonzalez to Anthony Ray Baca's Opposition to Proposed Courtroom Restrictions (Doc. 777), filed November 29, 2016 (Doc. 785 in United States v. DeLeon, No. CR 15-4268 JB)(Gonzalez).   The Court held an evidentiary hearing on November 28, 2016.   The primary issues are: (i) whether the United States Marshals Service's proposal to cordon off Defendant Anthony Ray Baca from his fellow Defendants in the courtroom -- so as to restrict Baca from

covertly communicating with the other Defendants -- violates Baca's rights under the First, Fifth, and Sixth Amendments to the Constitution of the United States of America; (ii) whether the USMS' proposal to bar all communication amongst the Defendants during court proceedings and during breaks is an appropriate restriction in light of alleged security concerns; and (iii) whether the USMS' assumption of unilateral authority to remove Defendants caught speaking with one another from the courtroom is an appropriate action by the USMS, or whether some Court order is instead required to authorize such removal.   Because the Court concludes that USMS' proposed restrictions of Baca and the other Defendants in the courtroom are not necessary at the present time, and will unreasonably restrict their participation in these hearings on matters which pertain to the charges Plaintiff United States of America has brought against them, the Court will sustain the objections in Baca's Notice.   In addition to not imposing a partition in front of Baca, the Court will also not order into effect the USMS' proposed restriction of communication amongst Defendants during both proceedings and breaks.   With respect to the USMS' third restriction -- immediate removal from the courtroom upon communication with another Defendant -- the Court retains final approval of such removal, but will defer to the USMS on a case-by-case basis.

## **FACTUAL BACKGROUND**

To provide context, the Court takes its recitation of facts from the Redacted Grand Jury Indictment in United States v. Baca, No. CR 16-1613 JB, filed Apr. 23, 2016 (Doc. 2)("Indictment").   The Court does not adopt the facts as findings or truth.   Syndicato de Nuevo Mexico ("SNM") is a prison gang that controls drug distribution and other illegal activities within the New Mexico prison system, and is similarly involved in narcotics trafficking occurring outside of the prison system.   See Indictment ¶ 3, at 2.   It is alleged that SNM's

leaders, members, prospects, and associates constitute an enterprise as is defined under 18 U.S.C. §§ 1959(b)(2) and 1961(4), which provide that an enterprise constitutes a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce.  See Indictment ¶ 2, at 2.  The Indictment thus provides that SNM constitutes "an ongoing organization whose members/prospects/associates function[] as a continuing unit for the common purpose of achieving the objectives of the enterprise."   Indictment ¶ 2, at 2. Accordingly, the Indictment alleges that Defendants Anthony Ray Baca, Christopher Garcia, Manuel Jacob Armijo, Frederico Munoz, Sergio Loya Rodriguez, Manuel Benito, Vincent Garduño, Mandel Lon Parker, Daniel Archuleta, Daniel Sanchez, Anthony Cordova, and Richard Gallegos, committed: (i) Racketeering Conspiracy under 18 U.S.C. § 1962(d); (ii) Violent Crimes in Aid of Racketeering (Murder) under 18 U.S.C. § 1959(a)(1); (iii) Aiding and Abetting under 18 U.S.C. § 2; and (iv) Violent Crimes in Aid of Racketeering (Conspiracy to Murder) under 18 U.S.C. § 1959(a)(5).  See Indictment at 1.

SNM was formed after the February, 1980 prison riots at the New Mexico Penitentiary in Santa Fe, New Mexico.  See Indictment ¶ 3, at 2.  During the prison riot, thirty-three inmates were killed; more than 200 inmates were injured; and certain inmates held hostage, assaulted, and raped twelve correctional officers.  See Indictment ¶ 3, at 2.  Since the prison riot, SNM has expanded throughout the New Mexican prison system and has an estimated 250 members.  See Indictment ¶ 4, at 2-3.  SNM's main goals include controlling and profiting from narcotics trafficking.  See Indictment ¶ 5, at 3.  SNM members are often expected to confront and attack suspected informants, cooperating witnesses, homosexuals, and sex offenders.  See Indictment ¶ 8, at 4.

Despite prison officials' close scrutiny, SNM leaders communicate orders to members and associates throughout and outside of the prison system by a variety of means, including secret notes, coded letters, and messages that complicit visitors deliver. See Indictment ¶ 5, at 3. SNM members are expected to remain loyal to the gang when they are released from prison. See Indictment ¶ 5, at 3. SNM disciplines members who fail to show continued loyalty in a variety of ways, including assault and murder. See Indictment ¶ 5, at 3. SNM members might display affiliation and loyalty with the Zia symbol,[1] the letters "SNM", the letter "S," and the numbers "19" and "505"[2] in tattoos, graffiti, drawings, and on clothing. Indictment ¶ 9, at 4-5.

SNM also operates outside of the prison system in the streets of New Mexico, influencing and intimidating smaller New Mexico gangs to establish a larger network for its illegal activities. See Indictment  6, at 3. Accordingly, SNM does not always have to use violence to assert its control outside of prison, because the smaller gangs often fear that SNM members will assault or kill their compatriots should they be incarcerated. See Indictment  6, at 3. SNM thus retains a large membership and powerful reputation which subdues rival gangs and prevents victims and witnesses from assisting authorities. See Indictment  ¶ 8, at 4.

The Indictment alleges that SNM engages in violence

to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, to gain notoriety and show its superiority over others, and to send a message to others that it is strong, powerful, and not to be provoked.

---

[1]The Zia sun symbol, originating as the sun symbol of the Zia Pueblo, now serves as the centerpiece of the New Mexico state flag. See The Zia Sun Symbol, New Mexico History, available at http://newmexicohistory.org/multimedia/videos/the-zia-sun-symbol (last accessed October 13, 2016).

[2]Until October 7, 2007, the "505" area code covered the entire state of New Mexico, and currently serves the Albuquerque, Santa Fe, and Farmington metropolitan areas. See Area Code 505, available at https://en.wikipedia.org/wiki/Area_code_505 (last accessed October 13, 2016).

Indictment ¶ 8, at 4.  SNM "members and associates commit, conspire, attempt, and threaten to commit acts of violence, including murders and assaults to protect and expand the enterprise's criminal operations." Indictment ¶ 13(a), at 6.  If the gang had a weak reputation, it would lose its membership and dissolve.  See Indictment ¶ 8, at 4.

For fuller context, there are four cases before the Court related to SNM's alleged criminal activity, coming in response to the Federal Bureau of Investigation's renewed investigation of SNM after threats of murder against high-ranking New Mexico Corrections Department Officials.  In this case, where Baca's Notice was filed -- United States v. Baca, No. CR 16-1613 JB, the Indictment names twelve defendants, all alleged SNM members or associates, who in part have allegedly engaged in a racketeering conspiracy, under 18 U.S.C. § 1962(d).  See Indictment, passim.  The United States has also named thirty Defendants in a different indictment, all alleged SNM members or associates, who in part have allegedly engaged in Violent Crimes in Aid of Racketeering activity, under 18 U.S.C. § 1959.  See United States v. DeLeon, No. CR 15-4268 JB.  There is also a prosecution of one Defendant for drug crimes, see United States v. Garcia, No. CR 15-4275 JB (D.N.M.)(Browning, J.), and of four defendants for further alleged conduct constituting Violent Crimes in Aid of Racketeering activity, under 18 U.S.C. § 1959, see United States v. Varela, No. CR 15-4269 JB (D.N.M.)(Browning, J.).

## PROCEDURAL BACKGROUND

On November 10, 2016, United States Marshall Royce Namoca sent to Ms. K'Aun Wild, the Court's Courtroom Deputy Clerk, an email entitled "Security Change -- SNM Conspiracy Hearings."  Namoca Email at 2.[3]  The Namoca Email states, in relevant part:

K'Aun,

---

[3]The Namoca email has internal page numbers that are different than the CM/ECF page number.  The court will use the CM/ECF numbers.

On 11/08/2016, I spoke with Marshall Candelaria and Chief Deputy US Marshal Ramos . . . .   We're proposing a few courtroom security changes for the mass appearance of defendants associated with the SNM conspiracy.  We're proposing and/or instituting three changes to augment the security in the courtroom.  Here are the three changes:

> [sic] We're wanting to create a partition/divider around Defendant Anthony Baca.  Baca has been identified as the leader or highest ranking member in the SNM prison gang conspiracy.  This partition/divider would limit Baca's line of sight to primarily the Judge and his attorney's [sic].  Baca's interactions with his codefendants would also be limited during the hearing; he won't be able to see them.  There are concerns that Baca's interactions and/or communications with his codefendants may contain coded messages that are nefarious in nature.  These potential coded messages may contain information that is unknown to most lay persons.  The USMS is tasked with ensuring that all patrons in the courtroom are safe and secure while maintaining the integrity of the judicial process.  Our intent is to limit any/all surreptitious communications that can present a danger to all patrons in attendance.  This can include possible communications about security procedures and relaying communications that may cause harm to others.

- The USMS will be limiting all communications/talking throughout the hearings (even during breaks) between defendants involved with the SNM prison gang conspiracy.  It appears unnecessary communications/talking between defendants has escalated especially during breaks in the hearings.  The USMS is tasked with maintaining the integrity of the judicial process.  Please notify defense counsel that the USMS will be limiting unnecessary communications between defendants for all future hearings involving the SNM conspiracy.

- Defendants who continue to communicate with other defendants and refuse to comply with orders from USMS personnel will be removed from the hearing.  Prior to removal, a warning will be given to the court that a defendant is unnecessarily talking to other defendants and refusing to comply with orders from USMS personnel.  Please notify defense counsel that the USMS will remove their client from the courtroom should they become disruptive.

Overall, we need to slightly modify our security procedures to deal with certain complexities involved with the SNM prison gang.  We're still learning and gathering information related to the SNM prison gang and the defendants charged

in this conspiracy; for both criminal cases. We want to continue to maintain the integrity of the judicial process, and ensure that all patrons in the courtroom as safe.

Let me know what you think about the correspondence above. I can memorialize it on a letterhead if it needs to be sent to defense counsel. I have to step out today, however, call my cell if you have any questions/concerns. Thank you.

Royce Namoca

Namoca Email at 2.

On November 23, 2016, the Court filed a letter via CM/ECF to all counsel of record in United States v. DeLeon, No. CR 15-4268 JB; United States v. Varela, No. CR 15-4269 JB; United States v. Garcia, No. CR 15-4275 JB; and United States v. Baca, No. CR 16-1613 JB. See United States v. DeLeon, No. CR 15-4268 JB, Letter from the Court to Counsel of Record at 1 (dated November 23, 2016), filed November 23, 2016 (Doc. 774); United States v. Varela, No. CR 15-4269 JB, Letter from the Court to Counsel of Record at 1 (dated November 23, 2016), filed November 23, 2016 (Doc. 88); United States v. Garcia, No. CR 15-4275 JB, Letter from the Court to Counsel of Record at 1 (dated November 23, 2016), filed November 23, 2016 (Doc. 137); United States v. Baca, No. CR 16-1613 JB, Letter from the Court to Counsel of Record at 1 (dated November 23, 2016), filed November 23, 2016 (Doc. 264)(collectively, "The Court's Letter"). The Court's Letter states: "Please find attached a memorandum that the United States Marshall Service sent to the Court. The Court proposes to follow these recommendations at the upcoming hearing unless the Court hears otherwise from you." Court's Letter at 1.

## 1. **The May 27, 2016, Memorandum Opinion and Order.**

On May 27, 2016, the Court issued a Memorandum Opinion and Order addressing, in part, the probable absence of one of the Defendants at a hearing set for June 2, 2016. See United States v. DeLeon, 2016 WL 3124632, at *1-2 (D.N.M. 2016)(Browning, J.). That Defendant

was "in Los Angeles, California, being evaluated for competency."  United States v. DeLeon,

2016 WL 3124632, at *2.  The Court globally held that Defendants, and not counsel, could seek

excusal from in-person attendance at the June 2, 2016, hearing.  See United States v. DeLeon,

2016 WL 3124632, at *1.

> Any Defendant seeking excusal must, however, seek and state the position of each
> or all Defendants.  In addition, all counsel will need to certify to the Court, before
> any excusals are granted, that the June 2, 2016, substantive motion hearing --
> involving a discovery dispute that the Court understands is very important to the
> Defendants -- is merely an administrative conference unrelated to any issues at
> trial, and is only a conference or hearing on a question of law.  The parties should
> be advised that the Court will, at the end of the hearing, ask whether there are any
> other issues that the Court needs to address or any other matters with which the
> Court can help the parties before the Court recesses.

United States v. DeLeon, 2016 WL 3124632 at *1.  The Court further explained that,

> if the Court and the parties are going to go to such great lengths to get together for
> the status conference that the Defendants have requested and for this motions
> hearing that the Court has set, the Court and the parties should maximize the use
> of time to discuss and decide as much as possible.

United States v. DeLeon, 2016 WL 3124632 at *1.  The Court also cautioned, however, that

> [t]he Defendants must decide what is in their best interests.  The Court is . . .
> skeptical that the counsel can take good notes and then explain fully what
> occurred at the hearing to the clients. . . .  Getting the decision "right," i.e. getting
> the law and facts correct and accurate, is obviously important, but getting it right
> is only one-half of a judge's task, particularly a trial judge's job.  The other half of
> dispensing justice is the appearance of justice -- did the Court listen to the
> litigant's arguments, wrestle with those arguments, and deal with them in an
> intellectually honest way.  Americans are pretty good about accepting a judicial
> decision -- even an adverse one -- and cease obsessing over an issue, if they are
> convinced that an authority figure has dressed up, taken them seriously, listened
> patiently and politely, wrestled with the arguments, addressed them, and
> accurately stated the facts.

