# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                         No. CR 16-1613 JB

ANTHONY RAY BACA, a.k.a. "Pup;"
CHRISTOPHER GARCIA, MANUEL
JACOB ARMIJO, a.k.a. "Big Jake;"
FREDERICO MUNOZ, a.k.a. "Playboy;"
SERGIO LOYA RODRIGUEZ, a.k.a.
"Churro;" MANUEL BENITO, a.k.a.
"Panther;" VINCENT GARDUÑO, a.k.a.
"Fatal; MANDEL LON PARKER, a.k.a.
"Chuco;" DANIEL ARCHULETA, a.k.a.
"Smurf;" DANIEL SANCHEZ, a.k.a. "Dan
Dan;" ANTHONY CORDOVA, a.k.a.
"Antone;" and RICHARD GALLEGOS,
a.k.a. "Dopey,"

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Manuel Benito's Appeal of

Detention Order, filed November 9, 2016 (Doc. 253)("Appeal"). The Court held a hearing on

December 6, 2016. The primary issue is whether Defendant Manuel Benito presents a flight risk

or is a danger to the community, and should therefore remain in custody pending trial, or whether

the Court can furnish conditions of release that can reduce those risks to acceptable levels. The

Court concludes that, given Benito's criminal history, previous lack of good conduct on release,

substance abuse, and history of placing law enforcement officers at risk, there is no condition or

combination of conditions that will reasonably ensure the community's safety, or, assure his

appearance in Court proceedings. The Court will deny Benito's Appeal, thereby affirming the

Honorable Karen Molzen, Chief United States Magistrate Judge for the United States District

Court for the District of New Mexico's Order of Detention. <u>See</u> Order, filed August 5, 2016 (Doc. 191)("Order of Detention").

## **FACTUAL BACKGROUND**

After the Grand Jury issued its Indictment, filed April 21, 2016 (Doc. 2)("Indictment"), in <u>United States v. Baca</u>, No. CR 16-1613 JB (D.N.M.)(Browning, J.), Benito was detained. To provide context, the Court takes its recitation of facts from the Indictment. The Court does not adopt the facts as findings or the truth. The Court recognizes that the factual background is largely Plaintiff United States of America's version and also recognizes that the Defendants are all presumed innocent.

Syndicato de Nuevo Mexico ("SNM") is a prison gang that controls drug distribution and other illegal activities within the New Mexico prison system, and is similarly involved in narcotics trafficking occurring outside of the prison system. <u>See</u> Indictment ¶ 3, at 2. It is alleged that SNM's leaders, members, prospects, and associates constitute an enterprise as defined under 18 U.S.C. §§ 1959(b)(2) and 1961(4), which provide that an enterprise constitutes a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce. <u>See</u> Indictment ¶ 2, at 2. The Indictment thus provides that SNM constitutes "an ongoing organization whose members/prospects/associates function[] as a continuing unit for the common purpose of achieving the objectives of the enterprise." Indictment ¶ 2, at 2. Accordingly, the Indictment alleges that Defendants Anthony Ray Baca, Christopher Garcia, Manuel Jacob Armijo, Frederico Munoz, Sergio Loya Rodriguez, Benito, Vincent Garduño, Mandel Lon Parker, Daniel Archuleta, Daniel Sanchez, Anthony Cordova, and Richard Gallegos committed: (i) Racketeering Conspiracy under 18 U.S.C. § 1962(d); (ii) Violent Crimes in Aid of Racketeering (Murder) under 18 U.S.C. § 1959(a)(1); (iii) Aiding and

Abetting under 18 U.S.C. § 2; and (iv) Violent Crimes in Aid of Racketeering (Conspiracy to Murder) under 18 U.S.C. § 1959(a)(5).  See Indictment ¶ 1 at 8.

SNM was formed after the February 1980, prison riots at the New Mexico Penitentiary in Santa Fe, New Mexico.  See Indictment ¶ 3, at 2.  During the prison riot, thirty-three inmates were killed; more than 200 inmates were injured; and certain inmates held hostage, assaulted, and raped twelve correctional officers.  See Indictment ¶ 3, at 2.  Since the prison riot, SNM has expanded throughout the New Mexican prison system and has an estimated 250 members.  See Indictment ¶ 4, at 2-3.  SNM's main goals include controlling and profiting from narcotics trafficking.  See Indictment ¶ 5, at 3.  SNM members are often expected to confront and attack suspected informants, cooperating witnesses, homosexuals, and sex offenders.  See Indictment ¶ 8, at 4.

Despite prison officials' close scrutiny, SNM leaders communicate orders to members and associates throughout and outside of the prison system by a variety of means, including secret notes, coded letters, and messages that complicit visitors deliver.  See Indictment ¶ 5, at 3.  SNM members are expected to remain loyal to the gang when they are released from prison.  See Indictment ¶ 5, at 3.  SNM disciplines members who fail to show continued loyalty in a variety of ways, including assault and murder.  See Indictment ¶ 5, at 3.  SNM members might display affiliation and loyalty with the Zia symbol,[1] the letters "SNM", the letter "S," and the numbers "19"[2] and "505"[3] in tattoos, graffiti, drawings, and on clothing.  Indictment ¶ 9, at 4-5.

---

[1] The Zia sun symbol, originating as the sun symbol of the Zia Pueblo, now serves as the centerpiece of the New Mexico state flag.  See The Zia Sun Symbol, New Mexico History, available at  http://newmexicohistory.org/multimedia/videos/the-zia-sun-symbol  (last accessed April 12, 2017).

[2] A tattoo displaying the number "19" refers to the letter "S," which represents the SNM gang.  See  The Albuquerque Journal, 25 prison gang member indicted, available at

SNM also operates outside of the prison system in the streets of New Mexico, influencing and intimidating smaller New Mexico gangs to establish a larger network for its illegal activities. <u>See</u> Indictment 6, at 3. Accordingly, SNM does not always have to use violence to assert its control outside of prison, because the smaller gangs often fear that SNM members will assault or kill their compatriots should they be incarcerated. <u>See</u> Indictment ¶ 6, at 3. SNM thus retains a large membership and powerful reputation that subdues rival gangs, and prevents victims and witnesses from assisting authorities. <u>See</u> Indictment ¶ 8, at 4.

The Indictment alleges that SNM engages in violence

> to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, to gain notoriety and show its superiority over others, and to send a message to others that it is strong, powerful, and not to be provoked.

Indictment ¶ 7, at 4. SNM "members and associates commit, conspire, attempt, and threaten to commit acts of violence, including murders and assaults to protect and expand the enterprise's criminal operations." Indictment ¶ 13(a), at 6. If the gang had a weak reputation, it would lose its membership and dissolve. <u>See</u> Indictment ¶ 8, at 4.

With respect to Benito's alleged SNM association, the United States contends that he performed nineteen unlawful overt acts "in furtherance of the conduct of the enterprise's affairs." <u>See</u> Indictment ¶ 11, at 5. First, the United States alleges that he joined SNM before 1997. <u>See</u> Indictment ¶ 22, at 13. The United States also alleges that Benito has a Zia symbol tattoo, which indicates affiliation with SNM. <u>See</u> Transcript of Hearing at 17:19-21 (taken December 6,

---

https://www.abqjournal.com/685837/25-prison-gang-members-indicted.html (last accessed April 5, 2017).

[3]Until October 7, 2007, the "505" area code covered the entire state of New Mexico, and currently serves the Albuquerque, Santa Fe, and Farmington metropolitan areas. <u>See</u> Area Code 505, <u>available at</u> https://en.wikipedia.org/wiki/Area_code_505 (last accessed April 12, 2017).

