# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                             No. CR 16-1613 JB

ANTHONY RAY BACA, a.k.a. "Pup,"
CHRISTOPHER GARCIA,
SERGIO LOYA RORDIGUEZ, a.k.a
"Churro,"
MANUEL BENITO, a.k.a. "Panther,"
VINCENT GARDUÑO a.k.a. "Fatal,"
MANDEL LON PARKER, a.k.a.
"Chuco,"
DANIEL ARCHULETA, a.k.a. "Smurf,"
DANIEL SANCHEZ, a.k.a. "Dan Dan,"
ANTHONY CORDOVA, a.k.a. "Antone,"
and ARTURO ARNULFO GARCIA,
a.k.a. "Shotgun,"

     Defendants.

## <u>MEMORANDUM OPINION</u>

**THIS MATTER** comes before the Court on Defendant Anthony Cordova's Motion for Intra-District Transfer of Proceedings, filed May 14, 2018 (Doc. 619)("Motion"). The Court held a hearing on June 14, 2018. The primary issue is whether the Court should alter its plan to hold Defendant Anthony Cordova's trial at the federal courthouse in Las Cruces, New Mexico and, instead, hold Cordova's trial at the Pete V. Domenici Federal Courthouse in Albuquerque, New Mexico. Cordova is charged with "offenses punishable with death" that allegedly took place in Bernalillo County, so 18 U.S.C. § 3235 requires the Court to hold Cordova's trial in Bernalillo County if "that can be done without great inconvenience." 18 U.S.C. § 3235. Because the Court can hold a single-defendant trial in the Pete V. Domenici Federal Courthouse,

which is within Bernalillo County, without great inconvenience, the Court grants Cordova's motion.

<div align="center">**FACTUAL BACKGROUND**</div>

The Court takes its background facts from the Superseding Indictment, filed March 9, 2017 (Doc. 372)("Indictment"). The Court does not set forth these facts as findings or for their truth. The Court recognizes that the factual background is largely Plaintiff United States of America's version of events and that the Defendants are all presumed innocent.

This case deals with the crimes that the Syndicato de Nuevo Mexico ("SNM") allegedly committed through its members. Indictment ¶¶ 1, 3, at 1-2. The SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including, murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." Indictment ¶ 1, at 2. The SNM constitutes an enterprise "as defined in Title 18, United States Code, Sections 1959(b)(2) and 1961(4), that is, a group of individuals associated in fact that engaged in, and the activities of which affected interstate and foreign commerce." Indictment ¶ 2, at 2. The enterprise is "an ongoing organization whose members/prospects/associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise." Indictment ¶ 2, at 2.

The SNM is a prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage. Indictment ¶ 3, at 2. During the riot, thirty-three inmates were killed, and over 200 were injured. See Indictment ¶ 3, at 2. After the PNM riot, the SNM expanded throughout the state's prison system and has had as many as 500

members.  See Indictment ¶ 4, at 2.  The SNM now has approximately 250 members, and "a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members." Indictment ¶ 4, at 2-3.  The SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system.  See Indictment ¶¶ 3, 5, at 2-3.  Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and the profit from narcotics trafficking.  See Indictment ¶ 5, at 3.  Members who fail "to show continued loyalty to the gang" may be assaulted or murdered.  Indictment at 4.  The SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities.  See Indictment ¶ 6, at 3.  If another gang does not abide by the SNM's demands, the SNM will assault or kill one of the other gang's members to show its power.  See Indictment ¶ 6, at 3.  The SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. See Indictment ¶ 7, at 4.  The SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others."  Indictment ¶ 7, at 4.  "Similarly, a member of the SNM Gang is expected to confront and attack any suspected law enforcement informants, cooperating witness[es], homosexuals, or sex offenders."  Indictment ¶ 8, at 4.  To achieve its purpose of maintaining power, the SNM uses intimidation, violence, threats of violence, assault, and murder.  See Indictment ¶¶ 6-8, at 3-4.  The SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers.  See Indictment ¶ 7, at 4.  The SNM's recent activities in a conspiracy to murder high-ranking New Mexico Corrections Department officials inspired the

Federal Bureau of Investigation's present investigation. See United States v. Garcia, 221 F. Supp. 3d 1275, 1277 (D.N.M. 2016)(Browning, J.).

## PROCEDURAL BACKGROUND

The FBI's SNM investigation resulted in this case as well as three other cases that are presently before the Court. See United States v. DeLeon, No. CR 15-4268; United States v. Varela, No. CR 15-4269; United States v. Garcia, No. CR 15-4275. United States v. Varela and United States v. Garcia did not go to trial, but the Court held two trials in United States v. DeLeon, one four-defendant trial and one seven-defendant trial. The two United States v. DeLeon juries found eight of those eleven defendants guilty of violating the Violent Crimes in Aid of Racketeering Act, 18 U.S.C. § 1959 ("VICAR"). See United States v. DeLeon, No. CR 15-4268, Jury Verdict at 1-3, filed March 12, 2018 (Doc. 1947); United States v. DeLeon, No. CR 15-4268, Jury Verdict at 1-5, filed May 25, 2018 (Doc. 2332). Five United States v. DeLeon defendants are also charged in this case. Compare Indictment at 1, with United States v. DeLeon, No. CR 15-4268, Second Superseding Indictment at 1, filed March 9, 2017 (Doc. 947)("DeLeon Indictment").

