# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                          No. CR 16-1613 JB

ANTHONY RAY BACA, a.k.a. "Pup";
CHRISTOPHER GARCIA; MANUEL JACOB
ARMIJO, a.k.a. "Big Jake"; FREDERICO
MUNOZ, a.k.a. "Playboy"; SERGIO LOYA
RODRIGUEZ, a.k.a "Churro"; MANUEL
BENITO, a.k.a. "Panther"; VINCENT
GARDUÑO a.k.a. "Fatal"; MANDEL LON
PARKER, a.k.a. "Chuco"; DANIEL
ARCHULETA, a.k.a. "Smurf"; DANIEL
SANCHEZ, a.k.a. "Dan Dan"; ANTHONY
CORDOVA, a.k.a. "Antone"; and ARTURO
ARNULFO GARCIA, a.k.a. "Shotgun,"

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the United States' Proffer Under Fed. R. Evid.

801(d)(2) and Objections, filed June 22, 2018 (Doc. 744-1)("James[1] Proffers"). The Court held

a James Hearing on July 3, 2018. The Court makes Findings of Facts and particularized rulings

on the admissibility of Plaintiff United States of America's proffered statements.

## FACTUAL BACKGROUND

The Court recounts the factual background in its Memorandum Opinion and Order at 2-4,

2018 WL 5980443, at *1, filed November 14, 2018 (Doc. 932)("MOO"). The Court incorporates

that recitation here.

---

[1]United States v. James, 590 F.2d 575 (5th Cir. 1979).

The Court takes its background facts from the Superseding Indictment, filed March 9, 2017 (Doc. 372)("Indictment").  The Court does not set forth these facts as findings or for their truth.  The Court recognizes that the factual background is largely the Plaintiff United States of America's version of events and that the Defendants who have not pled guilty are all presumed innocent.

This case deals with the crimes that the . . . [Syndicato de Nuevo Mexico ("SNM")] . . . allegedly committed through its members.  See Indictment ¶¶ 1, 3, at 1-2.  The SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including, murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking."  Indictment ¶ 1, at 2.  The SNM constitutes an enterprise "as defined in Title 18, United States Code, Sections 1959(b)(2) and 1961(4), that is, a group of individuals associated in fact that engaged in, and the activities of which affected interstate and foreign commerce."  Indictment ¶ 2, at 2.  The enterprise is "an ongoing organization whose members/prospects/associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise."  Indictment ¶ 2, at 2.

The SNM is a prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage.  See Indictment ¶ 3, at 2.  During the riot, thirty-three inmates were killed, and over 200 were injured.  See Indictment ¶ 3, at 2.  After the PNM riot, the SNM expanded throughout the state's prison system and has had as many as 500 members.  See Indictment ¶ 4, at 2.  The SNM now has approximately 250 members, and "a 'panel' or 'mesa' (Spanish for ["]table["]) of leaders who issue orders to subordinate gang members."  Indictment ¶ 4, at 2-3.  The SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system.  See Indictment ¶¶ 3, 5, at 2-3.  Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and the profit from narcotics trafficking.  See Indictment ¶ 5, at 3.  The SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities.  See Indictment ¶ 6, at 3.  If another gang does not abide by the SNM's demands, the SNM will assault or kill one of the other gang's members to show its power.  See Indictment ¶ 6, at 3.  The SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system.  See Indictment ¶ 7, at 4.  The SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others."  Indictment ¶ 7, at 4.  "Similarly, a member of the SNM Gang is expected to confront and attack any suspected law enforcement informants, cooperating witness[es], homosexuals, or sex offenders."  Indictment ¶ 8, at 4.  To achieve its purpose of maintaining power, the SNM uses intimidation, violence, threats of violence, assault, and

murder.  See Indictment ¶¶ 6-8, at 3-4.  The SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers.  See Indictment ¶ 7, at 4.  The SNM's recent activities in a conspiracy to murder high ranking New Mexico Corrections Department [("Corrections Department")] officials inspired the Federal Bureau of Investigation's [("FBI")] present investigation.  See United States v. Garcia, 221 F. Supp. 3d 1275, 1277 (D.N.M. 2016)(Browning, J.).

MOO at 2-4; 2018 WL 5980443, at *1.

## FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure requires that the Court state its essential findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record.").  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d) purposes.  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.  In so doing, the court is not bound by evidence rules, except those on privilege.").  The Court makes the following findings.

1.     The conspiracy to murder Shane Dix ("Dix Conspiracy") included Defendant Christopher, a.k.a. Chris, Garcia ("C. Garcia"), Defendant Anthony Cordova ("A. Cordova"), Billy Cordova ("B. Cordova"), Mario Montoya, Steven Morales, Bobby Dominguez, Rocky Sanchez, and Carmelito Sanchez.   See Draft Transcript of Hearing at 38:16-41:21 (taken July 3,

2018)(Court, Castellano, Morrissey)("July 3 Tr.")[2](agreeing to this finding of fact);[3] Letter from Fred Federici to the Court at 2 (dated June 29, 2018), filed July 2, 2018 (Doc. 766)("Conspiracy List").

2. The conspiracy to distribute drugs in a jail or prison ("Distribution Conspiracy") includes Richard Gallegos, A. Cordova, Melody Ortiz, Sylvia Gutierrez, and Dominic Pollock. See July 3 Tr. at 42:22-42:21 (Castellano, Court, Morrissey)(agreeing to this finding of fact); Conspiracy List at 2.

3. A. Cordova is not a member of the conspiracy to intimidate and/or retaliate against a witness ("Intimidation Conspiracy") or the conspiracy to murder Dwayne Santistevan,[4] Adam Vigil,[5] and Gregg Marcantel[6] ("Santistevan, Vigil, Marcantal Conspiracy"). See July 3 Tr. at 43:7-44:18 (Castellano, Court)(agreeing that A. Cordova is not a member of the witness Intimidation Conspiracy or the Santistevan, Vigil, Marcantel Conspiracy).

---

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

[3]The parties agreed to these facts and the Court has taken considerable evidence in this case.

[4]Santistevan is the former director of the "Corrections Department's Security Threat Intelligence Unit." See Carlos Andres López, Gang Leader Pleads Guilty to Conspiring to Murder Prison Officials, Albuquerque Journal (Sept. 16, 2016), https://www.abqjournal.com/846525/gang-leader-pleads-guilty-to-conspiring-to-murder-prison-officials.html.

[5]Vigil was a coordinator with the Security Threat Intelligence Unit. See DeLeon, 287 F. Supp. 3d DeLeon, 287 F. Supp. 3d 1187, 1211 (D.N.M. 2018)(Browning, J.).

[6]Marcantel is the former Secretary of the Corrections Department. See López, supra note 3.

**PROCEDURAL BACKGROUND**

The FBI's SNM investigation resulted in this case and three other cases before the Court. See United States v. DeLeon, No. CR 15-4268 ("DeLeon"); United States v. Varela, No. CR 15-4269; United States v. Garcia, No. CR 15-4275. Of the other cases resulting from the FBI investigation, United States v. Varela and United States v. Garcia did not go to trial, but the Court held two trials in DeLeon. In the end, the Court held one four-defendant trial ("First DeLeon Trial") and one seven-defendant trial ("Second DeLeon Trial"). Across the two trials, the juries found eight of the eleven DeLeon Defendants guilty of violating Violent Crimes in Aid of Racketeering Activity, 18 U.S.C. § 1959 ("VICAR"). See DeLeon, No. CR 15-4268, Jury Verdict at 1-3, filed March 12, 2018 (Doc. 1947); DeLeon, No. CR 15-4268, Jury Verdict at 1-5, filed May 25, 2018 (Doc. 2332).

On April 21, 2016, a Grand Jury returned the first indictment in this case. See Original Indictment at 1, filed April 21, 2016 (Doc. 2). On March 9, 2017, a Grand Jury returned the Indictment, which superseded the initial indictment. See Indictment at 1. Several DeLeon Defendants are charged in this case -- Defendant Anthony Ray Baca, C. Garcia, Defendant Daniel Sanchez, and Defendant Arturo Arnulfo Garcia. Compare Indictment at 1, with DeLeon, No. CR 15-4268, Second Superseding Indictment at 1, filed March 9, 2017 (Doc. 947). Count 1 of the Indictment charges eleven Baca Defendants -- Baca, C. Garcia, Defendant Manuel Jacob Armijo, Defendant Frederico Munoz, Defendant Sergio Loya Rodriguez, Defendant Manuel Benito, Defendant Vincent Garduño, Defendant Mandel Lon Parker, Defendant Daniel Archuleta, D. Sanchez, and A.A. Garcia -- with engaging in a racketeering conspiracy contrary to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO"). See Indictment at 8-9. Count 2 alleges that C. Garcia and A. Cordova committed murder on or

about February 4, 2005, in violation of VICAR. <u>See</u> Indictment at 54. Count 3 charges A. Cordova with using and carrying a firearm in relation to the crime charged in Count 2, in violation of 18 US.C. §§ 924(c), (j)(1), respectively, using a firearm during a violent crime and using a firearm to cause a person's death. <u>See</u> Indictment at 54.

Before the First <u>DeLeon</u> Trial, the Court held a full, several day <u>James</u> hearing, beginning on November 27, 2017. <u>See</u> <u>DeLeon</u>, No. CR 15-4268 JB, Transcript of Hearing at 10:12-24 (taken November 27, 2017)(Court), filed December 6, 2017 (Doc. 1545)("Nov. 27 Tr.")(granting the defendants' requests for a full <u>James</u> hearing). <u>See also</u> <u>DeLeon</u>, No. CR 15-4268 JB Defendant Daniel Sanchez's Motion in Limine to Preclude the Admission of Un-Confronted, Out of Court Statements Proffered by the Government at the James Hearing, filed October 6, 2017 (Doc. 1296). Before the Second <u>DeLeon</u> Trial, the parties agreed that the United States would submit a list of statements proposed for introduction at trial and that the Defendants would have the opportunity to object to the statements' admissibility. <u>See</u> Nov. 27 Tr. at 106:7-10 (Castellano)("It's my understanding [the Trial 2 Defendants will] get the statements and they'll make a determination at that point whether they want to challenge the statements."). <u>See also</u> <u>DeLeon</u>, 287 F. Supp. 3d 1187, 1201-02, (D.N.M. 2018)(Browning, J.); <u>United States v. DeLeon</u>, United States' Notice of Proposed James Statements for Trial 2, filed March 8, 2018 (Doc. 1903). The Court and the parties reasoned that this process would enable a more focused analysis of the statements.

1. **The** <u>**James**</u> **Proffers.**

Through the United States' Notice of Proposed James Statements, filed June 22, 2018 (Doc. 744), the United States conveyed the <u>James</u> Proffers to the Court on June 22, 2018. <u>See</u>

United States' Notice of Proposed James Statements at 1. The <u>James</u> Proffers contains the

following statements and information on those statements:

---

Statement 1: Dix's girlfriend owed Chris Garcia money. Dix shot Garcia in a confrontation about that money. Garcia wanted Dix dead after that and was willing to pay for Dix to be killed.

Declarant: Chris Garcia

Date: On or before February 4, 2005

Source: Michael Patrick Sullivan

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, and/or keep coconspirators abreast of an ongoing conspiracy's activities.

Statement 2: Chris Garcia paid Carmelito Padilla to hire Michael Snow but Snow never killed Dix.

Declarant: Chris Garcia

Date: On or before February 4, 2005

Source: Michael Patrick Sullivan

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.

---

Statement 3: Chris Garcia put out a $10,000 hit for Shane Dix.

Declarant: Chris Garcia

Date: On or before February 4, 2005

Source: Gilbert Angelo Serrano

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, and/or to reassure members of a conspiracy's continued existence.

Statement 4: Chris Garcia wanted Dix killed while he was out of town so that he had an alibi.

Declarant: Chris Garcia

Date: On or before February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, to allay a coconspirator's fears, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.

Statement 5: Chris Garcia had put money in Dix's books while Dix was in jail to mislead police that Garcia had forgiven Dix.

Declarant: Chris Garcia

Date: On or before February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, to allay a coconspirator's fears, keep coconspirators abreast of an ongoing conspiracy's activities, and/or to avoid detection by law enforcement.

Statement 6: Chris Garcia talked to Anthony Cordova and Mario Montoya about the fact that Dix hung out at the Chevron.

Declarant: Chris Garcia

Date: On or before February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.

---

Statement 7: Anthony Cordova was concerned that people would be able to identify the car after the murder. Cordova said he needed to get rid of his car. The car was a 1990s reddish/maroon Pontiac or Buick with a square rear end.

Declarant: Anthony Cordova

Date: On or before February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to reassure members of a conspiracy's continued existence, to allay a coconspirator's fears, keep coconspirators abreast of an ongoing conspiracy's activities, and/or to avoid detection by law enforcement.

---

Statement 8: Anthony Cordova and Mario Montoya saw Dix's vehicle at the gas station. Cordova told Montoya to shoot Dix there, but Montoya said they need to wait because there were so many people and cameras.

Declarant: Anthony Cordova

Date: On or before February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, to allay a coconspirator's fears, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy are statements regarding the roles of other coconspirators, and/or to avoid detection by law enforcement.

---

Statement 9: Cordova and Montoya asked Dix for drugs at the gas station. Dix called someone to get more drugs.

Declarant: Anthony Cordova

Date: On or before February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to prompt further action on the part of the conspirators and/or to reassure members of a conspiracy's continued existence.

Statement 10: Anthony Cordova suggested that he and Montoya go with Dix. Dix said no and told them he would be back with the drugs.

Declarant: Anthony Cordova

Date: On or before February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, and/or are statements regarding the roles of other coconspirators.

Statement 11: While Dix was on the phone inquiring about drugs, Anthony Cordova said he knew the person on the other line and asked to speak with him.

Declarant: Anthony Cordova
Date: On or before February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.

Statement 12: Anthony Cordova told Montoya that he knew where Dix was headed and gave directions to Montoya on how to get there.

Declarant: Anthony Cordova

Date: On or before February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, and/or are statements regarding the roles of other coconspirators.

Statement 13: Anthony Cordova told Mario Montoya to drive when they were leaving the gas station to locate Dix.

Declarant: Anthony Cordova

Date: On or before February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, and/or are statements regarding the roles of other coconspirators.

Statement 14: Mario Montoya got his gun from Chris Garcia and believed Anthony Cordova did as well. Cordova told Montoya to put his gun under the seat.

Declarant: Anthony Cordova

Date: On or before February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.

Statement 15: Anthony Cordova told Montoya to back up as Dix said, "It's me Shane. I got that for you."

Declarant: Anthony Cordova

Date: On or before February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, and/or are statements regarding the roles of other coconspirators.

Statement 16: Anthony Cordova was stalling and said "Who? Is that you Shane?"

Declarant: Anthony Cordova

Date: On or before February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, and/or to reassure members of a conspiracy's continued existence.

Statement 17: Anthony Cordova told Montoya to give him his gun and dumped his and Montoya's in the Rio Grande.

Declarant: Anthony Cordova

Date: On or before February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to allay a coconspirator's fears, and/or to avoid detection by law enforcement.

Statement 18:Chris Garcia gave Anthony Cordova a different car to drive after the murder.

Declarant: Anthony Cordova

Date: On or after February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to allay a coconspirator's fears and/or to avoid detection by law enforcement.

Statement 19:Montoya called Chris Garcia and told him the job was done by saying "cherry pie."

Declarant: Chris Garcia

Date: On or after February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to keep coconspirators abreast of an ongoing conspiracy's activities, and/or to avoid detection by law enforcement.

Statement 20: Following the murder, Montoya described the murder to Chris Garcia. Garcia gave Montoya money, drugs and forgave a drug debt of Mario Montoya. Cordova was leaving the house when Montoya got there.

Declarant: Anthony Cordova

Date: After February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to reassure members of a conspiracy's continued existence, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.