States v. DeLeon, 2016 WL 3124632, at *1 (citing A.M. ex rel. Youngers v. New Mexico Dept.

of Health, 117 F. Supp. 3d 1220, 1253 n.14 (D.N.M. 2015)(Browning, J.))(internal quotation

marks omitted).  Accordingly, the Court concluded that it was hard-pressed to agree that the

Defendants could fully appreciate that the Court was administering justice if their only interaction with the Court came from counsel's notes.  See States v. DeLeon, 2016 WL 3124632, at *1.

> **2.      The June 2, 2016, Hearing.**

The Court held a hearing on June 2, 2016.  See Transcript of Hearing, taken June 2, 2016 ("June Tr.").  At the June 2, 2016, hearing, in relevant part, the Court addressed the Defendant's concerns regarding the use of a black box[4] for their handcuffs in the courtroom.  See June Tr. at 48:7-18 (Villa).  Various Defendants complained of discomfort and requested an accommodation by the Court.  See Tr. at 48:7-18 (Villa).  The Court sympathized, but concluded that

> I'd like to -- you know, let's build some trust with each other that we can do [these hearings] together.  And if I start making individual exceptions, again, it's going to be difficult to put this together.  I've got to balance the concern of the marshals.  And the United States, obviously, didn't want this to occur, so I'm trying to balance a lot of stuff here.  If we can build up confidence that we can do these things and get through them, and everybody can do them, maybe we can start, you know, making more accommodations.

Tr. at 51:11-23 (Court).

> **3.      The October 4, 2016, Hearing.**

The Court held a hearing on October 4, 2016.  See Tr. of Hearing, taken October 4, 2016 ("Oct. Tr.").  At the hearing, the Court stated:

> All right.  The U.S. Marshals have requested that the attorneys not speak to other defendants.  You, of course, can speak to your clients.  But they request, for security purposes, that you not speak to other defendants during the course of this hearing.  Anybody got a great problem with that request?  Everybody can abide by it?  All right.

Oct. Tr. at 9:12-19 (Court).  At that time, no party objected.  See Oct. Tr. at 9:12-19

---

[4]Also known as a security box, these black boxes cover the key holes on a set of handcuffs, consequently lessening a defendant's range of motion at the same time.  See Restraining Devices § 9.1, USMS Prisoner Operations Directives (dated June 1, 2010), https://www.usmarshals.gov/foia/directives/prisoner_ops/restraining_devices.pdf.

(Court).

### 4.    Baca's Notice.

Baca objected to both the Namoca Email and the Court's intent to comply with the Namoca Email, as the Court memorialized in the Court's Letter, on November 27, 2016.  See Baca's Notice at 1.  Baca contends that

> [i]mplementation of the proposed restrictions as outlined in the Court's letter dated November 23, 2016 would violate Mr. Baca's rights under the First, Fifth, and Sixth Amendments to the United States Constitution as they are without any factual justification.  The USMS's request to impose such unprecedented restrictions on Mr. Baca's participation in court proceedings, as well as his interactions with his co-defendants and their counsel, are based on rank speculation, and therefore are not justified at all.

Baca's Notice at 1.  Baca requests that, because there is "no evidence whatsoever that Mr. Baca has sent his co-defendants coded messages during past hearings or that he has attempted to communicate with his co-defendants about court security procedures," the Court reject the three proposed restrictions that the Namoca Email provides.  Baca's Notice at 1-2.

Baca's Notice, then, outlines the factual history which he alleges has given rise to the USMS' proposed restrictions.  See Baca's Notice at 2.  According to Baca, "the restrictions are based solely on allegations that the defendants in this case belong to the SNM prison gang and that Mr. Baca is the purported leader of that gang."  Baca's Notice at 2.  Baca thus explains that, "[f]irst, the USMS desires to single out Mr. Baca by erecting a physical barrier around Mr. Baca and his attorneys such that they will be unable to see or communicate with co-defendants and their counsel during court proceedings."  Baca's Notice at 2.  Baca then provides that such barrier is allegedly to "limit any/all surreptitious communications that can present danger to all patrons in attendance."  Baca's Notice at 2 (citing Namoca Email at 1).  Baca, however, argues that the USMS has not alleged that Baca has engaged in such communication, or posed danger to

persons in the courtroom.  See Baca's Notice at 2-3.  Next, Baca addresses the second proposed restriction, whereby "the USMS seeks to limit communications between defendants not only while court is in session, but also during breaks," and explains that the alleged in-break communications that the USMS has observed at past hearings -- which "will somehow threaten the integrity of the judicial process" -- cannot form the basis for this restriction where the USMS has not even disclosed their content and consequence.  See Baca's Notice at 3 (internal quotation marks omitted).  Further, as Baca argues, the USMS has "had an overwhelming presence in the Courtroom . . . and not a single incidence of such conduct has been produced."  Baca's Notice at 3.  Last, Baca introduces the third restriction, by which the USMS "will remove from the courtroom any defendant who communicates with co-defendants after the USMS warns him [or her] not to or otherwise refuses to comply with orders from the USMS."  Baca's Notice at 3.  Baca takes issue, primarily, with this restriction in that it is unclear whether the USMS will seek Court approval before removal.  See Baca's Notice at 3.

Turning to Baca's substantive argument against the imposition of the aforementioned restrictions, Baca essentially argues that they "are unfair, oppressive, and violate Mr. Baca's rights to due process of law, a fair trial, the presumption of innocence, the effective assistance of counsel, as well as his First Amendment rights."  Baca's Notice at 3-4.  Such violations are unjustified in any sense, Baca argues, because the USMS neglects to point "to a single instance of conduct that would justify such unprecedented restrictions on a defendant's right to participate in criminal proceedings."  Baca's Notice at 4.  Baca then compares the USMS' proposed restrictions to the old English Star Chamber[5] and then begins argument specifically contrary to

---

[5]The Star Chamber was an English court "made up of Privy Counsellors, as well as common-law judges, and it supplemented the activities of the common-law and equity courts in both civil and criminal matters."  Star Chamber, Wikipedia (last accessed January 12, 2016),

the USMS' proposal to erect a physical barrier to conceal Baca from the rest of the courtroom. See Baca's Notice at 4 (citing Ullmann v. United States, 350 U.S. 422, 428 (1956)(observing that the historical abuses of the Star Chamber in England gave rise to the creation of the Fifth Amendment protections in the United States)).

Baca tackles the physical barrier restriction by first arguing that he has been unable to find a case "in which a court has authorized such an oppressive restriction, which is aimed at stigmatizing Mr. Baca and eroding his dignity as a human being." Baca's Notice at 4-5. Baca surmises that no such case exists, because the barrier prevents Baca from observing his co-Defendants and their counsel, prevents Baca's counsel from observing the courtroom, and sends an unwarranted message to the public that the Court considers Baca to be a dangerous individual whom the Court must segregate from his co-Defendants for everyone's safety. See Baca's Notice at 5. Baca, thus, primarily asserts that "the First and Sixth Amendments protect the public's right to visibly observe Mr. Baca inside the Courtroom, as well as Mr. Baca's right to be so observed." Baca's Notice at 5. Because, as Baca provides, the right to a public trial under the

---

https://en.wikipedia.org/wiki/Star_Chamber.

> Another function of the Court of Star Chamber was to act like a court of equity, which could impose punishment for actions which were deemed to be morally reprehensible but were not in violation of the letter of the law. This gave the Star Chamber great flexibility, as it could punish defendants for any action which the court felt should be unlawful, even when in fact it was technically lawful.

> However, this meant that the justice meted out by the Star Chamber could be very arbitrary and subjective, and it enabled the court to be used later on in its history as an instrument of oppression rather than for the purpose of justice for which it was intended.

Star Chamber, Wikipedia (last accessed January 12, 2016), https://en.wikipedia.org/wiki/Star_Chamber.

First and Sixth Amendment is applicable in pretrial settings, Baca has a right "to demand public participation in the judicial process."   Baca's Notice at 6.   Baca then cites Richmond Newspapers, Inc. v Virginia, 448 U.S. 555 (1980), for the proposition that "Mr. Baca has a right to be seen by the public, just as the public has a right to see Mr. Baca, so that all concerned can ensure that Mr. Baca is being treated fairly, and has not been the subject of violence or abuse while held in pre-trial detention."   Baca's Notice at 6.   Thus, according to Baca, placing him behind a partition and out of his co-Defendants' and public's view, "is the functional equivalent of removing the public from Mr. Baca's proceeding," and constitutes a violation of Baca's, and the public's, First and Sixth Amendment rights, because the standard to overcome the presumption of an open trial is not met on these facts.  Baca's Notice at 7.  That standard, Baca provides, requires a showing that there is an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.  See Baca's Notice at 7.  Here, "[t]he USMS's desire to implement these restrictions is based on unfounded paranoia and rank speculation, neither of which can satisfy this test."  Baca's Notice at 7.

Baca then makes the argument that "the Court would violate Mr. Baca's due process rights by invoking the security restrictions proposed by the USMS without engaging in the essential notice, discovery, and fact finding required to implement those measures."   Baca's Notice at 8.  In support, Baca relies on Goss v. Lopez, 419 U.S. 565, 574 (1975), which stands for the proposition that "due process requires," at least in the context of a temporary suspension from high school, "in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story."  Baca's Notice at 8.  Baca thus argues that here, in a case much more serious than a school suspension, "the

burden is on the USMS to provide tangible evidence to support their security restrictions." Baca's Notice at 8.  Baca demands, before the restrictions go in place, some discovery and the opportunity to challenge the USMS' restrictions in light of their proffered substantiation.  See Baca's Notice at 9.

Baca next argues that the USMS' proposed restrictions "would thwart Mr. Baca's effective assistance of counsel."  Baca's Notice at 9.  Here, Baca contends that the physical barrier will severely limit his counsel, because counsel will need to be seated with Baca -- thus, behind the barrier as well -- handicapping counsel's ability to collaborate with co-Defendants' counsel.  See Baca's Notice at 10.  Further, as Baca has already argued, the USMS is handicapping his counsel's ability based upon "speculation," which is not satisfactory evidence to overcome Baca's presumption of innocence or his right to effective assistance of counsel. Baca's Notice at 10.

Baca next highlights, in Baca's Notice, that "[t]he procedures proposed by the USMS would adversely affect the publicity surrounding this case, and undermine the presumption of innocence that Baca enjoys as well as the Court's obligation to treat Mr. Baca with dignity." Baca's Notice at 10.  Accordingly, Baca reminds the Court of the publicity that this case inherently carries with it, ranging from newspaper coverage to various television series featuring SNM.  See Baca's Notice at 10-11 (citing, e.g., Carlos Andres López, Gang Leader Pleads Guilty to Conspiring to Murder Prison Officials, Albuquerque Journal, September 16, 2016, available at https://www.abqjournal.com/846525/gang-leader-pleads-guilty-to-conspiring-to-murder-prison-officials.html).  Baca then suggests that, because of the unique publicity, the USMS' proposed barrier would exacerbate Baca's negative public image, ensuring that the public and "potential jurors" can draw only one conclusion from the barrier -- that he "is so dangerous that he must be

physically isolated from all other courtroom participants." Baca's Notice at 11 (citing <u>Deck v.</u> <u>Missouri</u>, 544 U.S. 622, 630 (2005)). Baca also argues that the proposed restriction offends

> the principle that judges must seek to maintain a judicial process that is a dignified process. The courtroom's formal dignity, which includes respectful treatment of defendants, reflects the importance of the matter at issue, guilt or innocence, and the gravity with which Americans consider any deprivation of an individual's liberty through criminal punishment.

Baca's Notice at 11 (citing <u>Deck v. Missouri</u>, 544 U.S. at 630). Indeed, as Baca seeks to remind the Court, "these are not the kind of accommodations that Mr. Baca . . . had in mind on June 2, 2016," when the Court addressed the Defendants in Court and explained that as they built up trust amongst each other, more accommodations might be made to make the Defendants time in Court more comfortable. Baca's Notice at 12.

Baca's Notice then turns to the second proposed restriction -- prohibiting the Defendants from speaking to each other during breaks and court proceedings -- and argues that the USMS' proposal "is not justified under the circumstances." Baca's Notice at 12. Baca argues this lack of justification is the case, because, while the USMS might consider such communication "unnecessary and somehow a threat to the integrity of the judicial process," no inappropriate communication has of yet occurred, and the Court has not entered a no contact order for this case. Baca's Notice at 12. Further, Baca provides, many of these Defendants are housed in the same cellblock -- they communicate on a daily basis. <u>See</u> Baca's Notice at 12. Thus, Baca contends that, with the USMS having provided no evidence in support of barring all relevant communication in the courtroom, and failing to provide some "articulable standard" for how the USMS will eradicate only "unnecessary communication," such a restriction runs afoul of the Defendants' due process rights and rights to engage in the courtroom proceeding under the First Amendment. Baca's Notice at 12-13.