2016)(Castellano)("Tr.").[4]  Second, Benito allegedly robbed a Pizza Hut employee on or about March 3, 1996, while he possessed a firearm.  See Indictment ¶ 19, at 12.  Third, on or about June 2, 1997, Benito allegedly "possessed substances used to make an intoxicant (homemade alcohol) which was to be shared among SNM Gang members and sold to other inmates" while he was in the New Mexico Corrections Department's ("NMCD") custody.  Indictment ¶ 28, at 13. Fourth, Benito "possessed a homemade weapon and attempted to hide the weapon" while in the NMCD's custody on or about July 1, 1997.  Indictment ¶ 30, at 14.  Fifth, Benito allegedly killed F.M. with Leonard Lujan and Munoz while incarcerated at Bernalillo County Detention Center on or about July 5, 1998.  Indictment ¶ 40, at 15.  As part of the murder, Benito was alleged to have "held the door or watched the door while [other] inmates committed a homicide."  Tr. 8:5-7 (Porter).  As a result, Benito plead guilty, in 2009, to conspiracy to commit murder, was sentenced to six years confinement followed by two years parole, and the remaining counts of first-degree murder and prisoner in possession of a deadly weapon or explosive were dismissed. See Pretrial Services Report at 9, (disclosed July 6, 2016)("Bail Report").  Sixth, on or before February 19, 1999, Benito was allegedly found to be a danger and placed in administrative segregation, because he "threatened, harassed, and intimidated other inmates" while in the NMCD's custody.  Indictment ¶ 47, at 17.  Seventh, on or about June 10, 1999, Benito allegedly warned other SNM gang members when correctional officers entered the SNM housing unit while he was in the NMCD's custody.  See Indictment ¶ 52, at 17.  Eighth, Benito allegedly possessed marijuana while in the NMCD's custody on or about November 21, 1999.  See Indictment ¶ 53, at 17.  Ninth, Benito allegedly "threatened to assault another inmate" while in the NMCD's custody on or about May 9, 2000.  Indictment ¶ 54, at 18.  Tenth, Benito allegedly

---

[4]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

"threatened, harassed, and intimidated other inmates, was found to be a danger, and was placed in administrative segregation" while in the NMCD's custody on or before September 17, 2001. Indictment ¶ 62, at 19. Eleventh, on or about March 29, 2002, Benito allegedly admitted to being a member of SNM, and correctional officers allegedly saw him to have SNM tattoos. See Indictment ¶ 64, at 19. Twelfth, Benito allegedly "assaulted a victim and fled from police officers" on or about September 21, 2003. Indictment ¶ 74, at 21. Thirteenth, Benito allegedly assaulted inmate R.C. with another SNM gang member while in the NMCD's custody on or about October 25, 2005. See Indictment ¶ 98, at 24. Fourteenth, on or before November 18, 2007, Benito allegedly "threatened, harassed, and intimidated other inmates, was found to be a danger, and was placed in administrative segregation" for a third time while in the NMCD's custody. Indictment ¶ 112, at 26. Fifteenth, Benito allegedly passed messages to other SNM gang members while in NMCD's custody on or about February 21, 2008. See Indictment ¶ 116, at 27. Sixteenth, on or before April 18, 2008, Benito allegedly "threatened, harassed, and intimidated other inmates, was found to be a danger, and was placed in administrative segregation" for a fourth time while in the NMCD's custody. Indictment ¶ 120, at 28. Seventeenth, Benito allegedly "possessed alcohol and materials to make alcohol," and assaulted a correctional officer while being led out of his cell on or about June 12, 2008. Indictment ¶ 121, at 28. Eighteenth, Benito allegedly signed an SNM "Petition for Roll Call," written by SNM member G.C., along with Defendant Christopher Garcia and several other SNM members. Indictment ¶ 125, at 29. Nineteenth, and finally, Benito allegedly "burglarized a residence and fled from police officers" on or about April 12, 2015. Indictment ¶ 187, at 40.

When Benito was arrested on April 28, 2016, for the current charges, he barricaded himself in his home. See Appeal at 2. See also Bernalillo County Sheriff's Department Special Investigations Unit Supplemental Report Form and Incident Report (dated May 2, 2016), filed

July 15, 2016 (Doc. 181-1)("BCSO Report").  He remained in his home for approximately one and one-half hours until law enforcement deployed "a flash bang and gas."  Tr. at 10:1 (Castellano).  Arresting officers found a syringe in Benito's pocket at the time of arrest.  See Tr. at 10:2-4 (Castellano).  According to the United States, at the time of his arrest, Benito admitted that "he believed that he had outstanding warrants for his arrest."  United States Response in Opposition to Defendant's Motion for Revocation of Detention Order and Release from Pretrial Detention, filed July 15, 2016, at 3 (Doc. 181)("Response").  Moreover, the United States believes that Benito was on release from several other state cases at the time of his arrest.  Response at 3.  During processing, Benito appeared to be incoherent and told officers that his name was "Amy Carrasco."  BCSO Report at 4.  Additionally, Benito's mother stated that she "believed her son was self-medicating by injecting heroin and methamphetamine," because he has a history of heroin use dating back to his teenage years when he was a member of the 18th Street Gang, and he has only inconsistently taken his psychotropic medications.  Tr. at 10:4-15 (Castellano).  Bail Report at 3.  Benito has "declined to discuss drug and alcohol abuse" at his counsel's request.  Bail Report at 3.

Benito has a history of learning disabilities and mental health issues.  See Bail Report at 1-3.  He was "diagnosed [with] learning disabilities throughout elementary, junior high, and high school."  Bail Report at 2.  Benito has also reported that he has been granted disability by the Social Security Administration because of his mental health issues.  See Bail Report at 2.  The diagnoses include: depression; post-traumatic stress disorder; anxiety disorder; cognitive functioning disorder; and schizophrenia.  See Bail Report at 3.  Benito self-reported that he was prescribed Wellbutrin and "other unknown drugs to control his mental disorders," which, according to his mother, he does not take as prescribed.  Bail Report at 3.

During his appeal of pretrial detention, Benito argued that his lack of criminal history after 2003 is important, because it demonstrates that he has "age[d] out of criminal conduct." Tr. at 5:9 (Porter). Accordingly, the Court will look at Benito's criminal history in light of that assertion, by explaining his criminal history as separated according to his pre- and post-2003 violations.

Benito has a juvenile and adult criminal record. See Bail Report at 3-13. Before 2003 and during his adulthood, Benito was charged with criminal conduct fourteen times, not including the two charges alleged to underlie Benito's current charges; eleven of those charges resulted in conviction. See Bail Report at 5-10. From 1993 up to and including 2003, Benito was convicted of the following: (i) criminal trespass (October 1993); (ii) unlawful taking of a motor vehicle (November 1993); (iii) resisting, evading, or obstructing an officer (November 1993); (iv) concealing identity (May 1994); (v) intentional arson over $1,000.00 (May 1994); (vi) petty larceny (November 1994); (vii) minor in possession of alcohol (September 1995); (viii) armed robbery with a deadly weapon (March 1996); (ix) conspiracy (March 1996); (x) public affray (June 1996); and (xi) residential burglary (June 1998). See Bail Report at 5-10. Only one of those fourteen charges were dismissed outright. See Bail Report at 5-10. Another charge was dismissed in 1994, because the victim/witness was not available; however, Benito plead guilty to failing to appear as a result of that domestic violence case. See Bail Report at 6. Similarly, an underlying battery against a household member and criminal damage to property charge was dismissed in 1996, although Benito plead guilty to failing to appear twice as a result of that matter. See Bail Report at 8. During that same time period, there are records indicating that Benito failed to appear, failed to comply with probation/parole requirements, and absconded multiple times. See Bail Report at 5-10. According to the Bail Report, Benito has had ten different state criminal cases filed since 2003. See Bail Report at 10-13. Three of those ten

cases are still outstanding: (i) a case following a January, 2014, arrest, alleging aggravated battery with a deadly weapon, aggravated assault with a deadly weapon, aggravated assault, and conspiracy to commit aggravated battery with a deadly weapon; (ii) a case following a February, 2015, arrest, alleging criminal damage to property under $1,000.00, and in which Benito failed to appear; and, (iii) a case following an August, 2015, arrest, alleging criminal damage to property under $1,000.00, and in which Benito twice failed to appear. See Bail Report 10-12. Two of Benito's post-2003 charges resulted in convictions: (i) the first conviction followed a guilty plea for a 2015 charge of marijuana possession; and (ii) a subsequent conviction in 2015 for disorderly conduct, during which Benito failed to appear. See Bail Report at 11-12. Benito's June, 2008, charge alleging aggravated battery on a household member was dismissed by a nolle prosequi. See Bail Report at 10. Benito's April, 2015, charge for battery against a household member, and, his April, 2015, breaking and entering charge, were also dismissed. See Bail Report at 11. Benito's May, 2015, charges alleging battery upon a peace officer, assault upon a peace officer, and two counts of resisting an officer, were dismissed by a nolle prosequi after Benito failed to appear. See Bail Report at 12. Most recently, Benito's charge following his November, 2015, arrest for possession of a controlled substance was dismissed by a nolle prosequi. See Bail Report at 13. Benito was also incarcerated from approximately 2009 to 2015. See Tr. 8:12-13 (Porter).