Unlike United States v. DeLeon, only one Defendant, Cordova, is going to trial in this case. The Court dismissed the charges against some Defendants. See Stipulated Order of Dismissal at Order at 1, filed June 14, 2018 (Doc. 727)(dismissing the charges against Defendant Anthony Ray Baca, Defendant Daniel Sanchez, and Defendant Arturo Arnulfo Garcia without prejudice); Order Dismissing Richard Gallegos Without Prejudice, filed January 30, 2017 (Doc. 317)(granting the United States' Motion to Dismiss Richard Gallegos Without Prejudice, filed November 22, 2016 (Doc. 260)). Other Defendants made plea agreements with the United States. See Plea Agreement, filed June 14, 2018 (Doc. 726)(Sergio Loya Rodriguez); Plea

Agreement, filed June 13, 2018 (Doc. 720)(Manuel Benito); Plea Agreement, filed June 7, 2018 (Doc. 700)(Mandel Lon Parker); Plea Agreement, filed June 7, 2018 (Doc. 698)(Daniel Archuleta); Plea Agreement, filed January 25, 2018 (Doc. 503)(Christopher Garcia); Plea Agreement, filed March 1, 2017 (Doc. 368)(Manuel Jacob Armijo); Plea Agreement, filed September 22, 2016 (Doc. 229)(Frederico Munoz). The Indictment alleges that Cordova violated VICAR by murdering Shane Dix and with violating 18 U.S.C. § 924(c), (j)(1) during that murder. See Indictment at 53-54. According to the Indictment, those offenses took place in Bernalillo County, New Mexico. See Indictment at 53.

### 1. First, Bifurcated United States v. DeLeon Trial.

On January 29, 2018, the Court began the first of two bifurcated trials in United States v. DeLeon. That trial involved four defendants, Baca, Sanchez, Rudy Perez, and Carlos Herrera. Six weeks later, on March 5, 2018, the parties gave their closing statements and the jury began its deliberations. While the jury was deliberating, the Court set aside the next week, March 12-16, 2018 for pretrial hearings regarding the second bifurcated United States v. DeLeon trial.

### 2. Second Bifurcated United States v. Deleon Trial's Pretrial Conference.

On March 12, 2018, while the jury from the first United States v. DeLeon trial continued its deliberations -- the Court held the pretrial conference for the second United States v. DeLeon trial. See United States v. Deleon, Transcript of Hearing at 6:8-16 (Court)(taken March 12, 2018), filed April 3, 2018 (Doc. 2026)("Mar. 12 Tr."). At that time, the Court believed that the second trial would involve eight defendants, but one trial-two defendant, Shauna Gutierrez, entered into a plea agreement with the United States a week before trial began. See United States v. Deleon, Plea Agreement at 1, filed March 29, 2018 (Doc. 2003). During the pretrial conference -- which the Court held in the same courtroom as the first trial -- the Court orally

indicated that it might move the second trial from Las Cruces to Albuquerque to better accommodate the increased number of defendants:

> I'm still a little undecided as to where we're going to have this trial. Of course on the [juror] questionnaire we have indicated it's here. And I think presumption-wise, the case was indicted down here, I did the first trial down here. We are looking at some rather large numbers. And so I'm trying to make it work. There was some discussion of putting it into the Sierra Blanca [court]room. And I'm not as familiar with the courthouse here as some of y'all may be, but I think that's the room right next door. It's a little larger, but it's only six feet larger. So it doesn't give me a lot more room. It doesn't give me the room that I have up in say, the Rio Grande [courtroom in the Albuquerque courthouse]. I think we've all been in the Rio Grande up in Albuquerque.

> I can't probably do the nice tables. I hope the [trial 1] defendants would agree that this was a nice layout for them during the trial. We worked very hard to make it one that worked as far as optics from the jury standpoint, from the voir dire standpoint, and also for the comfort of the defendants and their counsel and the paralegals. I probably can't do that with these sort of numbers that we're looking at. So I'm still undecided about location.

> Ms. Jacks[, Sanchez' learned counsel from Los Angeles, California,] has sort of educated us a little bit on her experience around the country. And we may pick up one of her tips as far as building two tables. And so, what I understand Ms. Wild is thinking about doing is putting a table -- just one long table here for the counsel, and then behind that a table for the defendants, and so you'll turn around. But I don't have anything better, and Ms. Jacks says it seems to work. So that's kind of what I'm looking at doing. And that's probably going to be whether it's in this room or Rio Grande or Sierra Blanca. I don't see any other way to do any sort of seating. So probably that means paralegals and other people that may sit with you may not be able to sit with you. We can probably figure out places that they can go. But right at the moment, the courtroom is still open, the location is still open, and the seating arrangement is probably going to move toward two long tables that I will have to build for this trial.

> So I don't have a lot more to say on that. I will still be working with Ms. Wild, and I'll keep you posted. But I'm concerned about the numbers that we're looking at, that Las Cruces may just not be able to accommodate a trial -- I guess there is eight of you for the second trial. So we'll just have to keep an eye on that.

Mar. 12 Tr. at 8:4-10:4 (Court).

3.      **The Mickendrow Letter**.

That afternoon, in response to the Court's indication that it might hold the second United States v. DeLeon trial in Albuquerque, Deputy United States Marshal Christopher Mickendrow wrote a letter to the Court's Courtroom Deputy; that letter was subsequently filed on the Court's United States v. DeLeon docket.  See United States v. DeLeon, Letter from Christopher Mickendrow to Carol Bevel at 1 (dated March 12, 2018), filed March 14, 2018 (Doc. 1938)("Mickendrow Letter").  In his letter, Mickendrow argues that the Court should not hold the second United States v. DeLeon trial in Albuquerque for logistical reasons:

-- Cell block space: In short, the Cellblock's up in ABQ cannot accommodate a trial of this size given the number of in-custody defendants AND in-custody witnesses.

Specifics:

-- USMS Las Cruces has 25 Cellblock locations and of those we have 15 locations that inmates can be separated sight and sound which is an important consideration when considering in-custody witnesses and the in-custody defendants.

-- USMS ABQ has 24 cells but only 5 places to separate sight and sound locations. 5 spaces does not reasonably address separatee issues which is something we would need to address.

-- The AUSA office has already informed me that they anticipate 32 in-custody witnesses (ex-parte info).  I spoke with defense and they were unable to provide me with a number at this point but did anticipate a number of in-custody witnesses.  This does not even address housing of these inmates (my next point).