Statement 21: Chris Garcia met with Montoya and Anthony Cordova and said Cordova was going to help kill Dix. Garcia wanted Cordova to help because he was more familiar with Dix's neighborhood.

Declarant: Anthony Cordova

Date: On or before February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.

Statement 22: Chris Garcia told Steven Morales that he wanted Morales to kill Dix.

Declarant: Chris Garcia

Date: Around 2004

Source: Steven Morales

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.

Statement 23: Steven Morales attempted to get Dix to meet up with Bobby Dominguez, an ex-

girlfriend, but Dix never took the bait.

Declarant: Chris Garcia

Date: Around 2004

Source: Steven Morales

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.

Statement 24: Chris Garcia was going to pay Steven Morales $5,000 and a pound of heroin to murder Dix.

Declarant: Chris Garcia

Date: Around 2004

Source: Steven Morales

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.

Statement 25: Chris Garcia Offered [sic] to clear Mario Montoya's drug debt if he killed Dix.

Declarant: Chris Garcia

Date: On or before February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.

Statement 26: Chris Garcia gave Mario Montoya a gun to kill Dix but Montoya was arrested soon after.

Declarant: Chris Garcia

Date: On or before February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.

| |
| --- |
| Statement 27: "I was in Vegas when Dix got hit so they wouldn't suspect me." "That's how you do it."

Declarant: Chris Garcia

Date: After the fact

Source: Gerald Archuleta

Basis for admission: Statement against interest. |

| |
| --- |
| Statement 28: "We're friends. If I go [to Las Vegas] and come back and it's [(the murder)] not done, we won't be friends."

Declarant: Chris Garcia

Date: On or before February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, and/or keep coconspirators abreast of an ongoing conspiracy's activities. |

| |
| --- |
| Statement 29: Cordova and Montoya gave Dix $50 dollars for drugs and expected Dix to take them to a secluded location to complete the transaction.

Declarant: Anthony Cordova

Date: On or before February 4, 2005 |

Source: Mario Montoya

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, and/or are statements regarding the roles of other coconspirators.

---

Statement 30:Cordova got rid of his car about a week later after the Dix murder.

Declarant: Anthony Cordova

Date: After February 4, 2005

Declarant: Mario Montoya

Basis for admission: Statement made to avoid detection by law enforcement.

---

Statement 31: Chris Garcia told Julian Romero that he wanted Shane Dix dead. Garcia attempted to hire Romero to kill Dix by offering to give Romero $10,000 and a 9mm gun a few months before Dix was murdered.

Declarant: Chris Garcia

Date: On or before February 4, 2005

Source: Julian Romero

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.

---

Statement 32: Chris Garcia asked Billy Cordova to kill Shane Dix.

Declarant: Chris Garcia

Date: On or before February 4, 2005

Source: Billy Cordova

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles

| |
|---|
| of other coconspirators. |
| Statement 33: Richard Gallegos told Melody Ortiz to contact a male and "tell him Tone sent you."<br><br>Declarant: Richard Gallegos<br><br>Date: On or about June 13, 2016<br><br>Source: Jail call recording<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators. |

Statement 34: Gallegos told Ortiz to find addresses to give to another male so that his "paperwork"[7] could be sent to him.

Declarant: Richard Gallegos

Date: On or about June 13, 2016

Source: Jail call recording

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, are statements regarding the roles of other coconspirators, and/or to avoid detection by law enforcement.

---

Statement 35: Gallegos and Cordova called Ortiz and Sylvia Gutierrez to arrange for the delivery of drugs in to the facility

Declarant: Richard Gallegos, Anthony Cordova, Melody Ortiz, and Sylvia Gutierrez

Date: On or about June 13, 2016

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.

Source: Jail call recording

---

Statement 36: "'Pup'[8] wants to send us a message to 'Creeper'" -- who we believe was Jerry Armenta's "family that they will be harmed if he testifies for the state. 'Pup' wants the family to know 'Creeper' is fucking up. If he takes the stand against this pedo, against anybody, we're coming for your ass. 'Pup' agrees that Mario is the best person to deliver the message."

Declarant: Anthony Ray Baca

Date: On or about November 2015

Source: not identified

---

[7]"Paperwork" in this instance refers to drugs. See July 3 Tr. at 58:18-23 (Castellano).

[8]Pup is a nickname for Baca. See DeLeon, 287 F. Supp. 3d at 1207.

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, to allay a coconspirator's fears, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, are statements regarding the roles of other coconspirators, and/or to avoid detection by law enforcement.

Statement 37: "'Pup' and CHS[9] are talking with Mario Montoya. 'Pup' says he is working on getting Mario guns."

Declarant: Anthony Ray Baca

Date: On or about November 2015

Source: not identified

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.

---

[9]CHS most likely stands for "confidential human source." <u>See</u>, <u>e.g.</u>, <u>United States v. DeLeon</u>, 287 F. Supp. 3d at 1211 (defining CHS as "confidential human source"); <u>United States v. DeLeon</u>, No. CR 15-4268 JB, 2017 WL 3054511, at *120 (D.N.M. June 30, 2017)(Browning, J.)(discussing CHS in a context suggesting that CHS means confidential human source); <u>United States v. Garcia</u>, No. CR 15-4275 JB, 2017 WL 2290963, at *6 (D.N.M. May 2, 2017)(Browning, J.)(abbreviating "confidential human source" "CHS").

Statement 38: "'Pup' wants research to be done on where Vigil and Santistevan live. He believes that the warden lives on prison grounds on Oasis Street, but also observed other houses that could belong to Vigil or Santistevan. He says it will be easier to get them if they do not reside on the prison grounds. He also says he wants to bring down [Elmer] Bustos, a former Associate Warden, who 'Pup' blames for sending him to the ADX.[10] Pup' does not specify that he wants Bustos hit, but it appears he wants the get him in trouble. 'Pup' believes that Bustos owns a Santa Fe real estate company."

Declarant: Anthony Ray Baca

Date: On or about October 2015

Source: not identified

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.

Statement 39: "Pup" and the CHS are talking about planning the hits and the best weapon to be used.

"Pup" says, "What's a good cuete[11] for that? It has to be a revolver, carnal,[12] not an automatic. Automatic might jam. Those are easier to put a silencer on, too, a homemade silencer, because it has a barrel."

Declarant: Anthony Ray Baca

Date: On or about November 2015

---

[10] ADX is an administrative maximum, high security prison. See Supermax prison, Wikipedia, https://en.wikipedia.org/wiki/Supermax_prison (last visited May 11, 2019).

[11] "Cuete" refers to a weapon. See United States v. Torres-Castro, 374 F. Supp. 2d 994, 1026 (D.N.M. 2005)(Browning, J.).

[12] "Carnale" literally means "brother" but can be used as a term referencing people to whom someone is close. See Carnal, Urban Dictionary, https://www.urbandictionary.com/define.php?term=carnal (last visited May 11, 2019); Carnale, Urban Dictionary, https://www.urbandictionary.com/define.php?term=Carnale (last visited May 11, 2019).

Source: not identified

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.

Statement 40: "Pup" and the CHS are talking about Michael Snow. "Pup" tells the CHS, "Ask him if he could try to get me a cuete. If he could, just get one, and I'll have him give it to somebody." Specifically, "Pup" asks for a revolver.

Declarant: Anthony Ray Baca

Date: On or about November 2015

Source: not identified

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.

Statement 41: To put this in context, this is happening on December 3, 2015. "Mario should have done the hit over the night. 'Pup' and CHS are wondering if the feds are going to charge the SNM. 'Pup' talks about the steps the feds would have to take, gather state evidence, bring in STIU [(Security Threat Intelligence Unit)] and local law enforcement."

Declarant: Anthony Ray Baca

Date: not identified

Source: not identified

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.

Statement 42: "The CHS asked 'Pup' if the SNM will get respect from the Mexican Mafia if Mario successfully kills the Secretary and all the carnales get sent into the federal system.

'Pup' responds, 'They already respect us. And with us going over there like that, with that type of fucking charge, oh, yeah, they fucking -- not only them' -- the Mexican Mafia -- 'everybody else respects the fuck out of that shit.'"

Declarant: Anthony Ray Baca

Date: not identified

Source: not identified

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.

Statement 43: "Pup" is talking about Jerry Armenta testifying. "And his family, his family gets hit. And that shit will hit the news, carnal. And they're going to say the only motive behind that has been because that fucker testified. That shit hits the news, too. That gives us more power. Because of that fact, everybody is going to know, a la verde,[13] they're going to hit my family, I'm never going to tell them."

Declarant: Anthony Ray Baca

Date: not identified

Source: not identified

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, to allay a coconspirator's fears, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, are statements regarding the roles of other coconspirators, and/or to avoid detection by law enforcement.

Statement at 44: He's referring to the magazine. He says, "Well, the firearm didn't have a magazine. It needs a magazine to be fully loaded." So what Garcia is explaining to Montoya is: "Put the bullet in the fucker and then you can shoot it. Or you can get a clip and, you know, do it the right way. Order a clip."

Declarant: Anthony Ray Baca

---

[13]"A la verde" means "to the green," but Baca probably said "a la verga," which is a vulgar phrase popularly used by New Mexicans to express shock or surprise.

<table>
<tr><td>

Date: not identified

Source: not identified

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, to allay a coconspirator's fears, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy and/or are statements regarding the roles of other coconspirators.
</td></tr>
</table>

James Proffers at 1-23.[14]

### 2. The James Proffers Reply.

A. Cordova responded to the James Proffers. See Anthony Cordova's Reply to United States' Notice of Proposed James Statements, filed June 27, 2018 (Doc. 760)("Objections"). A. Cordova takes the position that the United States cannot prove his involvement in any SNM conspiracy, as his connection to C. Garcia related to C. Garcia's personal revenge against Dix. See Objections at 2. A. Cordova addresses each statement in turn, and the Court addresses these objections infra in the Analysis. See Objections at 2-9.

### 3. The Conspiracy List.

The United States transmitted to the Court via email a summary of the conspiracies to which the United States refers in the James Proffers. See Conspiracy List. This summary lists four conspiracies: (i) the Dix Conspiracy, (ii) the Distribution Conspiracy, (iii) the Intimidation Conspiracy, and (iv) the Santistevan, Vigil, Marcantel Conspiracy. See Conspiracy List at 2.

---

[14]For this Memorandum Opinion and Order's purposes, the Court changes the table's formatting from the formatting in James Proffers, but the Court quotes the United States' text from the James Proffers.

## 2.     The Hearing.

At the hearing on July 3, 2018, the United States began by summarizing the evidence that it would present on the Dix Conspiracy.  See July 3 Tr. at 36:7-43:6 (Castellano).  The United States admitted that it could not show that Carmelito Padilla was part of the Dix Conspiracy.  See July 3 Tr. at 41:9-14 (Court, Castellano).  The United States summarized that C. Garcia, A. Cordova, B. Cordova, Montoya, Morales, Dominguez, R. Sanchez, and C. Sanchez participated in the Dix Conspiracy.  See July 3 Tr. at 41:18-22 (Castellano).  The United States indicated that it might not prove that Michael Snow participated in the Dix Conspiracy.  See July 3 Tr. at 42:15-18 (Castellano).  A. Cordova raised an objection only to the statement that Snow contributed to the Dix Conspiracy.  See July 3 Tr. at 44:3-4 (Morrissey).  The Court indicated that it would consider whether to deem Snow a coconspirator.  See July 3 Tr. at 44:22 (Court).

The United States turned to the Distribution Conspiracy, and named as conspirators Gallegos, A. Cordova, Ortiz, Gutierrez, and Pollock.  See July 3 Tr. at 45:11-14 (Castellano).  The Defendants had no objections to this list.  See July 3 Tr. at 46:9-10 (Morrissey).  The Court noted, and the United States agreed, that A. Cordova was not part of the Intimidation Conspiracy.  See July 3 Tr. at 46:11-48:3 (Court, Castellano).

The United States then began discussing the statements it sought to introduce by averring that statements 4 through 18 are admissible.  See July 3 Tr. at 49:18-24 (Castellano).  The United States argued that statement 19, which Montoya made after the murder, also furthered the Dix Conspiracy or formed a separate conspiracy to conceal the murder, because, in the statement, C. Garcia uses the code word "cherry pie" to inform Montoya the murder occurred.  See July 3 Tr. at 50:1-18 (Castellano, Court).  The Defendants objected that, because the conversation occurred after the murder, it was not part of the Dix Conspiracy.  See July 3 Tr. at 50:21-51:7 (Morrissey).

The United States replied that it would not introduce the words "cherry pie" for their truth.  See July 3 Tr. at 51:8-13 (Castellano).  The Court indicated its intention to consider the issue.  See July 3 Tr. at 51:14-17 (Court).

The United States noted that statement 20 also was made after Dix' death, but argued that the statement largely involves conduct.  See July 3 Tr. at 51:19-23 (Castellano).  The United States also clarified that Montoya and C. Garcia, and not A. Cordova, made the statement.  See July 3 Tr. at 52:20-24 (Castellano, Court).   The United States explained statement 20 -- Montoya will describe the murder and his agreement with C. Garcia to commit the murder in exchange for forgiveness of his drug debt, and the ability to obtain "additional money and drugs."  July 3 Tr. at 52:18 (Castellano).  See July 3 Tr. at 53:3-20 (Court, Castellano).  The Court stressed that it would not admit Montoya's description of the murder, and the United States agreed that Montoya would state only that he described to C. Garcia the murder.   See July 3 Tr. at 53:21-54:6 (Court, Castellano).  The Defendants agreed to these statements' admission only if the United States clarifies that A. Cordova did not participate in the conversation.  See July 3 Tr. at 53:14-19 (Morrissey).  The United States could not confirm, however, that A. Cordova did not witness the exchange.  See July 3 Tr. at 54:22-55:7 (Court, Castellano).  A. Cordova also objected that C. Garcia could not have forgiven a drug debt without words, but the Court interjected that such a statement would not be hearsay.  See July 3 Tr. at 55:10-22 (Morrissey, Court).  The Court indicated that it would likely admit Montoya's story, but not the murder's description.  See July 3 Tr. at 56:9-14 (Court).

In turning to statement 21, the United States agreed with the Court that C. Garcia was the correct declarant.  See July 3 Tr. at 56:16-18 (Castellano).  The United States continued, stating that the Court should admit statements 21, 22, and 23.  See July 3 Tr. at 56:20-57:4 (Castellano,

Court).  The United States clarified that Morales made statement 23.  <u>See</u> July 3 Tr. at 57:4-5 (Castellano).  The United States further summarized that statements 24, 25, and 26 are admissible and attributed in the <u>James</u> Proffers to the correct declarants.  <u>See</u> July 3 Tr. at 57:11-23 (Court, Castellano).  The United States explained that, for statement 26, it would introduce statements about a gun that C. Garcia gave to Montoya for Dix's murder and about C. Garcia's initial solicitations of Montoya for the murder.  <u>See</u> July 3 Tr. at 58:2-23 (Castellano, Court).  The Court indicated that it would further analyze those statements.  <u>See</u> July 3 Tr. at 58:24-59:1 (Court).

The United States noted that statement 27 is a statement against interest, and notes that statement 28 and other statements that C. Garcia made to Montoya and A. Cordova, support its reliability.  <u>See</u> July 3 Tr. at 59:4-60:1 (Castellano).  A. Cordova agreed to the statements' admission.  <u>See</u> July 3 Tr. at 60:4-5 (Morrissey).  The United States returned to the statements, noting that statement 28 is admissible and that statement 29 is admissible as A. Cordova's and Montoya's comments while negotiating a drug deal with Dix, which they used as an opportunity to follow him.  <u>See</u> July 3 Tr. at 60:17-61:4 (Castellano).  The Court indicated that it would likely admit the statements as non-hearsay and under 801(d)(2)(A).  <u>See</u> July 3 Tr. at 61:5-11 (Court).