Baca last addresses the USMS' third proposed restriction, which is its assumption of "unilateral authority to exclude Mr. Baca, as well as any other defendant, from the legal proceedings involving their criminal defense."  Baca's Notice at 13.  Baca argues that "[c]riminal defendants have a right to participate in court proceedings in their cases and may be excluded from those proceedings only upon order of the Court, not unilateral discretion of the USMS, and only if their conduct disrupts those proceedings."  Baca's Notice at 13.  Here, Baca contends, the USMS has provided no explanation as to "how it will deem any communication unnecessary, leaving the defendants to speculate about the scope of their First Amendment right to free speech; a right that is particularly acute here as these individuals have the right to communicate about their respective views on the court proceedings and issues presented therein."  Baca's Notice at 13.  Baca then explains that, in accordance with a defendant's due process rights, a defendant can lose his or her right to be in court only "if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom."  Baca's Notice at 14 (citing Illinois v. Allen, 397 U.S. 337, 343 (1970); Fed. R. Crim. P. 43(c)(1)(C))(emphases and internal quotation marks omitted).  Further, according to Baca, the right to be "present in court is so critical" that an excused defendant may reclaim the right upon a showing that he or she is willing "to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings."  Baca's Notice at 14.  Regarding the second aspect of the USMS' proposed restriction -- that the Defendants may not speak with one another, even during breaks -- Baca argues that the USMS' proposition lacks support in an authority or precedent.  See Baca's Notice at 14.  Indeed, as Baca provides, the caselaw regarding the removal of a Defendant from court

proceedings indicates that such removal may occur only after disruptive behavior that interferes with "the integrity of the court proceedings"; here, Baca argues, discussion amongst the Defendants during a court recess is not conduct that interferes with the integrity of ongoing court proceedings. Baca's Notice at 14-15.

In conclusion, Baca implores that, "given the importance of the rights jeopardized by the USMS' proposed courtroom restrictions, less than one business day is simply not enough time to adequately brief Mr. Baca's objections to those procedures." Baca's Notice at 15. Thus, Baca makes the following request:

> [A]t the very least, Mr. Baca asks the Court to refrain from considering these proposed restrictions until Mr. Baca has been fully informed of the purported evidence that nefarious communications have been made, an opportunity for discovery on whatever evidence will be provided, and an opportunity to fully brief the issue and to present evidence during a proper evidentiary hearing.

Baca's Notice at 15. Baca thus argues, in sum, that the Court should refrain from imposing the restrictions until full briefing has been undergone and evidence presented, because the USMS' allegations are presently unsubstantiated. See Baca's Notice at 15-16.

### 5. The November 28, 2016, Hearing.

The Court held a hearing on November 28, 2016. See Transcript of Hearing, taken November 28, 2016 ("Tr."). When the Court came into the courtroom, the USMS had done as they said they would in the Court's Letter. The Court began the hearing in accordance with the USMS' proposed restrictions, cordoned off Baca with a black screen and imposed the USMS' restrictions against communication betwixt the Defendants generally. See Tr. at 6:1-20 (Court, Lowry). Accordingly, Baca began argument in support of the arguments he had made in Baca's Notice. See Tr. at 6:11 (Lowry). Baca began by explaining that "there is a black partition set up in the corner of the courtroom with my client behind it. It's approximately five-and-a-half, six

- 19 -

feet high, so neither I nor my client have a vantage point of the courtroom." Tr. at 6:12-19 (Lowry). The Court explained to Baca's counsel, however, that counsel is free to stand and move around the barrier, so that counsel may observe the courtroom. See Tr. at 6:21-7:8 (Court). Further, the Court explained that the nature of the partition was not what the Court itself had envisioned when the USMS proposed it -- generally, the Court stated, Baca was seated during these hearings in front of the entire courtroom, and to the right -- to the bench's left -- whereas on November 28, 2016, the USMS had moved him to the corner behind the bench's right side, directly behind the witness podium, and facing the entire courtroom. See Tr. at 6:21-7:8 (Court).

> I was sort of envisioning this in my mind, of you and Mr. Baca sitting over there [to the bench's left]; Ms. Duncan maybe sitting with you, and there being a partition, so y'all could see me fairly easily, and then -- but Mr. Baca wouldn't be able to see the other defendants in the room.

Tr. at 7:2-8 (Court). Addressing, then, the Court's suggestion that Baca's counsel was free to move around, Baca responded that such an arrangement "puts counsel in the difficult position of choosing which right they want to protect; Mr. Baca's right to consult with his counsel during the hearing, or my right to confer with my colleagues throughout the room." Tr. at 7:18-23 (Lowry). Baca then reiterated that the real issues with the USMS' procedures were their lack of justification. See Tr. at 7:24-8:2 (Lowry).

The Court then posited, should the United States come to the Court and lay some foundation for what the USMS was proposing, whether the restrictions might thereby be appropriate. See Tr. at 8:3-6 (Court). Baca provided that, if the United States could somehow meet the "heavy burden of a strict scrutiny standard, yes, I think the Court would be in a position to do that," but he would need to have an opportunity to conduct discovery and challenge the United States' evidence at an appropriate evidentiary hearing. Tr. at 8:7-16 (Lowry). "We do not think [this restriction] comports with any notion of due process that's been examined in

hundreds of years of jurisprudence in this country." Tr. at 8:18-22 (Lowry). The Court mused that there was little authority on this restriction, regarding the barrier, to which Baca explained that, "even if the Court looks to, by analogy, cases involving stun guns, stun belts, and that type of thing, there still has to be some showing that the defendant is potentially disruptive." Tr. at 9:10-14 (Lowry). Indeed, Baca argued, the USMS has never told his counsel that Baca was being disruptive, or had otherwise complained about Baca's behavior. See Tr. at 9:16-22 (Lowry). The Court noted, however, that the USMS seems to be concerned about covert signals and that Baca is somehow communicating with the other Defendants in a secretive manner. See Tr. at 9:23-10:3 (Court). Baca scoffed at that possibility, explaining the skill it would take to be "throwing signals" so well that nobody could see them. Tr. 10:4-15 (Lowry). The Court hesitated to agree, surmising that prisoners often develop elaborate codes while behind bars and that such might have happened in this unique case. See Tr. at 10:16-23 (Court). Nonetheless, Baca argued, there are less intrusive ways to alleviate this issue -- such as putting a camera directly on Baca, to monitor if any signal throwing occurred, or covering his hands with socks to eradicate the ability to throw hand signals. See Tr. at 11:7-13:12 (Lowry). Of course, Baca reiterated, all of this "begs the question of the Government's proof that there are these nefarious signals in existence." Tr. at 11:7-13:12 (Lowry).

Baca then argued that "the larger point I would like to make . . . is I think these mechanisms are really part of a broader and larger plan by the Government to isolate, humiliate, and essentially strip Mr. Baca of his dignity, to force him into a cooperation agreement with the United States." Tr. at 13:15-21 (Lowry). In support of that hypothesis, Baca explained that "the case agent, Mr. Acee here promised him an eternal vacation in Club Fed, you know, playing tennis with everybody, if he'd only cooperate and write a book about all the nefarious activities

of the SNM." Tr. at 13:25-14:12 (Lowry).  Further, Baca explained, at a prior hearing, "Special

Agent Bryan Acee . . . [l]ooks at my client in [this] courtroom, and he says, 'Yo, Pup, when you

going to come in and talk to us?'"  Tr. at 14:21-24 (Lowry).  Accordingly, Baca surmised that

the United States was far from concerned about Baca's safety -- as, in open Court, it sought to

entice his cooperation -- and, thus, while Baca understood that the Court "needs to protect the

public, the court staff, spectators," "there is no, and I mean absolutely no evidence that my client

has thrown any kind of signal, has done anything with his behavior inside this courtroom to

jeopardize anyone's safety.  And we demand that we be shown any evidence that we're wrong."

Tr. at 15:5-13 (Lowry).

        The United States then argued, explaining that -- "[t]o a certain extent" -- they were

speaking on the USMS' behalf.  Tr. at 17:18-19 (Beck).  The United States stated:

> It's something that the marshals have requested, as we have been in discussions
> with them in the past about some of our concerns, the United States' concerns, the
> FBI's concerns of what goes on in the courtroom.  So I think, to a certain extent,
> it's them hearing our concerns, voicing their concerns in addition.

Tr. at 17:24-18:7 (Beck).  Regarding the applicable law, then, the United States argued that

"there doesn't need to be some sort of strict scrutiny to partition him off.  I think what your

honor has to find is, number one, what sort of proceeding we're talking about; and then, number

two, what sort of concerns we have."  Tr. at 18:8-13 (Beck).

         The United States then referenced briefing and discussions they had had earlier in the

history of these SNM criminal cases, in which they had argued that the Defendants need not

attend the proceedings -- i.e., because they do not even need to be there, there cannot be

constitutional concerns with the restrictions imposed once they are there.  See Tr. at 18:14-19

(Beck)(referring to United States v. DeLeon, 2016 WL 3124632 (D.N.M. 2016)(Browning, J.)).

The United States conceded, however, that there would be due process concerns should Baca be

excluded from a trial in this manner, as well as an implication of the public's First Amendment rights, but that such law does not apply equally in a pretrial setting.  See Tr. at 18:24-19:3 (Beck).  The United States then cited rule 43 of the Federal Rules of Criminal Procedure, explaining that a defendant need not be present when a criminal proceeding involves only a "conference or hearing on a question of law," and thus arguing that Baca's rights are not implicated in the robust fashion that he argues they are.  Tr. at 19:4-17 (Beck).  The United States in turn argued that "even the threat of intimidation would be sufficient to allow the marshals to cordon him off as they've done . . . .  [E]ven the threat or concern that there may be some witness intimidation . . . is a federal crime, [and] that certainly meets our burden."  Tr. at 20:12-20 (Beck)(citing to the United States Court of Appeals for the Tenth Circuit's precedent for excluding a codefendant from a trial because he had threatened a witness in a pretrial proceeding, see United States v. Addison, 708 F.3d 1181 (10th Cir. 2013)).  The Court then asked the United States if it was prepared to make a showing, to rebut Baca's contention that there has not yet been a showing of an attempt to harass or communicate with other persons in the courtroom at these hearings; the United States complied, and called FBI agent Thomas Neale to the stand to testify.  See  Tr. at 21:9-21 (Beck, Court, Armijo).

Before testimony, Baca and the Court shared the concern that Baca and his counsel were cordoned off by a screen and could not see Neale as he testified -- thus, the Court addressed Baca directly, and secured Baca's word that, should the Court "pull the partition down," he would not attempt to communicate with persons in the courtroom.  Tr. at 22:1-21 (Lowry, Court, Baca).  Neale then began his testimony, explaining that he is a Special Agent with the FBI assigned to the Albuquerque, New Mexico, office, and that he has been working on the SNM investigation reviewing telephone calls and reports regarding SNM's structural hierarchy.  See Tr. at 23:25-

24:18 (Neale).  Neale further explained that he knew who Baca was and that he understood Baca

to be a "leader within the organization."  Tr. at 24:20-25:5 (Neale).  After discussion of some of

the allegations against Baca which Neale was investigating for support, Neale testified that,

during the hearings for these SNM cases, he had "witnessed interaction between Mr. Baca and

another individual.  And I've been informed of other interactions that were observed by other

members of the investigative team."  Tr. at 24:18-28:22 (Neale).  Such interaction, Neale

explained, involved Baca "freely speaking with the other defendant, and began asking him first

about his glasses . . . which seemed harmless in nature.  However, as they continued to talk, Mr.

Baca began talking about his location . . . ."  Tr. at 29:1-11 (Neale).  Neale continued that

> the discussion of whereabouts is a concern for us, because we have a concern
> about where cooperators are, where certain witnesses are, and just a general
> discussion, free flow of information is of concern to us, because it could
> potentially be used to reach out and communicate or attempt to intimidate.

Tr. at 29:11-25 (Neale).  Baca, according to Neale, has specifically been housed separate from

the other Defendants, making this discussion of increased concern to the USMS.  See Tr. at 30:1-

25 (Neale).

Neale then recounted that, during the hearings, as "cooperators [are] walked into the

courtroom and [] taken out . . . other defendants in the audience were making -- essentially

taunting those first defendants.  And by what -- kind of chanting up the term which sounded like

'Rat, rat,' over and over again."  Tr. at 31:1-9 (Neale).  Neale also recounted that, on occasion,

he observed the Defendants at the hearings in these cases making hand gestures, or salutes of

some sort, to "show solidarity" to two particular Defendants in this case.  Tr. at 31:12-23

(Neale).  Neale then explained that, further, "we were advised by one of the defendants that,

during transition, and also I believe in the courtroom, another defendant in conversation asks the

first defendant if he would consider changing testimony in order to support the second

defendant." Tr. at 33:4-13 (Neale). Additionally, Neale testified that he had become aware of another conversation between Baca and a Defendant in the courtroom that regarded the location of another Defendant, with Baca essentially requesting that his conversation partner keep an eye out for the location of that other Defendant. See Tr. at 35:5-13 (Neale).

Neale then turned his testimony toward his review of certain video recordings of Baca at the Dona Ana County Detention Center, in Las Cruces, New Mexico, in which Baca spoke with a visitor, and that visitor was "miming or mouthing something to Mr. Baca," causing Baca to advise "his visitor to cease doing that, because the videos are recorded." Tr. at 36:4-24 (Neale). Neale also testified that, "since the first indictment in December of 2015," there have been incidents of witness intimidation, via physical and verbal threats. Tr. at 37:20-25 (Armijo, Neale). Baca then took up cross-examination. See Tr. at 38:7 (Lowry).