Pretrial Services recommends that Benito remain in custody "as it appears there is no condition or combination of conditions that will reasonably assure the appearance of this defendant as required or the safety of the community." Bail Report at 4. In support of its recommendation, Pretrial Services alleges seven factors which indicate that Benito poses a danger to the community: (i) the "[n]ature of the alleged offense;" (ii) "[a]rrest and conviction history;" (iii) "[h]istory of violence/weapons related offenses;" (iv) "[h]istory of domestic

violence/abuse;" (v) "[h]istory of assault on a law officer;" (vi) "[h]istory of unresolved substance abuse and addiction issues;" and, (vii) "[o]ther pending criminal charges." Bail Report at 4. Moreover, Pretrial Services' assessment of non-appearance cited five factors that indicate a risk of further non-appearance: (i) "[p]rior [f]ailures to appear for court;" (ii) "[u]se of other names and identifiers;" (iii) "[s]ubstance abuse and or addiction;" (iv) "[p]ast poor performance under community supervision, and non-compliance with Court order;" and, finally, (v) "[c]onduct at the time of arrest (barricade/uncooperative)." Bail Report at 3.

## PROCEDURAL BACKGROUND

In this opinion, the Court considers only Benito's Appeal of Detention Order. For fuller context, there are three cases before the Court related to SNM's alleged criminal activity. In a related case -- United States v. DeLeon -- a superseding indictment names thirty Defendants, all of whom are alleged SNM members or associates, and all of whom have allegedly engaged in Violent Crimes in Aid of Racketeering activity, under 18 U.S.C. § 1959. See United States v. DeLeon, No. CR. 15-4268 JB, Superseding Indictment at 1, filed April 21, 2016 (Doc. 367). There is also a prosecution of one Defendant for drug crimes, see United States v. Garcia, No. CR15-4275 JB (D.N.M.)(Browning, J.), and of four Defendants for further alleged conduct constituting Violent Crimes in Aid of Racketeering activity, under 18 U.S.C. § 1959, see United States v. Varela, No. CR 15-4269 JB (D.N.M.)(Browning, J.).

1.      **Benito's Appeal.**

Benito "appeals the Order of Chief U.S. Magistrate Judge Karen B. Molzen denying his Motion for Revocation of Detention Order and Release from Pretrial Detention." Appeal at 1. Chief Magistrate Judge Molzen rejected Benito's proposed placement and supervision plan at his renewed detention hearing, which took place on August 5, 2016. See Appeal at 3. Benito argues that the Court should review the Order of Detention, because "there are conditions of release that

will reasonably assure [his] appearance . . . as required and the safety of any other person and the community." Appeal at 1 (internal quotation marks and citations omitted). In support, Benito states that his appearance in court and the safety of the community can be ensured for three reasons: (i) he has a plan for release; (ii) he is not a flight risk; and, (iii) he presents no danger to the community. See Appeal at 3-4. Pretrial Services recommended that Benito continue to be detained "as it appears there is no condition or combination of conditions that will reasonably assure the appearance of this defendant as required or the safety of the community." Bail Report at 4.

Benito's assertion "that there are conditions that could be fashioned to ensure his appearance in court" is based on six premises. Appeal at 3-4. Benito first proposes that he live with his sixty-four-year-old mother, Irene Benito, in Albuquerque, New Mexico, who can sponsor him, "provide a drug and alcohol free residence, and assist with ensuring that [he] attends court as required and abides by any conditions of release." Appeal at 3. I. Benito is retired and does not have a criminal history. See Appeal at 3. I. Benito, however, had a child removed from her care and custody because of chronic alcoholism and a diagnosis of Fetal Alcohol Syndrome. See Bail Report at 2. Benito is willing to subject himself to the electronic monitoring of his whereabouts twenty-four hours a day or, alternatively, "reside at a half-way house pending his trial." Appeal at 3. Benito also cites his "severe learning disability, [being] only partially literate, and . . . on social security disability since his childhood" under his plan for pretrial release. Appeal at 3. Additionally, Benito states that two of his siblings reside in Albuquerque and are willing to assist him with appearing in court and complying with release conditions. See Appeal at 4. Last, Benito consents to drug and alcohol testing, and proposes participation in a substance abuse assessment. See Appeal at 4. Benito suggests all of these alternatives in an attempt to rebut Pretrial Services' assessment of non-appearance, which

indicates a risk of non-appearance for: (i) "[p]rior [f]ailures to appear for court;" (ii) "[u]se of other names and identifiers;" (iii) "[s]ubstance abuse and or addiction;" (iv) "[p]ast poor performance under community supervision, and non-compliance with Court order;" and, finally, (v) "[c]onduct at the time of arrest (barricade/uncooperative)." Bail Report at 3.

To further support his allegation that he is not a flight risk, Benito states that he was born and raised in Albuquerque, has "[a]ll of his family and community ties [within] New Mexico," and, furthermore, has "no ties to any other states or foreign countries." Appeal at 4. Benito has two children, aged nineteen and twenty-two, who live in Albuquerque. See Motion at 3. Although, Benito's father is a Mexican national, Benito maintains that he has not had contact with him for thirty years. See Bail Report at 1.

Benito next alleges that he is not a danger to the community for three reasons. See Appeal at 4. First, while he acknowledges his "significant criminal history," he contends that, because his last violent conviction was in 2008, the lack of any subsequent violent convictions indicates an absence of danger to the community. Appeal at 4. Second, Benito asserts that, because he was not in custody, nor under judicial supervision when he was arrested in this matter, he is not a danger to the community. See Appeal at 4. Finally, Benito alleges that he is not a danger to the community, because he has been charged with mere conspiracy related to SNM's racketeering activity dating back to 1980, and he "was five years old in 1980." Appeal at 4.

Benito then addresses the "release and detention factors," as 18 U.S.C. § 3142(g) requires, and argues that the factors favor his release. Appeal at 6. First, Benito argues that the nature and circumstances of the single count of "conspiracy to commit the offense of racketeering" against him favors release. Appeal at 6. Second, Benito addresses the weight of the evidence against him, by reviewing the overt acts that the Indictment alleges. See Appeal at

6.   According to Benito, the alleged Pizza Hut robbery, called overt act one, was in no way connected to SNM or any other prison gang, and took place two decades before the appeal.  See Appeal at 6.  As to the other overt acts that the Indictment alleges, Benito argues that they are "typical of any inmate in a correctional facility."  Appeal at 6.  Moreover, Benito affirmatively states that he "was housed involuntarily in the SNM housing unit by the New Mexico Corrections Department," and so it was not his choice to interact with them while incarcerated. Appeal at 7.

The third factor, "[h]istory and [c]haracteristics of [i]ndividual," favors release, Benito argues, because he has "avoided contact with any gang members, [and] focused on helping his mother and staying at home," and most of his alleged overt acts occurred approximately twenty years ago.   Appeal at 7.   Fourth, Benito addresses the factor of "[p]hysical and [m]ental [c]ondition" and argues that he "currently suffers from a mental/cognitive disorder[,] [] was on social security disability before his arrest[, and,] [c]ontinued incarceration causes him great mental anguish and exacerbates his mental disabilities."  Appeal at 7.  Fifth, Benito states that all of his familial and community ties are in the Albuquerque area.  See Appeal at 7.  Sixth, Benito states that he has a history of substance abuse, but, "is eager to be engaged in treatment."  Appeal at 8.  Seventh, Benito admits that his criminal history dates to when he was eighteen; however, his last "offense involving violence was in 2009 for an offense that occurred in 1998 . . . [and] [h]is only criminal convictions since 2009[] include two petty misdemeanor offenses: possession of marijuana [] in February 2015, and disorderly conduct in October 2015."  Appeal at 8. Eighth, Benito asserts that he "was not under probation or parole supervision nor was he on release from any other criminal offense at the time of . . . arrest."  Appeal at 8.  Finally, Benito states that, regarding the "[n]ature and [s]eriousness of [d]anger to [o]thers or [c]ommunity . . . , most of the Overt Acts allegedly committed by [him] were non-violent in nature," except for the

alleged murder overt act, which according to Benito is an inaccurate allegation. Appeal at 8.

Last, Benito, affirmatively states that he "has focused his energies on staying healthy and helping

his mother at home" since his release. Appeal at 8.

### 2. The Original Motion and Response.

The United States did not file a Response to Benito's Appeal, and thus, Benito did not

file a Reply. There was, however, a response to Benito's initial Motion for Revocation of

Detention Order and Release from Pretrial Detention, filed July 1, 2016 (Doc. 164)("Motion").

Benito's original Motion "request[ed] review of the detention order (Doc. 70) entered by Chief

U.S. Magistrate Judge Karen B. Molzen, at his arraignment." Motion at 1. Initially, Benito

"waived [his original] detention hearing and reserved [his] right to file for release at a later date,"

so that he could "gather more information . . . in support [of his] request for release pending the

trial in this matter." Motion at 2. The Court does not recount in detail Benito's arguments in the

Motion, because they are the same as his arguments in the Appeal. The Court addresses,

however, the United States' Response, because it chose not to respond to the Appeal.