-- Prisoner Housing: In short, ABQ cannot reasonable [sic] accommodate housing all of the in-custody defendants AND in-custody witnesses and maintain the level of safety required of our mandate.

Specifics:

-- USMS Las Cruces has 6 possible locations to utilize for housing of defendants and in-custody witnesses.  This allows us to address separatee issues of the defendants AND the in-custody witnesses.

-- USMS ABQ only has 3 possible locations to deal with all these prisoners.  This

is not enough space to take into consideration separatee issues.  Even during the motion hearings held up in ABQ, Las Cruces prisoner housing was utilized requiring us to transport between Las Cruces and ABQ each day.  This made for very long days and ran into issues regarding DOT and USMS regulations when it comes to working hours and transportation issues.

In addition, the locations available to ABQ have an average of 1hr 30min transport times.  This still causes manpower issues due to increased transport times (DOT regulations and USMS policy).

Mickendrow Letter at 1.  Mickendrow also argues that moving the trial to Albuquerque could cause funding and manpower issues for the Unites States Marshals Service.  See Mickendrow Letter at 2.

Before leaving Las Cruces, the Court told the United States and the Defendants that they should plan on a Las Cruces trial:

I guess at the present time . . . I guess I think it may be a little bit late to unscramble being down here. . . .  I do want to meet with some people up there [in Albuquerque], and get some more information and input.  But I think for the present time, I certainly have seen that, particularly on the defense side . . . that a lot of you have made some fairly significant efforts to plan [for a Las Cruces trial].  And so I want to be sensitive to not throwing y'all into turmoil.

And it may just be that what I can do in this space over here is about what I can do in the Rio Grande courtroom [in Albuquerque].  It may be that I can't change a whole lot.  So at least for the present time, I think I'm planning to be down here, and you probably can plan to be down here as well, just because I don't want to really upset the defendants' plans, which I have seen are quite considerable.

Now, . . . it may be that it's not as difficult to unscramble, and that's one thing I want to look at over the weekend, is exactly what y'all's plans are.  And if I feel like I'm throwing you into turmoil, I don't want to do that.  You've got enough things to think about, rather than where you're going to be.  So for the present time plan on being here, continue to make your plans.  And chances are what I'm going to learn up in Albuquerque early next week is not going to change things.  But I do think I owe it to a lot of different levels of the court, who have worked very hard to make what we do here work.  I owe it to them to listen and talk, stuff like that.  So if you'll give me that much of an out, I'd appreciate it.  But for your planning purposes, . . . I think I know that we're going to be down here.

Transcript of Motion Proceedings at 259:2-260:15 (Court)(taken March 16, 2018), filed April 3,

2018 (Doc. 2030).

On March 19, 2018, the Court met with members of the United States Marshals Service in Albuquerque. Those individuals confirmed that the Mickendrow Letter represents the official position of the United States Marshals Service. After a thorough guided tour of the Albuquerque cellblock and receiving more information from the United States Marshals Service regarding how an Albuquerque trial would play out, the Court decided to hold the second United States v. DeLeon trial in Las Cruces.

4.      **The First Baca USMS Letter.**

In response to an inquiry from the Court, during the second United States v. DeLeon trial,[1] regarding whether the Mickendrow Letter represents the position of the United States Marshals Service for the Baca trial, Sonya Chavez, United States Marshal for the District of New Mexico, sent a letter to the Court. See Letter from Sonya Chavez to the Court (dated May 3,

---

[1]This case's docket does not contain that inquiry, but -- for context -- the Court reproduces it in full here:

Marshall,

I am under some pressure from Chief Judge Johnson and the Clerk of the Court to hold the Baca trial in Albuquerque rather than in Las Cruces because of the cost to the Court of having so many jurors travel to and stay overnight in Las Cruces. I need to start setting hearings in June for the new trial and need to know where to set the pre-trial hearings and the trial. Please find attached the memo that I received from Deputy Mickendrow before the current trial [the Mickendrow Letter]. So that I can have a fully informed conversation with the Chief and Clerk, could you advise whether the Marshall's position, i.e., that the current trial cannot be done in Albuquerque, will be the same for the upcoming Baca trial?

Best regards.

Jim

Letter from the Court to Sonya Chavez (dated April 26, 2018).

2018) at 1, filed May 9, 2018 (Doc. 613)("First <u>Baca</u> USMS Letter").  When Chavez wrote that letter, nine Defendants remained in this case: (i) Baca; (ii) Sanchez; (iii) A. Garcia; (iv) Rodriguez; (v) Benito; (vi) Parker; (vii) Garduño; (viii) Archuleta; and (ix) Cordova.  In the First <u>Baca</u> USMS Letter, Chavez expresses her recommendation that "the best option is to continue to maintain the SNM trial responsibilities in Las Cruces."  First <u>Baca</u> USMS Letter at 1.  Chavez bases that recommendation on concerns regarding the size of the Pete V. Domenici Federal Courthouse's cell block, and the number of detention facilities near Albuquerque in which to house the Defendants and in-custody witnesses, which echo the Mickendrow Letter.  <u>See</u> First <u>Baca</u> USMS Letter at 1-2.[2]

    **5.**     **<u>The Motion.</u>**

In the Motion, Cordova "moves the Court, pursuant to Rule 18 of the Federal Rules of Criminal Procedure, for the intra-district transfer of the trial and pre-trial proceedings" from Las Cruces to Albuquerque.  <u>See</u> Motion at 1.  Cordova argues that holding the trial in Albuquerque would further the policy underlying the Constitution of the United States of America's vicinage provisions, <u>i.e.</u>, provisions that require courts to hold trials near where a crime occurred.  <u>See</u> Motion at 2-3 (citing U.S. Const. art. III, § 2, cl. 3; <u>id.</u> amend. VI).  Cordova adds that, "[h]istorically, federal criminal prosecutions were further limited to the *division* where the offense occurred" and that requirement was only removed to facilitate speedy trials.  Motion at 4-5 (emphasis in original)(footnote omitted).  Cordova concedes, however, that the Constitution

---

[2]After touring the cell block in the Pete V. Domenici Courthouse in Albuquerque and receiving briefing from the United States Marshals Service about the Albuquerque-area facilities that could house defendants and in-custody witnesses, the Court decided to hold the second <u>United States v. DeLeon</u> trial in Las Cruces.

and rule 18 of the Federal Rules of Criminal Procedure "do not absolutely require trial in the very community where the crime was committed." Motion at 5.