The United States noted that statement 30 should be admissible as conduct, because, according to the United States, Montoya will testify that A. Cordova stated that he would rid himself of his car and then did so.  <u>See</u> July 3 Tr. at 61:22-62: (Castellano).  A. Cordova disagreed, asserting that Montoya could testify to what he saw and did, but not that A. Cordova stated that he would rid himself of the car.  <u>See</u> July 3 Tr. at 62:10 -62:16 (Morrissey).  The Court indicated that A. Cordova's statement would be admissible as "a [rule] 801(d)(2)(A) [of the Federal Rules of Evidence] statement."  July 3 Tr. at 62:21-24 (Court).  The United States proceeded to note that statements 31, 32, 33, and 35 are admissible, and the Court and the parties agreed to admit

statement 34.  See July 3 Tr. at 63:3-64:9 (Castellano, Court, Morrissey); id. at 67:16-17 (Castellano).

The United States moved to statement 36, the first of the statements from the witness intimidation or retaliation conspiracies.  See July 3 Tr. at 67:18-20 (Castellano).  The United States commented that it might try to introduce these allegations not for A. Cordova's participation in the conspiracies but to show other elements of VICAR like racketeering activity.  See July 3 Tr. at 67:23-68:1 (Castellano).  The Court asked whether the United States would introduce evidence only and no statements.  See July 3 Tr. at 68:2-3 (Court).  The United States then switched to arguing the statements' admissibility.  See July 3 Tr. at 68:4-5 (Castellano).  The Court indicated that it would likely not admit statement 36, and the United States "table[d]" that statement.  July 3 Tr. at 68:10 (Castellano).  See id. at 68:8-11 (Court, Castellano).  The Court indicated, and the United States agreed, that parts of statements 36 and 37 might qualify for admission under rule 803(3) of the Federal Rules of Evidence.  See July 3 Tr. at 68:14-25 (Court, Castellano).  The United States noted that statement 37's admissible portion reflects: "That Pup tells Mr. Montoya that he's working on getting guns."  July 3 Tr. at 68:25-69:1 (Castellano).  See id. at 68:23-69:1 (Castellano).  The United States continued that likewise the Court should admit a segment of statement 38, and the Court agreed to look at the statements.  See July 3 Tr. at 69:9-14 (Court, Castellano).

The Court stated that statement 40 likely was inadmissible, and A. Cordova indicated that he recalled that the Court excluded such statements in the First and Second DeLeon trials.  See July 3 Tr. at 69:18-23 (Court, Morrissey).  The United States indicated that it had no argument to the contrary.  See July 3 Tr. at 70:7-12 (Castellano).

The United States turned to statement 41 and clarified for the Court that it involves a recording of Baca speaking to Eric Duran.  See July 3 Tr. at 70:25-71:21 (Castellano, Court, Morrissey).  The Court noted that the statement "'[Montoya] should have done the hit over the night' may be 803," July 3 Tr. at 72:23 (Court), but that it would exclude the remaining portions, see July 3 Tr. at 72:22-25 (Court).  The United States agreed with the Court.  See July 3 Tr. at 72:1 (Morrissey).

The Court and the United States agreed that the Court would not admit statement 42.  See July 3 Tr. at 72:5-14 (Castellano, Court).  The Court indicated that it also would not admit statements 43 or 44.  See July 3 Tr. at 72:16-24 (Court, Castellano).  The United States contended that it might introduce the recording's end for statement 44, which discusses the Santistevan, Vigil, Marcantel Conspiracy and mentions A. Cordova.  See July 3 Tr. at 72:25-73:14 (Castellano); id. at 74:5-12 (Castellano).  The Court indicated its doubts whether the United States could introduce evidence about the Santistevan and Marcantel murder conspiracies.  See July 3 Tr. at 72:13-19 (Court).  The United States argued that it would introduce the evidence to show racketeering, see July 3 Tr. at 72:20-22 (Castellano), but the Court expressed concern whether the United States could introduce such information without relying on hearsay, see July 3 Tr. at 74:23-75:2 (Court).  The United States noted that it would introduce that Montoya "picked up a gun from Christopher Garcia," July 3 Tr. at 75:4-5 (Castellano), and "the purpose was for the murder of Marcantel," July 3 Tr. at 75:6-7 (Castellano).  The Court questioned whether Montoya could make such statements without relying on hearsay, and the United States indicated that Montoya had personal knowledge of the ongoing conspiracy, his cooperation, and his story.  See July 3 Tr. at 75:10-15 (Castellano).  A. Cordova argued that the statement conflicted with other evidence, see July 3 Tr. at 76:1-4 (Morrissey), and that, in the Second DeLeon Trial, the Court had admitted no evidence of the

Marcantel murder conspiracy, see July 3 Tr. at 76:8-12 (Morrissey). The Court responded that some such information had entered the trial, and the United States agreed. See July 3 Tr. at 76:18-25 (Court, Castellano). As the Court concluded the James Proffers portion of the hearing, A. Cordova had nothing further to add or object. See July 3 Tr. at 77:10-12 (Morrissey). For the parties' reference before trial, the Court provided to the parties and filed on the electronic docket two draft tables reflecting the Court's conclusions on the proffered James statements. See Court's Draft Table Related to the United States' Proffered James Statements, filed July 2, 2018 (Doc. 767); Court's Second Draft Table Related to the United States' Proffered James Statements, filed July 5, 2018 (Doc. 777).

## LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible." United States v. Christy, No. CR 10-1534 JB, 2011 WL 5223024, at *5 (D.N.M. Sept. 21, 2011)(Browning, J.)(citing Fed. R. Evid. 802). Rule 801(c) of the Federal Rules of Evidence provides: "'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Hearsay bars a party from presenting its own statements, such as "a defendant . . . attempt[ing] to introduce an exculpatory statement made at the time of his arrest without subjecting himself to cross-examination." United States v. Cunningham, 194 F.3d 1186, 1199 (11th Cir. 1999). A statement that is otherwise hearsay, however, may be offered for a permissible purpose other than to prove the truth of the matter asserted, including impeaching a witness. See United States v. Caraway, 534 F.3d 1290, 1299 (10th Cir. 2008)("We have already explained why the content of the statement, if used substantively, would be inadmissible hearsay. If admitted for impeachment purposes, however, it is not hearsay.").

Hearsay is generally unreliable and untrustworthy.  See Chambers v. Mississippi, 410 U.S. 284, 298 (1973)(noting that hearsay is generally untrustworthy and lacks traditional indicia of reliability); United States v. Lozado, 776 F.3d 1119, 1121 (10th Cir. 2015)("Hearsay is generally inadmissible as evidence because it is considered unreliable." (citing Williamson v. United States, 512 U.S. 594, 598 (1994))); United States v. Console, 13 F.3d 641, 656 (3d. Cir. 1993)(stating hearsay is "'inherently untrustworthy'" because of the lack of an oath, presence in court, and cross examination (quoting United States v. Pelullo, 964 F.2d 193, 203 (3rd Cir. 1992))).  Testimonial proof is necessarily based upon the human senses, which can be unreliable.  See 5 Jack Weinstein & Margaret Berger, Weinstein's Federal Evidence § 802.02[1][b], at 802-5 (Joseph McLaughlin ed., 2d ed. 2017)("Weinstein's Federal Evidence").  The Anglo-American tradition uses three devices to illuminate inaccuracies in the testimonial proof: (i) the oath; (ii) personal presence at trial; (iii) and cross examination.  See Weinstein's Federal Evidence § 802.02[2][a], at 802-5.  It is difficult to evaluate the credibility of out-of-court statements when the three safeguards mentioned above are unavailable.  See Weinstein's Federal Evidence § 802.02[3], at 802-6 to -7.  Courts view hearsay evidence as unreliable because it is not subject to an oath, personal presence in court, or cross examination.  See, e.g., United States v. Console, 13 F.3d at 656.

"Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805. See, e.g., United States v. DeLeon, 316 F. Supp. 3d 1303, 1306 (D.N.M. 2018)(Browning, J.)(noting that a hearsay within hearsay issue remains after concluding that rule 803(8) of the Federal Rules of Evidence provided an exception for law enforcement reports); Wood v. Millar, No. CIV 13-0923 RB/CG, 2015 WL 12661926, at *4 (D.N.M. Feb. 19, 2015)(Brack, J.)(noting that witness statements in police reports may be admissible under hearsay exclusions other than rule 803(8)); Montoya v.

Sheldon, No. CIV 10-0360 JB/WDS, 2012 WL 6632524, at *7 (D.N.M. Oct. 31, 2012)(Browning, J.)(excluding medical records while characterizing statement within medical records as opposing party statements but the medical records themselves, which the opposing party did not sign, as inadmissible hearsay).

1.    **Rule 801(d)(2)(A).**

An opposing party's statement is not hearsay.  See Fed. R. Evid. 801(d)(2).  Rule 801(d)(2) specifies as an exclusion from hearsay:

> (2) *An Opposing Party's Statement*.  The statement is offered against an opposing party and:
>
>> (A) was made by the party in an individual or representative capacity;
>>
>> (B) is one the party manifested that it adopted or believed to be true;
>>
>> (C) was made by a person whom the party authorized to make a statement on the subject;
>>
>> (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or
>>
>> (E) was made by the party's coconspirator during and in furtherance of the conspiracy.
>
> The statement must be considered but does not by itself establish the declarant's authority under (C); the existence or scope of the relationship under (D); or the existence of the conspiracy or participation in it under (E).

Fed. R. Evid. 801(d)(2).  "The admissibility of opposing-party statements 'is not based on reliability; rather, they are admitted as part of the adversary system'; they are admitted, in short, because the party said the words and should be stuck with them, regardless of their accuracy." United States v. Ballou, 59 F. Supp. 3d 1038, 1074 (D.N.M. 2014)(Browning, J.)(quoting Stephen A. Saltzburg et. al, Federal Rules of Evidence Manual § 801.02[b], at 801-13 (2011)).

"Rule 801(d)(2)(A) does not . . . permit such a statement to be used against anyone other than the party who made the statement, such as codefendants." United States v. DeLeon, 287 F. Supp. 3d at 1256 (citing United States v. Wolf, 839 F.2d 1387, 1393 & n.4 (10th Cir. 1988); Stephen A. Saltzburg, et al., Federal Rules of Evidence Manual § 801.02[6][c] (11th ed. 2017)). "The United States Court of Appeals for the Tenth Circuit has stated that proponents of such evidence 'need only show by a preponderance of the evidence that the opposing party had made the statement.'" United States v. Shirley, No. CR 15-1285 JB, 2016 WL 9021832, at *7 (D.N.M. Dec. 21, 2016)(Browning, J.)(citing United States v. Brinson, 772 F.3d 1314, 1320 (10th Cir. 2014)). Statements made during closing argument by an attorney would qualify as an admission by a party opponent under rule 801(d)(2)(A). See United States v. Ganadonegro, 854 F. Supp. 2d 1088, 1121 n.11 (D.N.M. 2012)(Browning, J.)(citing United States v. McElhiney, 85 F. App'x 112, 115 (10th Cir. 2003)(unpublished)[15]). The Court has determined that rule 806 of the Federal Rules of Evidence, which permits attacking hearsay statements with "any evidence that would be admissible for those purposes if the declarant had testified as a witness," Fed. R. Evid. 806, "does not apply to rule 801(d)(2)(A) statements," DeLeon, No. CR 15-4268 JB, 2018 WL 878121, at *2

---

[15]United States v. McElhiney is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . [a]nd we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that United States v. McElhiney has persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

n.1 (D.N.M. Feb. 12, 2018)(Browning, J.). "Party opponents can, however, impeach their own admissions, i.e., rule 801(d)(2)(A) statements, even though rule 806 does not apply. If a party opponent admission is relevant, then anything that impeaches such a statement is also relevant." DeLeon, 2018 WL 878121, at *2 n.2.

## 2. **Rule 801(d)(2)(E).**

A statement is not hearsay, even if it is offered for its truth, if it is offered against an opposing party and it "was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). The Tenth Circuit has stated:

> "Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule [Citations omitted]. No guarantee of trustworthiness is required in the case of an admission. The freedom which admissions have enjoyed from technical demands of searching for an assurance of trustworthiness in some against-interest circumstance, and *from restrictive influences of the opinion rule and the rule requiring first-hand knowledge,* when taken with the apparently prevalent satisfaction with the results, calls for a *generous* treatment of this avenue of admissibility." [Emphasis supplied.]

Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 667 (10th Cir. 2006)(Seymour, J.)(quoting United States v. Pinalto, 771 F.2d 457, 459 (10th Cir. 1985)).[16]

---

[16]The 2011 restyling of the Federal Rules of Evidence removed "admissions" from the language of rule 801(d), and uses instead the term "statements." Fed. R. Evid. 801(d). This replacement was purposeful: "The term 'admissions' is confusing because not all statements covered by the exclusion are admissions in the colloquial sense -- a statement can be within the exclusion even if it 'admitted' nothing and was not against the party's interest when made." Fed. R. Evid. 801, advisory committee's note.

Although the Advisory Committee made the commentary quoted in the text regarding the trustworthiness of "admissions by a party-opponent" before the 2011 amendments, the analysis should not be different under the 2011 restyling of the rules. Because the Advisory Committee's purpose for the 2011 restyling was to make the rules "more easily understood and to make style and terminology consistent through the rules," and there was no "intent to change any result in any ruling on evidence admissibility," the analysis applied before 2011 remains useful for cases after the restyling. Fed. R. Evid. 801.

To admit out-of-court statements by coconspirators under rule 801(d)(2)(E), "the United States must demonstrate by a preponderance of the evidence that: (i) a conspiracy existed; (ii) the declarant and the defendant were members of that conspiracy; and (iii) the statements that the United States seeks to admit were made during the course and in furtherance of the conspiracy." United States v. Vigil, No. CR 05-2051, 2006 WL 4109681, at *3 (D.N.M. Aug. 31, 2006)(Browning, J.)(citing United States v. Sinclair, 109 F.3d 1527, 1533 (10th Cir. 1997)). The Court may consider the statements themselves and independent evidence to determine whether the conspiracy existed. See United States v. Lopez-Gutierrez, 83 F.3d 1235, 1242 (10th Cir. 1996)("In making its preliminary factual determination as to whether a conspiracy exists, the court may consider the hearsay statement sought to be admitted, along with independent evidence tending to establish the conspiracy."). While the statement itself "does not by itself establish . . . the existence of the conspiracy or participation in it," Fed. R. Evid. 801(d)(2), "there need only be some independent evidence linking the defendant to the conspiracy," United States v. Lopez-Gutierrez, 83 F.3d at 1242 (internal quotation marks omitted)(quoting United States v. Martinez, 825 F.2d 1451, 1453 (10th Cir. 1987)). This "independent evidence may be sufficient even when it is not 'substantial.'" United States v. Lopez-Gutierrez, 83 F.3d at 1242 (quoting United States v. Rascon, 8 F. 3d 1537, 1541 (10th Cir. 1993)). The Tenth Circuit has noted: "We have defined 'independent evidence' as 'evidence other than the proffered [coconspirator] statements themselves.'" United States v. Lopez-Gutierrez, 83 F.3d at 1242 (alteration in United States v. Lopez-Gutierrez)(quoting United States v. Martinez, 825 F.2d at 1451).

"[I]t is not necessary for the United States to show that proffered statements were made during the time in which [the defendant] was a member of a conspiracy." United States v. Vigil, 2006 WL 4109681, at *5 (citing United States v. U.S. Gypsum Co., 333 U.S. 364, 393

- 35 -

(1948))("With the conspiracy thus fully established, the declarations and acts of the various members, even though made or done prior to the adherence of some to the conspiracy, become admissible against all as declarations or acts of coconspirators in aid of the conspiracy.")). Moreover, a newcomer to a conspiracy assumes the risk for what has already happened in the course of the conspiracy. See United States v. Brown, 943 F.2d 1246, 1255 (10th Cir. 1991)("The fact that appellant may have joined the conspiracy after its inception does not make his coconspirators' previous statements inadmissible."); United States v. Adamo, 882 F.2d 1218, 1230-31 (7th Cir. 1989)(explaining that one who joins and participates in a conspiracy "adopt[s] the previous acts and declarations of his fellow coconspirators"). "A coconspirator must make a statement while the conspiracy persists for rule 801(d)(2)(E) to apply." DeLeon, 287 F. Supp. 3d at 1253 (citing Fed. R. Evid. 802(d)(2)(E)). "A statement is not made '"pursuant to and in furtherance of objectives of the conspiracy' if it is made 'after those objectives either had failed or had been achieved.'" DeLeon, 287 F. Supp. 3d at 1253 (quoting Krulewitch v. United States, 336 U.S. 440 (1949)).