Baca began by reaffirming his request for discovery, of the video-taped incident about which Neale testified, and then asked Neal whether having a partition in the courtroom would prevent Baca from communicating with other Defendants at Dona Ana County Detention Center. See Tr. at 38:7-20 (Lowry). Neale testified that it would not and that the partition would also not stop the Defendants from cat-calling over that partition to Baca. See Tr. at 38:21-39:1 (Neale). Neale also confirmed that he had not testified to any of his observations of Baca potentially throwing "nefarious or surreptitious gang signs that indicated a threat"; instead, he had testified only -- with respect to possible hand signs -- that other Defendants had saluted Baca. Tr. at 39:2-8 (Neale). Neale then confirmed that he had testified that Baca was a SNM leader, but also that Baca had been transferred from Southern New Mexico Correctional Facility to the New Mexico State Penitentiary, because he was soon to be the victim of an assassination attempt. See Tr. at 39:8-40:22 (Neale). Accordingly, Neale confirmed that Baca has been held "for a long time at

Level 6,[6]" probably because of the threats on his life by SNM gang members.  Tr. at 41:1-11 (Neale).  Neale further confirmed that he had not testified about the occurrence of any coded or surreptitious communications by Baca to other Defendants, and that instead he had testified only to the occurrence of some open court communications.  See Tr. at 43:9-44:22 (Neale).  Neale also testified that the open court communication about another Defendant's glasses, during which Baca also divulged his location, was the only occasion when he had personally seen Baca communicating.  See Tr. at 44:23-45:6 (Neale).  As to the fact that Baca had divulged his location, Neale could not say whether there had been specific instructions to the Defendants not to divulge that information.  See Tr. at 45:14-25 (Neale).  In conclusion, Neale confirmed that he had not testified as to the occurrence of Baca gesturing or covert communication, and that anything Baca may have attempted to do as an SNM leader was likely subject to co-leaders approval.  See Tr. at 47:5-49:6 (Neale).

Defendant Sanchez then cross-examined, because while only Baca was subject to the partition, the other Defendants were subject to the USMS' proposal to limit communication amongst all Defendants.  See Tr. at 49:10-16 (Jewkes).  Neale then testified that, beside Baca, Sanchez was one of the Defendants to whom other Defendants made salutes.  See Tr. at 49:17-50:19 (Neale).  Neale also demonstrated for the Court one of the more frequent gang signs that SNM uses amongst its members -- that being the formation of an "S" with one's hands.  See Tr. at 50:20-51:7 (Neale).  Neale testified that Sanchez would make that gang sign to the other Defendants when it was directed toward him.  See Tr. at 51:8-53:1 (Neale).

The United States then conducted Neale's redirect examination, eliciting testimony that it

---

[6]Level 6, at the Penitentiary of New Mexico, Santa Fe, New Mexico, houses the highest security classification of offenders.  See Penitentiary of New Mexico, New Mexico Corrections Department (last accessed January 18, 2017), http://cd.nm.gov/apd/pnm.html.

was quite normal for a leader of a prison gang like SNM to be the target of a death threat and assassination, as he had earlier testified to, particularly where a power struggle has ensued.  See Tr. at 53:9-54:7 (Neale).   Neale also testified that Baca, in recorded telephone calls, has attempted to use "code words, or just substitute words to try to avoid detection."  Tr. at 54:20-55:4 (Neale).   Neale explained, further, that he was aware of those telephone calls, generally between Baca and Baca's family members, as well as letters which pertained to witnesses in this case.   See Tr. at 55:19-56:3 (Neale).   Additionally, according to Neale, Baca's recorded conversations also revealed Baca's use of a code phrase -- "four figured leg lock" -- which SNM members use amongst themselves when speaking to persons housed in separate facilities to signify to the conversation partner that the message is being coded.  Tr. at 56:4-57:4 (Neale).  In closing, Neale talked about a power struggle between Baca and Sanchez which resulted in the threat of Baca's assassination.  See Tr. at 57:5-16 (Neale).

Upon completion of Neale's testimony, the United States parroted Baca's request for video tape from the proceedings thus far held before the Court, to scrutinize Baca's conduct, regarding which the Court told the parties they may run into issues, because the Chief Justice of the United States does not wish that the proceedings in federal courts be broadcasted, and that thus it is the Court's understanding that the USMS does not have recordings of the proceedings. See Tr. at 57:20-58:16 (Armijo, Court).  After the benefit of Neale's testimony, the United States explained to the Court that it should have spoken with more clarity earlier in the proceeding, because the USMS -- not the United States -- spearheaded the request for the partition.  See Tr. at 59:3-14 (Beck).  The Court then pointedly asked the United States if it wanted to continue to fight over this partition, in light of the United States Attorney's Office's role in helping the Court maintain due process, to which the United States replied that "I think if that's what the marshals

believe encourages safety, then we're standing behind them 100 percent, and we will go to bat over it." Tr. at 60:1-8 (Court, Beck).  The United States also argued that, "in terms of the signals that were given, in terms of the conversations Mr. Baca had, in which he conferred with another defendant, and told the defendant where he was housed, in what unit, those present specific safety concerns," thus establishing under the law support for the USMS' proposed restrictions. Tr. at 60:12-17 (Beck).  The Court inquired, however, how the partition played a role in alleviating any of the United States' concerns, and the United States answered, because "he can't talk to a co-defendant during a break."  Tr. at 60:18-21 (Beck).  The United States thus argued that the partition, in combination with the fact that Baca is housed alone and cannot communicate with the other Defendants on a regular basis, further ensures his separation from them.  See Tr. at 61:2-11 (Beck).

The Court provided:

I guess I was expecting you to have somebody tell me that, you know, he blinks his eyes in Morse Code or something like that, and communicates with the co-defendants here, and that's the reason you needed a partition.  But it sounds to me like what you're really concerned about is him just talking with co-defendants on the break.

Tr. at 61:13-19 (Court).  Further, the Court explained that

the reality is that the courtroom is a dynamic place.  Things happen.  We all run the risk of being witnesses if something happens in here.  Nobody wants to be a witness.  We want to be judges, we want to be lawyers, and we want to not end up being witnesses.  But we can have perjury here; we can have witness intimidation in cases that [] involve . . . threats on people . . . .

Tr. at 62:25-63:8 (Court).  The United States then responded that even Baca concedes that the Court

has the authority and the discretion to control matters within the courtroom, to ensure that justice is done.  And we'd submit that what the marshals are requesting here is within the Court's discretion, and find[s] support in the law based on this specific evidence that's been presented, both with the partition, but

- 28 -

for the marshal's other requests.   And I would say that those are rational and reasonable requests, to make sure that we do our best to not have that situation here.

Tr. at 63:17-64:2 (Beck).   The United States concluded that, particularly in the context of a pretrial conference, and in light of Neale's testimony as to the security issues that Baca presents, rule 43 and Tenth Circuit precedent support the USMS' restrictions and could thus be implemented at the Court's discretion.   See Tr. at 64:8-19 (Beck).

Baca then attempted to call another witness, Bryan Acee, to which the United States objected, "because there hasn't been a Touhy[7] filed."   Tr. at 65:12-15 (Lowry, Armijo).   Baca agreed to go through the "Touhy" procedures, to move the hearing along, and then potentially augment at a later date.   Tr. at 65:21-25 (Lowry).   Baca then argued, again, that the partition does not alleviate the problem of alleged nefarious communication between the Defendants, and that to focus on Baca for general outbursts and sign-throwing by other Defendants is an off-base attempt at a solution.   See Tr. at 66:3-67:5 (Lowry).   Indeed, Baca argued, specifically in response to Neale's testimony about alleged code used in telephone calls, a partition does not somehow alleviate that verbal coded messaging outside of the courtroom.   See Tr. at 67:6-17 (Lowry).   Once more, Baca reiterated that Neale had not testified to any use of coded messaging during hearings in this case.   See Tr. at 67:6-17 (Lowry).

Baca continued argument by stating that, thus far, Baca has comported himself in the manner the Court requested at the very first hearings in this case, and that, if the USMS does not want him making casual conversation with those around him, he would be happy to abide and refrain from such communication; however, it appeared to Baca that a casual conversation he had with another Defendant at a prior hearing was being held against him, despite the USMS'

---

[7]Referring to the request a party must make, under United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951), to compel testimony by members of the FBI.

failure to forewarn him that such conversation was not allowed.  See Tr. at 67:18-68:16 (Lowry).

Accordingly, Baca concluded that "I'm afraid that after listening to the showing, there just isn't

any evidence to justify the barrier, the physical barrier, because the physical barrier won't

resolve all the complaints that you heard about."  Tr. at 69:13-17 (Lowry).

> The Court decided:
>
> I'm going to take you up on your word.  Don't communicate.  I'm going to be
> with you tomorrow as well.[8]  So just don't use the court proceedings until I sort
> this out.  I'll try to look at the law, and get you some opinion and order out on
> that.  But those would be the ground rules.  And I won't put that [partition] back
> up there today or tomorrow.

Tr. at 69:22-70:3 (Court).  The United States clarified the Court's ruling, ensuring that there were

not going to be any communication during breaks or court proceedings.  See Tr. at 70:11-15

(Armijo).  The United States also pressed the issue as to the USMS' other proposed restrictions,

which applied to all Defendants, to which the Court explained:

> [W]e've kind of had an agreement that the defendants will not talk to each other
> during -- while we're here in the courtroom.  If the defendants need to
> communicate, they've got attorneys here.  So they can talk to each other through
> their attorneys.  They won't talk directly to each other.  I think we've had that in
> the past.  That's what I understand the marshals are asking here.  So at least in the
> courtroom, talk to each other through attorneys, not directly to each other while
> we're here in the courtroom.

Tr. at 70:23-71:9 (Court).  That restriction, the Court further provided, also applies during

breaks.  See Tr. at 71:10-13 (Court).  The Court then moved the hearing to other issues, with the

partition down.  See Tr. at 71:13-21 (Court).

## RELEVANT LAW REGARDING THE FIRST AMENDMENT, SIXTH AMENDMENT, AND THE RIGHT TO A PUBLIC TRIAL

The Sixth Amendment provides:

---

[8]The Court had also noticed a hearing in United States v. DeLeon, for the following day,
November 29, 2016.  See Notice of Motion Hearing, filed November 16, 2016 (Doc. 771).

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const. amend. VI.  The Sixth Amendment thus surrounds a criminal trial with guarantees "such as the rights to notice, confrontation, and compulsory process that have as their overriding purpose the protection of the accused from prosecutorial and judicial abuses."  Gannett Co. v. DePasquale, 443 U.S. 368, 379 (1979).  The Sixth Amendment thereby "provides to a person charged with the commission of a criminal offense, and to him alone, is the 'right to a speedy and public trial, by an impartial jury.'"  Gannett Co. v. DePasquale, 443 U.S. at 379-80.  The Sixth Amendment does not confer any right of access to a criminal trial to the public; "its guarantee, like the others enumerated, is personal to the accused."  Gannett Co. v. DePasquale, 443 U.S. at 379-80.  See Faretta v. California, 422 U.S. 806, 848 (1975)("[T]he specific guarantees of the Sixth Amendment are personal to the accused.")(Blackmun, J., dissenting).

The Supreme Court has, however, extended the public a right of access to criminal trials pursuant to the First Amendment.  See Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. 596, 603-04 (1982).  The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const. amend. I.  Although the First Amendment does not explicitly mention the right of access to criminal trials, the Supreme Court has held that

> we have long eschewed any "narrow, literal conception" of the Amendment's terms . . . for the Framers were concerned with broad principles, and wrote against

a background of shared values and practices.  The First Amendment is thus broad enough to encompass those rights that, while not unambiguously enumerated in the very terms of the Amendment, are nonetheless necessary to the enjoyment of other First Amendment rights.

Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 603-04.  See Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 579-80, 591 n.16 (1980).  The Supreme Court has emphasized that the right of access to criminal trials is of important stature, because "the criminal trial has historically been open to the press and general public," and because such public access "plays a particularly significant role in the functioning of the judicial process and the government as a whole."  Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 605-06.  Accordingly,

> [p]ublic scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole.  Moreover, public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process. And in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process-an essential component in our structure of self-government.  In sum, the institutional value of the open criminal trial is recognized in both logic and experience.

Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606.  The Supreme Court further cautions, however, that "although the right of access to criminal trials is of constitutional stature, it is not absolute."  Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606.  Still, the standard the government must meet to garner closure is hefty, requiring satisfaction of strict scrutiny.  See Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606-07.

## RELEVANT LAW REGARDING THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

The Supreme Court has long recognized that "the right to counsel is the right to effective assistance of counsel."  Strickland v. Washington, 466 U.S. 668, 686 (1984).  "The benchmark

- 32 -

for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that [it] cannot be relied upon as having produced a just result." Strickland v. Washington, 466 U.S. at 686.  A defendant can pursue an ineffective assistance of counsel claim by asserting that the process was not adversarial because of affirmative state interference or a conflict of interest, or by arguing that his or her attorney was so inadequate that he or she was effectively denied the benefit of full adversarial testing.  See Osborn v. Shillinger, 861 F.2d 612, 626 (10th Cir. 1988).  See also Madrid v. United States, 2016 WL 4492182, at *5 (D.N.M. 2016)(Browning, J.); United States v. Folse, 2016 WL 3996386, at *14 (D.N.M. 2016)(Browning, J.); Duran v. Attorney General of New Mexico, 2013 WL 1681216, at *10 (D.N.M. 2013)(Browning, J.).