The United States filed its Response in Opposition to Defendant's Motion for Revocation

of Detention Order and Release from Pretrial Detention, filed July 15, 2016 (Doc.

181)("Response"), and "move[d] for the continued detention of defendant Manuel Benito."

Response at 1. The United States argues that because of the charged Racketeering Conspiracy's

nature, and Benito's own "history and characteristics, there are no conditions that will guarantee

his appearance at future judicial proceedings or the community's safety." Response at 1. In

support, the United States also addresses the factors under 18 U.S.C. § 3142(g). See Response at

2-3. First, the United States reaches an opposite conclusion from Benito regarding his offenses'

nature and circumstances. See Response at 2. It alleges that a charge of racketeering conspiracy

and the corresponding nineteen overt acts favors Benito's continued detention. See Response at

2.  Second, the United States alleges that it has strong evidence against Benito favoring pretrial detention, thus, maintaining: (i) that Benito was convicted of "several" of the overt acts; (ii) the United States has numerous cooperating witnesses; (iii) the United States can prove that Benito is an SNM member; and (iv) the United States can prove that Benito committed crimes of SNM's behalf.  Response at 2.  Finally, the United States argues that Benito's history and characteristics show that he is a danger to the community.  See Response at 3.  In support of that proposition, the United States relays Benito's criminal history and further indicates that Benito himself admits that "he believed that he had outstanding warrants for his arrest."  Response at 3. Moreover, the United States argues, because Benito has a history of failures to appear and absconding, those infractions "clearly establish that he presents a risk of non-appearance . . . [and] [a]s the reality of the indictments sinks in, the defendant's aversion to the consequences of a federal conviction and spending a significant amount of time in federal prison will only grow." Response at 3.  Furthermore, Benito had to be forced out of his house by the deployment of chemicals and was under the influence of drugs at the time of his arrest.  See Response at 4. Hence, the United States argues, Benito is a danger to the community and should remain in custody.  See Response at 3-4.

Regarding conditions that could be fashioned to mitigate non-appearance or danger to the community, the United States argues that Benito's plan to stay with his mother, I. Benito, is not suitable.  See Response at 4.  In support of its argument, the United States reasons that Benito's mother's fabrication -- I. Benito told agents that her son had come to her home only the night prior to their conversation when the agents had her home under surveillance and knew that M. Benito had been at her home a minimum of two weeks -- to stop agents from getting him shows that her custody is inappropriate for his situation and would not mitigate danger.  See Response at 4.  Similarly, the house of Benito's mother is under a continuing narcotic trafficking

investigation, and Benito should not be placed in that state of affairs.  See Response at 4.  In conclusion, the United States argues that Benito "poses a serious risk of flight if released[,] [t]here is no condition or combination of conditions of release that will adequately address these concerns . . . [, and therefore,] asks the Court to deny the defendant [sic] pretrial release pending trial."  See Response at 4.

### 3.    The December 6, 2016, Hearing.

The Court held a hearing on December 6, 2016, and Benito began the hearing by providing background on his past.  Tr. at 2:14-17 (Porter).  Benito's counsel recounted that Benito appeared "very humble and burst into [tears,] basically [because he was] in a position of feeling like he was involved in something way over his head."  Tr. at 2:14-17 (Porter).  Benito then stressed his cognitive disability with an explanation of the difficulties he faces in the present action because of his disability.  See Tr. at 3:1-20 (Porter).  Benito explained that he "needs a lot of assistance to understand[] the complex discovery and the legal issues . . . and is also the type of person that was easily influenced."  Tr. at 3:14-17 (Porter).  Benito then presented two issues for the Court: the issue of flight and, most important, the issue of present "dangerousness" to the community.  Tr. at 3:20-21; 4:18-22 (Porter).

First, Benito argued that he is not a flight risk, because he "has never been outside the state of New Mexico . . . and all of his family ties [are here]."  Tr. at 3:21-23 (Porter).  I. Benito and Havana Saiz, Benito's sister, were also present during the hearing to "show their support and answer any questions the Court has."  Tr. at 3:23-4:1 (Porter).  Benito said that he could live with I. Benito in Albuquerque in a room where he would be the exclusive occupant, which "could be readily searched by pretrial and checked on a daily or weekly basis."  Tr. at 4:3-8 (Porter).  Moreover, I. Benito is retired and present in the home "all the time."  Tr. at 4:10 (Porter).  Then, Benito alleged that "[t]he house is a clean and sober house . . . and . . . Benito has . . . no ties to

any other countries" or other States.  Tr. at 4:11-14 (Porter).  Benito concluded the issue by stating that he has always stayed in New Mexico and has never fled the state, even when he was facing "big things."  Tr. at 4:14-18 (Porter).

Benito next addressed the issue whether he is "presently a danger to the community if released."  Tr. at 4:18-22 (Porter).  Benito argued that all of his significant criminal conduct occurred many years ago, that the only recent convictions were for two petty misdemeanors, and that he has, essentially, "age[d] out of criminal conduct."  Tr. at 4:22-5:9 (Porter).  Regarding the current allegations, Benito argues that the most serious accusations took place in the 1980s and he was in his elementary-school years at the time.  Tr. at 5:10-13 (Porter).  Furthermore, Benito alleged that he has already served "significant prison time" for the conspiracy to homicide, "not the actual killing of anyone," which is what "brought him into contact with . . . SNM."  Tr. at 5:14-17 (Porter).  Benito then contended that his mental issues are no longer present; that "[h]e was compliant; he wasn't combative with the FBI agents and [is] otherwise cooperative."  Tr. at 5:21-24 (Porter).

Benito then argued that there is an "absence of any evidence that he's a flight risk[]," and "absent any clear and convincing evidence that he's presently dangerous there is also due process consideration"; hence, "there is [no] need for him to sit in custody for [the] year [before trial]."  See Tr. at 5:25-6:13 (Porter).  Benito then proposed his release specifically to La Posada[5] with the following terms:

---

[5]Alternative House Inc./La Posada Halfway House is a holding facility for people that are coming out of federal prison or are going into federal prison.  Behavioral Health Services, Network of Care, August 9, 2016, http://newmexico.networkofcare.org/mh/services/agency.aspx?pid=AlternativeHouseIncLaPosad aHalfwayHouse_1446_2_0 (last accessed April 12, 2017).

[6]La Posada Halfway House is also referred to as "La Pasada Halfway House."  Yellow Pages, https://www.yellowpages.com/albuquerque-nm/mip/la-pasada-halfway-house-453861236 (last accessed April 8, 2017).

[W]ith electronic monitoring for a period of six months. That he get some programming for his substance abuse issues . . . and that I'm sure the Court is aware there is no place more strict and stringent than La Pasada as far as keeping track of Mr. Benito, making sure he's not using substances. In the event that he is successful at La Pasada for six months, we would then ask the Court to have him reside with his family, with the same conditions with electronic monitoring continuing any substance abuse programming that is necessary . . . propose to have Mr. Benito come to my [Porter's] office every week to review discovery and allow me [Porter] to ensure that he's continuing to comply with the conditions of release.

Tr. at 6:15-7:14 (Porter).