According to Cordova, "[b]ecause of the constitutional underpinnings of Rule 18, the *only* proper considerations for fixing the place of trial are the location where the offense was committed, the convenience of the defendant, any victim, and the witnesses, and the *prompt* administration of justice." Motion at 1 (emphasis in original). Cordova argues that those factors favor a trial in Albuquerque and not a trial in Las Cruces. See Motion at 5. Cordova asserts that Albuquerque is a more convenient location for witnesses, his family, and his attorneys:

> Mr. Cordova will call witnesses who were at the scene of the crime in Albuquerque and who continue to live there. He will also call numerous law enforcement personnel who were involved in the investigation of the crime, most of whom live in the Albuquerque area.
>
> . . . .
>
> Mr. Cordova's family lives in Albuquerque. His wife and daughter cannot afford to travel to Las Cruces to support their husband and father during trial.

Motion at 6-7.

Cordova recognizes that the "United States Marshals Service has provided the Court with a letter recommending that trial take place in Las Cruces," and expressing "concern regarding potential security issues that may arise should the trial be held in Albuquerque." Motion at 9 (citing First Baca USMS Letter at 1). Cordova avers, however, that those security issues are manageable vis-à-vis a trial with a single defendant. See Motion at 10-11.

**6.     The Response.**

The United States filed a response. See United States' Sealed Response to Defendants' Motion for Intra-District Transfer of Proceedings at 1, filed May 29, 2018 (Doc. 665)("Response"). In the Response, the United States contends that the Court "denied a

similar request" in United States v. DeLeon and "concluded twice . . . that the Las Cruces United States Courthouse was the best location for these trials."  Response at 1.  The Court's decisions in United States v. DeLeon made sense, according to the United States, because it "has the burden of proof, and all of the voluminous amounts of discovery, support staff, and several witnesses for this case are located in Las Cruces."  Response at 3.

> The Court took great measures to craft a ruling that balance the needs of the Court, the security concerns and needs of the United States Marshals Service, and the speedy trial concerns of the defendants.  The Court has repeatedly held that the Las Cruces United States Courthouse is the best location for this trial.

Response at 3.  The United States further contends that Cordova's suggestion -- severing the case and changing the venue for his trial to Albuquerque -- "may likely force to trial to be continued."  Response at 3.

> Juror questionnaires were sent to the prospective juror pool on May 11, 2018.  These were carefully crafted and sent out statewide.  The potential jurors are asked for conflicts with a trial being held in Las Cruces, New Mexico.  The Court would have to send another inquiry for conflicts due to the location being changed to Albuquerque, New Mexico.  This would surely create an undue delay in the commencement of trial.

Response at 3 (citation omitted).

    **7.**    **The Reply.**

Cordova filed a reply.  See Defendant Anthony Cordova's Reply in Support of Intra-District Transfer of Proceedings, filed June 12, 2018 (Doc. 717)("Reply").  Cordova begins by rehearsing his Motion arguments.  See Reply at 1.  Cordova continues by addressing the United States' argument that the Court should apply its United States v. DeLeon decisions regarding venue when determining where to charge this case.  See Reply at 2.  According to Cordova, trying United States v. DeLeon in Las Cruces made sense, because, in that case, "more crimes were alleged to have been committed around Las Cruces than any other location in New

Mexico."  Reply at 2.  Cordova argues that an Albuquerque trial makes sense in his case, because Counts 2 and 3 of the Indictment charges offenses that took place in Bernalillo County -- which contains Albuquerque -- while Count 1 charges RICO offenses that took place throughout New Mexico.  See Reply at 3 & n.3.  Additionally, Cordova avers that none of the United States v. DeLeon defendants filed "a written motion requesting that the trial take place in Albuquerque."  Reply at 3.  Cordova concludes by stating that the "case is no longer of any unusual size and no reason remains to believe that security logistics is of any more concern than it would be for any other multi-defendant case held in Albuquerque."  Reply at 4.  When Cordova filed the Reply, seven Defendants -- Baca, Sanchez, A. Garcia, Rodriguez, Benito, Garduño, and Cordova -- remained in this case.

**8.**  **The Hearing.**

The Court held a hearing on June 14, 2018.  See Transcript of Motion Proceedings (taken June 14, 2018), filed July 3, 2018 (Doc. 771)("Tr.").  By the time of the hearing, Cordova and Garduño were the only remaining Defendants.  At that hearing, Cordova repeated his argument, from the Motion, regarding the importance of conducting a trial in an alleged offense's vicinity. See Tr. at 32:24-35:15 (Acton).  Cordova also noted that "the case has changed quite a bit" since he filed the motion, because "we're down to two defendants in this case."  Tr. at 36:10-11 (Acton).  When the Untied States took the podium, it asserted that safety concerns favor a Las Cruces Trial over an Albuquerque trial and argued that a Las Cruces trial would be more convenient for its witnesses.  See Tr. at 53:21-54:19 (Armijo).