In determining the admissibility of coconspirator statements, "[t]he strongly preferred order of proof" is for the district court to hold a hearing "outside the presence of the jury to determine by a preponderance of the evidence the existence of a predicate conspiracy." United States v. Urena, 27 F.3d 1487, 1491 (10th Cir. 1994). A defendant does not possess a right to a pretrial hearing on admissibility of coconspirators statements; however, "a district court can only admit coconspirator statements if it holds a James hearing or conditions admission on forthcoming proof of a 'predicate conspiracy through trial testimony or other evidence.'" United States v. Townley, 472 F.3d 1267, 1273 (10th Cir. 2007)(quoting United States v. Owens, 70 F.3d 1118, 1123 (10th Cir. 1995)). The Tenth Circuit affords trial courts this flexibility, because it recognizes

that, in practice, the United States cannot always demonstrate that a conspiracy existed before admitting specific evidence at trial. See United States v. Peterson, 611 F.2d 1313, 1330 (10th Cir. 1979)(noting that the admissibility determination contemplates presentation of requisite conspiracy evidence before or during the United States' case in chief).

The Court has described several factors to consider when deciding whether statements furthered a conspiracy:

> First, "mere narratives between coconspirators or narrative declarations of past events" are not, generally, in furtherance of a conspiracy. United States v. Roberts, 14 F.3d 502, 514-15 (10th Cir. 1993). Second, "statements of future intent that set transactions integral to the conspiracy in motion and maintain the information flow among coconspirators" are usually in furtherance of the conspiracy. United States v. Roberts, 14 F.3d at 515. Third,
>
>> Statements made to induce enlistment or further participation in the group's activities . . . to prompt further action on the part of conspirators . . . [,] to "reassure" members of a conspiracy's continued existence . . . [,] to allay a coconspirator's fears . . . [, or] to keep coconspirators abreast of an ongoing conspiracy's activities satisfy the "in furtherance" of requirement.
>
> United States v. Roberts, 14 F.3d at 515 (alterations in original)(quoting United States v. Yarbrough, 852 F.2d 1522, 1535-36 (9th Cir. 1988)). Fourth, "[w]hen a conspiracy is ongoing, statements that relate to 'avoiding detection by law enforcement personnel' can be in furtherance of the conspiracy." United States v. Alcorta, 853 F.3d [1123,] 1139 [(10th Cir. 2017)](quoting United States v. Williamson, 53 F.3d 1500, 1520 (10th Cir. 1995)).

DeLeon, 287 F. Supp. 3d at 1253.

In United States v. Vigil, the Court did not hold a James hearing, because the defendant, Robert Vigil, had already been tried once, ending in a hung jury, and the Court concluded that "the evidence that" the Honorable James A. Parker, Senior United States District Judge for the United States District Court for the District of New Mexico, "admitted at the first trial satisfies the preponderance standard on the basis of the transcripts of the first trial's testimony." United States

v. Vigil, 2006 WL 4109681, at *4. Vigil was charged, among other charges, with being a member of a conspiracy to commit RICO violations, and the United States moved the Court to permit it to elicit non-hearsay coconspirator statements in Vigil's retrial. See 2006 WL 4109681, at *1. The Court noted that it had previously concluded, in deciding Vigil's motion for acquittal under rule 29 of the Federal Rules of Civil Procedure, that "'a reasonable jury could have found that Vigil agreed with at least one other person to conduct or participate in the affairs of the enterprise through a pattern of racketeering activity, or knowingly and voluntarily participated in the conspiracy.'" 2006 WL 4109681, at *4 (citing United States v. Vigil, No. CR 05-2051 JB, Memorandum Opinion, filed Aug. 7, 2006 (Doc. 268)).

In support of its determination that the United States had met its burden to prove that Vigil participated in the existent conspiracy, the Court pointed to testimony asserting that Garcia, an alleged coconspirator,

> "told Vigil that he would set up the same arrangement with Vigil as with Montoya, Vigil learned about the prior arrangement with Montoya through Garcia, Vigil indicated that he intended to continue the fee-sharing arrangement that Montoya had set up, and Vigil threatened to withhold the . . . contract from Everage."

2006 WL 4109681, at *4 (quoting United States v. Vigil, No. CR 05-2051 JB, Memorandum Opinion at 28). The Court reasoned that "[p]roof of the existence of a conspiracy is often based on circumstantial evidence, and this testimony is sufficient to establish Vigil's participation in a conspiracy by a preponderance of the evidence." 2006 WL 4109681, at *5. The Court thus concluded that it would "permit the United States to elicit from its witnesses at trial coconspirator statements made in furtherance of the conspiracy charged." 2006 WL 4109681, at *6.

### 3. Rule 803(1).

Rule 803(1) of the Rules of Evidence provides an exception to the rule against hearsay for

"[a] statement describing an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). "By its own terms, application of Rule 803(1) has three distinct requirements: i) the statement must describe or explain the event perceived; ii) the declarant must have in fact perceived the event described; and iii) the description must be 'substantially contemporaneous' with the event in question." United States v. Mejia-Valez, 855 F. Supp. 607, 613 (E.D.N.Y. 1994)(Korman, J.). "The present sense impression exception applies only to reports of what the declarant has actually observed through the senses, not to what the declarant merely conjectures." Brown v. Keane, 355 F.3d 82, 89 (2d Cir. 2004). "The underlying rationale of the present sense impression exception is that substantial contemporaneity of event and statement minimizes unreliability due to defective recollection or conscious fabrication." United States v. Hawkins, 59 F.3d 723, 730 (8th Cir. 1995). "The admissibility of spontaneous utterances -- one ground relied on by the state trial court -- was recognized by the Supreme Court over a century ago in Insurance Co. v. Mosley, 75 U.S. (8 Wall.) 397, 406-07 . . . (1869)." Martinez v. Sullivan, 881 F.2d 921, 928 (10th Cir. 1989).

4.      **Rule 803(2).**

Rule 803(2) of the Federal Rules of Evidence, commonly called the excited utterance exception, provides an exception to the exclusion of hearsay statements for "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). The United States Court of Appeals for the District of Columbia Circuit has noted that "[t]he rationale underlying the 'excited utterance' exception is that 'excitement suspends the declarant's powers of reflection and fabrication, consequently minimizing the possibility that the utterance will be influenced by self interest and therefore rendered unreliable.'" United States v. Alexander, 331 F.3d 116, 122 (D.D.C. 2003)(quoting

United States v. Brown, 254 F.3d 454, 458 (3d Cir. 2001)).  The Tenth Circuit, in United States v.

Smith, 606 F.3d 1270 (10th Cir. 2010), set forth a district court's required analysis for whether a

statement is admissible under the excited-utterance exception:

> The so-called "excited-utterance exception has three requirements: (1) a startling
> event; (2) the statement was made while the declarant was under the stress of the
> event's excitement; and (3) a nexus between the content of the statement and the
> event."  *Pursley,* 577 F.3d at 1220.  "[T]here is no precise amount of time between
> the event and the statement beyond which the statement cannot qualify as an excited
> utterance."  *United States v. Ledford,* 443 F.3d 702, 711 (10th Cir. 2005).
> Admissibility hinges on a statement's contemporaneousness with the excitement a
> startling event causes, not the event itself.  *See Pursley*, 577 F.3d at 1221-22.

606 F.3d at 1279.  The Tenth Circuit has noted:

> Courts consider a range of factors in determining whether a declarant made
> a statement while under the stress of a particular event.  Among the more relevant
> factors are: the amount of time between the event and the statement; the nature of
> the event; the subject matter of the statement; the age and condition of the declarant;
> the presence or absence of self-interest; and whether the statement was volunteered
> or in response to questioning.

United States v. Pursley, 577 F.3d 1204, 1220 (10th Cir. 2009).  "Permissible subject matter of the

statement is [not] limited . . . to description or explanation of the event or condition . . . .  [T]he

statement need only relate to the startling event or condition, thus affording a broader scope of

subject matter coverage."  United States v. Frost, 684 F.3d 963, 973 (10th Cir. 2012)(quoting Fed.

R. Evid. 803 advisory committee's notes).  "If the trial court has access to a recording of the

declarant's statement, it may also consider the declarant's 'tone and tenor of voice' in determining

whether the declarant made that statement while under the stress of excitement."  United States v.

Alexander, 331 F.3d at 123 (quoting United States v. Woodfolk, 656 A.2d 1145, 1151 n.16 (D.C.

1995)(collecting cases)).

The United States Court of Appeals for the Second Circuit has provided an analysis of the

similarities  and  differences  between  the  present-sense-impression  and  excited-utterance

exceptions to the rule against hearsay:

> As defined by the Federal Rules of Evidence, a present sense impression is a statement "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Rule 803(1), Fed. R. Evid. Such statements are considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory. See United States v. Brewer, 36 F.3d 266, 272 (2d Cir. 1994).

> The hearsay exception for excited utterances is premised on a similar, though distinct, assumption that the reliability of a statement increases as opportunity for reflection by the declarant decreases. An "excited utterance" is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Rule 803(2), Fed. R. Evid. As we have explained, "[t]he rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability." [United States v. ]Tocco, 135 F.3d [] [116,] 127[ (2d Cir. 1998)]. Unlike present sense impressions, "[a]n excited utterance need not be contemporaneous with the startling event to be admissible." Id. Rather "[t]he length of time between the event and the utterance is only one factor to be taken into account in determining whether the declarant was, within the meaning of rule 803(2), 'under the stress of excitement caused by the event or condition.'" United States v. Scarpa, 913 F.2d 993, 1017 (2d Cir. 1990).

> . . . .

> Thus while the hearsay exception for present sense impressions focuses on contemporaneity as the guarantor of reliability, and requires that the hearsay statement "describe or explain" the contemporaneous event or condition, Rule 803(1), Fed. R. Evid., the excited utterance exception is based on the psychological impact of the event itself, and permits admission of a broader range of hearsay statements -- i.e. those that "relate to" the event. Rule 803(2), Fed. R. Evid.

United States v. Jones, 299 F.3d 103, 112 & n.3 (2d Cir. 2002).

Many courts have found it proper to admit a 911 caller's statements as a present-sense impression and/or an excited utterance. See, e.g., United States v. Thomas, 453 F.3d 838, 841 (7th Cir. 2006)(holding that admission of a three minute and fifty-three second 911 call, in which the caller said that a man holding a handgun had shot someone outside her apartment and was still there, and in which the "emergency operator [] asked a series of questions about the facts of the

situation and the caller narrated what she was seeing as it happened," was proper as either a present-sense impression or excited utterance); <u>United States v. Hawkins</u>, 59 F.3d at 730 (holding that the tape of the 911 emergency telephone call from the defendant's wife reporting that the defendant displayed gun to his wife during a domestic dispute was proper as a present-sense impression, because of its sufficient contemporaneity to underlying events and because of its reliability, as evidenced by the wife's detailed description of gun); <u>United States v. Mejia-Valez</u>, 855 F. Supp. at 613-15 (concluding that admission of two callers' 911 call tape recordings as excited utterances and present-sense impressions was proper, because the two callers were at the scene of the underlying shooting, they placed the calls moments after the shooting, and both men described the shooting's circumstances, including giving the location and the shooter's description).

### 5. **Rule 803(3).**

Rule 803(3) permits the introduction of "hearsay . . . , even though the declarant is available as a witness," for a statement of the declarant's "[t]hen existing mental, emotional, or physical condition":

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Fed. R. Evid. 803(3). For the statement to qualify under the exception, it "must relate to the declarant's state of mind during" the incident in question. <u>United States v. Netschi</u>, 511 F. App'x 58, 61 (2d Cir. 2013)("'To admit statements of one's state of mind with regard to conduct that occurred . . . earlier as in this case would significantly erode the intended breadth of this hearsay exception.'" (quoting <u>United States v. Cardascia</u>, 951 F.2d 474, 488 (2d Cir. 1991))). This

requirement is not to say that the statement must be said at the very moment of the incident, but for intent to be proved, it must be "contemporaneous" to the act. Mut. Life Ins. of N.Y. v. Hillmon, 145 U.S. 285, 295 (1892). To be contemporaneous and therefore admissible under the present-state-of-mind exception, a statement must be "part of a continuous mental process." United States v. Cardascia, 951 F.2d at 488. In addition to the requirements that the statement be contemporaneous to the incident at hand and relevant to the issues of the case, it must also be established that there was no opportunity for the declarant to "'fabricate or to misrepresent his thoughts.'" United States v. Jackson, 780 F.2d 1305, 1315 (7th Cir. 1986)(quoting United States v. Layton, 549 F. Supp. 903, 909 (N.D. Cal. 1982)). The statements of intent must reveal information or details about the future, which has been contrasted with statements of memory, or looking to the past. See Shepard v. United States, 290 U.S. 96, 104 (1933). When statements entail issues of looking into the past combined with other concerns, it can often be too confusing for a jury to extract, upsetting the balance of advantage, and ultimately making the evidence inadmissible. See Shepard v. United States, 290 U.S. at 104. "The most obvious risk of prejudice is that the jury will consider the hearsay statement not as proof of state of mind and the subsequent conduct of the declarant, but rather for the truth of the facts that are related in the statement." Saltzburg, supra, § 803.02, at 4-803.

6. **Rule 804(b)(3).**

Under rule 804(b)(3) of the Federal Rules of Evidence, an out-of-court statement is admissible if the declarant is unavailable to testify, see Fed. R. Evid 804 (a) (listing conditions that render a declarant "unavailable as a witness"), and the statement is "against the declarant's proprietary, pecuniary, or penal interest," United States v. Lozado, 776 F.3d at 1125 (citing Williamson v. United States, 512 U.S. at 599-600). A statement against interest is one that "a

reasonable person in the declarant's position would have made only if the person believed it to be true." Fed. R. Evid. 804(b)(3)(A). Moreover, the statement must be "supported by corroborating circumstances that clearly indicate its trustworthiness." Fed. R. Evid. 804(b)(3)(B).

Rule 804(b)(3) embodies "'the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true.'" United States v. Smalls, 605 F.3d 765, 780-81 (10th Cir. 2010)(internal quotation marks omitted)(quoting Williamson v. United States, 512 U.S. at 599). The Tenth Circuit has said: "We may safely surmise that from time immemorial, only on the rarest occasion, if ever, has one of sound mind -- even one of sound mind who is not particularly honest -- falsely confessed a murder to an apparent acquaintance or friend." United States v. Smalls, 605 F.3d at 783. That sort of statement is admissible, however, only to the extent that it inculpates the declarant, because "[t]he fact that a statement is self-inculpatory does make it more reliable; but the fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability." Williamson v. United States, 512 U.S. at 600.

While rule 804(b)(3)'s depends on an objective standard and not on the declarant's subjective beliefs, see Fed. R. Evid. 804(b)(3), a "declarant's actual knowledge that a statement is self-incriminating" remains relevant, United States v. Lozado, 776 F.3d at 1126. "If there is proof of the declarant's actual knowledge, 'a reasonable person in the declarant's position' would have the declarant's actual knowledge." United States v. Lozado, 776 F.3d at 1127 (quoting Fed. R. Evid. 804(b)(3)(A)). Courts often lack such evidence when applying rule 804(b)(3), because the most obvious way to prove a declarant's subjective awareness is through declarant testimony, but the declaration-against-interest exception is available only when the declarant is "unavailable as a witness." Fed. R. Evid. 804(b). See United States v. Lozado, 776 F.3d at 1129 (stating that "the

- 44 -

declarant's belief about the self-inculpatory nature of the statement" is often unknown).  Absent

"evidence establishing the declarant's actual knowledge," courts must determine what ""a

reasonable person in the declarant's position' would know."  United States v. Lozado, 776 F.3d at

1128-29.