With regard to ineffective assistance arising from a conflict of interest, in Osborn v. Shillinger, the Tenth Circuit stated:

> The most common means by which an attorney may fail to function as his client's advocate in the absence of affirmative state interference involves a conflict of interest arising from multiple or dual representation.  An attorney may, however, abandon his "duty to loyalty" to his client through other sorts of conflicts as well. Whether the attorney is influenced by loyalties to other defendants, third parties, or the government, if he entirely fails to subject the prosecution . . . to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights.

861 F.2d at 625 (internal citations and quotations omitted).  A defendant who demonstrates that a conflict of interest affected his representation's adequacy does not need to show prejudice to obtain relief.  See Osborn v. Shillinger, 861 F.2d at 625 (citing Cuyler v. Sullivan, 446 U.S. 335, 349-50 (1980)).  In such situations, prejudice will be presumed.  See Osborn v. Shillinger, 861 F.2d at 625.  The defendant must, however, "demonstrate[] that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance."  Strickland v. Washington, 466 U.S. at 692.  "[U]ntil a defendant shows that his

counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." Cuyler v. Sullivan, 446 U.S. at 350.

With respect to ineffective assistance arising from inadequate lawyering, Strickland v. Washington provides the applicable two-part test:

> First, the defendant must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair [proceeding] . . . .

Strickland v. Washington, 466 U.S. at 687. See United States v. Kennedy, 225 F.3d 1187, 1197 (10th Cir. 2000); State v. Trammell, 2016-NMSC-030, ¶ 16, __ P.3d __. The appropriate standard for attorney performance is that of reasonably effective assistance -- the defendant must demonstrate that counsel's representation, considering all the circumstances, fell below an objective standard of reasonableness based on prevailing professional norms. See Strickland v. Washington, 466 U.S. at 687-88. In evaluating an attorney's performance, the court must be highly deferential:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.
>
> * * * *
>
> At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.
>
> [C]hoices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on

investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.  In particular, what investigation decisions are reasonable depends critically on such information.  For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether.  And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

Strickland v. Washington, 466 U.S. at 689-91 (internal citations and quotation marks omitted).

See United States v. Kennedy, 225 F.3d at 1197 ("There is a strong presumption that counsel provided effective assistance, and a . . . defendant has the burden of proof to overcome that presumption.")(quoting United States v. Williams, 948 F. Supp. 956, 960 (D. Kan. 1996)).

A defendant asserting ineffective assistance because of deficiency in attorney performance must also affirmatively prove prejudice.  See Strickland v. Washington, 466 U.S. at 693; United States v. Kennedy, 225 F.3d at 1197.  "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. at 694.

The Sixth Amendment requires a remedy tailored to the injury suffered.  See United States v. Rodgers, 751 F.2d 1074, 1078 (9th Cir. 1985)(citing United States v. Morrison, 449 U.S. 361, 364 (1981)).  In most ineffective-assistance-of-counsel cases, suppression of the evidence, rather than dismissal of the indictment, is the appropriate remedy.  See United States v.

Rodgers, 751 F.2d at 1078 (citing United States v. Morrison, 449 U.S. at 365-66, 366 n.3).

Dismissal is warranted, however, where there is continuing prejudice from a constitutional

violation that suppression of the evidence cannot remedy.  See United States v. Rodgers, 751

F.2d at 1078 (citing United States v. Morrison, 449 U.S. at 365-66, 366 n.2).

### RELEVANT LAW REGARDING THE FIFTH AMENDMENT AND DUE PROCESS

The Fifth Amendment provides:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

U.S. Const. amend. V.

The Tenth Circuit has held that "[t]he constitutional right of the defendant to be present at

trial is rooted in both the Confrontation Clause and the Due Process Clause."  United States v.

Beierle, 810 F.3d 1193, 1198 (10th Cir. 2016)(citing United States v. Gagnon, 470 U.S. 522, 526

(1985)(per curiam)).   Beyond actual presentation of evidence at trial, presence at court

proceedings implicates the Due Process Clause and not the Confrontation Clause.  See United

States v. Beierle, 810 F.3d at 1198.  Pursuant to the Due Process Clause, then, "'the presence of a

defendant is a condition of due process to the extent that a fair and just hearing would be

thwarted by his absence, and to that extent only.'"  United States v. Beierle, 810 F.3d at 1198

(original alterations omitted)(emphasis added)(quoting United States v. Gagnon, 470 U.S. at

526).  Given its importance, rule 43 of the Federal Rules of Criminal Procedure codifies this due-

process principle.

## RELEVANT LAW REGARDING RULE 43

Rule 43 of the Federal Rules of Criminal Procedure provides:

**(a) When Required.**  Unless this rule, Rule 5, or Rule 10 provides otherwise, the defendant must be present at:

> (1) the initial appearance, the initial arraignment, and the plea;
>
> (2) every trial stage, including jury impanelment and the return of the verdict; and
>
> (3) sentencing.

**(b) When Not Required.**  A defendant need not be present under any of the following circumstances:

> **(1)** Organizational Defendant.  The defendant is an organization represented by counsel who is present.
>
> **(2)** Misdemeanor Offense.  The offense is punishable by fine or by imprisonment for not more than one year, or both, and with the defendant's written consent, the court permits arraignment, plea, trial, and sentencing to occur by video teleconferencing or in the defendant's absence.
>
> **(3)** Conference or Hearing on a Legal Question.  The proceeding involves only a conference or hearing on a question of law.
>
> **(4)** Sentence Correction.  The proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c).

**(c) Waiving Continued Presence.**

> **(1) In General.**  A defendant who was initially present at trial, or who had pleaded guilty or nolo contendere, waives the right to be present under the following circumstances:
>
>> **(A)** when the defendant is voluntarily absent after the trial has begun, regardless of whether the court informed the defendant of an obligation to remain during trial;
>>
>> **(B)** in a noncapital case, when the defendant is voluntarily absent during sentencing; or

> **(C)** when the court warns the defendant that it will
> remove the defendant from the courtroom for
> disruptive behavior, but the defendant persists in
> conduct that justifies removal from the courtroom.
>
> **(2) Waiver's Effect.** If the defendant waives the right to be
> present, the trial may proceed to completion, including the
> verdict's return and sentencing, during the defendant's absence.

Fed. R. Crim. P. 43. Predominant secondary authority explains that a defendant's necessary

presence under Rule 43 is discerned by distinguishing between a hearing at which there is legal

argument only and one at which factual issues are presented:

> Undoubtedly there are many motions that require only argument on a question of
> law. Neither the Rule nor the Constitution requires the presence of defendant at
> the argument on such a motion. If fact issues are presented, however, as they
> often will be on a pretrial motion to suppress evidence, it would seem that
> defendant has a right to be present although in some instances the absence can be
> regarded as harmless error.

3B Charles Alan Wright, Andrew D. Leipold, Peter J. Henning, & Sarah N. Welling, Federal

Practice & Procedure: Criminal § 722 (4th ed.)(2016)(internal footnotes omitted). According to

Wright & Miller, several courts have even held that rule 43 does not require a defendant's

presence be present when factual issues are presented. See 3B Charles Alan Wright et al.,

Federal Practice & Procedure: Criminal § 722 n.4 (citing, among others, United States v. Burke,

345 F.3d 416, 422-24 & n.8 (6th Cir. 2003)). To that point, a criminal defendant's right to be

present does not extend to "administrative conferences unrelated to any issues at trial." United

States v. Oles, 994 F.2d 1519, 1525 (10th Cir. 1993). See also United States v. DeLeon, 2016

WL 3124632 at *1-2.

## LAW REGARDING PRESENCE AT SENTENCING

Rule 43 requires that "the defendant must be present at . . . sentencing." Fed. R. Crim.

Proc. 43(a)(3). Rule 43 provides several exceptions to the sentencing presence requirement

including but not limited to: (i) defendant's written consent for a misdemeanor offense, <u>see</u> Fed. R. Crim. Proc. 43(b)(2); (ii) a sentence correction, <u>see</u> Fed. R. Crim. Proc. 43(b)(4); and (iii) defendant's voluntary absence in a noncapital case, where the defendant was initially present at trial, or who had pled guilty, <u>see</u> Fed. R. Crim. Proc. 43(c)(1)(B).

In <u>United States v. Torres-Palma</u>, 290 F.3d 1244 (10th Cir. 2002), the Tenth Circuit addressed "the question of whether the use of video conferencing at sentencing violates the provision of Fed. R. Crim. Proc. 43, which requires a defendant to be 'present' at imposition of sentence." <u>United States v. Torres-Palma</u>, 290 F.3d at 1245 (quoting rule 43). Judge Porfilio noted that, "[w]hile certain exceptions to that mandate are granted in Rule 43(b), none of them explicitly permits the use of video conferencing." <u>United States v. Torres-Palma</u>, 290 F.3d at 1245. The Tenth Circuit spent considerable time talking about the advantages of video conferencing, about the caseload in New Mexico, and about the limited judicial resources within the District. <u>See generally</u> 290 F.3d at 1245. The Tenth Circuit stated that, "[a]lthough convinced of the need for and the benefits of technology to facilitate expeditious disposition of the ever-growing caseload in federal courts," it had to "reluctantly" remand for re-sentencing. 290 F.3d at 1245.

Judge Porfilio wrote in sweeping, definite language: "[W]e find ourselves unable to reach any conclusions other than the word, 'present,' in the context of Rule 43, means the defendant must be physically present before the sentencing court." <u>United States v. Torres-Palma</u>, 290 F.3d at 1245. Later in the opinion, after finding persuasive the analyses in cases from other circuits, Judge Porfilio stated: "Those analyses will not support a flexible reading of Rule 43 . . . ." <u>United States v. Torres-Palma</u>, 290 F.3d at 1248. He concluded:

> We believe the only relief from this result is a redrafting of the language of Rule 43. Until that time, video conferencing for sentencing is not within the scope of a

district court's discretion.  Furthermore, Rule 43 vindicates a central principle of the criminal justice system, violation of which is *per se* prejudicial.  In that light, presence or absence of prejudice is not a factor in judging the violation.

United States v. Torres-Palma, 290 F.3d at 1248.  The Tenth Circuit then remanded "to the district court for resentencing of the Defendant who shall be in the physical presence of the sentencing judge."  290 F.3d at 1249.  In United States v. Lawrence, 248 F.3d 300 (4th Cir. 2001), Lawrence appeared in the Columbia, South Carolina, courtroom through a video feed from his prison in Florence, Colorado.[9]  See 248 F.3d at 301.  Chief Judge Wilkinson of the United States Court of Appeals for the Fourth Circuit, writing for a unanimous panel, held that "presence" in rule 43 means physical presence and remanded the case.  United States v. Lawrence, 248 F.3d at 301.  The United States maintained "that district courts should have the discretion to permit video teleconferencing when circumstances warrant it."  248 F.3d at 304.  Chief Judge Wilkerson rejected that argument:  "If we were to hold that video teleconferencing satisfies the presence of Rule 43, it would permit the government to substitute such conferencing for physical presence for any defendant at any time for any reason."  United States v. Lawrence, 248 F.3d at 304.  The Fourth Circuit closed by stating:

> The United States urges us to create another exception to Rule 43, one that would allow video teleconferencing at the discretion of the district court.  We respect the position of the district court, which was understandably concerned that the value of Lawrence's physical presence did not outweigh the risks associated with transporting him.  In extreme circumstances such as this, the rule should indeed provide some flexibility.  But it does not.  We cannot travel where the rule does not go.  The rule's general requirement of physical presence in 43(a) is clear, and the exceptions in 43(b) do not apply here.  We are left with the principle that imposing punishment on those who break the law must be in accordance with the law.  Our system knows no other course.

United States v. Lawrence, 248 F.3d at 305.

---

[9]In United States v. Lawrence, the defendant objected to being sentenced via video conferencing, and thus the Fourth Circuit did not decide what "voluntarily absent" encompassed.

## LAW REGARDING THE CONFRONTATION CLAUSE

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court held that, consistent with the Sixth Amendment, "[t]estimonial statements of witnesses absent from trial [are admissible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."  541 U.S. at 59.  In Davis v. Washington, 547 U.S. 813 (2006), the Supreme Court further elaborated on what a "testimonial" statement is:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822.  The Tenth Circuit has restated this rule, defining a testimonial statement as "a 'formal declaration made by the declarant that, when objectively considered, indicates' that the 'primary purpose of the [statement is] to establish or prove past events potentially relevant to later criminal prosecution.'"  United States v. Morgan, 2014 WL 1378207, at *9 (10th Cir. 2014)(alteration in original)(quoting United States v. Smalls, 605 F.3d 765, 777-78 (10th Cir. 2010)).  Accord United States v. Chaco, 801 F. Supp. 2d 1200, 1209-10 (D.N.M. 2011)(Browning, J.)(discussing developments in Tenth Circuit precedent on the test regarding what qualifies as a testimonial statement).

In Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), the Supreme Court addressed whether the admission of an affidavit by a forensic chemist, who swore that the substance which the police seized from the defendant was cocaine of a certain amount, violated the Confrontation

Clause.  See 557 U.S. at 307.  The Supreme Court first found that such affidavits were testimonial, because they were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," and because, under Massachusetts law, the affidavit's sole purpose was to provide prima facie evidence of the content of the substance seized.  557 U.S. at 310.  The Supreme Court then used the affidavit introduced by the prosecution to outline its concerns regarding the lack of cross-examination when such affidavits are introduced as evidence:

> The affidavits submitted by the analysts contained only the bare-bones statement that "[t]he substance was found to contain: Cocaine."  At the time of trial, petitioner did not know what tests the analysts performed, whether those tests were routine, and whether interpreting their results required the exercise of judgment or the use of skills that the analysts may not have possessed.  While we still do not know the precise tests used by the analysts, we are told that the laboratories use "methodology recommended by the Scientific Working Group for the Analysis of Seized Drugs."  At least some of that methodology requires the exercise of judgment and presents a risk of error that might be explored on cross-examination.