The Court then requested more information related to Benito's guilty plea and the 1998 murder. See Tr. at 7:2-8:1 (Court). In response, Benito's counsel stated: "Mr. Benito was alleged to have held the door or watched the door while [other] inmates committed a homicide." Tr. 8:5-7 (Porter). Benito then urged the Court to consider the long amount of time between the 1998 murder, the 2009 conviction, and the present time, and, although he was incarcerated, the gap between his crimes. See Tr. at 8:7-9:3 (Porter). Benito's counsel discounted the incarceration, because "[i]t's just as easy to commit a state crime while in state custody . . . and Benito was able to avoid criminal conduct." Tr. at 8:22-9:3 (Porter). The United States asserted, however, that SNM ordered F.M.'s death as retribution for F.M.'s participation in a drive-by shooting that injured a young girl and that Benito was initially responsible only for keeping watch at the door while the murder took place. See Tr. at 12:13-21 (Castellano, Court). The United States indicated that Benito's co-defendant for those charges also pled guilty and admitted that Benito had to "help hold down[] [the] victim while they strangled him to death." Tr. at 13:9-19 (Castellano). Benito strongly challenged that accusation and asserted that "[t]he door [] which Mr. Benito was watching was on the lower level. And not even on the same level [as the homicide]." Tr. at 19:23-3 (Porter). Furthermore, the United States alleges that Benito, while in Court at the July 8, 2016, hearing for the present case, asked the person sitting next to

him in the jury box to say that Benito was not involved in the murder at all; Benito strongly contests that accusation. See Tr. at 17:22-18:2 (Castellano); Tr. at 19:17-20 (Porter). The Court next requested more information regarding Benito's recent dismissed charges for assault, resisting, and failure to appear. See Tr. at 9:4-9 (Court). Benito simply stated that the state prosecutor chose not to move forward. See Tr. at 9:9-11 (Porter). The United States then argued that the relevant statute requires assurance that the defendant will appear in court and, not necessarily flee. See Tr. at 9:16-21 (Castellano). The United States then argued:

> Let me start with the date of his arrest[.] Pretrial Services report indicates on the day of . . . his arrest, Mr. Benito barricaded [himself] . . . within his home, and after about one and a half hours of a stand off[,] law enforce[ment] . . . deploy[ed] a flash bang and gas[sed] Mr. Benito to get him out of the house. [O]fficers also located a syringe within one of his pockets after he was apprehended, and the defendant's mother [st]ated she believed her son was self-medicating by injecting heroin and methamphetamine. So he has some mental health history but the problem with him he doesn't stay on his meds and he self-medica[]tes and he does so with substances such as heroin and methamphetamine. So . . . I think that creates a risk of nonappearance in and of itself and it also creates other dangers in the community when you talk about involvement with drugs.

Tr. at 9:21-10:13 (Castellano). The United States then argued that the nature and length of Benito's criminal history -- while in and out of custody -- his mental illnesses, and his documented failure to comply, show that there is no condition or combination of conditions that assures his court appearance or the community's safety. See Tr. at 10:17-19:6 (Castellano). The United States concluded with its request to keep Benito detained before his trial. See Tr. at 19:6-8 (Castellano).

John Lovato, the United State Probation Officer, next offered his recommendation that Benito remain detained. See Tr. at 19:10-14 (Lovato). Lovato assessed Benito's risk of non-appearance and danger to the community, and concluded that there "is no combination of conditions that can be fashion[ed] which would reasonably assure his appearance or mitigate the risk of danger to the community." Tr. at 19:10-14 (Lovato).

Subsequently, the Court offered Benito "the last word." Tr. at 19:16 (Court). Benito "strongly contest[ed]" the allegation that he spoke to another inmate to change the murder narrative. Tr. at 19:18-20 (Porter). Benito's prison violations, he argued, were typical and should be ignored. See Tr. at 20:3-7 (Porter). Benito then argued that the United States did not establish by clear-and-convincing evidence that he is a danger to the community, and emphasized that there are indeed conditions that warrant a gradual release. See Tr. at 19:20-20:15 (Porter).

The Court denied Benito's Appeal, because the United States "established by clear and convincing evidence that the defendant is a danger to the community," and because there is no "condition or combination of conditions that will reasonably assure [Benito's] appearance at the necessary Court proceedings." Tr. at 21:1-22:18 (Court). The Court concluded that Benito is a danger to the community because of the quality and quantity of his criminal history, current charges, and potential for harming law enforcement. See Tr. at 20:16-22:15 (Court). Benito's Bail Report and past show a long history of violence, including, weapons-related offenses, conspiracy to murder, and domestic violence. See Tr. at 20:17-21:4 (Court). The current charges' seriousness and Benito's behavior upon arrest, the Court concluded, also show a risk of danger to the community. See Tr. at 20:18-21:1 (Court). The Court considered conditions that could be fashioned to reduce Benito's risk to the community, such as lock-down status at La Posada Halfway House or release to his family, and found them unsatisfactory. See Tr. at 21:10-22:6 (Court). The conditions would be unsatisfactory, because: (i) Benito might try to feed his drug habit; (ii) "he has not exhibited good conduct on release[,] [w]ith numbers of [failures to appear] [and] [failures to comply]"; (iii) he might assault law enforcement or have another stand-off with them; (iv) he has a high chance of walking away from the facility supervising release; and (v) he might harm law enforcement if they had to pick him up after walking off. Tr. at 21:5-

22:1 (Court). Moreover, the Court expressed that those same factors also support a determination that Benito's Court appearances cannot be reasonably assured, because of, in part, the related nature of danger to the community and assured Court appearances. <u>See</u> Tr. at 22:9-15 (Court). Accordingly, the Court concluded that the United States had met its burden, and that there are no conditions that could reasonably minimize the risk of danger to the community or reasonably assure Benito's Court appearance. <u>See</u> Tr. at 22:7-12. The Court thus sustained the Detention Order and ordered that Benito remain in custody until trial. <u>See</u> Tr. 22:16-18 (Court).

## <u>LAW REGARDING PRETRIAL DETENTION</u>

Pursuant to the Bail Reform Act of 1984, 18 U.S.C. §§ 3141-3150, a court may detain a defendant pending trial only after a hearing, held pursuant to 18 U.S.C. § 3142(f), and upon a finding "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). At such a hearing, the United States bears the burden of proving risk of flight by a preponderance of the evidence, and the burden of proving dangerousness by clear-and-convincing evidence. <u>See</u> 18 U.S.C. § 3142(f); <u>United States v. Cisneros</u>, 328 F.3d 610, 616 (10th Cir. 2003). "The rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). To determine whether pretrial detention is warranted, the judicial officer must consider the statutory factors that 18 U.S.C. § 3142(g) lists:

> (g) **Factors to be considered.** -- The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning
>
>> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section

1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2)     the weight of the evidence against the person;

(3)     the history and characteristics of the person, including

   (A)     the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

   (B)     whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4)     the nature and seriousness of the danger to any person or the community that would be posed by the person's release.   In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

8 U.S.C. § 3142(g).

When a defendant is charged with certain crimes, however, a presumption arises that the defendant is a flight risk and a danger to the community.  See 18 U.S.C. § 3142(e)(3); United States v. Villapudua-Quintero, 308 F. App'x 272, 273 (10th Cir. 2009)(unpublished)(per curiam)(recognizing that 18 U.S.C. § 3142(e) establishes a rebuttable presumption favoring detention in the case of, among other defendants, certain alleged drug offenders).  18 U.S.C. § 3142(e)(3)(A) provides that a detention presumption arises when "there is probable cause to believe that the person committed" certain drug offenses, specifically "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances

Act, the Controlled Substances Import and Export Act, or chapter 705 of title 46." 18 U.S.C. § 3142(e)(3)(A). The United States Court of Appeals for the Tenth Circuit has explained that "[t]he grand jury indictment is sufficient to establish the finding of probable cause that defendant committed a federal drug offense with a maximum prison term of ten years or more." United States v. Silva, 7 F.3d 1046, 1046 (10th Cir. 1993). Accord United States v. Holguin, 971 F. Supp. 2d 1082, 1088 (D.N.M. 2011)(Browning, J.). "'Once the presumption is invoked, the burden of production shifts to the defendant.'" United States v. Holguin, 791 F. Supp. 2d at 1087 (quoting United States v. Stricklin, 932 F.2d 1353, 1354-55 (10th Cir. 1991)).

To determine whether there are conditions that will reasonably assure the defendant's appearance and the community's safety, a court must consider: (i) the charged crime's nature and circumstances; (ii) the evidence's weight against the defendant; (iii) the defendant's history and characteristics, including family ties, employment, financial resources, community ties, drug or alcohol abuse history, and past conduct; and (iv) the nature and seriousness of the danger to the community, or to an individual that release would pose. See 18 U.S.C. § 3142(g). "Should the defendant satisfy his or her burden of production under 18 U.S.C. § 3142(f), the United States must then show by a preponderance of the evidence that the defendant presents a risk of flight, or by clear-and-convincing evidence that the defendant presents a danger to the community." United States v. Holguin, 791 F. Supp. 2d at 1087 (citing United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001); United States v. Stricklin, 932 F.2d at 1354-55 ("[T]he burden of persuasion regarding risk-of-flight and danger to the community always remains with the government.")). Notably, however, even if the defendant meets his or her burden of production under 18 U.S.C. § 3142(f), "the presumption remains a factor for consideration by the district court in determining whether to release or detain." United States v. Stricklin, 932 F.2d at 1355. Accord United States v. Mercedes, 254 F.3d at 436.