After noting that the two Deleon trials in Las Cruces had not received press coverage that interfered with the fairness of those proceedings and expressing concern that, in an Albuquerque

SNM trial, it might be harder to shield jurors from press coverage,[3] the Court indicated that it was not going to grant the Motion "at the present time." Tr. at 58:6-7 (Court). The Court did not, however, deny the Motion. See Tr. at 58:7-9 (Court)("I don't know if I'll ever grant but I'm not going to grant today and I'm not going to deny it. I'll take it under advisement."). The Court

---

[3]Specifically, the Court informed Cordova that an Albuquerque trial was more likely to draw press attention than a Las Cruces trial:

> Let me ask you something, Mr. Acton[.] [O]ne of the things that has been a concern of the defendants, that I think we certainly need to talk about, [is] the Albuquerque Journal has written some articles. And when they have written those articles, the defendants have not felt like the articles have helped them when they have come out. And they tend to come out at times, like the day before jury selection, the day before deliberations began, or things of that nature. The Journal doesn't have the money to send a reporter down there and watch this trial at any great length. But if this case is up here, have you given any thought to the publicity it might have if the reporter doesn't have to pay for a hotel room or transportation or food, and can just sit in the back, what that might do as far as making sure that your clients get a fair trial?
>
> . . . .
>
> One thing about the news media down in Las Cruces, [Albuquerque coverage] it starts in about Hatch, they don't get any television stations from Albuquerque [in Las Cruces]. And so Las Cruces doesn't seem to care much about these trials or do any coverage. So there is no [TV] coverage [in Las Cruces]. You can go to a Giant supermarket and buy s Journal. But they're not at the hotels. And [the Albuquerque Journal's coverage has] been manageable. In the last trial we had that article come out right before closings, and I was able to have jurors walk up here and say they hadn't seen the article, hadn't heard about it, or anything like that. I just wonder if the coverage might change if it were up here.

Tr. at 55:18-56:10 (Court). The next day, the Court commented, on the record, that an Albuquerque Journal reporter was in the courtroom observing the proceedings. See Transcript of Hearing at 200:2-6 (taken June 15, 2018)(Court), filed July 3, 2018 (Doc. 772) ("While we're doing yesterday things, we're plowing old ground, in case the people at the defense table did not know, that was Colleen Heild, with the Journal, in the back."). While the Court remains concerned about the press coverage that an Albuquerque trial may produce, the Court does not think that protecting Cordova from unfavorable publicity is a legitimate reason to deny Cordova's Motion and keep the case in Las Cruces. The Court will, instead, defer to Cordova's strategic judgment on this issue.

then asked the United States, the Defendants, and the United States Marshals Service to provide

additional information:

> I'm going to ask Mr. Mickendrow [who was in the room] to meet with the Marshal and then you give me a memo like you did before . . . . I did have communication with the Marshal to make sure she agreed with your assessment. So it seems to me there was another memo that got filed, that there were a couple that got filed [i.e., the Mickendrow Letter and the First Baca USMS Letter].

> But the situation has changed. We are down to two Defendants. . . . But your concerns and the U.S. Marshal's may not be any different.

> And Mr. Acton, what I'd like for you and Mr. Esquibel or Mr. Reisch [counsel for Garduño] to do is, before Deputy Mickendrow writes that [memo], I want you to talk to him. . . . [Y]ou tell him, you don't understand why certain things aren't happening and I'd like to have Deputy Mickendrow address that in the memo. And then let's take a look at it. And then you take a look at it.

> And if you still want this request, then, you know, just tell me and you'll get a ruling on it. But I think I need a more robust record. I want your questions to be addressed by the deputy, and then the deputy is going to have some other concerns.

> And then I guess, from the Government's standpoint, if you feel comfortable talking to the Marshal Service a little bit more about what this trial is going to look like from a witness standpoint, because at some point it's going to be out of the bag, your witnesses are going to be out of the bag. And so, if you can give them -- Deputy Mickendrow -- so that we really have a good factual basis. And I look to the Government -- you know, I'm inclined to deny this motion, but I also want to have a solid basis for doing so. So I think the Government's interests are going to be the same as the Court's, that we need to have a robust record.

Tr. at 58:10-60:6 (Court).

## 9.     The Second Baca USMS Letter.

Four days later, the Sonya Chavez sent a short letter to the Court addressing the Court's

request for more information:

> Your Honor --

> Thank you for providing the USMS with the opportunity to provide you with our feedback and recommendation regarding the location for the upcoming (third) SNM trial. Please know that it is the intention of our agency to always consider

safety and security of the witnesses, defendants, jury and entire court family at the forefront when making decisions like these. Also, know we are committed to flexibility and adaptability and are proud of our ability to meet the growing and ever-changing needs of the Court and of our partner agencies.

Based on our most recent assessment pertaining to the two-defendant trial, we believe Las Cruces still remains the most suitable location for the trial. Our understanding is that although the number of defendants is lower than originally planned for, there is still a high number of in-custody witnesses who will need to be separated throughout this process. The most suitable housing and cell block accommodations -- critical considerations -- for these individuals still remain down south. Transport time is another important consideration and is very workable for Las Cruces at this time. I am happy to discuss any details or concerns you may have and want to assure you we are prepared to meet whatever requirement the Court deems appropriate, provided there are no safety or security concerns with that requirement.

Based on the overall operational success of the first two trials for this investigation, I am confident the Marshals Service, together with Your Honor and our other participating agencies, can continue to work together to successfully facilitate this proceeding.

I welcome your input and again am happy to discuss any specifics you may wish to talk about.

Thank you again.

Sonya

Letter from Sonya Chavez to the Court at 1 (dated June 18, 2018), filed June 19, 2018 (Doc. 736). United States Marshal Chavez sent a second response, however, which indicates that a single-Defendant trial in Albuquerque might be feasible:

Judge

I have learned there is a pending plea that could change things significantly. If the plea agreement is agreed upon we are happy to discuss change in location to Albuquerque as it's my understanding that would bring us down to one defendant and the majority of the witnesses are in northern New Mexico. I understand and appreciate your concern about accommodating our witnesses and we will support you in that.