> In sum, under Rule 804(b)(3)(A), if proof establishes the declarant's actual
> state of mind as to whether the statement is against penal interest, courts should
> consider that evidence as part of "in the declarant's position" to determine whether
> the hearsay is admissible.  If, however, the declarant's state of mind on the against-
> interest question has not been proved, courts should consider whether "a reasonable
> person in the declarant's position" would believe the statement is against his or her
> interest.

United States v. Lozado, 776 F.3d at 1130 (footnotes omitted)(quoting Fed. R. Evid.

804(b)(3)(A)).

> If the declarant does not believe the statement is against his or her interest,
> then the statement generally cannot be admitted, regardless of what a reasonable
> person may believe.  If the declarant believes the statement is against his or her
> interest, the statement can qualify for admission, regardless of what a reasonable
> person may believe.

United States v. Lovato, 776 F.3d at 1130 n.9.

If a statement "is offered in a criminal case as one that tends to expose the declarant to

criminal liability," then it must be "supported by corroborating circumstances that clearly indicate

its trustworthy." Fed. R. Evid. 804(b)(3)(B).  "The Tenth Circuit has not squarely addressed how

a statement must be corroborated."  United States v. Lovato, 776 F.3d at 1132.  United States v.

Lovato indicates, however, that the presence -- or absence -- of evidence corroborating a

statement's contents, the circumstances in which a statement was made, the declarant's credibility,

whether the declarant had a motive to lie, and whether the statement is internally consistent are all

relevant to the rule 804(b)(3)(B) inquiry.  See 776 F.3d at 1132-33.

## LAW REGARDING RULE 403

Under rule 403 of the Federal Rules of Evidence, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice. See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989). "'[I]t is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter [under rule 403].'" United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(emphasis in United States v. Sides)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)). The Tenth Circuit has admonished district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d at 787.

The decision to admit or exclude evidence pursuant to rule 403 is within the district court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the district court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980). The Supreme Court has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 Steven Alan Childress & Martha S. Davis, Fed. Standards of Review § 4.02, at 4-16 (3d ed. 1999)). See United

States v. Abel, 469 U.S. 45, 54 (1984)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . .").

Evidence may be unfairly prejudicial if it would likely provoke an emotional response from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter. See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999). Evidence is not unfairly prejudicial merely because it damages a party's case. See United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008); United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991). Rather, "[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" United States v. Caraway, 534 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee's note).

"The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief v. United States, 519 U.S. 172, 180 (1997). "Such improper grounds certainly include . . . generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged." Old Chief v. United States, 519 U.S. at 180-81. In light of rule 404(b)'s prohibition regarding the use of character evidence to show that a person acted in conformity with their character, "[t]here is, accordingly, no question that propensity would be an 'improper basis' for conviction and that evidence . . . is subject to analysis under Rule 403 for relative probative value and for prejudicial misuse as propensity evidence." Old Chief v. United States, 519 U.S. at 182. The Supreme Court has advised lower courts to disregard the prosecution's need for "evidentiary depth to tell a

continuous story" when the prosecution's evidence consists of the underlying facts of a criminal defendant's prior felony conviction, as in an action for felon in possession. <u>Old Chief v. United States</u>, 519 U.S. at 189-90. In such an action, "[t]he most the jury needs to know is that the conviction admitted by the defendant falls within the class of crimes that Congress thought should bar a convict from possessing a gun, and this point may be made readily in a defendant's admission and underscored in the court's jury instructions." <u>Old Chief v. United States</u>, 519 U.S. at 191. The Court has previously ruled that, under the Supreme Court's decision in <u>Old Chief v. United States</u>, the underlying facts of a defendant's prior conviction should be excluded, even if relevant to the offense. <u>See</u>, <u>e.g.</u>, <u>United States v. Williams</u>, No. CR 12-1675 JB, 2012 WL 5476228, at *2 (D.N.M. Nov. 7, 2012)(Browning, J.); <u>United States v. Ashley</u>, No. CR 04-2497 JB, 2006 WL 4109679, at *3 (D.N.M. Aug. 1, 2006)(Browning, J.)("Even if relevant under rule 404(b), given the nature of the crime with which he is charged here and the similarity to these prior crimes, the danger of unfair prejudice outweighs the probative value of specifically identifying the prior crimes."). <u>See also</u> <u>United States v. Wacker</u>, 72 F.3d 1453, 1472 (10th Cir. 1995)("Whereas the fact of a defendant's prior felony conviction is material to a felon in possession charge, the nature and underlying circumstances of a defendant's conviction are not.").

## <u>ANALYSIS</u>

The Court will permit some but not all statements in the <u>James</u> Proffers as evidence at trial. In the chart below, the Court provides each statement the United States proposes to introduce and information related to the statement. The Court rules individually whether to admit each statement.

| <u>James</u> **Proffers Statement** | **Ruling** |
|---|---|
| Statement 1: Dix's girlfriend owed Chris Garcia money. Dix shot Garcia in a | The statement that "Garcia wanted Dix dead . . . and was willing to pay for Dix to be killed" is admissible |

| | |
|---|---|
| confrontation about that money. Garcia wanted Dix dead after that and was willing to pay for Dix to be killed.<br><br>Declarant: Chris Garcia<br><br>Date: On or before February 4, 2005<br><br>Source: Michael Patrick Sullivan<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, and/or keep coconspirators abreast of an ongoing conspiracy's activities.<br><br>Objection: Objections at 2-3. | for its truth under rule 801(d)(2)(E). C. Garcia and A. Cordova are members of a conspiracy to murder Shane Dix. See FOF ¶ 1. C. Garcia's statements that he wants Dix murdered and is willing to pay for someone to murder Dix is in furtherance of the conspiracy, because he is "encouraging others to join, assist, or deal with the conspiracy." Stephen A. Saltzburg, Federal Rules of Evidence Manual § 4-801.02 (2018)("Saltzburg"). That Michael Patrick Sullivan is not a member of the conspiracy to murder does not affect the Court's 801(d)(2)(E) analysis, because a coconspirator's statement need not be made to another coconspirator to be admissible under that provision. See Saltzburg § 4-801.02 ("To be admissible the statement must be made by a coconspirator, but it need not be made to a coconspirator."). The statement may not be admissible under 801(d)(2)(E), however, if C. Garcia made the statement to Sullivan in a context in which C. Garcia was not encouraging others to join, assist, or deal with the conspiracy.<br><br>The statement "Garcia wanted Dix dead after that and was willing to pay for Dix to be killed" is also admissible for its truth as a then-existing mental, emotional, or physical condition under rule 803(3).<br><br>The statement "Dix's girlfriend owed Chris Garcia money. Dix shot Garcia in a confrontation about that money" is also admissible for its truth under rule 801(d)(2)(E), because C. Garcia could have used that backstory in his attempt to convince Sullivan to join the conspiracy.<br><br>The statement "Dix's girlfriend owed Chris Garcia money. Dix shot Garcia in a confrontation about that money" is not admissible for its truth under rule 803(3), however, because that rule allows statements to prove what a person's state of mind was at a certain time, but it may not be used to prove "why the person had [that] state of mind." Saltzburg § 803.02 ("Rule 803(3) permits a hearsay statement to be used to prove what a person's state of mind was at the time of the statement, but it does not allow a |

| | statement to be used to prove why the person had the state of mind they did."). |
|---|---|
| | A. Cordova objects that he has not received discovery regarding the statement. <u>See</u> Objections at 2-3. Whether the United States has provided A. Cordova with discovery supporting this statement does not, however, impact the Court's hearsay analysis.<br><br>**THE STATEMENT IS ADMISSIBLE.** |
| **WITHDRAWN[17]**<br><br>Statement 2: Chris Garcia paid Carmelito Padilla to hire Michael Snow but Snow never killed Dix.<br><br>Declarant: Chris Garcia<br><br>Date: On or before February 4, 2005<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.<br><br>Source: Michael Patrick Sullivan | **WITHDRAWN**<br><br>This statement is admissible for its truth as a coconspirator's statement under rule 801(d)(2)(E), because C. Garcia made the statement to "encourag[e] others to join, assist, or deal with the conspiracy." <u>Saltzburg</u> § 4-801.02 (stating that statements made "in furtherance of a conspiracy" can include "encouraging others to join, assist, or deal with the conspiracy").<br><br>If further evidence shows that C. Garcia did not make the statement to Sullivan to encourage Sullivan or others to join or assist in the conspiracy to kill Dix, then the statement is not admissible under rule 801(d)(2)(E). Although a coconspirator's statements meant to keep other conspirators informed on the conspiracy's developments and coconspirators' roles, the United States does not allege that Sullivan was a member of the conspiracy to kill Dix. |
| **WITHDRAWN[18]** | **WITHDRAWN** |

---

[17]At the July 3 <u>James</u> Hearing, the United States withdrew Statement 2. <u>See</u> July 3 Tr. at 44:19 45:9 (Court, Castellano).

[18]At the July 3 <u>James</u> Hearing, the United States withdrew Statement 3. <u>See</u> July 3 Tr. at 44:19 45:9 (Court, Castellano).

| | |
|---|---|
| Statement 3: Chris Garcia put out a $10,000 hit for Shane Dix.<br><br>Declarant: Chris Garcia<br><br>Date: On or before February 4, 2005<br><br>Source: Gilbert Angelo Serrano<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, and/or to reassure members of a conspiracy's continued existence.<br><br>Objection: Objections at 3 | This statement is admissible for its truth as coconspirator's statement under rule 801(d)(2)(E), because C. Garcia made the statement to "encourag[e] others to join, assist, or deal with the conspiracy." Saltzburg § 4-801.02. C. Garcia telling Gilbert Serrano that C. Garcia has "put out a $10,000 hit for Shane Dix" encourages others to join the conspiracy by offering compensation for killing Dix.<br><br>Further, this statement is admissible for a non-hearsay purpose, i.e., for a purpose other than the statement's truth. That C. Garcia was offering people money to kill Dix is relevant even if C. Garcia never intended to make good on those offers such that they were, in a sense, false.<br><br>If further evidence shows that C. Garcia did not make the statement to Serrano to encourage Serrano or others to join or assist in the Dix Conspiracy, then the statement is not admissible under rule 801(d)(2)(E). Although a coconspirator's statements meant to keep other conspirators informed on the conspiracy's developments and coconspirators' roles are admissible, the United States has not shown and does not allege that Serrano was a member of the Dix Conspiracy.<br><br>A. Cordova argues that, for the statement to qualify for 801(d)(2)(E), there must be a showing that Serrano was a part of the conspiracy, or actually was the source for this information and not repeating "gossip or rumor." Objections at 3.<br><br>The United States does not need to show that Serrano was part of the conspiracy. See Saltzburg § 4--801.02 ("To be admissible the statement must be made by a coconspirator, but it need not be made to a coconspirator."). Serrano cannot relate C. Garcia's statement to the jury unless he has personal knowledge regarding that statement. See Fed. R. Evid. 602. If Serrano did not hear C. Garcia make this statement, he lacks personal knowledge regarding that statement; Serrano could only testify |

| | that someone else told him that C. Garcia made this statement, which would present a hearsay-within-hearsay issue. <u>See</u> Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."). <u>See also</u> <u>Saltzburg</u> § 805.02 (stating a rule 805's requirement that "each part of the combined statements conforms with an **exception** to the rule" does not preclude a statement that is not hearsay, such as a rule 801(d) statement, from being used to satisfy rule 805 (emphasis added)). |
|---|---|
| Statement 4: Chris Garcia wanted Dix killed while he was out of town so that he had an alibi.<br><br>Declarant: Chris Garcia<br><br>Date: On or before February 4, 2005<br><br>Source: Mario Montoya<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, to allay a coconspirator's fears, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators. | This statement is admissible for its truth as a coconspirator's statement under rule 801(d)(2)(E), because C. Garcia made the statement to Montoya -- who the Court determines by a preponderance of the evidence is a member of the Dix Conspiracy, <u>see</u> FOF ¶ 1 -- to further the conspiracy by giving instructions and/or "keeping other members apprised of conspiratorial developments [or] providing reassurance." <u>Saltzburg</u> § 4--801.02 (stating that "in furtherance of a conspiracy" may include "keeping other members apprised of conspiratorial developments [or] providing reassurance").<br><br>The statement is also admissible for its truth as a then-existing mental, emotional, or physical condition under rule 803(3), because C. Garcia is expressing his intent and plan to evade suspicion by being out of town when Dix is killed.<br><br>**THE STATEMENT IS ADMISSIBLE.** |
| Statement 5: Chris Garcia had put money in Dix's books while Dix was in jail to mislead police that Garcia had forgiven Dix.<br><br>Declarant: Chris Garcia<br><br>Date: On or before February 4, 2005 | This statement is admissible for its truth as a coconspirator's statement under rule 801(d)(2)(E).<br><br>A. Cordova objects that this statement is not admissible under rule 801(d)(2)(E), because it is a "mere narrative[]" relating to past events that does not serve the conspiracy's purposes, even if it relates to the conspiracy. Objections at 3. <u>See</u> <u>United States</u> |

| | |
|---|---|
| Source: Mario Montoya<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, to allay a coconspirator's fears, keep coconspirators abreast of an ongoing conspiracy's activities, and/or to avoid detection by law enforcement.<br><br>Objections: Objections at 3 | v. Wolf, 839 F.2d at 1393 (stating that 801(d)(2)(E) does not apply to statements relating to past events that does not serve an immediate or future conspiratorial purpose).<br><br>A coconspirator's statement is admissible for its truth under 801(d)(2)(E), however, when the statement is meant to reassure conspiracy members, to keep coconspirators abreast of ongoing conspiracy activities. See Saltzburg § 801.02. Here, A. Cordova's statement to Montoya informs him of a development in the conspiracy and assures Montoya that A. Cordova had taken steps to avoid detection.<br><br>**THE STATEMENT IS ADMISSIBLE.** |
| Statement 6: Chris Garcia talked to Anthony Cordova and Mario Montoya about the fact that Dix hung out at the Chevron.<br><br>Declarant: Chris Garcia<br><br>Date: On or before February 4, 2005<br><br>Source: Mario Montoya<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators. | This statement is admissible under rule 801(d)(2)(E). C. Garcia made this statement describing Dix's activities to A. Cordova to make it easier for A. Cordova to kill Dix. Thus, the statement was made in furtherance of the Dix Conspiracy.<br><br>**THE STATEMENT IS ADMISSIBLE.** |
| Statement 7: Anthony Cordova was concerned that people would be able to identify the car after the murder. Cordova said he needed to get rid of his car. The car was a 1990s | This statement is admissible for its truth as an admission of a party opponent. See Fed. R. Evid. 801(d)(2)(A).<br><br>**THE STATEMENT IS ADMISSIBLE.** |

| | |
|---|---|
| reddish/maroon Pontiac or Buick with a square rear end.<br><br>Declarant: Anthony Cordova<br><br>Date: On or before February 4, 2005<br><br>Source: Mario Montoya<br><br>Basis for admission: Statement made to reassure members of a conspiracy's continued existence, to allay a coconspirator's fears, keep coconspirators abreast of an ongoing conspiracy's activities, and/or to avoid detection by law enforcement. | |
| Statement 8: Anthony Cordova and Mario Montoya saw Dix's vehicle at the gas station. Cordova told Montoya to shoot Dix there, but Montoya said they need to wait because there were so many people and cameras.<br><br>Declarant: Anthony Cordova<br><br>Date: On or before February 4, 2005<br><br>Source: Mario Montoya<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, to allay a coconspirator's fears, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy are statements regarding the roles of other coconspirators, and/or to avoid detection by law enforcement. | This statement is admissible for its truth as an admission of a party opponent. <u>See</u> Fed. R. Evid. 801(d)(2)(A).<br><br>**THE STATEMENT IS ADMISSIBLE.** |