557 U.S. at 320.  Because there was no opportunity to cross-examine on these issues, the Supreme Court concluded that introduction of the affidavit violated the defendant's rights under the Confrontation Clause.  See 557 U.S. at 329 ("The Sixth Amendment does not permit the prosecution to prove its case via ex parte out-of-court affidavits, and the admission of such evidence against Melendez-Diaz was error.")(emphasis in original).  The Supreme Court has since extended this holding to "forensic laboratory report[s] containing a testimonial certification -- made for the purpose of proving a particular fact -- through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification."  Bullcoming v. New Mexico, 564 U.S. 647, 652 (2011)("Accordingly, the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'").  See

United States v. Harry, 2014 WL 1950409 (D.N.M. 2014)(Browning, J.)(discussing the Confrontation Claus, but finding no violation where statement was not testimonial).

Except in rare cases, the prosecution's use of live or recorded video testimony without the defendant having the ability to confront the witness face-to-face violates a defendant's Confrontation Clause rights -- absent a showing of unavailability and prior opportunity to confront the witness.  See United States v. Sandoval, 2006 WL 1228953, at *7-9 (D.N.M. 2006)(Browning, J.).  In Maryland v. Craig, 497 U.S. 836 (1990) -- which the Supreme Court decided before Crawford v. Washington -- the Supreme Court rejected a Confrontation Clause challenge to a Maryland statute that allowed a child witness in a child molestation case, under certain circumstances, to testify via a one-way closed circuit television, which did not allow the witness to view the defendant.  See Maryland v. Craig, 497 U.S. at 860.  While upholding the constitutionality of a child's testimony outside the defendant's presence, the Supreme Court in Maryland v. Craig recognized that the "central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."  497 U.S. at 845.[3]

The Supreme Court in Maryland v. Craig recognized that the context of an adversary proceeding before the trier of fact involved "[t]he combined effect of these elements of confrontation -- physical presence, oath, cross-examination, and observation of demeanor by the trier of fact" that "is the norm of Anglo-American criminal proceedings."  497 U.S. at 846.  The Supreme Court in Maryland v. Craig also acknowledged the peculiar power of face-to-face confrontation in that "face-to-face confrontation enhances the accuracy of fact finding by

---

[3] The Supreme Court has since distanced itself from this holding that the purpose of the Confrontation Clause is to ensure the reliability of evidence.  See Bullcoming v. New Mexico, 564 U.S. at 652; Crawford v. Washington, 541 U.S. at 61.

reducing the risk that a witness will wrongfully implicate an innocent person," 497 U.S. at 846 (citing Coy v. Iowa, 487 U.S. 1012, 1019-20 (1988)), and that "face-to-face confrontation forms 'the core of the values furthered by the Confrontation Clause,'" Maryland v. Craig, 497 U.S. at 847 (quoting California v. Green, 399 U.S. 149, 157 (1970)).

The Supreme Court explained in Maryland v. Craig that the Confrontation Clause "reflects a preference for face-to-face confrontation at trial," but that the preference "must occasionally give way to considerations of public policy and the necessities of the case." 497 U.S. at 849 (internal quotation marks omitted). The Supreme Court emphasized that the preference for face-to-face confrontation is strong, and that a defendant's Sixth Amendment confrontation right "may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." 497 U.S. at 850.

While the issue is decidedly less clear, it is unlikely that a violation of a defendant's Confrontation Clause rights occur when he calls one of his own witnesses who is aligned with him by videoconference or telephonically. See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him . . . ." (emphasis added)). Cf. United States v. Olguin, 643 F.3d 384, 392 (5th Cir. 2011)("The Sixth Amendment guarantees the right to confrontation against a party testifying against him, not against others."). The need for "adversariness" is not present when the witness is aligned with the defendant. Maryland v. Craig, 497 U.S. at 845. The Supreme Court spoke in Crawford v. Washington about the need for the defendant to have "an adequate opportunity to cross-examine" a witness to satisfy the Confrontation Clause, a need which is not present when the witness is aligned with the defendant. See 541 U.S. at 58. The Federal Rules of Evidence,

for example, generally do not permit a party to ask leading questions -- a key tool of cross examination -- of a witness aligned with the party calling the witness.  See Fed. R. Evid. 611(c).[4] A defendant might also waive a Confrontation Clause challenge by calling his own witness by videoconference or telephonically.  See United States v. Lopez-Medina, 596 F.3d 716, 730-34 (10th Cir. 2010)("Prior to Crawford, we held there was 'no doubt' a defendant could waive his rights under the Confrontation Clause.  The parties do not argue Crawford changed this rule.").

Like many constitutional rights, a defendant may choose to waive his Confrontation Clause rights.   In 1969, the Supreme Court recognized that a defendant may waive his Confrontation Clause rights and that defendants commonly do so when pleading guilty.  See Boykin v. Alabama, 395 U.S. 238, 270 (1969)("Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial. . . .  Third, is the right to confront one's accusers.").  The Tenth Circuit has recognized that, both before and after the Supreme Court's decision in Crawford v. Washington, a defendant may knowingly waive his Confrontation Clause rights at trial.  See United States v. Lopez-Medina, 596 F.3d at 730-34 (recognizing that Confrontation Clause rights may be waived at trial "at least where there is an explicit waiver").  Specifically, the Tenth Circuit stated: "Prior to Crawford, we held there was 'no doubt' a defendant could waive his rights under the Confrontation Clause.  The parties do not argue Crawford changed this rule."  United States v. Lopez-Medina, 596 F.3d at 731 (citations omitted).  The Tenth Circuit has held in prior cases that a defendant's counsel can stipulate to the admissibility of evidence that would otherwise violate the Confrontation Clause if

---

[4]Rule 611(c) of the Federal Rules of Evidence provides: "(c) **Leading Questions.** Leading questions should not be used on direct examination except as necessary to develop the witness's testimony.   Ordinarily, the court should allow leading questions: (1) on cross-examination; and (2) when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party."  Fed. R. Evid. 611(c).

doing so "was a matter of prudent trial strategy."  Hawkins v. Hannigan, 185 F.3d 1146, 1155 (10th Cir. 1999).  The United States Court of Appeals for the Sixth Circuit has recognized that such a waiver can be permissible in the context of the prosecution admitting a videotaped deposition of one of its witnesses.  See Earhart v. Konteh, 589 F.3d 337, 344 (6th Cir. 2009). The Sixth Circuit in that case relied on one of its prior decisions where it had permitted such a waiver:

> The State relies upon our holding in Bailey v. Mitchell, 271 F.3d 652 (6th Cir. 2001), to argue that Earhart waived his right to contest the admission of the videotape deposition.  In Bailey, we held that a criminal defendant waived his right to confrontation by entering into a quid pro quo agreement with a state prosecutor. Id. at 657.  The petitioner in Bailey had agreed to allow the State to admit the videotape deposition if the prosecutor would consent to the defendant's motion for a continuance.  Id.  Importantly, the Ohio state courts found as a factual matter that Bailey had made an explicit deal with the prosecutor for the admission of the videotape.  Id.

Earhart v. Konteh, 589 F.3d at 344.  Notably, the Tenth Circuit's case in United States v. Lopez-Medina involved an oral waiver on the record in open court.  See 596 F.3d at 731 ("It is clear from this statement [to the judge] that defense counsel intentionally relinquished his (or rather, his client's) confrontation right through his questioning of Johnson.").

In United States v. Sandoval, 2006 WL 1228953 (D.N.M. 2007)(Browning, J.), the Court considered the Confrontation Clause in the context of a minor victim and her alleged sexual attacker, as well as a statute permitting such testimony over closed-circuit television.  See United States v. Sandoval, 2006 WL 1228953, at *10-13.  The Court concluded that "Two-Way closed-circuit television testimony" would be appropriate in that case "because the introduction of testimony in this manner" did not "violate[] the Confrontation Clause of the Sixth Amendment." 2006 WL 1228953, at *10.  Given the nature of the accusations and the unique circumstances in that case, the Court thereby allowed closed-circuit television testimony.  2006 WL 1228953, at

*12 ("Jane Doe will suffer emotional trauma if forced to testify in open court, in the same courtroom, with the person who allegedly abused her, and will thus be unable to testify.  Jane Doe will also be unable to testify because of her fear of her father-Dr. Kern's opinion does not rest on Jane Doe's ability to testify in a court room setting generally, but is based upon the fear of her father.  The Court had an opportunity to examine Dr. Kern's findings at a hearing before trial and to make specific findings to satisfy the factors set forth in Maryland v. Craig and § 3509.  The Court will best protect Jane Doe's welfare if it allows her to testify by two-way closed circuit television, and Sandoval's Confrontation Clause rights will not be violated.").

## RELEVANT LAW REGARDING THE TRIAL JUDGE'S DISCRETION TO CONDUCT PROCEEDINGS

The Supreme Court has "long recognized that adverse publicity can endanger the ability of a defendant to receive a fair trial."  Gannett Co. v. DePasquale, 443 U.S. at 378.  See Sheppard v. Maxwell, 384 U.S. 333 (1966); Irvin v. Dowd, 366 U.S. 717 (1961); Marshall v. United States, 360 U.S. 310 (1959); Estes v. Texas, 381 U.S. 532 (1965).  To safeguard the due process rights of the accused, then, a trial judge has the affirmative constitutional duty to minimize the prejudicial effects of pretrial publicity.  See Sheppard v. Maxwell, 384 U.S. at 362-64.  Given the Constitution's pervasive concern for these due process rights, the trial judge is authorized to take protective measures -- even when they are not strictly necessary.  See Gannett Co. v. DePasquale, 443 U.S. at 378.  Indeed, it is a real risk that publicity concerning the proceedings at a pretrial hearing will influence "public opinion against a defendant and inform potential jurors of inculpatory information wholly inadmissible at the actual trial."  Gannett Co. v. DePasquale, 443 U.S. at 378.  In a case where the probability of prejudicial publicity is high, closure -- in contravention to the principles underlined by the First Amendment -- might even be warranted.  See Gannett Co. v. DePasquale, 443 U.S. at 378-79.

All of these principles, suffice it to say, underscore the principle that a trial judge has near unfettered discretion to orchestrate courtroom proceedings in the way he or she deems fit, so long as it does not offend the constitutional rights of a defendant. See, e.g., Sheppard v. Maxwell, 384 U.S. at 359 ("The carnival atmosphere at trial could easily have been avoided since the courtroom and courthouse premises are subject to the control of the court."). "It is the judge's responsibility to exercise control over the courtroom and take security precautions . . . ." Martinez v. Winner, 771 F.2d 424, 434 (10th Cir. 1985), opinion modified on denial of reh'g by 778 F.2d 553 (10th Cir. 1985), judgment vacated sub nom. by Tyus v. Martinez, 475 U.S. 1138 (1986).

> It is a judge's duty to order some type of precaution if he or she believes there might be some sort of trouble. Usually this sort of thing is delegated to the United States Marshal or to court security officers, but the judge remains ultimately responsible, and this responsibility directly concerns his duty to see that cases are decided in a peaceful and dignified atmosphere.

Martinez v. Winner, 771 F.2d at 434.

The Supreme Court has admonished certain courtroom practices that affected defendant's fair-trial rights. See Holbrook v. Flynn, 475 U.S. 560, 562, 570 (1986)(addressing whether seating "four uniformed state troopers" in the row of spectators' seats immediately behind the defendant at trial denied the defendant his right to a fair trial, and holding that such was not so inherently prejudicial it denied the right to a fair trial); Estelle v. Williams, 425 U.S. 501, 502, 512 (1976)(considering "whether an accused who is compelled to wear identifiable prison clothing at his trial by a jury is denied due process or equal protection of the laws," and holding that "the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes"). The "Williams-Flynn" standard thus demands of a trial judge that courtroom proceedings -- sponsored by the state -- do not

result in an inherent prejudice to a criminal defendant.  Carey v. Musladin, 549 U.S. 70, 76-77

(2006).  That standard, then, can be "a guide for trial judges . . . its general formulation is enough

to [further] tell trial judges that it applies to the behavior of courtroom visitors."  Carey v.

Musladin, 549 U.S. at 82 (Souter, J., concurring in the judgment).

## LAW REGARDING CONTACT BETWEEN CRIMINAL DEFENDANTS, WITNESSES, AND VICTIMS

18 U.S.C. § 1514 provides:

> A United States district court, upon application of the attorney for the
> Government, shall issue a temporary restraining order prohibiting harassment of a
> victim or witness in a Federal criminal case if the court finds, from specific facts
> shown by affidavit or by verified complaint, that there are reasonable grounds to
> believe that harassment of an identified victim or witness in a Federal criminal
> case exists or that such order is necessary to prevent and restrain an offense under
> section 1512 of this title, other than an offense consisting of misleading conduct,
> or under section 1513 of this title.