## THE DISTRICT COURT'S STANDARD OF REVIEW

Section 3145(a) of Title 18 of the United States Code provides that a "court having original jurisdiction over the offense" may review a magistrate judge's detention order or release order. 18 U.S.C. § 3145(a)-(b). "The standard of review for the district court's review of a Magistrate Judge's detention or release order under § 3145(a) is de novo." United States v. Cisneros, 328 F.3d at 616 n.1. "When the district court acts on a motion to revoke or amend a magistrate's pretrial detention order, the district court acts de novo and must make an independent determination of the proper pretrial detention or conditions for release." United States v. Rueben, 974 F.2d 580, 585-86 (5th Cir. 1992). See United States v. Maull, 773 F.2d 1479, 1481 (8th Cir. 1985)(stating that a district court's review of a Magistrate Judge's order setting bond is de novo).

## ANALYSIS

Benito's pretrial release is not warranted, because the United States has met its burden of proving that he presents both a flight risk and a danger to the community, as well as that there is no condition, or combination of conditions, that will mitigate those risks to an acceptable level. Although the evidence may not prove that Benito is guilty of the charged offense beyond a reasonable doubt, it is enough to support continued pretrial detention. The 18 U.S.C. § 3142(e) presumption of detention does not apply in this case, because of the nature of the charges against Benito. Even if it did, however, the United States nonetheless shoulders the burden to prove that Benito is flight risk by a preponderance of the evidence, and that he is a danger to the community by clear-and-convincing evidence. See 18 U.S.C. § 3142(f). The Court thus concludes that all of the 18 U.S.C. § 3142(g) factors favor Benito's continued detention and affirms the Order of Detention.

The statutory factors that the Court considers when deciding whether to order pretrial detention, based on a defendant's entangled risks of flight and danger to the community, are: (i) "the nature and circumstances of the offense charged"; (ii) "the weight of the evidence against the person;" (iii) "the history and characteristics of the person"; and (iv) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

## I. THE NATURE AND CIRCUMSTANCES OF BENITO'S CHARGED OFFENSE SUPPORTS PRETRIAL DETENTION.

The Court will first evaluate the initial statutory factor regarding the nature and circumstances of Benito's charged offense of Conspiracy to Commit Racketeering under 18 U.S.C. § 1962(c), and the nineteen, mostly violent, underlying overt acts that he allegedly committed in furtherance of SNM's serious and illegal affairs. See Indictment at 5-40. Certain offenses are riskier offenses, namely: (i) "whether the [charged] offense is a crime of violence"; (ii) whether the charged offense is in "violation of section 1591," which concerns sex trafficking of children or by force, fraud, or coercion; (iii) whether the charged offense is "a Federal crime of terrorism"; and (iv) whether the charged offense "involves [either] a minor victim . . . controlled substance, firearm, explosive, or destructive device." 18 U.S.C. § 3142(g)(1). See 18 U.S.C. § 1591. "[T]he term 'crime of violence' means -- (A) an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another; (B) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense; or (C) any felony under chapter 77, 109A, 110, or 117." 18 U.S.C. § 3156(a)(4). Accordingly, Benito's charge of Conspiracy to Commit Racketeering under 18 U.S.C. § 1962(c) indicates a higher risk of flight risk and danger to the community,

because there are seventeen overt acts underlying Benito's charge that are either violent, in furtherance of violence, used a deadly weapon, or, involved controlled substance. See Indictment at 3-40. See also 18 U.S.C. § 3142(g)(1). Accord 18 U.S.C. § 3156(a)(4). Moreover, the circumstances surrounding the charge in relation to the gang, SNM, also demonstrates a higher risk of flight and danger to the community. SNM is a large and powerful prison gang that continues to operate and control narcotics trafficking and other illegal activities within New Mexico, both inside and outside of the State's prison system -- that activity being highly risky in terms of considering Benito's flight risk and danger. See Indictment ¶ 2, at 2. The Indictment alleges that SNM uses intimidation, violence, and murder in furtherance of its goals -- also increasing Benito's risk of flight and danger to the community. See Indictment at 1-6. Benito has also, allegedly, repeatedly demonstrated his commitment to SNM's goals and activities as established through: (i) his alleged SNM membership since 1997; (ii) a Zia symbol tattoo which indicates his affiliation with SNM; and (iii) his signature in the gang's Petition for Roll Call. See Indictment at 13, 19, 29. See also Tr. 14:19-21 (Castellano). Benito contests, however, that all of the overt acts were connected to SNM, and also asserts that the gap of time between violent convictions and the present time indicates that he is not a danger to the community, despite his non-compliant and dangerous actions during his arrest regarding the Racketeering charges, which might suggest otherwise. See Tr. at 4:21, 8:7-16 (Porter). See also BCSO Report at 1-5. Accord Tr. at 20:16-21:17 (Court).

The Court concludes that the gap of time between violent convictions is misleading and unconvincing, because Benito was either in state custody, or facing other charges that were eventually dismissed or not prosecuted (for unknown reasons). See Tr. at 8:17-21 (Castellano, Court). Furthermore, Benito's behavior in response to the current charges and mental/physical condition upon arrest for the current charges indicate a disregard for the safety of law

enforcement, and demonstrate erratic behavior that cannot reasonably assure required Court appearances or compliance with requirements on release. See BCSO Report at 1-5. See also Tr. at 20:16-21:17 (Court). The Court concludes that Benito's arguments are unpersuasive and that the record demonstrates that the amount, and the nature and circumstances of the overt acts with which Benito is charged -- including the number of violent acts, the history of weapons use, his behavior and condition on arrest, and the indicia of his affiliation with and commitment to SNM and its history, goals, and alleged activities -- places the safety of the community at risk, and further indicates a high likelihood of Benito's flight, thus favoring Benito's continued pretrial detention. Correspondingly, the risks associated with the charged offense cannot practically be modified, and, therefore, this factor cannot be mitigated.

Benito is accused of a racketeering conspiracy, including murder and eighteen other, mostly violent, overt acts. See Indictment ¶¶ 19, 22, 28, 30, 40, 47, 52, 53, 54, 62, 74, 98, 112, 116, 120, 121, 125, 187, at 12-40. He has not performed well on release on other occasions. He has been hard to arrest in the past and has resisted arrest. The Court fears that if Benito left La Posada Halfway House -- which it considers a high probability -- he would endanger the lives of United States Marshals who come to arrest him. Given the violent crimes of which he has been convicted and accused, and given his connection to the SNM gang, the Court is convinced that he would leave La Posada Halfway House and carry out acts of violence against co-conspirators, against the United States Marshals, or other members of the public.

Thus, regarding the factor exploring the nature and circumstances of Benito's charged offense, the Court concludes that its analysis indicates a high flight risk and a risk of danger to the community. Further, the Court cannot mitigate the risks that Benito presents under this factor to acceptable levels. Ultimately, the nature and circumstances of Benito's charged offense

indicates a risk, but that risk is not dispositive on the pretrial detention issue, however, the Court must balance that factor with the other statutory factors.

## II.    THE WEIGHT OF THE EVIDENCE AGAINST BENITO FAVORS PRETRIAL DETENTION.

The Court next considers the factor concerning the weight of the evidence against Benito -- the second statutory factor -- and concludes that its analysis also favors pretrial detention, because the weight of the evidence against Benito is substantial. The United States argues that, because it has "numerous cooperating witnesses," and, because Benito was convicted of several of the alleged overt acts, the evidence against him is strong, and that the United States can prove that Benito is an SNM member and that he committed crimes on SNM's behalf. Response at 2. In terms of Benito's SNM membership, the United States has proffered that: (i) he has allegedly been a SNM member since 1997; (ii) he has a Zia symbol tattoo, which indicates his affiliation with SNM; and (iii) his signature is on SNM's Petition for Roll Call, which is proof of his membership. See Indictment ¶¶ 22, 64, 125, at 13, 19, 29. See also Tr. 14:19-21 (Castellano). Benito, however, calls the credibility of the United States' witnesses into question, challenges the United States' statement of facts regarding F.M.'s murder, and further denies that any of the alleged overt acts had any connection to SNM. See Tr. at 19:23-20:3 (Porter). See also Tr. at 4:21, 8:7-16 (Porter). Still, the arresting detectives found "hundreds of documents pertaining to [Benito's] connection to the SNM prison gang." BCSO Report at 1.