Thank you

Sonya

Letter from Sonya Chavez to the Court at 1 (dated June 18, 2018), filed June 19, 2018

(Doc. 736). The United States Marshals Service's conclusory responses did not satisfy the

Court, so the Court sent a response asking specific questions:

> Sonya,
>
> Just so that there is no misunderstanding between us, the Court asked your office -- though the attorneys and/or your deputies -- to assume that there is only one defendant in this case -- Anthony Cordova -- and whether that one defendant case could be tried in Albuquerque. The Court asked the U.S. Marshal to be as detailed as possible in its response so that the Court can write an opinion deciding Mr. Cordova's motion to transfer the case to Albuquerque. The Court will need much more information than your email provides. The Court needs details rather than the U.S. Marshal Services' conclusions. The Court has to decide the location under 18 U.S.C. § 3235, and the relevant test does not include the U.S. Marshal Services' preference or conclusions.
>
> Here are some questions that the Court has for which it needs detailed answers:
>
> 1. The Court must consider the convenience of the defendant, Mr. Cordova. The Court understands that Mr. Cordova was detained at Sierra Blanca in West Texas, but that he is now detained in Cibola. Could he be, consistent with security concerns, maintained there throughout the trial and transported conveniently to court each day of trial? If not, please explain in detail.
>
> 2. The Court must consider the convenience of the witnesses. The Court will need you to sit down with the United States and Mr. Cordova, state whom will be called, and where they are located. The U.S. Marshal Service then needs to tell me whether, consistent with security concerns, each one can be maintained in a northern location throughout the trial and/or transported conveniently to court each day of trial? If not, please explain in detail.
>
> 3. The Court wants to know, in detail, any other concerns that you have. Again, however, your concerns need to be stated in detail and provide the Court with information and not preference or conclusions.
>
> The Court strongly prefers that this information not be provided ex parte unless

the parties do not object to you providing information ex parte. The Court understands that you may not, because of security concerns, be able to share some information with the Defendants' attorneys, but give me what you can. This email and your response will be filed for attorneys' eyes only.

Jim

Letter from the Court to Sonya Chavez at 1 (dated June 19, 2018), filed June 19, 2018 (Doc. 736)("Court's Response"). The Court has not received a response from the United States Marshals Service regarding the Court's Response, and the Court has not heard from Cordova or the United States regarding the Motion since the Court's June 14 hearing.

The last Defendant, other than Cordova, in this case -- Garduño -- entered into a plea agreement with the United States two days after the Court sent the Court's Response. See Plea Agreement at 1, filed June 21, 2018 (Doc. 740). On that day, the Court entered an Order granting the Motion and promising "a Memorandum Opinion at a later date more fully detaining its rationale for this decision." Order, filed June 21, 2018 (Doc. 738)(text-only docket entry). This Memorandum Opinion is the Memorandum Opinion that the Court promised on June 21, 2018.

## ANALYSIS

The Court will hold Cordova's trial in Albuquerque. The United States Code states that, "[t]he trial of offenses punishable with death shall be had in the county where the offense was committed, where that can be done without great inconvenience." 18 U.S.C. § 3235. The Court's research reveals few cases parsing § 3235, and those cases give the statute cursory treatment and are not binding authority. See, e.g., United States v. Parker, 103 F.2d 857, 861 (3d Cir. 1939)(Maris, J.)(concluding that a trial court's determination that "the change of venue applied for would result in great inconvenience to the Government" was not an abuse of

discretion); <u>Hale v. United States</u>, 25 F.2d 430, 433 (8th Cir. 1928)(Van Valkenburgh, J.)(commenting that a motion seeking to transfer a case to a particular county -- and not to the newly established federal district containing that county -- does not properly invoke § 3235's statutory precursor). Accordingly, the Court is writing on a relatively clean slate.

Cordova is charged with offenses that can be punished by death that allegedly occurred in Bernalillo County. Count 2 alleges that, "[o]n or about February 4, 2005, in Bernalillo County," Cordova committed murder "in violation of 18 U.S.C. §§ 1959(a)(1) and 2." Indictment at 53. Section 1959(a)(1) murder violations -- as opposed to § 1959(a)(1) kidnapping violations -- are punishable "by death or life imprisonment." 18 U.S.C. § 1959(a)(1). Count 3 alleges that, "[o]n or about February 4, 2005, in Bernalillo County," Cordova

> did knowingly use and carry a firearm during and in relation to a crime of violence for which he may be prosecuted in a Court in the United States, as set forth in Count 2 of this Superseding Indictment, and in the course of said offense cause the death of S.D. through the use of the firearm, which killing is murder as defined in 18 U.S.C. § 1111(a). In violation of 18 U.S.C. §§ 924(c) and 924(j)(1).

Indictment at 53-54. Section 924(j)(1) violations are punishable "by death or by imprisonment for any term of years or for life." 18 U.S.C. § 924(j)(1).

Those offenses -- VICAR murders and § 924(j)(1) violations -- are "offences punishable by death," 18 U.S.C. § 3235, even though the United States does not seek to impose the death penalty in this case, <u>see</u> Notice of Intent Not to Seek a Sentence of Death at 1, filed September 13, 2016 (Doc. 210). The plain meaning of § 3235's text suggests that conclusion, because an offense is punishable in a particular way, <u>e.g.</u>, with death, if the law permits the offense to be punished in that way:

> An offence which the statute imperatively requires to be punished by imprisonment 'at hard labor,' and one that must be punished by 'imprisonment,' but the sentence to which imprisonment the court may, in certain cases, and in its

discretion require to be executed in a penitentiary where hard labor is prescribed for convicts, are, each, 'punishable' by imprisonment at hard labor.

In re Mills, 135 U.S. 263, 266 (1890). See Punishable, BLACK'S LAW DICTIONARY (Bryan Garner, ed., 10th ed. 2014)("(Of a crime or tort) giving rise to a specified punishment <a felony punishable by imprisonment for up to 20 years>.").

Dicta from the Supreme Court of the United States of America's decision in Smith v. United States, 360 U.S. 1 (1959)("Smith") also indicates that whether 18 U.S.C. § 3235 applies depends on whether "the offense as charged is sufficiently broad to justify a capital verdict." Smith, 360 U.S. at 8.