| | |
|---|---|
| Statement 9: Cordova and Montoya asked Dix for drugs at the gas station. Dix called someone to get more drugs.<br><br>Declarant: Anthony Cordova<br><br>Date: On or before February 4, 2005<br><br>Source: Mario Montoya<br><br>Basis for admission: Statement made to prompt further action on the part of the conspirators and/or to reassure members of a conspiracy's continued existence. | This statement is admissible for its truth as an admission of a party opponent.  <u>See</u> Fed. R. Evid. 801(d)(2)(A).   Dix calling someone is not a statement, so it raises no hearsay concerns.<br><br>**THE STATEMENT IS ADMISSIBLE.** |
| Statement 10: Anthony Cordova suggested that he and Montoya go with Dix. Dix said no and told them he would be back with the drugs.<br><br>Declarant: Anthony Cordova<br><br>Date: On or before February 4, 2005<br><br>Source: Mario Montoya<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, and/or are statements regarding the roles of other coconspirators. | This statement is admissible for its truth as an admission of a party opponent.  <u>See</u> Fed. R. Evid. 801(d)(2)(A).<br><br>**THE STATEMENT IS ADMISSIBLE.** |
| Statement 11: While Dix was on the phone inquiring about drugs, Anthony Cordova said he knew the person on the other line and asked to speak with him.<br><br>Declarant: Anthony Cordova<br><br>Date: On or before February 4, 2005 | This statement is admissible for its truth as an admission of a party opponent.  <u>See</u> Fed. R. Evid. 801(d)(2)(A).<br><br>**THE STATEMENT IS ADMISSIBLE.** |

| | |
|---|---|
| Source: Mario Montoya<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators. | |
| Statement 12: Anthony Cordova told Montoya that he knew where Dix was headed and gave directions to Montoya on how to get there.<br><br>Declarant: Anthony Cordova<br><br>Date: On or before February 4, 2005<br><br>Source: Mario Montoya<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, and/or are statements regarding the roles of other coconspirators. | This statement is admissible for its truth as an admission of a party opponent. <u>See</u> Fed. R. Evid. 801(d)(2)(A).<br><br>**THE STATEMENT IS ADMISSIBLE.** |
| Statement 13: Anthony Cordova told Mario Montoya to drive when they were leaving the gas station to locate Dix.<br><br>Declarant: Anthony Cordova<br><br>Date: On or before February 4, 2005<br><br>Source: Mario Montoya | This statement is admissible for its truth as an admission of a party opponent. <u>See</u> Fed. R. Evid. 801(d)(2)(A).<br><br>**THE STATEMENT IS ADMISSIBLE.** |

| | |
|---|---|
| Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, and/or are statements regarding the roles of other coconspirators. | |
| Statement 14: Mario Montoya got his gun from Chris Garcia and believed Anthony Cordova did as well. Cordova told Montoya to put his gun under the seat.<br><br>Declarant: Anthony Cordova<br><br>Date: On or before February 4, 2005<br><br>Source: Mario Montoya<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators. | This statement is admissible for its truth as an admission of a party opponent. See Fed. R. Evid. 801(d)(2)(A).<br><br>**THE STATEMENT IS ADMISSIBLE.** |
| Statement 15: Anthony Cordova told Montoya to back up as Dix said, "It's me Shane. I got that for you."<br><br>Declarant: Anthony Cordova<br><br>Date: On or before February 4, 2005<br><br>Source: Mario Montoya<br><br>Basis for admission: Statement made to | This statement is admissible for its truth as an admission of a party opponent. See Fed. R. Evid. 801(d)(2)(A).<br><br>**THE STATEMENT IS ADMISSIBLE.** |

| | |
|---|---|
| induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, and/or are statements regarding the roles of other coconspirators. | |
| Statement 16: Anthony Cordova was stalling and said "Who? Is that you Shane?"

Declarant: Anthony Cordova

Date: On or before February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, and/or to reassure members of a conspiracy's continued existence. | This statement is admissible for its truth as an admission of a party opponent. See Fed. R. Evid. 801(d)(2)(A).

**THE STATEMENT IS ADMISSIBLE.** |
| Statement 17: Anthony Cordova told Montoya to give him his gun and dumped his and Montoya's in the Rio Grande.

Declarant: Anthony Cordova

Date: On or before February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to allay a coconspirator's fears, and/or to avoid detection by law enforcement. | This statement is admissible for its truth as an admission of a party opponent. See Fed. R. Evid. 801(d)(2)(A).

Additionally, dumping the gun is an action and not an assertion, so it is not hearsay.

**THE STATEMENT IS ADMISSIBLE.** |

| | |
|---|---|
| Statement 18:<br><br>Chris Garcia gave Anthony Cordova a different car to drive after the murder.<br><br>Declarant: Anthony Cordova<br><br>Date: On or after February 4, 2005<br><br>Source: Mario Montoya<br><br>Basis for admission: Statement made to allay a coconspirator's fears and/or to avoid detection by law enforcement. | This statement is admissible as a statement made by a party opponent under rule 801(d)(2)(A) if A. Cordova really is the declarant.<br><br>It would seem, however, that this is an action that C. Garcia took and not a statement that A. Cordova made. If so, C. Garcia's act -- giving a car to A. Cordova -- is not a statement, because it was not intended as an assertion, so it cannot be hearsay. |
| Statement 19: Montoya called Chris Garcia and told him the job was done by saying "cherry pie."<br><br>Declarant: Chris Garcia<br><br>Date: On or after February 4, 2005<br><br>Source: Mario Montoya<br><br>Basis for admission: Statement made to keep coconspirators abreast of an ongoing conspiracy's activities, and/or to avoid detection by law enforcement. | This statement is not admissible under rule 801(d)(2)(E), because it was not made during the Dix Conspiracy. That conspiracy ended when its goal was accomplished, i.e., when Dix died. See Krulewitch v. United States, 336 U.S. at 442-43 ("This hearsay declaration, attributed to a coconspirator, was not made pursuant to and in furtherance of objectives of the conspiracy charged in the indictment, because if made, it was after those objectives either had failed or had been achieved."). See also United States v. Silverstein, 737 F.2d 864, 867 (10th Cir. 1984)("[A] declaration made after the termination of the conspiracy does not fall within the exception. . . . [A] conspiracy terminates when its central criminal purposes have been attained.").<br><br>The United States argues that the statement is admissible under 801(d)(2)(E), because<br><br>    it happens shortly after the murder . . . , and [there was] agreement between Mr. Montoya and Mr. C. Garcia that Mr. Montoya would communicate with Mr. C. Garcia that the crime took place. And so he used the term or code cherry pie to let him know that happened. So I would say that speaking on the phone |

and uttering those words helped to avoid detection by law enforcement.

July 3 Tr. at 45:25-46:14 (Castellano). A. Cordova responds that Montoya made the statement after the conspiracy ended and the statement did not further the conspiracy's objectives. See July 3 Tr. at 46:20-47:6 (Morrissey).

The Court agrees with A. Cordova. The statement was not made in the course of the Dix Conspiracy, because the Dix Conspiracy concluded when its members achieved their objective of killing Dix. See Krulewitch v. United States, 336 U.S. at 442-43. The statement was not made in furtherance of that conspiracy, because the conspiracy was complete when Montoya made the statement. Statements made to evade detection by law enforcement can be in the course and furtherance of a conspiracy if evading law enforcement helps achieve a conspiracy's purpose. That principle does not apply, however, when such a statement is made after the conspirators have achieved the conspiracy's purpose

Moreover, even assuming that Montoya's "cherry pie" statement was made in the course and furtherance of a separate conspiracy to evade law enforcement, the United States has not shown or alleged that A. Cordova joined that conspiracy.

The United States also argues that the statement "cherry pie" could be admissible for a nonhearsay purpose, because the United States does not mean to prove the truth of the words "cherry pie." See July 3 Tr. at 47:7-11 (Castellano). Montoya saying "cherry pie" was an implied assertion that Dix was killed. See James Proffers at 10 ("Montoya called Chris Garcia and told him the job was done by saying 'cherry pie.'"). Using a code phrase like "cherry pie" is an implied assertion, and implied assertions are subject to the rules against hearsay. See Saltzburg § 801.02 ("[M]ost federal courts . . . agree[] . . . that implied assertions are hearsay if they are intentionally communicated by the speaker -- and

| | |
|---|---|
| | not hearsay if there is no intent to communicate the implication"); <u>United States v. Summers</u>, 414 F.3d 1287, 1300 (10th Cir. 2005). In other words, courts look to the message's intended meaning, and not the message's literal meaning.<br><br>**THE STATEMENT IS NOT ADMISSIBLE.** |
| Statement 20: Following the murder, Montoya described the murder to Chris Garcia. Garcia gave Montoya money, drugs and forgave a drug debt of Mario Montoya. Cordova was leaving the house when Montoya got there.<br><br>Declarant: Mario Montoya and Chris Garcia[19]<br><br>Date: After February 4, 2005<br><br>Source: Mario Montoya<br><br>Basis for admission: Statement made to reassure members of a conspiracy's continued existence, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators. | Montoya's statement describing the Dix murder is not admissible under rule 801(d)(2)(E), because it was not made during the Dix Conspiracy. That conspiracy ended when its goal was accomplished, <u>i.e.</u>, when Dix died. <u>See Krulewitch v. United States</u>, 336 U.S. at 442-43; <u>United States v. Silverstein</u>, 737 F.2d at 867.<br><br>That C. Garcia gave Montoya money and drugs is non-assertive conduct, so it is not a statement and, thus, cannot be hearsay.<br><br>C. Garcia forgiving Montoya's drug debt is admissible for a non-hearsay purpose -- as circumstantial evidence of C. Garcia's gratitude to Montoya for killing Dix. The Court assumes that the United States is not offering this statement to establish whether, after the Dix murder, Montoya owed money to C. Garcia, and -- even if it were -- the statement would be admissible as legally operative language akin to accepting a contractual offer and not for its truth.<br><br>A. Cordova leaving the house as Montoya arrived is non-assertive conduct, so it is not a statement and, thus, cannot be hearsay.<br>**MONTOYA'S STATEMENT DESCRIBING THE MURDER IS NOT ADMISSIBLE.**<br><br>**MONTOYA'S TESTIMONY THAT C. GARCIA GAVE HIM MONEY AND DRUGS** |

---

[19]In the <u>James</u> Proffers, the United States identified A. Cordova as Statement 20's declarant. <u>See James</u> Proffers at 10. At the July 3 <u>James</u> Hearing, the United States stated that Montoya and C. Garcia are Statement 20's declarants, not A. Cordova. <u>See</u> July 3 Tr. at 48:13-22 (Castellano, Court).

| | **AND FORGAVE HIS DEBT IS ADMISSIBLE.** |
|---|---|
| | **MONTOYA'S TESTIMONY THAT A. CORDOVA LEFT THE HOUSE AS MONTOYA ARRIVED IS ADMISSIBLE.** |
| Statement 21: Chris Garcia met with Montoya and Anthony Cordova and said Cordova was going to help kill Dix. Garcia wanted Cordova to help because he was more familiar with Dix's neighborhood.<br><br>Declarant: Chris Garcia[20]<br><br>Date: On or before February 4, 2005<br><br>Source: Mario Montoya<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators. | C. Garcia's statements to Montoya and A. Cordova that A. Cordova was going to help kill Dix and that C. Garcia wanted A. Cordova's help because A. Cordova was familiar with Dix's neighborhood are admissible for their truth under rule 801(d)(2)(E). C. Garcia's statements were in the course and furtherance of the conspiracy to kill Dix, because they kept the coconspirators apprised of the conspiracy's developments and informed Montoya of another coconspirator's role. See Saltzburg § 801.02.<br><br>**THE STATEMENTS ARE ADMISSIBLE.** |
| Statement 22: Chris Garcia told Steven Morales that he wanted Morales to kill Dix.<br><br>Declarant: Chris Garcia<br><br>Date: Around 2004 | This statement is admissible for its truth as a coconspirator's statement under rule 801(d)(2)(E), because C. Garcia made the statement to Morales to encourage him to "join, assist, or deal with the conspiracy." Saltzburg § 4-801.02 (stating that statements made "in furtherance of a conspiracy" can include "encouraging others to join, assist, or deal with the conspiracy"). |

---

[20]In the James Proffers, the United States identified A. Cordova as Statement 21's declarant. See James Proffers at 11. At the James Hearing, the United States stated that C. Garcia is Statement 21's declarant, not A. Cordova. See July 3 Tr. at 52:11-22 (Castellano).

| | |
|---|---|
| Source: Steven Morales<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators. | This statement is also admissible as a statement of C. Garcia's then-existing state of mind under rule 803(3).<br><br>**THE STATEMENT IS ADMISSIBLE.** |
| Statement 23: Steven Morales attempted to get Dix to meet up with Bobby Dominguez, an ex-girlfriend, but Dix never took the bait.<br><br>Declarant: Steven Morales[21]<br><br>Date: Around 2004<br><br>Source: Steven Morales<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators. | This statement is admissible for its truth under rule 801(d)(2)(E), because Morales' statements attempting to lure Dix to a meeting were made in furtherance of the Dix Conspiracy. The fact that Morales' attempt failed does not mean that the statements were not made in furtherance of the conspiracy; the proper inquiry is whether a statement was made in an effort to further the conspiracy and not whether -- in hindsight -- the statement actually did so.<br><br>**THE STATEMENT IS ADMISSIBLE.** |
| Statement 24: Chris Garcia was going to pay Steven Morales $5,000 and a pound of heroin to murder Dix. | This statement is admissible for its truth as a coconspirator's statement under rule 801(d)(2)(E), because C. Garcia stating to Morales that he would |

---

[21]In the <u>James</u> Proffers, the United States identified C. Garcia as Statement 23's declarant. <u>See</u> <u>James</u> Proffers at 12. At the July 3 <u>James</u> Hearing, the United States stated that Morales, not Garcia, is Statement 23's declarant. <u>See</u> July 3 Tr. at 52:23-25 (Castellano).

| | |
|---|---|
| Declarant: Chris Garcia<br><br>Date: Around 2004<br><br>Source: Steven Morales<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators. | pay Morales $5,000.00 and a pound of heroin to murder Dix is a statement encouraging Morales to "join, assist, or deal with the conspiracy." <u>Saltzburg</u> § 4-801.02 (stating that statements made "in furtherance of a conspiracy" can include "encouraging others to join, assist, or deal with the conspiracy").<br><br>It is also admissible under rule 803(3) as a statement of C. Garcia's then-existing state of mind, specifically his plan.<br><br>**THE STATEMENT IS ADMISSIBLE.** |
| Statement 25: Chris Garcia Offered [sic] to clear Mario Montoya's drug debt if he killed Dix.<br><br>Declarant: Chris Garcia<br><br>Date: On or before February 4, 2005<br><br>Source: Mario Montoya<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators. | This statement is admissible for its truth under rule 801(d)(2)(E), because C. Garcia made this statement in an effort to get Montoya to participate in the Dix Conspiracy.<br><br>**THE STATEMENT IS ADMISSIBLE.** |
| Statement 26: Chris Garcia gave Mario Montoya a gun to kill Dix but Montoya was arrested soon after. | That C. Garcia gave Montoya a gun is non-assertive conduct, so it is not hearsay. Likewise, Montoya getting arrested is an action and not a statement, so it |

| | |
|---|---|
| Declarant: Chris Garcia<br><br>Date: On or before February 4, 2005<br><br>Source: Mario Montoya<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators. | is not hearsay.<br><br>At the <u>James</u> Hearing, the United States contended that Montoya will testify that C. Garcia "had pressured him and continued to ask him to murder Shane Dix," and that C. Garcia giving a gun to Montoya was "one of those events." July 3 Tr. at 54:7-11 (Castellano).<br><br>Any C. Garcia statements encouraging Montoya to join the conspiracy to kill Dix are admissible for their truth as a coconspirator's statement under rule 801(d)(2)(E).<br><br>**MONTOYA'S TESTIMONY THAT C. GARCIA GAVE HIM A GUN AND THAT HE, MONTOYA, WAS ARRESTED SOON THEREAFTER IS ADMISSIBLE.**<br><br>**C. GARCIA'S STATEMENTS PRESSURING MONTOYA TO MURDER DIX ARE ADMISSIBLE.** |
| Statement 27: "I was in Vegas when Dix got hit so they wouldn't suspect me." "That's how you do it."<br><br>Declarant: Chris Garcia<br><br>Date: After the fact<br><br>Source: Gerald Archuleta<br><br>Basis for admission: Statement against declarant's interest.<br><br>Objections: Objections at 4 | The statements are admissible as an exception to the rule against hearsay as a statement made against the declarant's interest under rule 804(b)(3). That rule applies only when the declarant is unavailable as a witness. <u>See</u> Fed. R. Evid. 804(a) (defining unavailability). C. Garcia is unavailable as a witness, because he has invoked his right under the Fifth Amendment to refuse to testify in this case. <u>See</u> Fed. R. Evid. 804(a)(1) (stating that a witness is unavailable if he or she is "exempted from testifying . . . because the court rules that a privilege applies"). <u>See also</u> Motion to Quash Trial Subpoena Due to Witness Unavailability, Fifth Amendment Privilege and Request for Pretrial hearing ¶ 9, at 5, filed June 25, 2018 (Doc. 756)("Motion to Quash")(asserting that C. Garcia is unavailable as a witness, because he will invoke his right to remain silent if he is compelled to take the stand); July 3 Tr. at 30:20-24 (Court)(granting C. Garcia's Motion to Quash and stating that "Mr. C. Garcia will be excused from the proceedings, . . . because he is |

| | |
|---|---|
| | going to . . . invoke his Fifth Amendment privilege and no testify at trial"). The statement exposed C. Garcia to criminal liability, because he is explaining how he avoided suspicion in the Dix murder.