18 U.S.C. § 1514 (a)(1) (2012).  Further,

> [a] United States district court, upon motion of the attorney for the Government,
> or its own motion, shall issue a protective order prohibiting harassment of a
> victim or witness in a Federal criminal case or investigation if the court, after a
> hearing, finds by a preponderance of the evidence that harassment of an identified
> victim or witness in a Federal criminal case or investigation exists or that such
> order is necessary to prevent and restrain an offense under section 1512 of this
> title, other than an offense consisting of misleading conduct, or under section
> 1513 of this title.

18 U.S.C. § 1514 (b)(1).  The United States, then, must make a showing that there are

"reasonable grounds to believe that harassment of an identified victim or witness in a Federal

criminal case exists" before a court imposes a temporary restraining order prohibiting harassment

by a Defendant of a victim or witness in their case.  18 U.S.C. § 1514 (a)(1).  Where such a

showing is necessary in cases involving alleged harassment, a court order generally restraining

communication amongst Defendants in a joint prosecution -- where many Defendants may be

witnesses -- similarly must entail a showing giving a court reasonable grounds to believe it is

necessary.  See 18 U.S.C. § 1514 (a)(1), (b)(1).  See also United States v. Cofield, 11 F.3d 413, 418 (4th Cir. 1993), as amended (Jan. 5, 1994)("In response to widespread witness intimidation and retaliation, Congress further expanded the protections available to witnesses and others in the federal judicial system by enacting the Victim and Witness Protection Act of 1982."

## ANALYSIS

The Court is tasked with balancing the competing interests of the United States, the Defendants, and the USMS.  Here, the USMS has alleged risks to the security of all persons in the courtroom -- as well as risks to the security of persons outside of the courtroom -- that Baca and other Defendants are creating or inciting during courtroom proceedings.  The United States, on the USMS' behalf, made an evidentiary showing at the hearing that Baca was a leader in the SNM organization and that Baca had, outside of the courtroom, probably communicated with coded messages.  The specific allegations underlying Namoca's Email, however, accuse Baca of sending coded messages during the courtroom proceedings.   While recognizing the safety interests at stake, the Court finds that Namoca's Email restricts some of the Defendants' constitutional interests at stake in this matter, and will control the courtroom proceedings in a manner that sustains the objections Baca made in Baca's Notice.  The Court will not impose the USMS' proposed restriction to cordon Baca off from the rest of the Defendants in the courtroom.  The Court will also not order into effect the USMS' proposed restriction of communication amongst Defendants during both proceedings and breaks.  With respect to the USMS' third restriction -- immediate removal from the courtroom upon communication with another Defendant -- the Court retains final approval of such removal, but will consult with the USMS on a case-by-case basis to reach an informed decision.

I.      **THE COURT WILL NOT IMPOSE THE USMS' PROPOSAL TO CORDON OFF BACA FROM THE REST OF THE COURTROOM WITH A SCREEN.**

The USMS wants to

create a partition/divider around Defendant Anthony Baca.   Baca has been identified as the leader or highest ranking member in the SNM prison gang conspiracy.  This partition/divider would limit Baca's line of sight to primarily the Judge and his attorney's [sic].  Baca's interactions with his codefendants would also be limited during the hearing; he won't be able to see them.  There are concerns that Baca's interactions and/or communications with his codefendants may contain coded messages that are nefarious in nature.  These potential coded messages may contain information that is unknown to most lay persons.  The USMS is tasked with ensuring that all patrons in the courtroom are safe and secure while maintaining the integrity of the judicial process.  Our intent is to limit any/all surreptitious communications that can present a danger to all patrons in attendance.   This can include possible communications about security procedures and relaying communications that may cause harm to others.

Namoca Email at 1.  Baca, in turn, objects to this proposed restriction in full; according to Baca, the United States and the USMS have not demonstrated that the allegations in the Namoca Email are true.  See Baca's Notice at 1.  Thus, Baca argues, implementation of the restriction will violate a whole host of Baca's constitutional rights provided under the First, Fifth, and Sixth Amendments.   See Baca's Notice at 1.   The Court will sustain his objection to the implementation of such partitioning in the courtroom during these SNM proceedings, because the Court agrees with Baca that the screen does not, at this time, serve an appropriate role in these proceedings.

"It is the judge's responsibility to exercise control over the courtroom and take security precautions . . . ."  Martinez v. Winner, 771 F.2d at 434.  See Tr. at 63:17-64:2 (Beck).  The Court must ensure -- with the USMS' help -- that all those who attend these proceedings are safe and that what occurs inside of these proceedings does not result in a threat to the attendees' safety.  As a consequence of this duty, the Court takes seriously the USMS' suggestion that Baca has been covertly communicating with other SNM members in the courtroom and that a probable

result of that communication might be a threat to another's safety.  The Court, however, has not been presented with evidence that such covert communication has occurred or is even likely to occur.  Indeed, the United States elicited evidence at the hearing which suggested only that Baca is a leader in SNM and that he had communicated with verbal code over telephone.  See Tr. at 61:13-63:25 (Court).  Such evidence, however, does not suggest the use of coded signals in the courtroom.  Further, with respect to the suggestion that Baca might use verbal code, a partition of this sort does not restrict Baca from speaking openly.  See Tr. at 38:21-39:1 (Neale).

The Court also has concerns regarding the optics of such a partition.  The Supreme Court has emphasized that, specifically, the right of access to criminal trials is of important stature, because "the criminal trial has historically been open to the press and general public," and because such public access "plays a particularly significant role in the functioning of the judicial process and the government as a whole."  Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 605-06.  To safeguard the accused's rights, a trial judge has the affirmative constitutional duty to minimize pretrial publicity's prejudicial effects, although the First Amendment right to open proceedings can prohibit maximum protection of an accused's rights should they conflict.  See Sheppard v. Maxwell, 384 U.S. at 359, 362-64 (explaining that to safeguard the due process rights of the accused, then, a trial judge has the affirmative constitutional duty to minimize the prejudicial effects of pretrial publicity, and also stating that, in that case, "[t]he carnival atmosphere at trial could easily have been avoided since the courtroom and courthouse premises are subject to the control of the court").  The Court is not convinced that a partition is a per se constitutional violation of the First, Fifth, and Sixth Amendments.  If Baca were shooting someone in the courtroom, the Court could stop him without implicating the Constitution.  See Martinez v. Winner, 771 F.2d at 434 ("It is the judge's

responsibility to exercise control over the courtroom and take security precautions . . . .").  If he were yelling threats and talking about killing another Defendant or person, the Court could stop that activity.  See Martinez v. Winner, 771 F.2d at 434.  If he were holding up a poster board or passing some note saying that he was going to have someone killed, the Court could stop what is a crime.  See Martinez v. Winner, 771 F.2d at 434.  The Court is not convinced that, because Baca or others use eye codes or hand signals to communicate death threats or further their conspiracy, the Court cannot stop that activity on a showing that such communication was prevalent.  Thus, the Court concludes that, if there is evidence that Baca or others are communicating in nonverbal ways about subjects that put people in or outside the courtroom at risk of physical harm, it can use a partition to stop that communication without violating the Constitution.  Accord Sheppard v. Maxwell, 384 U.S. at 359 ("The carnival atmosphere at trial could easily have been avoided since the courtroom and courthouse premises are subject to the control of the court.").  Particularly pretrial, there is minimal risk of an adverse jury verdict, and even if there is publicity, the Court can minimize the risk of a tainted jury with an effective voir dire and by drawing jurors from a large venire outside the Albuquerque area.  See, e.g., United States v. Rodella, 2014 WL 4792598, at **10-11 (D.N.M. 2014)(Browning, J.); United States v. Gould, 508 F. Supp. 2d 896, 900-05   (D.N.M. 2007)(Browning, J.)(explaining the constitutionality of using different geographical areas for a jury pool, opposed to an entire district).

As to the First Amendment rights implicated, if the press came to the courtroom, they have a right to see what is happening in the courtroom.  When the press shows up and sees Baca behind the partition, that is the story, and the Court is likely not to complain.  If the press complains, the Court would need to remove the partition, because seeing the defendant is

probably one of the more important parts of seeing a criminal proceeding -- unless there is an overriding interest.  If the Court were convinced that Baca was communicating with the Defendants in a way that puts people at risk, the Court would override the press' right to see the Defendant, because of safety concerns.  Given that the Court has concluded that the United States and the USMS have not made a showing that Baca or others are communicating by eye or hand gestures, or are putting people at risk, the Court will not override any of the press' First Amendment rights.

The analysis of the Defendants' First Amendment rights is similar to the Court's analysis of the press' rights.  The Defendants have a right to see criminal proceedings in which they are involved, and seeing the faces of other Defendants is probably the most important thing they see at a criminal proceeding.  On the other hand, the Court would override the right of a Defendant were they threatening others with hand or eye signals.

Finally, the Defendants' due process rights are satisfied if they have an opportunity to effectively complain about any partition.  Here, the Court gave notice of Namoca's Email before the hearing.  It took up the issue immediately when the Court opened.  That satisfies due process, because Baca and others had a full opportunity to argue -- effectively and successfully -- that his constitutional rights were being violated.  There is a due process right to be treated fairly and impartially, see United States v. Fred, 2006 WL 4079619, at *6 (D.N.M. 2007)(Browning, J.)("[T]he rights to a fair trial are precious, and the Court is zealous to protect them . . . ."), but the Court can override these rights if he is not behaving.  Here, the Court lacks evidence of misbehavior to treat Baca differently from others.

The Court can avoid Confrontation Clause problems by making certain that he can see the witness box and the people testifying against him.  He should also be able to see the Assistant

United States Attorneys and the Court at all times.  Finally, if one of the other Defendants' counsel starts making accusations against Baca, he should be able to see that attorney and Defendant while the adverse attorney is arguing.

Nevertheless, the Court is not convinced that it should impose this partition without more evidence that Baca is engaging in these communications.  Baca can still use the telephone at the detention facility.  The risk of coded messages there remains.  While the Court is not convinced that it would violate the Constitution if it put a partition in place if he were sending coded messages that are putting people at risk, the Court is not convinced that he is doing so in the courtroom.  The partition can be used in a way that violates the Constitution, but it still may undercut the Court's appearance of being fair and just to all Defendants.   Protecting the Constitution and law is only one-half of a trial judge's task; the other half -- creating the appearance of justice -- may be the most important.  As the Court stated:

> The Defendants must decide what is in their best interests.  The Court is . . . skeptical that the counsel can take good notes and then explain fully what occurred at the hearing to the clients. . . .  Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job.  The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way.  Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts.

United States v. DeLeon, 2016 WL 3124632, at *1 (citing A.M. ex rel. Youngers v. New Mexico Dept. of Health, 117 F. Supp. 3d at 1253 n.14)(internal quotation marks omitted).  A partition may be necessary, but it should be used sparingly and only on a strong showing of actual need.  Otherwise, it gives the appearance that the Court -- not just the United States and USMS -- has decided that Baca is guilty and is already, given that presumption of guilt, decided to treat him

differently.  The Court seeks to treat Defendants with courtesy, and, by imposing a partition, the Court may be seen to be treating Baca with open suspicion and hostility.  That partition is not a good way for the Court to get started with a Defendant in a process of pretrial proceedings that may take a long time.  These proceedings have not yet reached a trial.  The Court is persuaded, however, that the risk of adverse publicity about what the Court is doing to Baca, particularly absent more concrete evidence of this partition's role in eliminating a security threat, also counsels against imposition of the USMS' proposal in this regard.  In other words, the Court should not unnecessarily make it harder to give Baca a fair trial down the road when there is not a strong evidentiary basis for this right now.  Accordingly, the Court will not, at this time, allow the USMS to cordon off Baca in such a fashion.

Finally, the Court stresses that its analysis of the First, Fifth, and Fourteenth Amendment rights has been in the pretrial proceedings, where the case is new, and the analysis will change at any trial.  The Constitutional rights are going to be much more permanent and pronounced at trial.  For example, the First Amendment rights will be harder to override at trial.  The Court will not allow a partition at trial, because that would be prejudicially unfair to a defendant during trial.  The press and other Defendants may desire to see Baca, and the Court will allow it, regardless what Baca is trying to do or communicate.  Juries are very intelligent and observant, and if he is trying to make such communications at trial, he endangers his defense.  Baca also will have a stronger right to be seen at trial, and it will override any security concerns.[10]  Finally, the Court can protect Baca's Confrontation Clause rights even with a partition, but the due process rights will be affected by the partition.  In any case, unless the United States or USMS

---

[10]The Court notes that, at trial, the manner in which the courtroom is situated can inherently limit Baca's opportunity to send coded messages to observers, should he actually be capable of such conduct.

comes up with more evidence of a security risk, there is not much competing with Baca's due

process rights.

## II.   THE COURT WILL NOT INCORPORATE INTO A COURT ORDER THE USMS' RESTRICTION OF COMMUNICATION AMONGST DEFENDANTS IN THE COURTROOM AND DURING BREAKS.

Next, the USMS explains that it

> will be limiting all communications/talking throughout the hearings (even during breaks) between defendants involved with the SNM prison gang conspiracy. It appears unnecessary communications/talking between defendants has escalated especially during breaks in the hearings. The USMS is tasked with maintaining the integrity of the judicial process. Please notify defense counsel that the USMS will be limiting unnecessary communications between defendants for all future hearings involving the SNM conspiracy.