The United States has proffered multiple pieces of evidence that support the conclusion that the evidence's weight is substantial, see Response at 2 and Tr. at 9:21-19:7 (Castellano, Court), while Benito has merely contested evidence without support, see Tr. at 19:17-20:7 (Porter). The United States asserts that it has "numerous cooperating witnesses" to support its contention that the evidence against Benito for the current charge is strong. Response at 2. A

jury could find that multiple witnesses corroborating the United States' position would be credible and persuasive, and, for that reason, the United States' witnesses support a finding that the evidence against Benito is strong. Additionally, the United States argues that, because Benito was convicted of many of the overt acts, the evidence against him is compelling. <u>See</u> Response at 2. Benito's previous criminal convictions would have been found beyond a reasonable doubt, which suggests that much of the evidence that the United States would use against him in the current charge is strong. Moreover, the Unites States' argument that Benito has a Zia symbol tattoo and has signed SNM's Petition for Roll Call solidly support its allegation that he has been a SNM member. Furthermore, the multitude of documents connecting Benito to SNM that the arresting detectives founds lends additional credence to the weight of the United States' evidence. The Court concludes that the weight of evidence against Benito is significant and, therefore, also favors pretrial detention.

## III. BENITO'S PERSONAL HISTORY AND CHARACTERISTICS, AS WELL AS THE NATURE AND SERIOUSNESS OF THE POTENTIAL DANGER THAT HE PRESENTS, DEMONSTRATE THAT PRETRIAL DETENTION IS <u>WARRANTED</u>.

The Court will last evaluate Benito's personal history and characteristics, as well as the nature and seriousness of the potential danger that he presents, which are the third and fourth statutory factors, respectively. The following are the relevant sub-factors evaluating Benito's personal history and characteristics, the third factor under 18 U.S.C. § 3142(g):

> character, physical and mental condition, family ties . . . length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, [] record concerning appearance at court proceedings; and whether, at the time of the current offense or arrest, [Benito] was on probation, on parole, or on other release pending trial sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law.

18 U.S.C. § 3142(g)(3)(A-B).

Mr. Porter, Benito's counsel, gave the Court his personal assurance regarding Benito's character, stating that, when he met Benito, he appeared "very humble and burst into [tears] . . . feeling like he was involved in something way over his head." Tr. at 2:14-17 (Porter). There is also an abundance of evidence concerning Benito's physical and mental condition. <u>See</u> Bail Report at 1-3. <u>See also</u> BCSO Report at 4. He also has a long history of drug abuse, learning disabilities and mental health issues. <u>See</u> Bail Report at 1-3. He was "diagnosed [with] learning disabilities throughout elementary, junior high, and high school." Bail Report at 2. Benito has also reported that the Social Security Administration granted him disability because of his mental health issues, including diagnoses of: depression; post-traumatic stress disorder; anxiety disorder; cognitive functioning disorder; and schizophrenia. <u>See</u> Bail Report at 2-3. Benito self-reported that he was prescribed Wellbutrin and "other unknown drugs to control his mental disorders," which, according to his mother, he does not take as prescribed. Bail Report at 3. Furthermore, there is evidence that Benito does not medicate himself as doctors prescribe and reportedly self-medicates "by injecting heroin and methamphetamine." Tr. at 10:4-15 (Castellano). <u>See</u> Bail Report at 3. The United States adds that photographs and details of Benito from the time of arrest, and the arresting officers' reports, indicate that Benito's physical and mental condition was not well. <u>See</u> Tr. at 17:4-25 (Castellano). Indeed, Benito stated that he is "easily influenced." Tr. at 3:17 (Porter).

All of Benito's family and community ties are in New Mexico. <u>See</u> Motion at 3. Benito was born and raised in Albuquerque, has "[a]ll of his family and community ties [within] New Mexico," and has "no ties to any other states or foreign countries." Appeal at 4. Benito has two children, ages nineteen and twenty-two, who live in Albuquerque. <u>See</u> Motion at 3. Benito's father is a Mexican national but Benito maintains that he has not had contact with him for thirty years. <u>See</u> Bail Report at 1. Additionally, Benito states that he has never left the state despite

previously facing serious criminal proceedings. See Tr. at 3:21-4:1 (Porter); Tr. at 4:14-18 (Porter). The Court notes, however, that Benito does not have a good record concerning appearance at required court proceedings. See Tr. at 21:15-18 (Court). Indeed, Benito has a history of consistent non-appearance at required court proceedings, poor performance under community supervision, and non-compliance with Court orders. See Bail Report at 3.

Benito also has a long criminal history spanning from his juvenile years throughout his adulthood. See Bail Report at 3-13. Benito's history of criminal convictions, many of which were violent, include a conspiracy to murder. See Bail Report at 3-13. Benito thus asks the Court to look at the gaps between crimes and convictions, and particularly, his lack of violent criminal activity since 2003. See Tr. at 4:7 (Porter). Following 2003, however, Benito has been convicted of marijuana possession and disorderly conduct, has garnered an additional ten charges that were dismissed, and has three currently outstanding charges. See Bail Report at 11-12. The outstanding charges are: (i) a case following a January, 2014, arrest, alleging aggravated battery with a deadly weapon, aggravated assault with a deadly weapon, aggravated assault, and conspiracy to commit aggravated battery with a deadly weapon; (ii) a case following a February, 2015, arrest, alleging criminal damage to property under $1,000.00, and in which Benito failed to appear; and (iii) a case following an August, 2015, arrest, alleging criminal damage to property under $1,000.00, and in which Benito twice failed to appear. See Bail Report 10-12. The charges since 2003 that have been dismissed include: (i) a June, 2008, charge alleging aggravated battery on a household member, see Bail Report at 10; (ii) an April, 2015, charge for battery against a household member, see Bail Report at 11; (iii) an April, 2015, breaking and entering charge, see Bail Report at 11; (iv) May, 2015, charges alleging battery upon a peace officer, assault upon a peace officer, and two counts of resisting an officer, and a failure to appear, see Bail Report at 12; and (v) a charge following his November, 2015, arrest for

possession of a controlled substance, see Bail Report at 13. Benito was also incarcerated from 2009 to 2015. See Tr. 8:12-13 (Porter). Before 2003, and not including acts related to the pertinent charges, Benito was convicted of criminal trespass; unlawful taking of a motor vehicle; resisting, evading, or obstructing an officer; concealing identity; intentional arson over $1,000.00; petty larceny; minor in possession of alcohol; armed robbery with a deadly weapon; and conspiracy. See Bail Report at 9-13. During that time, Benito also faced multiple violent charges, but was not prosecuted. See Bail Report at 9-13.

While it is not clear whether Benito was on probation or parole at the time of arrest, he was, at the least, facing outstanding charges and had only recently been released from prison, after being sentenced to six years to be followed by two years of parole. See Bail Report at 9. Additionally, according to the United States, Benito admitted that "he believed that he had outstanding warrants for his arrest" at the time of his arrest. Response at 3. Moreover, Benito was intoxicated and combative, barricading himself within his mother's home for up to two hours and inciting chemical agent deployment at the time of his arrest, despite his assertion that he was compliant. See BCSO Report at 1, 4-5. See also Tr. at 5:18-24 (Porter).

In line with the above facts, Pretrial Services recommends continued detention, and affirmed that there "is no combination of conditions that can be fashion[ed] which would reasonably assure [Benito's] appearance." Tr. at 19:10-14 (Lovato). The Bail Report also stated five factors indicating that Benito is at risk for non-appearance: (i) "[p]rior [f]ailures to appear for court"; (ii) "[u]se of other names and identifiers"; (iii) "[s]ubstance abuse and or addiction"; (iv) "[p]ast poor performance under community supervision, and non-compliance with Court order"; and, finally, (v) "[c]onduct at the time of arrest (barricade/uncooperative)." Bail Report at 3.

In terms of Benito's character, and considering the vast amount of evidence regarding the other factors, Mr. Porter's personal assurance of good character is unpersuasive and does not mitigate the other findings of Benito's flight risk or danger to the community. The history regarding Benito's physical and mental condition, drug abuse, learning disabilities and mental health issues also does not favor pretrial release. While Benito's learning disabilities and mental health issues do not support pretrial detention on their own, those conditions likely increase daily instability in his life which, in turn, increases the likelihood that he may not appear at required Court hearings. Moreover, Benito's drug abuse also increases the likelihood that he will behave erratically -- whether he is placed on supervised pretrial release in a halfway house or with his mother -- and potentially fail to appear for Court despite never leaving the state. Furthermore, if Benito chooses to continue self-medicating with illegal narcotics -- a highly probable possibility considering his history of drug abuse spanning over two decades even up to his time of arrest for the current charge -- his potentially erratic behavior could lead to non-appearance but also, and more important, these risks could likely lead to him walking away from supervised release and placing law enforcement in serious danger when they pick him up, or place the community and law enforcement in direct harm as a result of the combination of his intoxication and behavioral instability. Indeed, Benito's admission of being "easily influenced" increases these potential prospects even more, because he can be easily persuaded, perhaps by the SNM organization, to engage in activities that either prevent his appearance at required Court proceedings and/or place the community at risk. Tr. at 3:17 (Porter).