> The Courts of Appeals which have been concerned with the statute [the Federal Kidnapping Act, Pub. L. No. 72-189, 47 Stat. 326 (1932)] have uniformly construed it to create the single offense of transporting a kidnapping victim across state lines. We agree with this construction. Under the statute, that offense is punishable by death if certain proof is introduced at trial [i.e., if the victim was not released unharmed]. When an accused is charged, as here, with transporting a kidnapping victim across state lines, he is charged and will be tried for an offense which may be punished by death. Although the imposition of that penalty will depend on whether sufficient proof of harm is introduced during the trial, that circumstance does not alter the fact that the offense itself is one which may be punished by death and thus must be prosecuted by indictment. In other words, when the offense as charged is sufficiently broad to justify a capital verdict, the trial must proceed on that basis, even though the evidence later establishes that such a verdict cannot be sustained because the victim was released unharmed. It is neither procedurally correct nor practical to await the conclusion of the evidence to determine whether the accused is being prosecuted for a capital offense. For the trial judge must make informed decisions prior to trial which will depend on whether the offense be so punished. He must decide, among other things, whether the accused has the right to obtain a list of veniremen and government witnesses, 18 U.S.C. s 3432, **whether venue is properly set, 18 U.S.C. s 3235,** whether the accused has the benefit of twenty rather than ten peremptory challenges, Federal Rules of Criminal Procedure, Rule 24(b), whether indictment rather than information is necessary, Federal Rules of Criminal Procedure, Rule 7, and who may bail the accused. 18 U.S.C. s 3141.

Smith, 360 U.S. at 8-9 (emphasis added).

While caselaw construing § 3235's text is sparse, see supra at 17, cases applying 18 U.S.C. § 3281 buttress the Court's conclusion regarding § 3235. "Undoubtedly, there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433 (1932). Section 3235 contains text that is nearly identical to § 3281. Compare 18 U.S.C. § 3235 (providing a venue rule for "offenses punishable with death"), with 18 U.S.C. § 3281 (stating that no statute-of-limitations defense exists for "any offense punishable by death"). Courts have uniformly held that § 3281 applies no matter whether the United States seeks to impose the death penalty in a particular case. See, e.g., United States v. Payne, 591 F.3d 46, 58-59 (2d Cir. 2010)(concluding that VICAR murder is an offense punishable by death "within the meaning of § 3281," because the offense "is one for which the statute authorizes death as a punishment, regardless of whether the death penalty is sought by the prosecution"); Coon v. United States, 360 F.2d 550, 554-55 (8th Cir. 1966)(rejecting a defendant's argument that § 3281 did not apply, because the jury chose not to impose the death penalty).[4]  Along similar lines, the Court concluded, in United States v. Martinez, 505 F. Supp. 2d 1024 (D.N.M. 2007)(Browning, J.), that § 3281 applies even when 18 U.S.C. § 3598 -- which restricts the availability of the death penalty for Indian country offenses -- means that the death penalty is not on the table. See 505 F. Supp. 2d at 1031-32.  In that case, the defendant argued that, "because the homicide with which the United States charges him in this matter cannot be punished by death," under 18 U.S.C. § 3598, "it is not a capital offense and the applicable statute of limitations is five years." United

----

[4]In fact, if VICAR murder and § 924(j)(1) violations were not "offense[s] punishable by death," 18 U.S.C. § 3281, then Cordova's prosecution would be untimely, because those offenses would be subject to a five-year statute of limitations, see 18 U.S.C. § 3282(a), and Cordova is charged with offenses that occurred on or about February 24, 2005, see Indictment at 53-54.

States v. Martinez, 505 F. Supp. 2d at 1031.  The Court rejected the defendant's argument, because it "overlooks the difference between a statutorily available sentence and the case-specific sentence he potentially faces. . . .  Congress did not want such rules [like 18 U.S.C. § 3281] to depend on case specifics as much as on the category of substantive crime."  United States v. Martinez, 505 F. Supp. 2d at 1031.  Given the textual similarity between § 3281 and § 3235, the Court's United States v. Martinez analysis suggests that § 3235 likewise applies no matter whether the United States seeks to impose the death penalty on a particular occasion.

Interpreting § 3235 such that it applies whenever death is a legally authorized penalty is in accord with the general approach that courts take when evaluating the severity of an offense, i.e. by looking at the maximum penalty that the statute authorizes.  For example, when analyzing whether an offense is an infamous crime for the purposes of the Fifth Amendment to the Constitution's grand jury guarantee, "[t]he test is whether the crime is one for which the statutes authorize the court to award an infamous punishment, not whether the punishment ultimately awarded is an infamous one."  Mackin v. United States, 117 U.S. 348, 350 (1886).  Likewise, a criminal defendant is not constitutionally entitled to a trial by jury if the defendant is charged with a petty offense, which depends on how a statute is written and not the details of a particular prosecution.  See Lewis v. United States, 518 U.S. 322, 328 (1996)("Where we have a judgment by the legislature that an *offense* is 'petty,' we do not look to the potential prison term faced by a *particular defendant* who is charged with more than one such petty offense."  (emphasis in the original)).  See also id. at 326 ("An offense carrying a maximum prison term of six months or less is presumed petty, unless the legislature has authorized additional statutory penalties so severe as to indicate that the legislature considered the offense serious.").  Similarly, whether a crime is a felony depends on the maximum term of imprisonment associated with that crime.

See 18 U.S.C. § 3156 (asserting that a felony is "an offense punishable by a maximum term of imprisonment of more than one year").

The record before the Court does not demonstrate that conducting Cordova's single-Defendant murder trial in Albuquerque requires "great inconvenience." 18 U.S.C. § 3235.[5] Notwithstanding the concerns that the First Baca USMS Letter identifies vis-à-vis a nine-Defendant trial, the Court assumes that the United States Marshals Service is able to provide security for a single Defendant in the Pete V. Domenici Courthouse. Consequently, § 3235 requires the Court to hold Cordova's trial in Bernalillo County, so the Court grants the Motion.