A. Cordova contends that rule 804(b)(3) does not apply to these statements, because they are not against A. Cordova's interests. <u>See</u> Objections at 4. Rule 804(b)(3)'s applicability depends on the declarant's interests, not the party against whom the statement is being introduced. <u>See</u> Fed. R. Evid. 804(b)(3) (describing a statement against interest is one for which "a reasonable person in the declarant's position would have made only if the person believed it to be true"); <u>Witham v. Mabry</u>, 596 F.2d 293, 296 (8th Cir. 1979)(explaining that the rationale for the statement-against-interest exception to the rule against hearsay is that a declarant is not likely to say something untruthful if the statement goes against the declarant's interests).

The statement is not admissible for its truth under rule 801(d)(2)(E), because the Dix Conspiracy had ended when C. Garcia made this statement. <u>See</u> <u>James</u> Proffers at 14 (stating that C. Garcia made this statement after Dix was murdered).

**THE STATEMENTS ARE ADMISSIBLE.** |
| Statement 28: "We're friends. If I go [to Las Vegas] and come back and it's [(the murder)] not done, we won't be friends."

Declarant: Chris Garcia

Date: On or before February 4, 2005

Source: Mario Montoya

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the | This statement is admissible for its truth under rule 801(d)(2)(E), because C. Garcia made the statement to Montoya to further the conspiracy by instructing and encouraging -- <u>i.e.</u>, implicitly threatening -- Montoya to get Montoya to participate in the Dix murder.

**THE STATEMENT IS ADMISSIBLE.** |

| | |
|---|---|
| conspirators, to reassure members of a conspiracy's continued existence, and/or keep coconspirators abreast of an ongoing conspiracy's activities. | |
| **Statement 29:**<br><br>Cordova and Montoya gave Dix $50 dollars [sic] for drugs and expected Dix to take them to a secluded location to complete the transaction.<br><br>Declarant: Anthony Cordova, Mario Montoya[22]<br><br>Date: On or before February 4, 2005<br><br>Source: Mario Montoya<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, and/or are statements regarding the roles of other coconspirators. | At the <u>James</u> Hearing, the United States explained that A. Cordova and Montoya, pursuant to the Dix Conspiracy, arranged to buy drugs from Dix and then follow Dix. <u>See</u> July 3 Tr. at 56:7-19 (Castellano).<br><br>Montoya may testify as to his own experiences and observations without implicating the rules against hearsay.<br><br>If Montoya testifies about a specific statement that A. Cordova made, such a statement will be admissible as a statement made by a party opponent under rule 801(d)(2)(A).<br><br>If Montoya testifies about statements he made to Dix or A. Cordova during this incident, those statements are admissible for their truth under rule 801(d)(2)(E), because Montoya's statements were made in the course and furtherance of the Dix Conspiracy.<br><br>**MONTOYA'S TESTIMONY ABOUT BOTH A. CORDOVA'S ACTIONS AND A. CORDOVA'S STATEMENTS IS ADMISSIBLE.** |
| **Statement 30:** Cordova got rid of his car about a week later after the Dix murder.<br><br>Declarant: Anthony Cordova<br><br>Date: After February 4, 2005<br><br>Source: Mario Montoya | A. Cordova objects to this statement's admissibility, arguing that it is an "alleged act" and not a statement. Objections at 5. A. Cordova argues that there is no basis for "finding that Mr. Cordova said this to Dix," and that "the evidence indicates that Montoya neither saw Mr. Cordova get rid of the car or heard him say he did so, because Montoya and Mr. Cordova had no contact after seeing each other at Garcia's house right after February 5, 2005." Objections at 5 (citing |

---

[22]In the <u>James</u> Proffers, the United States identified A. Cordova as Statement 29's sole declarant. <u>See</u> <u>James</u> Proffers at 15. At the July 3 <u>James</u> Hearing, the United States stated that A. Cordova and Montoya are both Statement 23's declarants. <u>See</u> July 3 Tr. at 56:7-9 (Castellano).

| | |
|---|---|
| Basis for admission: Statement made to avoid detection by law enforcement.<br><br>Objections: Objections at 5 | Federal Bureau of Investigation CHS Reporting Document at 1, filed June 27, 2018 (Doc. 760-2)(stating that, "[a]fter the murder, CHS and A. CORDOVA parted ways and never spoke about it")).<br><br>A. Cordova is correct that getting rid of a car is an action and not a statement but introducing evidence regarding a person's non-assertive conduct does not require an exception -- or a rule 801(d) exclusion -- to the rule against hearsay, because non-assertive conduct cannot be hearsay in the first place.<br><br>At the July 3 <u>James</u> Hearing, the United States explained that, on the night of the murder, A. Cordova told Montoya that he was planning to get rid of his car, and actually did get rid of his car. <u>See</u> July 3 Tr. at 57:18-20 (Castellano). Montoya may testify as to A. Cordova's statements, because A. Cordova's statements are admissible under rule 801(d)(2)(A) as a statement made by a party opponent. They are also admissible under rule 803(3) as statements of A. Cordova's then-existing state of mind, specifically his plan.<br><br>**A. CORDOVA'S STATEMENTS ARE ADMISSIBLE.** |
| Statement 31: Chris Garcia told Julian Romero that he wanted Shane Dix dead. Garcia attempted to hire Romero to kill Dix by offering to give Romero $10,000 and a 9mm gun a few months before Dix was murdered.<br><br>Declarant: Chris Garcia<br><br>Date: On or before February 4, 2005<br><br>Source: Julian Romero<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to | This statement is not admissible for its truth under rule 801(d)(2)(E), because C. Garcia made this statement months before Dix died, so there is no indication that the Dix Conspiracy existed when C. Garcia made this statement..<br><br>C. Garcia's statement that he wants Dix dead is admissible under rule 803(3) as a statement of C. Garcia's then-existing state of mind. That C. Garcia offered Romero a gun and money to kill Dix is admissible as an action that C. Garcia took -- albeit an action accomplished with words -- and not as an assertion. That action is relevant, because it is circumstantial evidence of C. Garcia's state of mind, <u>i.e.</u>, to show that C. Garcia's desire to kill Dix was sincere and strong enough for C. Garcia to take |

| | |
|---|---|
| prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators. | action to effectuate that desire.<br><br>**THE STATEMENTS ARE ADMISSIBLE.** |
| Statement 32: Chris Garcia asked Billy Cordova to kill Shane Dix.<br><br>Declarant: Chris Garcia<br><br>Date: On or before February 4, 2005<br><br>Source: Billy Cordova<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators. | This statement is not admissible for its truth under rule 801(d)(2)(E), because there is no indication that the Dix Conspiracy existed when C. Garcia made this request (if B. Cordova had agreed to kill Dix, that would have created a conspiracy to kill Dix, however).<br><br>That C. Garcia asked B. Cordova to kill Dix is admissible as an action that C. Garcia took -- albeit an action accomplished with words. Such actions, e.g., "pass me that wrench, please," can only be hearsay if they are intended as assertions. C. Garcia might have intended to assert that he wanted Dix dead when asking B. Cordova to kill him, but such an assertion would be admissible under rule 803(3) as a statement of C. Garcia's then-existing state of mind. Thus, this statement is either non-assertive conduct -- in which case it is not hearsay -- or is admissible hearsay under rule 803(3).<br><br>**THE STATEMENT IS ADMISSIBLE.** |
| Statement 33: Richard Gallegos told Melody Ortiz to contact a male and "tell him Tone sent you."<br><br>Declarant: Richard Gallegos<br><br>Date: On or about June 13, 2016<br><br>Source: Jail call recording<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to | This statement is admissible for its truth as a coconspirator's statement under rule 801(d)(2)(E). The United States contends that Gallegos, Ortiz, and A. Cordova are members of a Distribution Conspiracy. . See Conspiracy List at 2. The Court presumes that the United States intends to show that Gallegos' statement to Ortiz to contact someone and tell him that "Tone sent [him]" is a statement made to further the conspiracy to distribute drugs into a prison and that the conspiracy was tied to the SNM.<br><br>A. Cordova objects to this statement's admission |

| | |
|---|---|
| prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.<br><br>Objections: Objections at 5 | for several reasons. <u>See</u> Objections at 5. First, A. Cordova argues that this statement is not alleged to have been made during the course and in furtherance of the Dix Conspiracy, nor has the United States shown that this statement was made in furtherance of any other conspiracy. <u>See</u> Objections at 5. The Court has since determined by a preponderance of the evidence that Gallegos, A. Cordova, and Ortiz are part of the Distribution Conspiracy. <u>See</u> FOF ¶ 2. Consequently, statements made in the course and furtherance of the Distribution Conspiracy are admissible under rule 801(d)(2)(E).<br><br>Second, A. Cordova argues the United States has not shown why this statement and/or the related conspiracy are relevant to the charges against A. Cordova. <u>See</u> Objections at 5. Relevancy is a very low bar; rule 401 provides that evidence is relevant if it has "any tendency to make a fact more or less probable," and that the "fact is of consequence in determining the action." Fed. R. Evid. 401. To return a guilty verdict in this case, the jury will need to conclude, beyond a reasonable doubt, that the SNM is an "enterprise engaged in racketeering activity." 18 U.S.C. § 1959. Drug trafficking is racketeering activity. <u>See</u> 18 U.S.C. § 1961(a). An SNM-related conspiracy to distribute drugs in prison makes it more likely that the SNM is an enterprise engaged in racketeering activity, so evidence regarding such a conspiracy is relevant under rule 401.<br><br>Third, A. Cordova argues that, although he is sometimes known as "Antone," there is no evidence that he is known by "Tone." Objections at 5. Whether "Tone" refers to A. Cordova may bear on the statement's relevance and overall credibility, but the uncertainty is not a sound basis for the Court to exclude the statement.<br><br>**THE STATEMENT IS ADMISSIBLE.** |
| Statement 34: Gallegos told Ortiz to find | This statement is admissible for its truth as a |

| | |
|---|---|
| addresses to give to another male so that his "paperwork" could be sent to him.<br><br>Declarant: Richard Gallegos<br><br>Date: On or about June 13, 2016<br><br>Source: Jail call recording<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, are statements regarding the roles of other coconspirators, and/or to avoid detection by law enforcement.<br><br>Objections: Objections at 5-6 | coconspirator's statement under rule 801(d)(2)(E). At the July 3 <u>James</u> Hearing, the United States explained that "paperwork" refers to drugs, and that Statement 34 relates to the Distribution Conspiracy. <u>See</u> July 3 Tr. at 58:18-23 (Castellano). The Court determined that A. Cordova is a member of the Distribution Conspiracy. <u>See</u> FOF ¶ 1; July 3 Tr. at 58:24-59:1 (Court). Consequently, the statement is admissible under rule 801(d)(2)(E), because it is a statement made in the course and furtherance of a conspiracy in which A. Cordova is a member.<br><br>**THE STATEMENT IS ADMISSIBLE.** |
| Statement 35: Gallegos and Cordova called Ortiz and Sylvia Gutierrez to arrange for the delivery of drugs in to the facility<br><br>Declarant: Richard Gallegos, Anthony Cordova, Melody Ortiz, and Sylvia Gutierrez<br><br>Date: On or about June 13, 2016<br><br>Source: Jail call recording<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing | A. Cordova's statements are admissible as statements made by a party opponent under rule 801(d)(2)(A).<br><br>The statements by Gallegos, Ortiz, and Gutierrez are admissible for their truth as coconspirator statements under rule 801(d)(2)(E), because they are made in the course and furtherance of the Distribution Conspiracy. The United States may, however, have to overcome a rule 403 objection to show that the statements' probative value is not substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. <u>See</u> Fed. R. Civ. P. 403.<br><br>**THE STATEMENTS ARE ADMISSIBLE.** |

| | |
|---|---|
| conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.<br><br>Objections: Objections at 6. | |
| Statement 36: "'Pup' wants to send us a message to 'Creeper'" -- who we believe was Jerry Armenta's "family that they will be harmed if he testifies for the state. 'Pup' wants the family to know 'Creeper' is fucking up. If he takes the stand against this pedo, against anybody, we're coming for your ass. 'Pup' agrees that Mario is the best person to deliver the message."<br><br>Declarant: Anthony Ray Baca<br><br>Date: On or about November 2015<br><br>Source: not identified[23]<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, to allay a coconspirator's fears, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, are statements regarding the roles of other coconspirators, and/or to avoid detection by law enforcement.<br><br>Objections: Objections at 6 | Baca's statements are not admissible for their truth under rule 801(d)(2)(E), because Baca did not make the statement in the course and in furtherance of a conspiracy in which A. Cordova was a part. Because the declarant is Baca, the statement appears to relate to a conspiracy to "intimidate/retaliate against a witness." Conspiracy List at 2. The United States contends that the Intimidation Conspiracy's members are Baca and Mario Rodriguez. See Conspiracy List at 2. Rule 801(d)(2)(E) provides that statements of coconspirators may only be used against an opposing party. See Fed. R. Evid. 801(d). Because A. Cordova is not a member of the Intimidation Conspiracy, see FOF ¶ 3, Statement 36 cannot be admitted for its truth under that rule.<br><br>Baca's statement that he wanted others to threaten a witness' family is admissible under rule 803(3), because it expresses Baca's then-existing state of mind -- i.e., his desire to intimidate a witness and his family.<br><br>Baca's statement that he wants Creeper's family to know that Creeper is "fucking up" is also admissible under 803(3), because it expresses his then-existing desire to intimidate a witness and his family.<br><br>Baca's statement that he wants Creeper and his family to understand that SNM will retaliate against Creeper for testifying is also admissible under 803(3), because it expresses his then-existing desire to intimidate a witness and his family.<br><br>Baca's statement that Mario is the best person to |

_____

[23]At the July 3 <u>James</u> Hearing, the United States explained that Statement 36's source is a taped recording of Baca. <u>See</u> July 3 Tr. at 62:20-23 (Court).