Namoca Email at 1.  The Court allowed this restriction that the USMS requested for the

November 28, 2016, hearing, primarily because the Court was under the impression that the

USMS is merely reiterating restrictions that had already been imposed at the October hearing and

that the Defendants did not then challenge.  See, e.g., Oct. Tr. at 9:12-19 (Court).[11]

> [W]e've kind of had an agreement that the defendants will not talk to each other during -- while we're here in the courtroom.  If the defendants need to communicate, they've got attorneys here.  So they can talk to each other through their attorneys.  They won't talk directly to each other.  I think we've had that in the past.  That's what I understand the marshals are asking here.  So at least in the courtroom, talk to each other through attorneys, not directly to each other while

---

[11]At the hearing, the Court stated:

> All right.  The U.S. Marshals have requested that the attorneys not speak to other defendants.  You, of course, can speak to your clients.  But they request, for security purposes, that you not speak to other defendants during the course of this hearing.  Anybody got a great problem with that request?  Everybody can abide by it?  All right.

Oct. Tr. at 9:12-19 (Court).  Although not specifically addressing communication amongst the Defendants, the Court was under the impression that, on November 28, 2016, it had disallowed communication -- the Court must have assumed that, if the USMS asked counsel not to communicate with other Defendants, and the Defendants agreed, the USMS had also counseled against inter-Defendant communication in the courtroom.

we're here in the courtroom.

Tr. at 70:23-71:13 (Court).

The Court will not, by Court order, limit communication amongst Defendants while in the courtroom or during breaks.  On the other hand, the Court will not preclude the USMS from limiting such communication if such communication is disruptive.  The Court and the USMS have different roles.  If the Defendants want to communicate during the proceedings, they can channel their discussion through their attorneys.  See Tr. at 70:23-71:9 (Court).  The Defendants' attorneys are free to facilitate the flow of information between Defendants so that they may present a united defense, should they so choose.  The Court does not read the Nacoma Email to be trying to restrict that activity.   In the past, the USMS has raised the concern that the Defendants' counsel may unwittingly convey coded messages by passing on messages to another Defendant and have tried to restrict the Defendants' counsel from talking to anyone but the counsel's own Defendant during court.  The Namoca Email does not appear to go that far and thus the USMS seems to have backed off from that request.  The USMS may have realized that it cannot soundly ask counsel not to talk to other Defendants, who will be witnesses in the case.  It is true that they may become conduits of coded messages, but that could happen outside the courtroom as well as inside the courtroom.  The Court is not inclined to police closely what is happening in the courtroom when the same conduct may occur outside of the courtroom.  The Court will not impose any restriction on counsel talking to other Defendants or Defendants talking to other Defendants.  While the Court has great respect and appreciation for what the USMS is doing in this case to protect the Defendants and to provide security for all, the Court must apply the law even if there are security interests and concerns.  The Court is reluctant to prohibit all communication between Defendants in the courtroom, including during breaks.  The

Defendants have to prepare a defense.  The Court does not generally prohibit Defendants from talking to each other in other cases.  If it has not imposed a no-contact order in this case -- and no one has asked for one -- it does not see why it should do so in the courtroom.  The USMS is proposing to the Court that this restriction is in furtherance of its segregation of Defendants into different detention centers, but the Court cannot recreate prison conditions in its courtroom.  The United States and the USMS may have a host of reasons for segregation and for making communication difficult, and those reasons may have something to do with keeping Baca safe, and others safe from Baca.  The USMS' request is circumventing the law that has built up around no-contact orders.  The United States does not care about contact between some Defendants, because some are housed together and not segregated.  The USMS' requested order is thus overbroad.  It limits some communication about which the United States and even the USMS do not have a concern.  For example, Defendants that are housed in Torrance County with each other, and regularly interact, are usually seated together in the courtroom during these proceedings.  Restricting their communication while in court, but not outside of court, then, does not appear to accomplish anything.

In the end, the Court does not think it should make some broad rule that the Defendants not talk to each other in the courtroom.  Such a rule is not tailored to the circumstances.  There is insubstantial evidence that inappropriate activity is occurring in the courtroom.  While the Court will not order the Defendants not to speak to each other during breaks or in the courtroom, the abstention from such an order does not mean that the Defendants can disobey the USMS' orders.  The USMS is well trained to maintain order and to keep matters secure.  Their orders should not be ignored in this case any more than they would be in another case.  The USMS tells the Defendants all the time to sit down, be quiet, and to do or not to do things.  The USMS has the

power to maintain decorum in this case like it has in all others.  The Court obviously cannot hold

a proceeding if all Defendants and all attorneys -- sometime as many as thirty Defendants in the

courtroom -- are talking at the same time.  Thus, the Defendants have to be ready to have the

USMS order them to be quiet during proceedings.  Similarly, during breaks, the Defendants

cannot be threatening or intimidating other witnesses by yelling at them.  The Defendants will

have to obey orders from the USMS during breaks.  In short, the USMS should treat this case --

when it comes to Defendants talking -- like any other case, and the Defendants should -- when it

comes to obeying the USMS -- do so like they do in any other case.  The Court will not enter any

special order in this case on communication between Defendants in court or during breaks, but

the USMS should not see that as rendering them unable to do what they always do or somehow

to authorize the Defendants to talk when they should not.  To the extent that Baca and the rest of

the Defendants argue that they were not apprised before Namoca's Email of the restriction to

their communication amongst each other in the courtroom, and during breaks, the Court

reiterates that a restriction on the Defendants' counsel had been in place and the Court thought

that it extended to the Defendants.  The Court will rely, as it said at the June 2, 2016, hearing, on

the Defendants' appropriate behavior during these court proceedings.  See Tr. at 51:11-23

(Court).  As the Defendants continue to build a rapport with the Court, the Court will consider

making further accommodations for the Defendants in the courtroom.  See Tr. at 51:11-23

(Court).  At this time, the Court is convinced, however, that a restriction on communication in

court and during breaks is not needed for ensuring the security of all present.  Nevertheless, the

Court will not order the proposed restriction that Namoca's Email requests and will thus not

enforce its application in a fashion distinct from other cases.

## III.   THE COURT WILL RETAIN FINAL AUTHORITY OVER REMOVAL OF DEFENDANTS SHOULD THEY BE DISRUPTIVE TO COURT PROCEEDINGS.

Last, the USMS directs that the

Defendants who continue to communicate with other defendants and refuse to comply with orders from USMS personnel will be removed from the hearing. Prior to removal, a warning will be given to the court that a defendant is unnecessarily talking to other defendants and refusing to comply with orders from USMS personnel. Please notify defense counsel that the USMS will remove their client from the courtroom should they become disruptive.

Namoca Email at 1. The Court understands why the USMS wants the authority to act swiftly and promptly to eliminate distractions during courtroom proceedings. It is not clear, however, that they are asking for unilateral authority. They say "[p]rior to removal, a warning will be given to the court . . . ." Namoca Email at 1. If they are, the Court will retain the final authority of removal. Should the USMS alert the Court to disruptive conduct, the Court will take the USMS' suggestions under advisement as it makes its own independent determination. The Court, ultimately, is tasked with the conduct of its proceedings, and to the extent that it is feasible, the Court will not allow the USMS to remove Defendants without assent from the Court. See Martinez v. Winner, 771 F.2d at 434. The Court is likely to defer heavily, if not entirely, to the USMS about safety matters, particularly if matters deteriorate quickly. Nonetheless, if it is just talking too loud or something like in any other case, the Court will be the final authority. Thus far, the Court notes, no Defendants have exhibited a disruption of order nearing his or her necessity of removal. Accordingly, the Court will not impose in a court order the restriction as Namoca's Email states it.

**IT IS ORDERED** that: (i) the objections in Anthony Ray Baca's Opposition to Proposed Restrictions on his Participation and Inclusion in Court Proceedings, filed November 24, 2016 (Doc. 267 in United States v. Baca, No. CR 16-1613 JB), are sustained; (ii) the directives

outlined in the Email from Royce Namoca (USMS) to K'Aun Wild (dated November 10, 2016),

filed November 23, 2016 (Doc. 264), are not incorporated in any court order; (iii) Defendant

Baca will not, at this time, be subject to partitioning as the United States Marshal Service has

suggested; (iv) the Defendants are free communicate with one another, during courtroom

proceedings and breaks through their respective counsel as long as said communication in the

courtroom complies with the USMS' need to maintain control and ensure orderly proceedings;

and (v) any Defendants disrupting courtroom proceedings or otherwise violating the USMS'

regular and normal restrictions in an unacceptable manner will be subject to the Court's removal.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon Martinez
  United States Attorney
Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

-- and --

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

      *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

-- and --

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

     *Attorneys for Defendant Edward Troup*

Russell Dean Clark
Russell Dean Clark, LLC
Las Cruces, New Mexico

     *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

-- and --

Robert R. Cooper
Robert R. Cooper Law Firm, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

     *Attorney for Defendant Eugene Martinez*

Phillip A. Linder
The Linder Firm
Dallas, Texas

-- and --

Jeffrey C. Lahann
The Lahann Law Firm
Las Cruces, New Mexico

*Attorneys for Defendant Allen Patterson*

Orlando Mondragon
Law Office of Orlando Mondragon
El Paso, Texas

*Attorney for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers LLC
Denver, Colorado

-- and --

Noel P. Orquiz
Noel P. Orquiz Attorney at Law
Deming, New Mexico

*Attorneys for Defendant Javier Alonso*

Billy R. Blackburn
Billy R. Blackburn Law Office
Albuquerque, New Mexico

*Attorney for Defendant Arturo Arnulfo Garcia*

Jerry Daniel Herrera
Law Offices of J.D. Herrera
Albuquerque, New Mexico

-- and --

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

*Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Pedro Pineda, Attorney at Law
Las Cruces, New Mexico

*Attorney for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

     *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

-- and --

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

     *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Steven M. Potolsky, P.A.
Miami, Florida

-- and --

Santiago David Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

     *Attorneys for Defendant Mario Rodriguez*

Steven Lorenzo Almanza
Steven Almanza Law Firm
Las Cruces, New Mexico

     *Attorney for Defendant Timothy Martinez*

Joe A. Spencer
Joe A. Spencer Attorney & Counselor at Law
El Paso, Texas

-- and --

Mary Stillinger
The Law Office of Mary Stillinger
El Paso, Texas

    *Attorneys for Defendant Mauricio Varela*

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

-- and --

Richard Jewkes
Richard Jewkes, Attorney at Law
El Paso, Texas

    *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
George A. Harrison, Attorney at Law
Las Cruces, New Mexico

    *Attorney for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

    *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Theresa M. Duncan, Esq.
Albuquerque, New Mexico

-- and --

Marc M. Lowry
Rothstein, Donatelli, Hughes, Dahlstrom & Schoenburg, LLP
Albuquerque, New Mexico

    *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
McElhinney Law Firm LLC
Las Cruces, New Mexico

     *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Marcia J. Milner, Attorney at Law
Las Cruces, New Mexico

     *Attorney for Defendant Roy Paul Martinez*

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

-- and --

Christopher W. Adams
Charleston, South Carolina

     *Attorney for Defendant Christopher Garcia*

Michael V. Davis
Michael V. Davis, Attorney & Counselor at Law, P.C
Corrales, New Mexico

-- and --

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

     *Attorney for Defendant Carlos Herrera*

Donald R. West
Don West Law
Orlando, Florida

-- and --

Ryan J. Villa
The Law Office of Ryan J. Villa
Albuquerque, New Mexico

     *Attorneys for Defendant Rudy Perez*

Donavon A. Roberts
Donavon A. Roberts, Attorney at Law
Albuquerque, New Mexico

     *Attorney for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

     *Attorney for Defendant Santos Gonzalez*

Keith R. Romero
The Law Office of Keith R. Romero
Albuquerque, New Mexico

     *Attorney for Defendant Paul Rivera*

Angela Arellanes
Albuquerque, New Mexico

     *Attorney for Defendant Shauna Gutierrez*

Roman Romero
The Romero Law Firm, P.A.
Albuquerque, New Mexico

-- and --

Wayne Baker
Law Office of Wayne Baker
Albuquerque, New Mexico

     *Attorneys for Defendant David Calbert*

Todd Bruce Hotchkiss
Todd B. Hotchkiss, Attorney at Law, LLC
Albuquerque, New Mexico

     *Attorney for Defendant Manuel Jacob Armijo*

John C. Anderson
Holland & Hart, LLP
Santa Fe, New Mexico

     *Attorneys for Defendant Frederico Munoz*

Donald Kochersberger
Business Law Southwest, LLC
Albuquerque, New Mexico

    *Attorneys for Defendant Sergio Loya Rodriguez*

Barrett (Barry) George Porter
Burgess and Porter Law, LLC
Albuquerque, New Mexico

    *Attorneys for Defendant Manuel Benito*

Diego R. Esquibel
The Barnett Law Firm
Albuquerque, New Mexico

    *Attorneys for Defendant Vincent Garduño*

Marc Grano
Grano Law Offices
Las Vegas, New Mexico

    *Attorney for Defendant Mandel Lon Parker*

Daniel J. Tallon
Daniel J. Tallon, Attorney at Law
Placitas, New Mexico

-- and --

Ahmad Assed
Law Office of Ahmad Assed
Albuquerque, New Mexico

    *Attorneys for Defendant Daniel Archuleta*

Marcia A. Morrissey
Santa Monica, California

-- and --

Gregory M. Acton
Albuquerque, New Mexico

    *Attorneys for Defendant Anthony Cordova*

David Evans

-- and --

Marshall J. Ray
Law Offices of Marshall J. Ray LLC
Albuquerque, New Mexico

-- and --

Kari T. Morrissey
Law Office of Kari Morrissey
Albuquerque, New Mexico

*Attorneys for Defendant Richard Gallegos*