Benito's family and community ties also do not mitigate the other factors that indicate that he is a flight risk. The question of being a flight risk is not merely the risk of leaving the jurisdiction; it also includes the risk of not appearing at required court proceedings. See 18 U.S.C. § 3142(e). Even if Benito has never left the state, nor has any reason to leave, staying

within the Court's jurisdiction does not equate to appearing in court. The evidence demonstrates that Benito's appearance in court is not likely to be assured. The Court thus concludes that Benito's family and community ties do not support a finding that he is reasonably assured to appear at required Court.

Benito's history of non-appearance at required court proceedings, "[p]oor performance under community supervision, and non-compliance with Court orders," further support a conclusion of pretrial detention. Bail Report at 3. Benito has a proven, long-standing track record of ignoring his legal obligations, and there is nothing to indicate that he is now willing to comply. The Court therefore concludes that Benito's record concerning court proceedings supports continued pretrial detention.

Benito's life-long criminal history also supports a finding of continued pretrial detention, because many of his convictions were violent and, therefore, indicate that he is a danger to the community. See Bail Report at 3-13. Although Benito has demonstrated his willingness to use violence in many of his convictions, his conviction of conspiracy to murder is hard to overcome on its own when he asserts that he is no longer a danger to the community. See Bail Report at 3-13. Moreover, the 2003 benchmark that Benito tried to establish as the point when he no longer represented a danger to the community is unpersuasive. Even though Benito's marijuana possession and disorderly conduct convictions since 2003 are not violent, most of his outstanding charges -- aggravated battery with a deadly weapon, aggravated assault with a deadly weapon, aggravated assault, and conspiracy to commit aggravated battery with a deadly weapon -- are violent, and suggest that Benito is still, in fact, likely to be a danger to the community. Benito's additional two charges regarding criminal damage to property and the associated failures to appear also suggest that Benito consistently disregards the law and the community, making it less likely that his required court presence can be assured and more likely that he will disregard

the community's safety.  Although Benito has had additional charges since 2003 dismissed, he was suspected of many more violent actions that further support a finding that he still represents a danger to the community, including (i) a June, 2008, charge alleging aggravated battery on a household member, see Bail Report at 10; (ii) an April, 2015, charge for battery against a household member, see Bail Report at 11; and (iii) May, 2015, charges alleging battery upon a peace officer, assault upon a peace officer, two counts of resisting an officer, and a failure to appear, see Bail Report at 12.  The record shows that Benito continued violent and criminal activity even after being released from a six-year stint in prison.  See Tr. 8:12-13 (Porter).  See also Bail Report 3-13.  The United States has proffered Benito's criminal history as proof of his danger to the community and, because his record strongly suggests that he has been, and continues to be, a danger to the community, the Court concludes that the United States has met its burden by clear-and-convincing evidence.

Benito's legal disposition and circumstances at the time of his arrest further indicate that continued pretrial detention is warranted.  In addition to the fact that Benito was facing outstanding charges and had only recently been released from prison, he allegedly admitted that, at the time of his arrest, "he believed that he had outstanding warrants for his arrest."  Response at 3.  Moreover, Benito's intoxication and combativeness at the time of his arrest suggest that he is capable of erratic and dangerous behavior.  See BCSO Report at 1, 4-5.  See also Tr. at 5:18-24 (Porter).  The Court concludes that this factor also supports a finding of pretrial detention.

Ultimately, the evidence supports the Court's adoption of Pretrial Services' recommendation that Benito continue to be detained and Pretrial Services' conclusion that there "is no combination of conditions that can be fashion[ed] which would reasonably assure [Benito's] appearance."  Tr. at 19:10-14 (Lovato).  The Bail Report states five factors indicating that Benito is at risk for non-appearance: (i) "[p]rior [f]ailures to appear for court"; (ii) "[u]se of

other names and identifiers"; (iii) "[s]ubstance abuse and or addiction"; (iv) "[p]ast poor performance under community supervision, and non-compliance with Court order"; and, finally, (v) "[c]onduct at the time of arrest (barricade/uncooperative)." Bail Report at 3. Pretrial Services' recommendation regarding Benito's risk factors for non-appearance are in line with the Court's conclusions on the evidence. Consequently, the evidentiary support for the multiple risk factors further suggests that Benito's appearance cannot be reasonably assured, and, therefore, the United States has met its burden regarding his flight risk by a preponderance of the evidence. Moreover, Pretrial Services' seven factors indicating that Benito poses a danger to the community supplement the Court's conclusions above that Benito seriously threatens the community's safety and the that United States has met its burden in proving it by clear-and-convincing evidence. See Bail Report at 4. Because of the nature and seriousness of the evidentiary support for Benito's risk factors, and the high likelihood of those risks becoming a reality, there is no condition or combination of conditions that could be fashioned to reasonably assure Benito's appearance or mitigate his danger to the community. The mother is no security at all. And because Benito has performed so poorly on release for earlier crimes, and he is likely to walk off, the Court is convinced that he will walk off if the Court orders release.

The Court therefore finds that the United States has met its burden of proving that Benito's personal history and characteristics, as well as the nature and seriousness of the potential danger that he presents, demonstrate that he is a flight risk by a preponderance of the evidence, and that he is a danger to the community by clear-and-convincing evidence, and thus, pretrial detention is warranted.

The evaluating factors demonstrate that Benito's appearance at required Court settings is not assured and that his release might create a danger to the community. Likewise, there is no condition or combination of conditions that can be fashioned to reasonably assure his appearance

or the safety of the community. The chances of Benito walking away from any facility upon release is high and, further, reducing the risk of flight to acceptable conditions will not work in this scenario, because Benito, as his combative arrest for the present charges evidence, could put law enforcement in danger if they ever needed to retrieve him. The nature and circumstances of the charged offense, the weight of the evidence against Benito, Benito's history and characteristics, and the nature and seriousness of the danger that Benito poses in the community, particularly law enforcement, all support his continued detention. As such, Benito presents a flight risk and a danger to the community, and should therefore remain in custody pending trial.

**IT IS ORDERED** that Defendant Manuel Benito's Appeal of Detention Order, filed November 9, 2016 (Doc. 253), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Maria Y. Armijo
Randy M. Castellano
Matthew M. Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

    *Attorneys for Plaintiff*

Marc M. Lowry
Rothstein, Donatelli, Hughes,
  Dahlstrom & Schoenburg, LLP
Albuquerque, New Mexico

-- and --

Theresa M. Duncan
Theresa M. Duncan, Esq.
Albuquerque, New Mexico

    *Attorneys for  Defendant Anthony Ray Baca*

Christopher W. Adams
Charleston, South Carolina

-- and --

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

    *Attorneys for Defendant Christopher Garcia*

Todd Bruce Hotchkiss
Todd B. Hotchkiss, Attorney at Law, LLC
Albuquerque, New Mexico

    *Attorney for Defendant Manuel Jacob Armijo*

John C. Anderson
Holland & Hart, LLP
Santa Fe, New Mexico

    *Attorney for Defendant Frederico Munoz*

Donald Kochersberger
Business Law Southwest, LLC
Albuquerque, New Mexico

    *Attorney for Defendant Sergio Loya Rodriguez*

Barrett (Barry) George Porter
Burgess and Porter Law, LLC
Albuquerque, New Mexico

    *Attorney for Defendant Manuel Benito*

Diego R. Esquibel
The Barnett Law Firm
Albuquerque, New Mexico

    *Attorney for Defendant Vincent Garduño*

Marc Grano
Grano Law Offices
Las Vegas, New Mexico

    *Attorney for Defendant Mandel Lon Parker*

Daniel J. Tallon
Daniel J. Tallon, Attorney at Law
Placitas, New Mexico

-- and --

Ahmad Assed
Law Office of Ahmad Assed
Albuquerque, New Mexico

    *Attorneys for Defendant Daniel Archuleta*

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

-- and --

Richard Jewkes
El Paso, Texas

    *Attorneys for Defendant Daniel Sanchez*

Marcia A. Morrissey
Santa Monica, California

-- and --

Gregory M. Acton
Albuquerque, New Mexico

    *Attorneys for Defendant Anthony Cordova*

David Evans

-- and --

Marshall J. Ray
Law Offices of Marshall J. Ray LLC
Albuquerque, New Mexico

-- and --

Kari T. Morrissey
Law Office of Kari Morrissey
Albuquerque, New Mexico

     *Attorneys for Defendant Richard Gallegos*