Even if § 3235 did not apply in this case, the Court would reach the same result under rule 18 of the Federal Rules of Criminal Procedure. That rule requires the United States to "prosecute an offense in a district where the offense was committed," and it requires the Court to "set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice." Fed. R. Crim. P. 18. The

---

[5]The second United States v. DeLeon trial provides an example where trying an offense punishable with death "in the county where the offense was committed" could not "be done without great inconvenience." 18 U.S.C. § 3235. That trial involved four different VICAR murders. See DeLeon Indictment at 9-12. Three of those VICAR murders occurred in Doña Ana County, see DeLeon Indictment at 8-11, which contains the Las Cruces Federal Courthouse, but the fourth took place in Socorro and Valencia Counties, DeLeon Indictment at 11-12. The Doña Ana County murders were tried "in the county where the offense was committed." 18 U.S.C. § 3235. Trying the fourth VICAR murder in a separate trial in Socorro County or Valencia County would have been greatly inconvenient, because neither of those counties has a federal courthouse and Congress has not authorized federal proceedings to be held in either county. See 28 U.S.C. § 111 ("New Mexico constitutes one judicial district. Court shall be held at Albuquerque, Las Cruces, Las Vegas, Roswell, Santa Fe, and Silver City."). Consequently, trying that fourth murder in Las Cruces did not violate 18 U.S.C. § 3235. Additionally, none of the United States v. DeLeon defendants brought 18 U.S.C. § 3235 to the Court's attention or filed a motion asking the Court to move the trial to Albuquerque, so the United States v. DeLeon defendants waived any venue defect. See Fed. R. Crim. P. 12(b)(3) (requiring defendants to raise improper venue objections "by pretrial motion if the basis for the motion is then reasonably available"). See also Fed. R. Crim. P. 47(b)("A motion must state the grounds on which it is based and the relief or order sought.").

Court can properly consider security issues when applying rule 18. See United States v. Afflerback, 754 F.2d 866, 869 (10th Cir. 1985)("Rule 18 allows a court to consider 'the prompt administration of justice' in fixing the place of trial and matters of security clearly fall within that consideration." (quoting Fed. R. Crim. P. 18)).[6] Now that Cordova is the only Defendant remaining in this case, it is not clear whether those concerns favor a Las Cruces trial over an Albuquerque trial. See Letter from Sonya Chavez to the Court at 1 (dated June 18, 2018), filed June 19, 2018 (Doc. 736)("If the plea agreement is agreed upon we are happy to discuss change in location to Albuquerque as it's my understanding that would bring us down to one defendant . . . .").[7] The convenience of Cordova's family and the witnesses that Cordova intends to call militate in an Albuquerque trial's favor. See Motion at 6-7. The convenience of the United States' witnesses also militates in an Albuquerque trial's favor. See Letter from Sonya Chavez to the Court (dated June 18, 2018) at 1, filed June 19, 2018 (Doc. 736)("If the plea agreement is agreed upon we are happy to discuss change in location to Albuquerque as it's my understanding that . . . the majority of the witnesses are in northern New Mexico."). Consequently, the Court concludes that the rule 18 factors indicate that trying this case in Albuquerque would be the correct decision even if 18 U.S.C. § 3235 did not mandate that result.

---

[6]Cordova is correct that, until 1966, federal law required courts to try offenses in the division and the district where an offense occurred. See United States v. Gould, 508 F. Supp. 2d 896, 900 (D.N.M. 2007)(Browning, J.)(citing Salinger v. Loisel, 265 U.S. 224 (1924) and Marvel v. Zerbst, 83 F.2d 974 (10th Cir. 1936)). That point is a non sequitur, however, insofar as "[t]he District of New Mexico does not contain Congressionally assigned divisions." United States v. Gould, 508 F. Supp. 2d at 902.

[7]After Garduño pled, neither the United States nor the United States Marshals Service provided information to the Court, and the United States Marshal did not respond to the Court's June 19 email requesting detailed information.

**IT IS ORDERED** that Defendant Anthony Cordova's Motion for Intra-District Transfer of Proceedings, filed May 14, 2018 (Doc. 619), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
   Attorney for the United States
     Acting Under Authority Conferred by 28 USC § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
   Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

     *Attorneys for the Plaintiff*

Theresa M. Duncan
Duncan, Earnest, LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

     *Attorneys for Defendant Anthony Ray Baca*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

 *Attorneys for Defendant Christopher Garcia*

Todd Bruce Hotchkiss
Todd B. Hotchkiss, Attorney at Law, LLC
Albuquerque, New Mexico

 *Attorney for Manuel Jacob Armijo*

Louis E. Lopez, Jr.
El Paso, Texas

 *Attorney for Frederico Munoz*

Donald F. Kochersberger, III-
Business Law Southwest, LLC

 *Attorney for Sergio Loya Rodriguez*

Susan Burgess-Farrell
Barry G. Porter
Burges & Porter Law, LLC
Albuquerque, New Mexico

 *Attorneys for Manuel Benito*

Diego R. Esquibel
The Barnett Law Firm
Albuquerque, New Mexico

--and--

R. Scott Reisch
Reisch Law Firm, LLC
Denver, Colorado

 *Attorneys for Vincent Garduno*

Marc Grano
Grano Law Offices
Las Vegas, New Mexico

    *Attorney for Mandel Lon Parker*

James Baiamonte
Albuquerque, New Mexico

--and--

Ahmad Assed
Ahmad Assed & Associates
Albuquerque, New Mexico

    *Attorneys for Daniel Archuleta*

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

    *Attorneys for Defendant Daniel Sanchez*

Marcia A. Morrissey
Santa Monica, California

--and--

Gregory M. Acton
Albuquerque, New Mexico

    *Attorneys for Anthony Cordova*

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

*Attorneys for Defendant Arturo Arnulfo Garcia*