| | deliver a message threatening Creeper and his family is not being offered to prove the truth of the matter asserted, <u>i.e.</u>, that Mario was actually the best person; instead, the United States is offering it for a non-hearsay purpose, as circumstantial evidence of Baca's thoughts, plans, and beliefs. |
|---|---|
| | **THE STATEMENTS ARE ADMISSIBLE.** |
| Statement 37: "'Pup' and CHS are talking with Mario Montoya. 'Pup' says he is working on getting Mario guns."<br><br>Declarant: Anthony Ray Baca<br><br>Date: On or about November, 2015<br><br>Source: not identified<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.<br><br>Objections: Objections at 6-7 | This statement is not admissible for its truth under rule 801(d)(2)(E), because Baca did not make the statement in the course and in furtherance of a conspiracy in which A. Cordova was a part. This statement relates to the Santistevan, Vigil, Marcantel Conspiracy, and A. Cordova is not a member of that conspiracy. <u>See</u> FOF ¶ 3; Conspiracy List at 2.<br><br>The statement "Pup and CHS are talking with Mario Montoya" appears to not be a statement, but rather context provided by the United States.<br><br>Baca's statement that he is "is working on getting Mario guns" is not admissible to show its truth, <u>i.e.</u>, to show that Baca actually was working on getting Mario guns. It would be admissible, however, as circumstantial evidence of Baca's plan to have Mario use a gun as part of his larger conspiracy.<br><br>**THE STATEMENTS ARE ADMISSIBLE, BUT NOT FOR THE TRUTH OF THE MATTER ASSERTED.** |
| Statement 38: "'Pup' wants research to be done on where Vigil and Santistevan live. He believes that the warden lives on prison grounds on Oasis Street, but also observed other houses that could belong to Vigil or Santistevan. He says it will be easier to get them if they do not reside on the prison grounds. He also says he wants to bring down Bustos, a former Associate Warden, who 'Pup' blames for sending him to the ADX. | Baca's statements are not admissible for their truth under rule 801(d)(2)(E), because Baca did not make the statement in the course and in furtherance of a conspiracy in which A. Cordova was a part. Because the declarant is Baca, this statement relates to the Santistevan, Vigil, Marcantel Conspiracy, of which A. Cordova is not a member. <u>See</u> FOF ¶ 3; Conspiracy List at 2.<br><br>Baca's statement that he wants someone to research where Vigil and Santistevan live is admissible under |

Pup' does not specify that he wants Bustos hit, but it appears he wants the get him in trouble. 'Pup' believes that Bustos owns a Santa Fe real estate company."

Declarant: Anthony Ray Baca

Date: On or about October 2015

Source: not identified

Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.

Objection: Objections at 7

rule 803(3) as a then-existing mental state, because he expresses his intentions and plans.

Baca's statements about where the warden, Vigil, and Santistevan live are not admissible for their truth -- i.e., to show where those individuals actually lived. They are admissible to show that Baca knew those pieces of information -- or at least thought that he did.

Baca's statement that he wants to "bring down" a former Associate Warden is admissible under rule 803(3), because it expresses his then-existing state of mind, i.e., his desire to harm the former Associate Warden.

Baca's statement that he blames the Associate Warden is admissible under rule 803(3), because it expresses his then-existing state of mind, i.e., that he blames the Associate Warden.

Baca's statement that the Associate Warden sent Baca to ADX for its truth, but it is admissible as circumstantial evidence of Baca's state of mind -- i.e., that Baca felt aggrieved and wanted revenge.

Baca's statement that he wants Bustos to be in trouble is admissible under rule 803(3), because it expresses his then-existing state of mind, i.e., his desire, intent, and plan to get Bustos into trouble.

Baca's statement that he believes that Bustos owns a real estate company is not admissible for its truth, i.e., to show that Bustos actually owned a real estate company. The statement is admissible as circumstantial evidence of Baca's state of mind, but whether Baca believed that Bustos owned a real estate company is not relevant.

**BACA'S STATEMENTS THAT (i) HE WANTS SOMEONE TO RESEARCH WHERE VIGIL AND SANTISTEVAN LIVE; (ii) THAT HE WANTS TO BRING DOWN BUSTOS; (iii) THAT HE BLAMES BUSTOS; AND**

| | |
|---|---|
| | **(iv) THAT HE WANTS TO GET BUSTOS IN TROUBLE ARE ADMISSIBLE FOR THEIR TRUTH.**<br><br>**BACA'S STATEMENTS (i) ABOUT WHERE THE WARDEN, VIGIL, AND SATISTEVEN LIVE; AND (ii) THAT THE ASSOCIATE WARDEN SENT BACA TO ADX ARE ADMISSIBLE, BUT NOT FOR THEIR TRUTH.**<br><br>**BACA'S STATEMENT THAT HE BELIEVES BUSTOS OWNS A REAL ESTATE COMPANY IS NOT ADMISSIBLE.** |
| Statement 39: "Pup" and the CHS are talking about planning the hits and the best weapon to be used.<br><br>"Pup" says, "What's a good cuete for that? It has to be a revolver, carnal, not an automatic. Automatic might jam. Those are easier to put a silencer on, too, a homemade silencer, because it has a barrel."<br><br>Declarant: Anthony Ray Baca<br><br>Date: On or about November 2015<br><br>Source: not identified<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.<br><br>Objections: Objections at 7-8 | These statements are not admissible for their truth under rule 801(d)(2)(E), because Baca did not make them in the course and in furtherance of a conspiracy in which A. Cordova was a part. These statements relate to the Santistevan, Vigil, Marcantel Conspiracy, and A. Cordova is not a member of that conspiracy. See FOF ¶ 3.<br><br>Baca's statements are not admissible for their truth -- i.e., to show the relative merits of semiautomatic handguns and revolvers -- under rule 803(3), because Baca expresses an opinion about the best weapons for a certain situation, but does not express a motive, intent, or plan.<br><br>Baca's statements are admissible as circumstantial evidence of Baca's state of mind -- they show why Baca subsequently asks for Michael Snow to obtain a revolver.<br><br>**THE STATEMENTS ARE ADMISSIBLE., BUT NOT FOR THEIR TRUTH.** |

| | |
|---|---|
| Statement 40: "Pup" and the CHS are talking about Michael Snow. "Pup" tells the CHS, "Ask him if he could try to get me a cuete. If he could, just get one, and I'll have him give it to somebody." Specifically, "Pup" asks for a revolver.<br><br>Declarant: Anthony Ray Baca<br><br>Date: On or about November 2015<br><br>Source: not identified<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators. | These statements are not admissible for their truth under rule 801(d)(2)(E), because Baca did not make them in the course and in furtherance of a conspiracy in which A. Cordova was a part.<br><br>Baca's statement asking the CHS to ask Snow to get him a cuete is not admissible for their truth under rule 803(3), because Baca's request does not express a motive, intent, or plan.<br><br>Baca's statement specifically asking for a revolver is not admissible for their truth under rule 803(3), because Baca's request does not express a motive, intent, or plan.<br><br>That Baca was asking for Snow to get a revolver is, however, admissible to show that Baca was making such a request. That Baca made such a request is relevant, because it is an overt act in furtherance of the Santistevan, Vigil, Marcantel Conspiracy , which, in turn, is relevant because it makes it more likely that the SNM is an enterprise engaged in racketeering activity.<br><br>Baca's statement that, if Snow can get a cuete, Baca will have Snow give it to someone else, is admissible under 803(3), because it expresses Baca's intent and plan.<br><br>**BACA'S STATEMENT THAT HE WILL HAVE SNOW GIVE THE WEAPON TO SOMEONE ELSE IS ADMISSIBLE.**<br><br>**BACA'S OTHER STATEMENTS ARE ADMISSIBLE, BUT NOT FOR THEIR TRUTH.** |

| | |
|---|---|
| Statement 41: To put this in context, this is happening on December 3, 2015. "Mario should have done the hit over the night. 'Pup' and CHS are wondering if the feds are going to charge the SNM. 'Pup' talks about the steps the feds would have to take, gather state evidence, bring in STIU and local law enforcement.<br><br>Declarant: Anthony Ray Baca<br><br>Date: not identified<br><br>Source: not identified<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.<br><br>Objections: Objections at 8 | These statements are not admissible for their truth under rule 801(d)(2)(E), because Baca did not make them in the course and in furtherance of a conspiracy in which A. Cordova was a part.<br><br>Baca's statement that Mario was supposed to have done the hit overnight is not admissible for its truth under rule 803(3); at most, this statement expresses Baca's belief regarding what Mario was to have done -- according to their plan -- to prove the truth of that belief.<br><br>That Baca was wondering about whether the federal government was going to charge the SNM and his speculation regarding the steps law enforcement would have to take are admissible as circumstantial evidence of Baca's consciousness of guilt.<br><br>**BACA'S STATEMENT THAT MARIO WAS SUPPOSED TO HAVE DONE THE HIT OVERNIGHT IS NOT ADMISSIBLE.**<br><br>**BACA'S MUSINGS REGARDING WHETHER THE SNM WAS GOING TO GET CHARGED AND THE STEPS LAW ENFORCEMENT WOULD HAVE TO TAKE ARE ADMISSIBLE, BUT NOT FOR THEIR TRUTH.** |
| Statement 42: "The CHS asked 'Pup' if the SNM will get respect from the Mexican Mafia if Mario successfully kills the Secretary and all the carnales get sent into the federal system.<br><br>'Pup' responds, 'They already respect us. And with us going over there like that, with that type of fucking charge, oh, yeah, they fucking -- not only them' -- the Mexican Mafia -- 'everybody else respects the fuck out of that shit.'"<br><br>Declarant: Anthony Ray Baca | These statements are not admissible for their truth under rule 801(d)(2)(E), because Baca did not make them in the course and in furtherance of a conspiracy in which A. Cordova was a part. Because the declarant is Baca, this statement relates to either the Intimidation Conspiracy or the Santistevan, Vigil, Marcantel Conspiracy, neither of which A. Cordova is a member. See Conspiracy List at 2.<br><br>Baca's statement about the respect that SNM receives is admissible under rule 803(3) to show Baca's beliefs. The United States is not offering those belief statements to prove that the SNM actually would have received respect if their plan |

| | |
|---|---|
| Date: not identified<br><br>Source: not identified<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, and/or are statements regarding the roles of other coconspirators.<br><br>Objections: Objections at 8-9 | succeeded, so those statements do not fall into rule 803(3)'s exception for statements of belief offered to prove the truth of the matter believed. |
| Statement 43: "Pup" is talking about Jerry Armenta testifying. "And his family, his family gets hit. And that shit will hit the news, carnal. And they're going to say the only motive behind that has been because that fucker testified. That shit hits the news, too. That gives us more power. Because of that fact, everybody is going to know, a la verde,they're going to hit my family, I'm never going to tell them."<br><br>Declarant: Anthony Ray Baca<br><br>Date: not identified<br><br>Source: not identified<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, to allay a coconspirator's fears, keep | These statements are not admissible for their truth under rule 801(d)(2)(E), because Baca did not make them in the course and in furtherance of a conspiracy in which A. Cordova was a part.<br><br>Depending on the exact phrasing of these statements, they are either admissible under rule 803(3) as statements of Baca's then-existing state of mind -- specifically his motive for plotting to attack Armenta if he testifies and his beliefs about what the consequences of such an attack would be -- or as circumstantial evidence regarding those motivations or beliefs. If the statements are in the form of "I believe that if we do X then Y will occur," or "My motive to do X is so that Y will occur," then rule 803(3) applies. If the statements are in the form of "If we do X then Y will occur" then the statements are circumstantial evidence. Either way, the statements are admissible, but if the statements are admissible as circumstantial evidence of Baca's state of mind then they are not admissible for their truth. Likewise, 803(3) permits the statements to be admitted to show Baca's beliefs, but not to prove the truth of those beliefs. |

| | |
|---|---|
| coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy, are statements regarding the roles of other coconspirators, and/or to avoid detection by law enforcement.<br><br>Objections: Objections at 9 | **THE STATEMENTS ARE ADMISSIBLE TO SHOW BACA'S BELIEFS AND STATE OF MIND BUT NOT THE TRUTHS OF THE BELIEFS.** |
| Statement at 44: He's referring to the magazine. He says, "Well, the firearm didn't have a magazine. It needs a magazine to be fully loaded." So what Garcia is explaining to Montoya is: "Put the bullet in the fucker and then you can shoot it. Or you can get a clip and, you know, do it the right way. Order a clip."<br><br>Declarant: Anthony Ray Baca<br><br>Date: not identified<br><br>Source: not identified<br><br>Basis for admission: Statement made to induce enlistment or further participation in the group's activities, to prompt further action on the part of the conspirators, to reassure members of a conspiracy's continued existence, to allay a coconspirator's fears, keep coconspirators abreast of an ongoing conspiracy's activities, identify other members of the conspiracy and/or are statements regarding the roles of other coconspirators.<br><br>Objections: Objections at 9-10 | These statements are not admissible for their truth under rule 801(d)(2)(E), because Baca did not make them in the course and in furtherance of a conspiracy in which A. Cordova was a part.<br><br>These statements are not admissible under rule 803(3), because Baca instructs how to use a certain weapon, but does not express a then-existing mental, emotional, or physical condition.<br><br>**THE STATEMENTS ARE NOT ADMISSIBLE.** |

**IT IS ORDERED** that the Court makes Findings of Facts and particularized rulings on the admissibility of Plaintiff United States of America's proffered statements in the United States'

Proffer Under Fed. R. Evid. 801(d)(2) and Objections, filed June 22, 2018 (Doc. 744-1), as described above.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
  Attorney for the United States
    Acting Under Authority Conferred by 28 U.S.C. § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew M. Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

     *Attorneys for the Plaintiff*

Theresa M. Duncan
Duncan Earnest, LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli, LLP
Albuquerque, New Mexico

     *Attorneys for Defendant Anthony Ray Baca*

Christopher W. Adams
The Law Office of Christopher W. Adams, P.C.
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

      *Attorneys for Defendant Christopher Garcia*

Todd Bruce Hotchkiss
Todd B. Hotchkiss, Attorney at Law, LLC
Albuquerque, New Mexico

      *Attorney for Defendant Manuel Jacob Armijo*

Louis E. Lopez, Jr.
Louis Lopez Law
El Paso, Texas

      *Attorney for Defendant Frederico Munoz*

Donald F. Kochersberger, III
Business Law Southwest, LLC
Albuquerque, New Mexico

--and--

Pamela Sullivan
Law Office of Pamela Sullivan
Albuquerque, New Mexico

      *Attorneys for Defendant Sergio Loya Rodriguez*

Susan Burgess-Farrell
Barrett G. Porter
Burgess & Porter Law, LLC
Albuquerque, New Mexico

      *Attorneys for Defendant Manuel Benito*

Diego R. Esquibel
The Barnett Law Firm
Albuquerque, New Mexico

--and--

R. Scott Reisch
Reisch Law Firm, LLC
Denver, Colorado

     *Attorneys for Defendant Vincent Garduño*

Marc Grano
Grano Law Offices
Las Vegas, New Mexico

     *Attorney for Defendant Mandel Lon Parker*

James Baiamonte
Law Office of James P. Baiamonte Esq.
Albuquerque, New Mexico

--and--

Ahmad Assed
Ahmad Assed & Associates
Albuquerque, New Mexico

     *Attorneys for Defendant Daniel Archuleta*

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

     *Attorneys for Defendant Daniel Sanchez*

Marcia A. Morrissey
Law Office of Marcia A. Morrissey
Santa Monica, California

--and--

Gregory M. Acton
Acton Law Firm P.C.
Albuquerque, New Mexico

      *Attorneys for Defendant Anthony A. Cordova*

Scott Moran Davidson
The Law Office of Scott M. Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Billy R. Blackburn Law Office
Albuquerque, New Mexico

--and--

Laura E. Udall
Cooper & Udall, PC
Tucson, Arizona

      *Attorneys for Defendant Arturo Arnulfo Garcia*